IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE | : | CHAPTER 11 |
| JOSEPH GRASSO, | : | |
| DEBTOR. | : | BANKRUPTCY NO. 12-11063-MDC |

# MEMORANDUM

BY: MAGDELINE D. COLEMAN, UNITED STATES BANKRUPTCY JUDGE

## INTRODUCTION

On October 16, 2012, this Court issued an Order ordering the appointment of a Chapter 11 Trustee (the "Trustee Order") for the estate of the debtor, Joseph Grasso (the "Debtor") for cause pursuant to 11 U.S.C. §1104(a)(1), and in the best interest of creditors pursuant to §1104(a)(2). On October 31, 2012, the Debtor filed a motion for reconsideration of the Trustee Order (the "Motion"). In the Motion, the Debtor acknowledged that the appointment of a Chapter 11 Trustee was warranted. However, the Debtor requested that this Court amend the Trustee Order to reflect appointment under §1104(a)(2) only and remove all findings regarding his conduct as a basis for its decision. At the hearing on the Motion, this Court advised the Debtor that it would not amend the Trustee Order to provide for appointment under §1104(a)(2) only, or withdraw any of the factual findings. Thereafter, Debtor requested that this Court, at a minimum, remove from the Trustee Order its finding in Paragraph (L) that the Debtor had employed Bruce Kaplan, as Debtor's accountant without application to or approval from the Bankruptcy Court.

For the reasons discussed below, this Court will grant the Debtor's request that it amend the Trustee Order and remove the findings set forth in Paragraph L. This Court finds that the

Debtor was denied an opportunity to address this Court's concern that the Debtor circumvented

the requirements of §327 by relying on Bruce Kaplan to serve as his estate's accountant.  The

Debtors' request for any other amendment to the Trustee Order remains denied.  In support of

this Court's determination, this Memorandum will, by way of background provide first, the

procedural history for the Trustee Order and, second, a detailed summary of the Court's reasons

for the Trustee Order.  Having stated this Court's reasons for the Trustee Order, this Court will

then address the merits of the Motion.

**PROCEDURAL BACKGROUND**

The matters addressed by the Trustee Order were first raised pursuant to a Motion to

Convert dated July 23, 2012 (the "Motion to Convert")[1] whereby Madison Capital Company,

LLC ("Madison") requested this Court convert the Debtor's case to a chapter 7 proceeding.

Madison premised its Motion to Convert on the Debtor's failure to file monthly operating reports

and the required financial disclosures for various entities in which he holds an ownership

interests.  The Motion to Convert also cited the Debtor's unauthorized use of estate assets to fund

his and his non-debtor wife's post-petition living expenses.  Finally, the Motion to Convert

raised for the first time the legitimacy of the Debtor's claim that he owns his various business

interests with his wife as tenants by the entirety.  Like a sweater come undone by the pulling of

one loose string, the Debtor's legitimacy as a debtor-in-possession quickly began to unravel as

Madison and his other creditors began to investigate the allegations made by this Motion to

Convert.

Shortly after Madison filed its Motion to Convert, Roberta A. DeAngelis, the United

States Trustee (the "US Trustee"), filed a Motion to Convert or in the Alternative to Dismiss

dated July 25, 2012 (the "Trustee's Conversion Motion").  In the Trustee's Conversion Motion,

---

[1] On August 2, 2012, Madison subsequently filed a substantially identical Motion to Convert [Docket No. 193].

the US Trustee argued that cause for conversion or dismissal existed because of the Debtor's

failure to (i) file timely and accurate monthly operating reports, (ii) pay the quarterly fees

required by 28 U.S.C. §1930(a)(6), and (iii) propose a confirmable plan of reorganization.

Thereafter, Madison filed a Joinder dated August 9, 2012 joining the Trustee's Conversion

Motion.

  The Debtor filed his Response to the Motion to Convert on August 14, 2012 (the "First

Response").  In the Debtor's First Response, the Debtor relied on his filing of certain of his

operating reports that were filed after the Motion to Convert and the Trustee's Conversion

Motion.  The Debtor also contested whether he had made progress toward proposing a

confirmable plan of reorganization.

  On August 28, 2012 and September 5, 2012, this Court held hearings to address the

Motion to Convert and the Trustee's Conversion Motion.  At these hearings, this Court heard

testimony from the Debtor and Bruce Kaplan, the Debtor's accountant.  At the close of the

September 5th hearing, it became apparent that the Debtor was unwilling to investigate whether

his wife's interests in the entireties property may be invalidated for the benefit of his estate.

Madison then advised this Court that it would file a motion for the appointment of a trustee,

under either Chapter 11 or Chapter 7.  As a result, this Court expressed its serious concerns with

regard to the management of the Debtor's estate and whether appointment of a Chapter 11

Trustee was required.

  Consistent with its representations at the close of the September 5th hearing, Madison

filed a Motion to Appoint Trustee dated September 14, 2012 (the "Trustee Motion") requesting

that the Court appoint pursuant to 11 U.S.C. §1104(a) a Chapter 11 Trustee to operate or manage

the Debtor's chapter 11 estate.  The Trustee Motion was subsequently joined by Marshall J. Katz

("Katz") and The Sherwin Williams Company ("SWC"), both of whom are alleged creditors of
the Debtor.  The Debtor filed his Response to the Trustee Motion on September 28, 2012 (the
"Second Response").  This Court then held a hearing on October 15, 2012 (the "October 15th
Hearing") to address the appointment of a trustee pursuant to 11 U.S.C. §1104 to operate and
manage this Debtor's estate.  At the October 15th Hearing, this Court heard the testimony of both
the Debtor and his accountant, Bruce Kaplan.

At the close of the October 15th Hearing, this Court made several factual findings
including, *inter alia*, that (1) the Debtor was dishonest in his testimony to this Court, (2) the
Debtor diverted estate assets, and (3) the Debtor breached his fiduciary duty as a debtor-in-
possession.  Despite these findings, the Debtor requested this Court provide him an opportunity
to redeem himself.  His advocates suggested this Court give the Debtor a short period during
which he may, with the assistance of new counsel, attempt to rehabilitate himself.  Rather than
issue its ruling at the close of the October 15th Hearing, this Court advised the parties that it
would take the matter under advisement.  After considering whether circumstances required the
appointment of a Chapter 11 Trustee, this Court concluded that the Debtor's misconduct
warranted appointment and were not outweighed by any benefit that would accrue to the estate if
the Debtor was left in possession.  The Trustee Order embodying this Court's decision was
issued on October 16, 2012.

In response to the Trustee Order, the Debtor first filed a notice of appeal dated October
30, 2012 (the "Notice of Appeal").  The next day, the Debtor filed the instant Motion.  On
November 13, 2012, the Debtor filed a praecipe to withdraw the Notice of Appeal.  The hearing
on the Motion was originally scheduled for November 27, 2012, but that was later rescheduled to
allow the parties to submit briefs addressing the Motion.  The hearing ultimately was held on

4

January 15, 2013 (the "January 15th Hearing"), at which time the Court heard arguments from

the various parties.  At the January 15th Hearing, the Debtor and his representatives did not

dispute the basis of this Court's factual findings or whether those findings warranted the

appointment of a Chapter 11 Trustee.  Rather, the Debtor requested that this Court retract all of

its factual findings relating to whether cause existed for appointment pursuant to §1104(a)(1) and

instead limit its order to a general finding that appointment was in the interests of creditors and

the estate pursuant to §1104(a)(2).  The Debtor argued that, if the factual findings remained a

part of the record, such findings would impair his estate's ability to reorganize.

At the close of the January 15th Hearing, the Court advised the parties that based upon its

consideration of the Motion, the various memoranda submitted by the parties and the appearance

of all parties in interest at the January 15th Hearing, it would deny the Motion with regards to

amending (1) the Trustee Order for appointment under §1104(a)(2) only, and (2) all of its factual

findings except for this Court's findings contained in paragraph L(13) of the Order.  The Court

took under advisement the issues relating to Paragraph L(13) and provided all interested parties

an opportunity to file briefs on that issue.  No briefs were filed and the Court is now prepared to

issue a decision.

### REASONS FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE

As this Court acknowledged in the Trustee Order, it found by clear and convincing

evidence that pursuant to §1104(a)(1) cause existed to appoint a Chapter 11 Trustee.  Based upon

the same misconduct underlying this Court's §1104(a)(1) determination, this Court also found

that pursuant to §1104(a)(2) appointment of a Chapter 11 Trustee was in the best interest of the

Debtor's creditors.  This Court's findings with regard to cause under §1104(a)(1) and with regard

to the best interest of his creditors under §1104(a)(2) are intertwined and dependent upon the same facts.

At the October 15th Hearing, this Court did not find that the Debtor's conduct was simply the result of him being "overmastered" by the bankruptcy process.  Rather, this Court determined that the Debtor's conduct was part of an intentional scheme to obscure from this Court and his creditors the nature of his finances.  Generally speaking, the Debtor has consistently provided incomplete or inaccurate information to this Court, hidden assets from his creditors, caused the dissipation of estate assets, breached his fiduciary obligations and exhibited a general disregard for the requirements imposed upon a debtor in possession by the Bankruptcy Code, 11 U.S.C.A. §101 *et seq*. (the "Code").  This Court made several factual findings that, after further consideration, this Court determined to require appointment of a Chapter 11 Trustee.  Among those findings were this Court's determination that the Debtor (1) had lied to this Court and his creditors about his purchase of the claim asserted by the Wilmington Savings Fund Society FSB ("WSFS"); (2) breached his fiduciary obligation as a debtor-in-possession by failing to disclose the opportunity to purchase the same claim; and (3) diverted assets that should have accrued to estate as a result of the sale of property located at 124-134 S. 15th Street, Philadelphia, Pennsylvania.

Despite having initiated his bankruptcy on February 6, 2012 (the "Petition Date"), the Debtor provided few details about his interests in the various business entities in which he holds an ownership interest.  The Debtor's lack of disclosure was compounded by the fact that the entities he owns and the cash flow they generate are the Debtor's sole assets.  He claims to earn no income and to be entirely dependent on the repayment of loans he allegedly made to these entities to fund his and his non-debtor wife's living expenses.  Accordingly, the ability of this

6

Court and the Debtor's creditors to evaluate the feasibility of the Debtor's reorganization is entirely dependent upon the Debtor supplying a clear and accurate description of his business interests. Problematically, the Debtor showed no inclination to provide such information.[2] At best, the Debtor presented an incomplete and confusing description of his various business interests, how they relate to each other and under what circumstances his estate is entitled to receive payments from their revenues. At worst, the Debtor had purposefully obscured the nature of his business interests to frustrate his creditors' efforts to obtain repayment of their claims.

Throughout this case, this Court has found the Debtor to be an often belligerent and uncooperative witness. When it suits him, he trumpets the significance of his role in the operation of his various business interests. Yet, when confronted by the efforts of his creditors to untangle the web of entities he controls and the sources of revenue from which their claims may be repaid, he claims ignorance of material information about his financial affairs. Contrary to the Debtor's apparent understanding, the bankruptcy process may not be used to frustrate his creditors' legitimate efforts to ascertain the scope of estate assets and to prevent their dissipation. The privilege of discharge requires the Debtor to disclose for the benefit of his creditors *all information* relating to his property rights. Absent an appointment, creditors would have been without the means to identify what assets are available to repay their claims and to evaluate the feasibility of the Debtor's reorganization. At stake was not just the estate's ability to marshal its assets on behalf of its creditors, but also the integrity of the bankruptcy system. To fail to appoint a trustee in circumstances such as these would have required this Court to strike, for all

---

[2] Among the Debtor's various excuses for his failure to provide timely and complete disclosure, the Debtor has cited his unfamiliarity with the bankruptcy process. The Debtor's claim strains credulity. While this bankruptcy is the Debtor's first personal bankruptcy, he is far from unfamiliar with the bankruptcy process and its requirements. He is an owner of at least four other entities that have recently filed for bankruptcy relief. The four cases are *In re Saxbys Coffee Worldwide, LLC*, 09-15898; *In re Union Trust Philadelphia, LLC*, 11-12565; *In re WSC 717 Associates, L.P.*, 11-12567; and *Walnut Street Capital, LLC*, 11-19315.

practical purposes, §1104 from the Code.  To further explain the basis of the Trustee Order, this Court will elaborate upon several episodes that this Court relied upon to decide that appointment of a Chapter 11 Trustee was necessary.

## I.    **The Purchase of the WSFS Claim**

Of primary significance to this Court's decision to issue the Trustee Order were the circumstances surrounding 15th and Sansom, L.P.'s (the "Sansom Partnership") alleged purchase of the Proof of Claim dated March 15, 2012 filed by WSFS evidencing a secured claim against the Debtor in the amount of $929,259.69 (the "WSFS Claim").  Contrary to the Debtor's characterization of this transaction, this Court found that he, and not the Sansom Partnership, was the purchaser of the WSFS Claim.  This Court relied on the Debtor's purchase of the WSFS Claim and his subsequent attempts to obscure his conduct as a factual basis for its findings under both §1104(a)(1) and §1104(a)(2).  An examination of this episode illustrates, *inter alia*, the Debtor's dishonesty, his breach of his fiduciary duty, and his diversion of estate assets.

### A.    **The WSFS Claim**

The WSFS Claim relates to the amounts due pursuant to a Revolving Credit Agreement dated August 2, 2006 between the Debtor and WSFS whereby WSFS advanced to the Debtor up to $1,000,000.00 to be used for real estate investments (the "Loan").  As further evidence of the Loan, the Debtor executed a Promissory Note dated August 2, 2006 in the principal amount of $1,000,000.00 (the "Note") and two Partnership Interest Pledge Agreements dated August 2, 2006 (the "Pledge Agreements") whereby the Debtor granted a security interest to WSFS in his interests in the Sansom Partnership and 1111 Spring Garden Associates, L.P. (collectively, the

"Loan Collateral").[3]  On August 4, 2006, WSFS filed a Financing Statement with the

Pennsylvania Department of State at File No. 2006080701309.  Pursuant to the Pledge

Agreements, WSFS held a lien on the Debtor's interest in the Sansom Partnership.  This security

interest is significant because the Sansom Partnership's only asset was real estate located at

1500-1504 Sansom Street, 124 134 S.15th Street, 1502-05 Moravian Street, Philadelphia,

Pennsylvania (the "Sansom Property").

        As originally contemplated, the Debtor was obligated to repay the Loan on or before

February 2, 2008 subject to one automatic extension for a period of one year.  The Debtor failed

to repay the Loan by February 2, 2009.  On March 31, 2011, WSFS and the Debtor executed a

Forbearance Agreement (the "Forbearance Agreement") that extended the term of the Loan to

June 30, 2011.  As consideration for WSFS's forbearance, the Debtor executed an Assignment of

Distributions, Income and Proceeds of Partnership Interests and Security Agreement dated

March 31, 2011 (the "Assignment Agreement")[4] that granted to WSFS a security interest in his

rights to distributions from Curtis Investors, L.P. and PLB Partners, L.P. (the "Forbearance

Collateral").  On April 5, 2011, WSFS filed a Financing Statement with the Pennsylvania

Department of State at File No. 2011040702431 reflecting its interest in the Forbearance

Collateral.

        Despite the Forbearance Agreement, the Debtor ultimately defaulted on his obligation to

repay the Loan.  As a result, WSFS confessed judgment against the Debtor on July 6, 2011 in an

action captioned *Wilmington Savings Funds Society, FSB v. Grasso*, Court of Common Pleas,

Philadelphia County, Case. No. 110700207 and obtained a judgment against the Debtor in the

---

[3] In the Pledge Agreement, the Debtor warranted that "All of the Collateral is owned by Borrower, free and clear of
any and all options, claims, or other Liens except those created hereby or pursuant to the Partnership Agreement."
Claim 4-1, Exh. 3, p.4.

[4] In the Assignment Agreement, the Debtor warranted that "Grasso is the sole owner of, and has good and absolute
title to the Grasso Partnership Interests…"  Claim 4-1, Exh. 6, p.3.

amount of $875,138.58 plus continuing interest, costs and fees (the "Judgment").  WSFS

transferred the Judgment to Montgomery County on July 11, 2011.

###    B.        The Sale of the Sansom Property

On May 16, 2012, the Sansom Partnership sold the Sansom Property to Goodsam 1500,

L.P. and Sansom and Sons, LLC.  The sale price of the Property was $6,200,000.00 and resulted

in the Sansom Partnership receiving net proceeds of $2,410,593.64.  As provided by the

partnership agreement governing the operation of the Sansom Partnership, the proceeds of this

sale were to be immediately distributed to its partners, including the Debtor, according to their

percentage ownership interests.[5]  At the time of the sale, the Debtor's estate appears to have had

an interest in the proceeds of up to $1,181,070.35 and no less than $779,344.92.[6]  As of the

October 15th Hearing, none of the proceeds had been remitted to the Debtor's estate.  Instead, as

discussed below, the Debtor caused the diversion of at least $500,000.00 of these proceeds by

orchestrating the purchase of the WSFS Claim.  In addition, distributions totaling $156,758.35

were either made for the Debtor's benefit to non-debtor entities, or issued to the Debtor and

diverted by him to the operating accounts of non-debtor entities that he controls.[7]

---

[5]   Section 7.6 Agreement of Limited Partnership of 15th and Sansom, L.P. dated November 27, 2000 provides:
"Upon sale or refinancing of the Partnership Property, the cash available for distribution (after payment of expenses
and any previously outstanding indebtedness of the Partnership) *shall be distributed* to all Partners, pro rata amongst
them, in accordance with their Percentage Interests."  (Emphasis added.)

[6]   The Sansom Partnership's 2010 Schedule K-1 discloses that the Debtor's share of profit, loss and capital was
48.995%.  Whereas, the Sansom Partnership's 2011 Schedule K-1 discloses that the Debtor's share of profit, loss
and capital was 32.33%.

[7]   The distributions include (1) a check from the Sansom Partnership dated June 7, 2012, in the amount of $30,000.00
issued to the Debtor; (2) a check from the Sansom Partnership dated June 7, 2012, in the amount of $32,758.35
issued to JGKM Associates LLC; and (3) a check from the Sansom Partnership dated July 5, 2012, in the amount of
$94,000.00 issued to the Debtor.

On July 6, 2012, David M. Shafkowitz,[8] purportedly on behalf of the Sansom

Partnership, filed a Transfer of Claim Other Than For Security Pursuant To B.R. 3001(e)(2) (the

"Claim Transfer").  Attached to the Claim Transfer is an Assignment dated May 23, 2012 (the

"Assignment") evidencing the alleged terms of the assignment of the Claim from WSFS to the

Sansom Partnership.  Pursuant to the Assignment, WSFS assigned to the Sansom Partnership all

of WSFS's rights, title and interest in and to the Loan Collateral and the Forbearance Collateral.

Although the Assignment makes reference to a Purchase, Assignment and Assumption

Agreement dated May 23, 2012 (the "Purchase Agreement"), this document was not attached to

the Claim Transfer and has not otherwise been made available to this Court.  As described by the

Assignment, the Purchase Agreement purports to provide the terms pursuant to which WSFS

purportedly transferred WSFS's interests in the Loan to the Sansom Partnership.

While the Purchase Agreement was not available, evidence demonstrated that the

purchase of WSFS's Claim was paid via a $500,000.00 wire transfer made on May 24, 2012

from Grasso Holdings LP to WSFS.  Addressing the source of $500,000.00, the Debtor claimed

that the funds came out of each owner's percentage share equally.  Audio recording dated

10/15/2012 @ 1:44 pm, Bky. No. 12-11063MDC.  Assuming the Debtor's characterization is

correct, no less than $161,650.00 of estate assets were used to fund the purchase of the WSFS

Claim.  However, the Debtor has admitted that he has no basis for his characterization because

he does not know how the $500,000.00 payment was accounted for by the Sansom Partnership.

Admittedly, the structure of the Debtor's various entities is fairly convoluted.  So, this

---

[8] Mr. Shafkowitz was and remains retained by the Debtor in connection with the development of various real estate projects.  When questioned about whether Mr. Shafkowitz remains in the Debtor's employ, the Debtor admitted that Mr. Shafkowitz currently represents his interests. Transcript 9/5/2012, 79:16-18 ("[Mr. Shafkowitz represents some of my entities.").  Attempting to put some distance between himself and Mr. Shafkowitz, the Debtor later testified that, in the Debtor's words, he adopted a barter system whereby the Debtor provides to Mr. Shafkowitz an office and phone in exchange for Mr. Shafkowitz's services. Audio recording dated 10/15/2012 @ 4:37 to 4:40 pm, Bky. No. 12-11063MDC.

Court understands how confusion may exist as to who owns what and who received what.

However, the Debtor had ample opportunity to provide a coherent explanation of his role in the

transaction, the source of funds used to purchase the WSFS Claim and whether such funds were

estate assets.  For whatever reason, the Debtor proved unwilling to provide such information.  As

demonstrated by the Debtor's constantly shifting testimony as to his role in the purchase of the

WSFS Claim and whether or not it was or was not funded by estate assets, the Debtor was

unwilling to assist his creditors in completing the inquiry into the circumstances of the Claim

Transfer.  Despite the Debtor's incomplete and inconsistent testimony, it was clear to this Court

that the Debtor, with the assistance of other parties, diverted estate assets to fund his purchase of

the WSFS Claim.  Notwithstanding any documents that may show that the Sansom Partnership

was the buyer, the WSFS Claim was purchased by the Debtor.  To the extent the Sansom

Partnership was involved, its involvement was merely to hide the true nature of the transaction.

### C. The Debtor's Diversion and Mismanagement of Estate Assets

Section 541(a) creates a bankruptcy estate for the benefit of that consists of "all legal and

equitable interests of the debtor in property." 11 U.S.C. §541(a)(1). Significantly, the estate

includes all "[p]roceeds ... or profits of or from property of the estate[.]"  11 U.S.C. §541(a)(6).

As provided by the Sansom Partnership Agreement, the Sansom Partnership was required to

distribute to the Debtor his pro rata share of the proceeds of any sale of the Sansom Property.

Rather than distribute the Debtor's pro rata share of the proceeds to his estate, the Debtor caused

the Sansom Partnership to divert these proceeds by (1) funding the purchase of the WSFS Claim,

and (2) issuing checks to entities owned by the Debtor.

The Debtor's diversion of estate assets constituted mismanagement sufficiently egregious

to justify the appointment of a Chapter 11 Trustee under both §1104(a)(1) and §1104(a)(2). *In re*

*PRS Insurance Group, Inc.*, 274 B.R. 381, 385 (Bankr. D. Del. 2001); *Intercat, Inc.*, 247 B.R.

911, 923 (Bankr. S.D. Ga. 2000); *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 527

(Bankr. E.D.N.Y. 1989); *In re Main Line Motors, Inc.*, 9 B.R. 782, 784-85 (Bankr. E.D. Pa.

1981).  The Debtor's diversion of estate assets was exacerbated by his subsequent efforts to

cover up his diversion of these assets and his failure to disclose his receipt, via payments made

by other entities on his behalf, of the remainder of his share of the proceeds that were not used to

purchase the WSFS claim.

The Debtor's inability or, as this Court determined, his unwillingness to account for

estate assets including, *inter alia*, whether estate assets were used to fund the purchase of the

WSFS Claim, also constituted evidence of mismanagement of estate assets.  *In re PRS Insurance*

*Group, Inc.*, 274 B.R. 381, 387 (Bankr. D. Del. 2001) (appointing trustee where debtor failed to

provide an explanation of diversion of funds from entities in which the debtor held an interest);

*Intercat, Inc.*, 247 B.R. 911, 923 (Bankr. S.D. Ga. 2000) (recognizing that diversion of

substantial corporate assets to the debtor's management or to other corporations owned by

management constituted mismanagement at best and fraud or dishonesty at worse); *In re*

*Humphreys Pest Control Franchises, Inc.*, 40 B.R. 174, 177 (Bankr. E.D. Pa. 1984) (recognizing

cause for appointment existed where debtor had failed to establish adequate controls necessary to

prevent the transfer and depletion of estate assets).  As stated by in *PRS Insurance*,

> If there is a contractual relationship justifying the transfers, surely the Debtor's
> controller should be able to explain what it is.  In the absence of such an
> explanation, we must conclude that either there is not a legitimate one or that the
> Debtor is incompetent.

*In re PRS Insurance Group, Inc.*, 274 B.R. 381, 387 (Bankr. D. Del. 2001).

Here the same was true.  Not only did the Debtor cause the diversion of estate assets, the

Debtor failed to abide by his obligation to account for whether estate assets were used to

purchase the WSFS Claim.  His failure to do so was inconsistent with his obligations as a debtor-in-possession and merited a finding of mismanagement sufficient to justify the appointment of a Chapter 11 Trustee.

This Court was unimpressed by the Debtor's *post hoc* justification for his violation of his fiduciary obligations and his diversion of estate assets.  At the October 15th hearing, the Debtor argued that his purchase of the WSFS Claim resulted in a net benefit to his estate that should inoculate his bad acts.  Whether or not his purchase of the WSFS Claim resulted in a net benefit to his estate is irrelevant.  *See, e.g., In re Free*, 466 B.R. 48, 54 (Bankr. W.D. Pa. 2012) (refusing to credit debtor's "no harm, no foul" defense to alleged misconduct); *In re Johnson*, Bky. No. 05-14164, 2009 WL 65246, *13 (Bankr. D. Del. Jan. 9, 2009) (recognizing that noncompliance with Bankruptcy Code's disclosure requirements may not be excused by a "no harm, no foul" defense); *In re Coram Healthcare Corp.*, 271 B.R. 228, 235-36 (Bankr. D. Del. 2001) (refusing to rely on "no harm, no foul" theory to find plan had been proposed in good faith despite existence of an actual conflict of interest held by the debtor's chief executive officer).

By filing for bankruptcy relief, the Debtor must accept certain obligations in exchange for his receipt of the benefit of a discharge.  Paramount among those obligations is the obligation of complete disclosure by the Debtor of all assets in which he may hold an interest.  *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996); *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988); *In re Tully*, 818 F.2d 106, 110 (1st Cir. 1987).  To allow the Debtor to secrete estate assets based upon a determination made unilaterally by the Debtor and outside the purview of this Court would upend the system of disclosure required to maintain the integrity of the bankruptcy system.  Further, a rule that allows a debtor the discretion to pay one creditor outside the supervision of

the bankruptcy court would risk the subversion of the integrity of estate administration by

eliminating any mechanism to protect the Code's distribution priorities.  *See, e.g., In re Foster*,

19 B.R. 28, 29 (Bankr. E.D. Pa. 1982) (holding that the unauthorized transfer of estate assets

"was in blatant disregard of the integrity of the Court as well as the constraints mandated by

Congress in the Bankruptcy Code").  While this Court's equitable powers are broad, they exist to

effectuate the purposes of the Code.  11 U.S.C. §105(a) ("The court may issue any order,

process, or judgment that is necessary or appropriate *to carry out the provisions of this title*.")

(emphasis added).  This Court's equitable powers may not be invoked to obviate the Debtor's

obligations.  *In re Combustion Engineering, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004); *In re Kestell*,

99 F.3d 146, 148-49 (4th Cir. 1996).

 For these reasons, this Court gave no credence to the Debtor's claim that his diversion of

estate assets should be excused by his unilateral determination that the purchase of the WSFS

Claim would result in a net benefit to his remaining creditors.  If the Debtor believed that his use

of estate assets to purchase the WSFS Claim was justified by the benefits that would accrue to

his estate, he should have sought approval from this Court *prior to consummating the*

*transaction*.  Absent prior approval, the Debtor's diversion of estate assets to purchase the WSFS

Claim constituted a violation of his obligations as a debtor-in-possession.

 **D.**  **The Debtor's Breach of his Fiduciary Obligation**

 Even if the Debtor had been willing to account for whether estate assets were or were not

used to purchase the WSFS Claim, the Debtor's undisclosed involvement in the transaction

constituted a violation of his fiduciary obligation as a debtor-in-possession.  *See, e.g., Official*

*Committee of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery,*

*et al*., 330 F.3d 548, 573 (3d Cir. 2003) (recognizing that a debtor has a fiduciary duty to

maximize the value of its estate); *In re Sharon Steel Corp*., 871 F.2d 1217, 1228 (3d Cir. 1989);

*In re Pacific Forest Indus., Inc.*, 95 B.R. 740, 743 (Bankr. C.D. Cal. 1989).  The Third Circuit

has recognized that the availability of claims for purchase at a discount constitutes a corporate

opportunity.  *In re Papercraft Corp*., 160 F.3d 982, 988 (3d Cir. 1998) (holding that insider

violated fiduciary duty by failing to disclose to debtor's board its intent to purchase claims);

*Brown v. Presbyterian Ministers*, 484 F.2d 998 (3d Cir. 1973) (held that a director of a

corporation in bankruptcy owes a fiduciary duty to creditors and cannot seize a corporate

opportunity without disclosure to the creditors or their representative); *In re Nationwide Sports

Distributors, Inc*., 227 B.R. 455, 465 (Bankr. E.D. Pa. 1998).

 In *Papercraft*, the Third Circuit addressed the purchase of a claim against a debtor's

estate by an insider of the debtor.  The purchaser was an officer of Citicorp Venture Capital

("CVC") as well as a member of the board of directors of the debtor, Papercraft Corporation.

CVC held an equity position in debtor's parent corporation prior to debtor's bankruptcy filing

but held no notes issued by debtor.  After the debtor filed its bankruptcy petition, CVC acting

through its officer purchased at a discount pre-petition notes issued by the debtor in favor of third

parties.  As a result of the purchases, CVC was able to gain sufficient votes to control approval

of the debtor's plan of reorganization.  Problematically, CVC and its officer failed to notify the

debtor's board of directors, the committee, or the bankruptcy court before purchasing the notes.

 After the purchase was disclosed, the creditors' committee brought an adversary action

against CVC in which it objected to allowance of the claims CVC had purchased and requested

equitable subordination of those claims.  The bankruptcy court found in favor of the committee,

holding that CVC, by failing to disclose the opportunity to purchase the notes, had failed to meet

its fiduciary obligation to act in the best interest of debtor and its creditors.  However, the

bankruptcy court declined to equitably subordinate CVC's purchased claims.  Instead, the

bankruptcy court applied a *per se* rule that, when an insider purchases a claim at discount

without adequate disclosure to the debtor and its creditors, the acquired claims will be limited to

the amount paid by the acquiring insider.

On appeal, the district court upheld the bankruptcy court's determination that CVC

violated its fiduciary obligations and had caused injury to the debtor's creditors.  However, it

went further than the bankruptcy court and rejected the *per se* rule articulated by the bankruptcy

court.  The district court held that CVC's recovery should, at a minimum, be limited to the

amount CVC had paid for the notes, so as to eliminate any potential profits from purchasing the

notes.  The district court went on to recognize that, contrary to the bankruptcy court's

understanding, it would be permissible for the bankruptcy court to equitably subordinate the

claims to further limit the amount CVC may be paid for the claims.

On appeal from the district court, the Third Circuit determined that CVC's position was

at odds with its decision in *Brown v. Presbyterian Ministers*, 484 F.2d 998 (3d Cir. 1973).  In

*Brown*, the Third Circuit held that the availability of discounted claims for purchase constitutes a

corporate opportunity that a fiduciary may not take for itself without prior disclosure to the

corporation.  The *Brown* court concluded that, in the bankruptcy context, the disclosure

obligations are extended.  Not only must an insider disclose the existence of a corporate

opportunity to the corporation, an insider of a bankrupt entity may not claim an opportunity of

the bankrupt entity without also disclosing its availability to the estate's creditors.  *Brown v.

Presbyterian Ministers*, 484 F.2d 998, 1005 (3d Cir. 1973) ("The opportunity should have been

disclosed to the receiver as representative of the creditors").  Based on *Brown*'s holding, the

Third Circuit in *Papercraft* determined that consistent with the district court's determination, the

17

remedy of equitable subordination was appropriate in cases where an insider purchases a claim

against an estate without prior disclosure to the estate's creditors.  *In re Papercraft Corp.*, 160

F.3d 982, 987 (3d Cir. 1998).

The Third Circuit's decision in *Papercraft* and *Brown* are significant because they

establish that the Debtor was obligated to disclose his knowledge of the opportunity to purchase

the WSFS Claim.  Even if the Debtor had not diverted estate assets to fund the purchase, the

Debtor was obligated to disclose his knowledge of the opportunity to purchase the WSFS Claim.

The Debtor had prior knowledge of the opportunity to purchase the WSFS Claim at a discount

yet, in violation of his duties, he failed to disclose this knowledge to his creditors.  *In re*

*Papercraft Corp.*, 160 F.3d 982, 988 (3d Cir. 1998) (insider's fiduciary duty "required that it

share everything that it knew with [debtor's] board and [its creditors] before commencing its

purchases").[9]

The Debtor's failure to disclose the opportunity to purchase the WSFS claim was

exacerbated by his subsequent efforts to cover up the true nature of this transaction.  At first, the

Debtor denied any pre-existing knowledge of the opportunity to purchase the WSFS Claim.  At

the August 28th hearing, the Debtor represented to this Court that he was not involved in the

negotiation of any portion of the Claim Transfer.  When asked what the sale price was, the

Debtor stated "I have never seen these documents, so you tell me, I'm not sure exactly the

amount."  Transcript 8/28/2012, 92:1-10.  He testified that he never saw the HUD-1

---

[9] Based upon the Debtor's allegations contained in his memorandum dated November 27, 2012 [Docket No. 352]
(the "Debtor's Memorandum"), the Debtor now admits to have directed the purchase of the WSFS Claim.  In
relevant part, the Debtor's Memorandum states:

> Mr. Grasso saw an opportunity for an entity in which he had an interest to purchase one of the
> creditor claims against him (the WSFS claim) very favorably to the bankruptcy estate; he acted as
> a businessman would regarding the WSFS claim, not necessarily as a trustee of a bankruptcy
> estate would.

Debtor's Memorandum, p.4.

documenting the sale.  Transcript 8/28/2012, 93:6-20.  He also testified that he recalled having

no conversations with his brother regarding the acquisition of Claim 4-1.  Transcript 8/28/2012,

98:25-99:25.  When asked whether the proceeds of the Property were used to funds the purchase

of Claim 4-1, the Debtor stated:

> I don't have personal knowledge of it.  I didn't see the transaction happen.  I don't
> have a document that says that.  I didn't talk to WSFS.  I haven't had a – I don't
> know who their lawyer is.  I have never seen the documents, so I'm not sure.

Transcript 8/28/2012, 103:5-9.

Only after he was confronted at the September 5th hearing with documentary evidence

undermining his claims of ignorance,[10] the Debtor finally admitted that he knew of the

opportunity to purchase the WSFS Claim.  He admitted that contrary to his prior testimony he

had conversations with his brother regarding the purchase wherein he advised his brother, David

Grasso, that he believed that the purchase represented a good opportunity.  Transcript 9/5/2012,

65:22-25.  He admitted that the substance of his conversations with his brother involved the

value of the WSFS Claim.  Transcript 9/5/2012, 66:3-11.  He specifically stated that he advised

his brother "I thought there was some value there."  Transcript 9/5/2012, 66:9.

At the October 15th Hearing, the Debtor's testimony about his involvement in the

purchase of the WSFS Claim evolved to the point that he was no longer able to provide a

coherent explanation of his role in the transaction.  Once again, he admitted that contrary to his

prior testimony he recalled having prior discussions with his brother about the purchase of the

WSFS Claim at a "discount."  Audio Recording dated 10/15/2012 @ 4:49:25 pm, Bky. No. 12-

---

[10] The documents include correspondence between counsel for the Debtor and counsel for WSFS and the time
records of counsel for the Debtor attached to his Application for compensation dated July 17, 2012 [Docket No.
164] (the "Application").  The Application contains statements disclosing the Debtor's involvement in the
negotiations with WSFS and in the funding of the Claim Transfer.  For instance, a series of time entries dated May
17, 2012 make explicit that the Debtor was directly involved in the negotiation of the purchase of the WSFS Claim.
These time entries render incredible the Debtor's subsequent statements to this Court that he lacked any knowledge
of the circumstances of the purchase of the WSFS Claim.

11063MDC.  In addition to contradicting his original testimony whereby he stated he had no

prior knowledge of the opportunity to purchase the WSFS Claim, the Debtor further clouded the

record as to whether in fact he directly purchased the WSFS Claim.  Within the same breath, he

both stated that he did and he did not purchase the WSFS Claim.  In relevant part, he stated:

> I bought the claim for $500,000.00.  I didn't buy it.  The partnership bought the
> claim that was for $500,000 which was a $926,000.00 claim.

Audio Recording dated 10/15/2012 @ 4:40:30 pm, Bky. No. 12-11063MDC.

Despite having knowledge of the opportunity to purchase the WSFS Claim at a discount,

the Debtor made no effort to disclose this opportunity to his creditors.  By acting in this manner,

the Debtor breached his fiduciary duty owed to his creditors as a debtor-in-possession.  Coupled

with his subsequent efforts to cover up the nature of this transaction, this Court was convinced

cause existed for appointment and that such appointment was in the best interests of his estate's

creditors.  Problematically, the scope of the Debtor's misbehavior was not limited to his

diversion of estate assets to purchase the WSFS Claim.

## II.     The Debtor's Alleged Entireties Interest in the Partnership Entities

If this Court could identify the original thread that caused the Debtor's case to unravel,

this Court would point to the Debtor's claim that he holds the majority of his property as

entireties property.[11]  By failing to provide documentation of his wife's interests, the Debtor

frustrated his creditors' efforts to investigate the legitimacy of his wife's interests.  In addition,

the existence of potential claims the Debtor may have against his wife arising from the transfer

of his interest in the partnership entities created a conflict of interest that prevented him from

---

[11] For example, it was apparently counsel for WSFS who at the Debtor's meeting of creditors questioned the basis for his wife's alleged interests.  At the Debtor's meeting of creditors held on March 13, 2012, the Debtor was questioned about the basis for his wife's alleged interests.  Counsel for WSFS questioned why the Debtor at the time the Debtor obtained the Loan from WSFS did not disclose his wife's interest in WSFS's Loan Collateral.  The Debtor responded, "I didn't think that it was pertinent information."  When asked whether his representations to WSFS were inaccurate, the Debtor responded "you can say that."  Audio recording dated 10/15/2012 @ 4:41 pm, Bky. No. 12-11063MDC.

carrying out his fiduciary duties as a debtor in possession.  This Court relied on the Debtor's

allegations regarding his wife's alleged interest in the partnership entities as a factual basis for its

findings under both §1104(a)(1) and §1104(a)(2).

On the Debtor's Schedule B, the Debtor indicated that he holds ownership interests in at

least 22 different operating entities.  On the Schedule B, the Debtor stated that, in all but three of

these entities,[12] his ownership interests are held as tenants by the entireties with his spouse.

Despite the Debtor's allegations and his creditors' subsequent inquiries, the Debtor failed to

provide documents substantiating his wife's alleged interests in all entities except the Sansom

Partnership.

The Debtor has admitted that as of the Petition Date partnership documents evidencing

his ownership interests did not reflect the alleged transfers and indicated that he retained sole

ownership of his interests.  Problematically, the only corporate documents that evidence his

wife's interests in the partnership entities were created post-petition according to the Debtor.

The following chart summarizes the ownership information disclosed in the various partnership

K-1 forms that were submitted to this Court.

---

[12] The three entities that the Debtor claimed are not held with his wife as tenants by the entireties are: (1) Grasso
Family Partnership, LP; (2) Saxbys Coffee Worldwide, LLC; and (3) Union Trust Philadelphia, LLC.  The Debtor's
claim of exclusive ownership of Saxbys Coffee Worldwide, LLC is consistent with his previous representations in *In
re Saxbys Coffee Worldwide, LLC*, 09-15898 where he stated he held a 70% membership interest in his own name.
List of Equity Security Holders [09-15898, Docket No. 45].  Similarly, in *In re Union Trust Philadelphia*, LLC,
11-12565, the Debtor stated that he held a 50% ownership interest of Union Trust Philadelphia, LLC in his own
name.  In *In re Walnut Street Capital, LLC*, 11-19315, the Debtor listed that he held a 50% ownership interest of that
entity in his own name.  However, the Walnut Street Capital was not identified by the Debtor's schedules and he has
not otherwise made a claim that his wife held any interest in this entity.  Whereas, the Debtor claimed to hold his
ownership interest in WSC 717 Associates, L.P. with his wife as tenants by the entireties.  However, in *In re WSC
717 Associates, L.P.*, 11-12567, the Debtor listed that he held a 25% ownership interest of that entity *in his own
name*. List of Equity Security Holders, Bky. No. 11-12567, Docket No. 24.

| Entity | 2010 K-1 | Ownership % | 2011 K-1 | Ownership % |
|---|---|---|---|---|
| WSC 717 Associates, LP | Joseph Grasso | 25% | Joseph and Donna Grasso, T/E | 25% |
| PLB Investors, L.P. | Joseph Grasso | 72.44% | Joseph and Donna Grasso, T/E | 72.44% |
| Curtis Investors, L.P. | Joseph Grasso | 72.44% | Joseph and Donna Grasso, T/E | 72.44% |
| York and Swamp Assoc., LLC | Joseph Grasso | 89% | Joseph and Donna Grasso, T/E | 89% |
| 730 E. Elm St. Assoc., LP | Joseph Grasso | 50% | Joseph and Donna Grasso, T/E | 50% |
| QPSR Partners, LP | Joseph and Donna Grasso[13] | 24.833% | Joseph and Donna Grasso | 24.833% |
| Grasso Family Limited Partnership | Joseph Grasso | 19.8% | Not available | Not available |
| 15th & Sansom, LP | Joseph Grasso | 32.33% | Joseph Grasso | 32.33% |

To explain why his wife's name is not listed on the partnerships' 2010 K-1s, the Debtor

stated:

> We joint – we are – we file jointly, and it wouldn't make a difference from a tax perspective if it was me and her or me – or me, myself. When we get – we pay our taxes, we pay them jointly. And we receive a refund, we receive them jointly, as well. And it's all – all the partnerships come in that way. So, if I had a credit from a partnership, it would come in as Joseph and Donna Grasso, not as Joseph Grasso.

Transcript 8/28/2012, 66:4-13.

To explain why his wife's name was listed on the partnerships' 2011 K-1s, the Debtor

stated:

> I imagine what happened was that after we – the – the – the filing of my Chapter 11 bankruptcy, that we made a lot of, quote/unquote, "housekeeping," making sure that I was – that the documents were in order. So, I'm not sure that – I didn't specifically ask somebody to do this, but I'm not surprised. I'm more surprised that it's not two or three years back.

Transcript 8/28/2012, 71:4-9.

---

[13] Exhibit 14 contains two 2010 K-1s for QPSR Partners, LP. One lists "Joseph and Donna Grasso" and the shareholder's name. The other lists "Joseph Grasso" as the shareholder's name.

Despite the significance of his wife's alleged interests on the Debtor's prospects for reorganization, the Debtor made minimal efforts to substantiate his claim that these partnership interests are held with his wife as entireties property.  He claimed that she obtained her interest as a result of a transaction that occurred in 2008 whereby he and his wife contributed to these partnerships $2,000,000.00 in operating capital drawn from the equity in their marital home.  As consideration for her portion of this contribution, the Debtor claimed that his partnership interests were retitled as entireties property.  To explain how these entities came to be held as entireties property, the Debtor stated:

> I'm married to my wife 29 years – 29 years.  Every bit of investment that I ever put into any property was part – was half hers that I invested into these partnerships to begin with.
> On top of that, we – on our 25th wedding anniversary [August 13, 2008], we – we – I believe had a document signed that would actually make both of us equal ownerships in the – in the property that – in the businesses that I – I run in my – in my portion, whatever my interest is.

Transcript 8/28/2012, 62:10-18.

As evidence that the partnership interests are held with his wife as entireties property, the Debtor claimed that several pre-petition conveyance agreements memorialize these transactions. *See, e.g.,* Second Response, ¶5 ("A copy of *one of the conveyance agreements* is appended to this Motion as Exhibit 1.") (emphasis added).  Despite making reference to *multiple conveyance agreements*, the Debtor had at the time of the October 15th Hearing, only produced *one such agreement*, an Assignment and Assumption of Partnership Interests dated August 15, 2008 whereby the Debtor transferred to himself and his wife as tenants by the entireties the Debtor's interest in the Sansom Partnership (the "Sansom Partnership Assignment").  Second Response, Exh. 1.  The Sansom Partnership Assignment relates only to the Sansom Partnership and makes no reference to any other entity.  Despite the Sansom Partnership Assignment, both the 2010 and 2011 K-1s for the Sansom Partnership do not identify Mrs. Grasso as a holder of an interest in

this partnership.

The Debtor offered no cogent explanation other than his unexcused neglect for his failure to provide any documents evidencing the alleged transfers to his wife.  The Debtor admitted that prior to the September 5th hearing he made no effort to obtain copies of the alleged 2008 agreements or the other agreements between him and his wife pursuant to which he alleges her interest in the entities was established.  Transcript 9/5/2012, 28:15-22.  Without making any inferences from the Debtor's apparent inability to produce these documents, this Court concluded that his failure to produce evidence supporting his assertion that the entities are held with his wife as entireties property constituted evidence of mismanagement.  *See, e.g., In re Oklahoma Refining Co.*, 838 F.2d 1133, 1136 (10th Cir. 1988) ("failure to keep adequate records and make prompt and complete reports justifies the appointment of a trustee"); *Tradex Corp. v. Morse*, 339 B.R. 823, 833 (D. Mass. 2006) (recognizing that debtor's failure to provide creditors information about business operations justified appointment of trustee); *In re Philadelphia Athletic Club, Inc.*, 15 B.R. 60,62-63 (Bankr. E.D. Pa. 1981) (finding that appointment was in best interests of creditors where debtor had failed to keep adequate business records).

The issues relating to the lack of documentation were compounded by the fact that they demonstrated that the Debtor's personal interests were adverse to his estate's interest.  Even if this Court took the Debtor's allegations at face value, it appeared that the Debtor's estate may have claims against the Debtor's wife arising from the alleged transfer of the partnership interests.  The Debtor claimed that his wife conveyed $1,000,000.00 (one half of the equity in their marital home) in exchange for her alleged interests in the partnership entities.  The Debtor's creditors have estimated the value of the estate's interest in the partnership entities to exceed $8,000,000.00.  SWC Memorandum, p.4.

While the basis of the estate's claims remains to be determined, including, *inter alia*, whether the Debtor's wife provided reasonably-equivalent value in exchange for the interests she received, s*ee, e.g., Pension Transfer Corp. v. Beneficiaries under the Third Amend. to Fruehauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203 (3d Cir. 2006) (stating that transaction may be avoided as fraudulent when debtor did not receive the rough equivalent in value in return for interests conveyed), this Court recognized that the Debtor's estate possessed colorable claims against the Debtor's wife relating to these alleged transfers that warranted an independent and impartial investigation.  The existence of the estate's potential claims against the Debtor's wife evidenced a conflict of interest and that such conflict constituted cause for appointment of a Chapter 11 Trustee.  *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 473 (3d Cir. 1998) (conflict of interest supported appointment of trustee); *In re Euro-American Lodging Corp*., 365 B.R. 421, 428 (Bankr. S.D.N.Y. 2007) (recognizing that cause for appointment of a trustee exists when a debtor suffers from a conflict of interest); *In re Clinton Centrifuge, Inc*., 85 B.R. 980, 985 (Bankr. E.D. Pa. 1988) ("inappropriate relations between corporate parents and subsidiaries" constitutes cause under §1104(a)(1)); *In re Humphreys Pest Control Franchises, Inc*., 40 B.R. 174, 176–177 (Bankr. E.D. Pa. 1984) (finding that "an obvious conflict of interest exists… because the officers and principals of the parent corporation are the same individuals as the officers and the principals of the debtor."); *In re Philadelphia Athletic Club, Inc*., 15 B.R. 60, 62–63 (Bankr. E.D. Pa. 1981) (appointing a trustee in the best interests of the creditors when the principals of the debtor occupied conflicting positions in transferee companies).

Allowing a debtor to remain in control of its business during a bankruptcy filing is "premised upon an assurance that the officers and managing employees can be depended upon to

carry out the fiduciary responsibilities of a trustee." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 255 (1985). The Debtor's relationship to his wife as well as his alleged shared interest in the entireties property created an incentive for the Debtor to act contrary to the best interests of his estate and his creditors. The Debtor's inability to document his wife's alleged interests demonstrated that this conflict colored his conduct as a debtor-in-possession. The Debtor could not provide such assurance that he would honor his fiduciary obligation thereby providing another basis for this Court's decision to appoint an independent trustee.

### III.    <u>Unauthorized Use of Property of the Estate</u>

In addition to its determination regarding the Debtor's diversion of assets that should have accrued to the estate as a result of the sale of the Sansom Property, this Court determined that the payment of a post-petition retainer to Debtor's counsel, Law Offices of Paul J. Winterhalter, P.C. ("Winterhalter Firm") constituted an unauthorized use of property of the estate. Subsequent to the filing of the Debtor's petition, the Winterhalter Firm received a *post-petition* retainer payment. On August 10, 2012, Mr. Winterhalter filed a Supplemental Statement on the Disclosure of Compensation of Attorneys for Debtors Pursuant to Federal Rule of Bankruptcy Procedure 2016(b) (the "Supplemental Statement"). In the Supplemental Statement, Mr. Winterhalter revealed that the Winterhalter Firm received a payment from Curtis Investors, L.P. ("Curtis Investors") on behalf of the Debtor in the amount of $30,000.00 (the "Post-Petition Retainer").

Not surprisingly, the estate's creditors were interested in the source of the Post-Petition Retainer and addressed the subject at the August 28th hearing. When asked about the source of the retainers received by the Winterhalter Firm, the Debtor admitted that he personally directed Curtis Investors to pay the Post-Petition Retainer to the Winterhalter Firm. Transcript

8/28/2012, 106:9-11.  He further explained:

> He gets paid by me or my controller, making sure that he gets paid.  I'm sure it's a
> – somehow, *some money that I have control over* a partnership and – and he'd
> have to get paid, I believe.  I don't have money sitting in an account right now
> that I can go cut another check to him.

Transcript 8/28/2012, 105:7-11 (emphasis added).

When asked why the Winterhalter Firm was paid the Post-Petition Payment, the Debtor

stated:

> Because I believe that he was – I – I believe that's where the funds were taken
> from, and I believe that he does work on that partnership, as many – as well as
> many other ones as part of defense.

Transcript 8/28/2012, 105:20-24.

The Debtor further admitted that he had no idea how Curtis Investors accounted for the

Post-Petition Retainer.  Transcript 8/28/2012, 106:2-8.  The Post-Petition Retainer was paid from

a distribution from Curtis Investors to the Debtor.  The fact it was received by the Winterhalter

Firm and not the Debtor did not exclude it from the scope of the Debtor's estate.  *In re*

*Valladares*, 415 B.R. 617, 625 (Bankr. S.D. Fla. 2009) (finding that corporate distributions paid

to law firm were property of debtor's estate); *In re W.T. Mayfield Sons Trucking Co., Inc*., 225

B.R. 818, 827 (Bankr. N.D. Ga. 1998) (holding that payments to debtor's counsel from a wholly-

owned subsidiary constituted property of the estate).  As estate property, the Post-Petition

Retainer should have accrued to the Debtor's estate and not the Debtor's attorney.

In addition to constituting the diversion of estate assets that should be made available to

the payment of creditors, the payment of attorneys' fees by a debtor-in-possession is not an

ordinary-course transaction.  *In re Pannebaker Custom Cabinet Corp.*, 198 B.R. 453, 464

(Bankr. M.D. Pa. 1996) ("payments to professionals are treated separately and specifically under

the Bankruptcy Code and are thus without question payments outside the ordinary course of a

debtor-in-possession's ordinary financial affairs."); *In re Prime Foods of St. Croix, Inc.*, 80 B.R.

758, 762-63 (D.V.I. 1987) (recognizing that an attorney hired to represent a debtor is not

employed in the ordinary course); *In re Pannebaker Custom Cabinet Corp.*, 198 B.R. 453, 462

(Bankr. M.D. Pa. 1996) (recognizing that post-petition payments to debtor's attorney may not be

characterized as ordinary course transaction exempt from 363(b)(1)'s notice and hearing

requirements); *In re Perrysburg Marketplace Co.*, 176 B.R. 797, 799 (Bankr. N.D. Oh. 1994)

(same).  As a result, the Debtor's payment of the Post-Petition Retainer, not to mention the

purchase of the WSFS Claim, constitutes a violation of §363(b)(1).[14]  Violation of the

Bankruptcy Code constitutes mismanagement and is cause for appointment of a chapter 11

trustee.  *In re AG Service Centers, L.C.*, 239 B.R. 545, 550 (Bankr. W.D. Mo. 1999) ("Section

1104(a)(1) does not specifically list 'noncompliance with court orders' or 'failure to comply with

the Bankruptcy Code' as causes for the appointment of a trustee, but such conduct clearly falls

within the scope circumscribed by the statute—either as a 'similar cause' or as a permutation of

'incompetence, or gross mismanagement.'").

## IV.    The Inadequacy of the Debtor's Written Financial Disclosures

This Court also relied on the Debtor's failure to file timely and accurate financial

disclosures as a factual basis for its findings under both §1104(a)(1) and §1104(a)(2).  Absent

such reports this Court and the Debtor's creditors were deprived of the information necessary to

monitor the reorganization process.  The Debtor filed for Chapter 11 relief on February 6, 2012.

On March 5, 2012, the Debtor filed his bankruptcy schedules.  Despite having an obligation to

file monthly operating reports,[15] the Debtor did not do so until after the US Trustee and the

---

[14] A debtor-in-possession's failure to seek court approval for payments to professionals represents cause for dismissal or conversion. *In re 3868–70 White Plains Rd., Inc.*, 28 B.R. 515 (Bankr. S.D.N.Y. 1983).

[15] Fed. R. Bankr. P. 2015(a)(3) requires a chapter 11 debtor in possession to file monthly operating reports.  The timely filing of such reports has been characterized a "one of the most fundamental and crucial duties of a debtor-in-possession."  *In re Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989); *see also In re Horn &*

Debtor's creditors moved for conversion of his case to chapter 7.  Only after this issue was raised

did the Debtor file on August 7, 2012 his March 2012, April 2012 and May 2012 Operating

Reports.  When the insufficiency of these documents became apparent, the Debtor, as ordered by

this Court, augmented the record by filing on October 1, 2012 amended operating reports for

March 2012, April 2012, and May 2012  and well as operating reports for February 2012, June

2012 and July 2012 (collectively the "Operating Reports").

        In addition to failing to file timely Operating Reports, the Debtor also failed to file timely

the periodic financial reports required by Fed. R. Bankr. 2015.3 ("Periodic Financial Reports").

The Debtor was required to have filed his Rule 2015.3 reports "no later than seven days before

the first date set for the meeting of creditors" and "no less frequently than every six months

thereafter…"  Fed. R. Bankr. 2015.3(b).  The Debtor's meeting of creditors was held on March

13, 2012.  Therefore, his first Periodic Financial Reports should have been filed no later than

March 6, 2012 and his second Periodic Financial Reports should have been filed no later than

September 6, 2012.  The Debtor did not file any of the required disclosures until ordered to do so

by this Court.  As a result, the Debtor filed his first Periodic Financial Reports on September 21,

2012.  Thereafter, as ordered, seven days later on September 28, 2012, the Debtor filed his first

periodic report in which he provided financial information with regard to entities in which he

holds a minority interest.

        In addition to being filed long after the applicable deadline, the contents of the Debtor's

Periodic Financial Reports were also insufficient.  As provided by Official Form 26, Periodic

Financial Reports are to include financial information for the most recent six-month period of the

current fiscal year and for the prior fiscal year.  *See, e.g.,* Official Form 26, Exhs B-1 and B-2.

---

*Hardart Baking Co.*, 22 B.R. 668, 670 (Bankr.E.D.Pa.1982) (recognizing the debtor-in-possession's duty to file
records and operating reports).

Problematically, the Debtor's Periodic Financial Reports contained no information relating to the most recent six-month period.  The omission of this information is of particular significance as it would have disclosed the source of the monies used to purchase the WSFS claim as well as illuminated the source of the monies used to fund the loan repayments that the Debtor relies upon to fund his post-petition expenses.

The Debtor's delay in filing his written disclosure was compounded by the fact that they conflict with the contents of his schedules.  Consistent with his schedules, the Operating Reports disclosed that the Debtor earns no personal services income and is completely dependent upon the proceeds of estate property to fund his post-petition operating expenses.  The Operating Reports further disclosed that loan repayments and partnership distributions are the exclusive source of the Debtor's post-petition income.  The following chart summarizes the disclosures contained in the six operating reports the Debtor had filed prior to this Court's determination that appointment of a Chapter 11 Trustee was warranted.

|  | **February** | **March** | **April** | **May** | **June** | **July** | **August** |
|---|---|---|---|---|---|---|---|
| **Beginning Cash** | $16,691.18 | $7,845.54 | $12,603.03 | $337.03 | $1,866.89 | $6,403.40 | $2,757.57 |
| **Wages** | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Loan Repayments** | $10,000.00[16] | $25,000.00[17] | $10,000.00[18] | $17,000.00[19] | $20,000.00[20] | $10,000.00[21] | $0.00 |
| **Distributions** | $4,000.00[22] | $4,000.00[23] | $0.00 | $8,141.00[24] | $5,000.00[25] | $4,000.00[26] | $28,000.00[27] |
| **Refunds** | $929.56 | $196.09 | $0.00 | $8.00 | $0.00 | $189.25 | $51.37 |
| **Expenses** | $23,775.23 | $24,438.69 | $22,265.97 | $23,619.32 | $20,563.52 | $17,835.11 | $22,110.12 |
| **Ending Cash** | $7,845.53 | $12,602.94 | $337.06 | $1,866.78 | $6,403.40 | $2,757.57 | $9,679.89 |

Despite being the only source of his estate's operating income, the Debtor testified that

he lacks any knowledge as to the amount, repayment schedule or terms of the various loans.

Transcript, 8/28/2012, 38:19-39:1.  He also testified that he had no knowledge of the source of

---

[16] The Debtor received a loan repayment on February 23, 2012 in the amount of $10,000.00 from "Avalon Breezes."

[17] The Debtor received a loan repayment on March 2, 2012 in the amount of $10,000.00 from "JGKM," a loan repayment on March 8, 2012 in the amount of $5,000.00 from "JGKM," and a loan repayment on March 23, 2012 in the amount of $10,000.00 from "JGKM."

[18] The Debtor received a loan repayment on April 4, 2012 in the amount of $10,000.00 from "JGKM."

[19] The Debtor received a loan repayment on April 27, 2012 in the amount of $10,000.00 from "JGKM," and a loan repayment on May 11, 2012 in the amount of $7,000.00 from "JGKM."

[20] The Debtor received a loan repayment on May 30, 2012 in the amount of $10,000.00 from "JGKM," and a loan repayment on June 20, 2012 in the amount of $10,000.00 from "JGKM."

[21] The Debtor received a loan repayment on July 6, 2012 in the amount of $10,000.00 from "JGKM."

[22] The Debtor received a distribution on February 7, 2012 in the amount of $4,000.00 from the Grasso Family Partnership.

[23] The Debtor received a distribution on March 9, 2012 in the amount of $4,000.00 from the Grasso Family Partnership.

[24] The Debtor received a distribution on May 7, 2012 in the amount of $8,141.00 from the Grasso Family Partnership.

[25] The Debtor received a distribution on June 8, 2012 in the amount of $5,000.00 from the Grasso Family Partnership.

[26] The Debtor received a distribution on July 10, 2012 in the amount of $4,000.00 from the Grasso Family Partnership.

[27] The Debtor received a distribution on July 27, 2012 in the amount of $10,000.00 from Curtis Investors, a distribution on August 2, 2012 in the amount of $4,000.00 from Curtis Investors, a distribution on August 7, 2012 in the amount of $4,000.00 from the Grasso Family Partnership, and a distribution on August 22, 2012 in the amount of $10,000.00 from Curtis Investors.

the partnership distributions reported by the March 2012 operating report.  Transcript, 8/28/2012,

41:3-5.  When asked whether he was aware of the amount of the loans owed to him, the Debtor

stated: "No. I don't have – I don't know the amounts."  Transcript 8/28/2012, 38:20.  With

regard to the amount of the repayments received by the Debtor, the Debtor stated: "I don't know

– I don't know it from week-to-week or from month-to-month what my – what my controller

does to book the loan repayments, no, I don't know."  Transcript, 8/28/2012, 41:20-22.

At the August 28th hearing, the Debtor attempted to recharacterize the loan payments.

When asked what he would do to fund his post-petition expenses if he did not receive further

loan repayments, the Debtor stated:

> I don't believe 100 percent of them are loan repayments.  There is work that I do
> every single day on every one of these partnerships.  And if you think I do it for
> free, I go – I work at – I come to the office.  I work seven days a week.  Actually
> six days a week, and sometimes I'm there on Sundays, as well, and for the benefit
> of all my partnerships.  I don't have any other – I don't have a second job, if
> you're asking me that.  But I assume that these – my partnerships will be able to –
> that I'm involved in will be able to pay me for my time.

Transcript 8/28/2012, 39:7-18.

When asked the source of the May loan repayments, the Debtor testified "I'm not sure

what specifically the loans were paid – I don't know the specific partnerships it came from."

Transcript 8/28/2012, 43:9-15.  Addressing the source of the March loan repayments, he

testified:

> I don't know specifically which partnership.  They all owe me a lot of money, but
> I'm not sure which one actually paid me.

Transcript, 8/28/2012, 35:13-15.[28]

Addressing the nature of the funds the Debtor received from entities post-petition, the

---

[28] In addition to not disclosing the actual source of the loan repayments, the Debtor was a difficult and evasive
witness.  For instance, when asked what money he was owed, the Debtor responded "Green money."  Transcript
8/28/2012, 35:18.

Debtor stated:

> I would imagine it's paid back of investment or money that I have to put in. And
> depending on how the accountant and my – and the CFO have treated that from
> the standpoint of an accounting, it would be booked in either was a repayment of
> loan or – I'm not sure exactly.

Transcript, 9/5/2012, 18:22-19:5.

The Debtor's testimony was insufficient to explain the material omission of his interest in the loans from his Schedule B. Moreover, the fact that the Debtor did disclose his equity interest in the partnerships was not sufficient to disclose the debt obligations owed to him by these same entities. The essential purpose of bankruptcy is to effect the orderly distribution of assets among a debtor's creditors. *Begier v. IRS*, 496 U.S. 53, 58 (1989). As a result, a debtor owes a duty to disclose all assets that *may* be part of the debtor's estate. *United States v. Beard*, 913 F.2d 193, 197 (5th Cir. 1990) (stating that debtor must disclose all assets even if likely to later be excluded from estate); *United States v. Jackson*, 836 F.2d 324, 330 (7th Cir. 1987) (noting that debtor must disclose even those assets whose bankruptcy status is uncertain); *United States v. Cherek*, 734 F.2d 1248, 1254 (1984) (stating that debtor has duty to disclose to court existence of assets whose status in bankruptcy is undetermined). The fact that the Debtor was not sure, at the time he drafted his schedules, whether he would receive loan repayments did not excuse his failure to disclose in his schedules these potential interests. *See, e.g.*, *Walsh v. Helsel, et. al. (In re Helsel)*, 326 B.R. 591, 600 (Bankr. W.D. Pa. 2005).

Even if this Court had assumed that the Debtor's disclosure of his equity interests in the partnership interest was sufficient to disclose the partnerships' debt obligations to him, the Debtor failed to provide his creditors any basis to determine under what circumstances his estate is entitled to payment. Ideally, the Debtor would have produced copies of the loan agreements evidencing these obligations. Not only did he fail to produce such documents, his testimony

further clouded his creditors' ability to determine when his estate would be entitled to payments.

Aggravating matters, the Debtor's testimony consistently conflated himself with his various partnership interests.  He did not state that in the past the partnerships did not repay the loans.  He stated that in the past *he* did not repay the loans *to himself*.  Transcript 8/28/2012, 45:21-22 ("I don't think I've ever paid back some of my loans.").  His testimony suggested that he controls whether repayments are made and that the occurrence of loan repayments is entirely dependent upon his personal financial needs and not the business realities of the partnership entities or the observation of any contractual requirements.  When he needs money to fund his personal expenses, he directs the partnerships to make "loan repayments" to him.

Considering that the Debtor also testified that he spends six or seven days per week working on behalf of these entities, it was unclear why he would have no knowledge as to which entity was making loan repayments on his behalf.  The fact that only one of the entities was actually making loan repayments should not be something unknown to a person who spends as much time as the Debtor claimed to spend working on these matters.  On the six operating reports filed by the Debtor prior to this Court's decision to appoint a Chapter 11 Trustee, the Debtor stated he received loan repayments in the total amount of $92,000.00 and partnership distributions in the total amount of $25,141.00.

These amounts are not insignificant and the Debtor's creditors were entitled to a coherent explanation of why he and his estate were entitled to these payments.  If he was in fact ignorant as to the source and nature of the loan repayments, his obligations as a debtor-in-possession required him to educate himself.  The Debtor's interest in the loan repayments was not some obscure asset.  Rather, the Debtor was exclusively relying upon the loan repayments to fund his reorganization.

Other problems were evident in the Debtor's schedules when compared to the contents of his operating reports.  The Debtor stated in his schedule J the total amount of his average monthly expenses was $15,625.00.  Yet, in the six operating reports filed by the Debtor, his monthly expenses averaged $22,082.97 and ranged between $17,835.11 and $24,438.69.  His actual expenses exceeded his projections by almost 50%.  Problematically, he supplied no explanation for this discrepancy.

Finally, the Debtor submitted conflicting statements with regard to the income of his non-debtor wife.  The Debtor's Schedule I states that his wife, Donna Grasso, has no income of any sort.  Although stating that he receives on average $16,000.00 in distributions per month, the Schedule I specifically states that the Donna Grasso receives $0.00 in distributions per month.  Despite the contents of the Debtor's schedules, the Debtor stated in his Second Response:

> The Grasso Family Partnership distributes monies monthly for the individual benefit of both the Debtor and Donna Grasso, therefore, contrary to prior conjecture; *Mrs. Grasso does have an independent source of income to pay her personal bills*.

Second Response, ¶19 (emphasis).  Despite stating that his wife *does* have personal income, the Debtor never corrected his previously-filed Schedule I in which the Debtor stated that his wife *does not* have personal income.

### V.    <u>Failure to Obtain Approval of Employment of Professionals</u>

A trustee or debtor-in-possession may employ attorneys, accountants, appraisers, auctioneers, and other professionals to assist the trustee or debtor-in-possession in carrying out his or her duties.  However, the trustee or debtor-in-possession may do so, only "with the court's approval" 11 U.S.C. § 327(a).  The Third Circuit has held that §327(a) contemplates "prior approval."  *Matter of Arkansas Co. Inc.*, 798 F.2d 645, 649 (3d Cir. 1986) (emphasis added).  A bankruptcy court may not approve the employment of a professional, for services already

performed by the professional, unless the court finds (1) that it would have approved the

employment had the professional applied in advance, and (2) that there are "extraordinary

circumstances" excusing the professional's failure to get advance approval. *F/S AirLease II, Inc.*

*v. Simon*, 844 F.2d 99, 105 (3d Cir. 1988); *Matter of Arkansas Co.*, 798 F.2d 645, 650 (3d Cir.

1986).

The Debtor repeatedly stated that is he dependent upon Mr. Kaplan to explain the nature

of his financial circumstances and carry out his duties as a debtor-in-possession. The Debtor has

stated that he delegated to Mr. Kaplan the responsibility for preparing his financial disclosures

on behalf of his estate. Transcript 8/28/2012, 54:3-56:7; Audio recording dated 10/15/2012 @

12:47 pm, Bky. No. 12-11063MDC; Audio recording dated 10/15/2012 @ 3:14 pm, Bky. No.

12-11063MDC. Mr. Kaplan is indubitably providing accounting services necessary for the

administration of the Debtor's estate. *See, e.g., In re Renaissance Residential of Countryside,*

*LLC*, 423 B.R. 848, 860-61 (Bankr. N.D. Ill. 2010). However, from this Court's review of the

record extant at the time of its decision to appoint a trustee, it did not appear that Mr. Kaplan was

an employee of the Debtor. *See, e.g., F/S Airlease II, Inc. v. Simon*, 844 F.2d 99, 108 (3d Cir.

1988) (recognizing §327(b) not applicable because party was not employed by the debtor).

Rather, it appeared that Mr. Kaplan was an employee of one or more of the entities in which the

Debtor held an ownership interest. In such circumstances, this Court expected the Debtor to seek

approval from bankruptcy courts to retain Mr. Kaplan to perform accounting services on behalf

of his estate.

The fact that Mr. Kaplan was performing such services for free or on behalf of one or all

of the entities that the Debtor controls did not suspend this requirement. The Debtor's failure to

submit an application for retention of Mr. Kaplan prevented this Court from testing whether his

services would benefit the interests of the estate and whether Mr. Kaplan may suffer from a

conflict of interest that would otherwise prevent his employment by the Debtor's estate.  *See,*

*e.g., In re Liebfried Aviation, Inc.*, 445 B.R. 30, 34 (Bankr. D. Mass. 2011) (recognizing that

debtor's failure to submit application for employment prevented the court from evaluating

accountant's "purported disinterestedness and lack of a material adverse interest as regards the

debtor and the bankruptcy estate").

**VI.**    **The Debtor's Animus for his Creditors' Legitimate Efforts to Obtain Information Regarding Estate Assets**

This Court also found that appointment of a Chapter 11 Trustee was warranted due to the

animosity held by the Debtor for his creditors legitimate attempts to evaluate whether sufficient

assets are available to satisfy their claims.  *In re Marvel Entertainment Group, Inc*., 140 F.3d

463, 474 (3d Cir. 1998) (upholding the district court's determination that "deep seated conflict

and animosity between a debtor and its creditors" was "at the heart of this bankruptcy case" and

that a trustee would most efficiently serve to implement a reorganization plan in the best interests

of the parties and the estate); *In re Taub*, 427 B.R. 208, 228 (Bankr. E.D.N.Y. 2010) ("A debtor's

ability to work with retained professionals on a consistent and productive basis is one indicator

of successful management of the Chapter 11 reorganization process.").  The record before the

Court clearly reflected that the Debtor exhibited general intransigence with regard to disclosing

to this Court and his creditors the nature of his financial affairs.  He routinely failed to provide

answers that were responsive to the questions he was asked.  Despite his voluntary decision to

avail himself of the benefits of bankruptcy, the Debtor appeared wholly unwilling to accept any

of its burdens.

**VII.**   **Balance of Benefits of Appointing a Chapter 11 Trustee Against Costs Associated with Displacement of Debtor-in-Possession**

In deciding whether appointment of a Chapter 11 Trustee was warranted, this Court's final inquiry underlying its issuance of the Trustee Order was whether the costs associated with appointment would outweigh the benefits that would accrue to the Debtor's estate as a result of his removal.  The Third Circuit has recognized that the benefits of appointment of a Chapter 11 Trustee must be balanced against the costs imposed on the estate by the appointment.  *Official Committee of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery, et al.*, 330 F.3d 548, 577 (3d Cir. 2003) (recognizing that the incremental costs of appointment of a trustee typically outweigh the benefit that may accrue to the debtor's estate).  Ultimately, this Court found that the benefits of appointment would outweigh the costs incurred by the Debtor's displacement.

The Debtor admitted that he is generally unfamiliar with the nature of estate assets and the sources of his post-petition income.  He testified that he is totally reliant on his accountant to supply him with this information.  Unlike cases involving debtors who have provided adequate disclosure regarding estate assets, *see, e.g., In re Clinton Centrifuge, Inc.*, 85 B.R. 980, 985 n.6 (Bankr. E.D. Pa. 1988) (finding that the debtor had maintained "careful records" that enabled creditors to monitor the activities of the debtor-in-possession and therefore), this Court found that the Debtor's unwillingness to provide reasonable disclosure regarding his affairs as a debtor-in-possession precluded his creditors from monitoring his activities as a debtor-in-possession.  For this reason, this Court found that the appointment of a Chapter 11 Trustee would likely reduce the estate's administrative expenses as it would avoid much of the contentious litigation precipitated by the Debtor's general intransigence.  *See, e.g., In re Nortel Networks, Inc.*, 669 F.3d 128, 143 (3d Cir. 2011) ("No party will benefit if the parties continue to clash over every

statement and over every step in the process.  This will result in wasteful depletion of the

available assets from which each seeks a portion.").  For example, had the Debtor's disclosed in

his operating reports his receipt of the proceeds of the sale of the Sansom Property his estate

would have been spared significant costs and attorneys' fees incurred at the various hearings

addressing this issue.  This Court further observed that the Debtor's eleventh-hour efforts to

replace his counsel and financial advisors were not only insufficient to remedy his prior

misconduct, *see, e.g., In re Sharon Steel Corp.*, 871 F.2d 1217, 1229 (3d Cir. 1989) ("Corrective

measures that are too few too late cannot defeat a change in command."), but also indicated that

allowing the Debtor to remain in possession would result in increased administrative costs

incurred by his proposed replacement professionals as they get up to speed with the details of

this proceeding.[29]  For these reasons, this Court found that appointment of an independent trustee

was warranted and therefore issued its Trustee Order affecting that end.

### THE SUFFICIENCY OF THE DEBTOR'S MOTION FOR RECONSIDERATION

Having reviewed and elaborated upon this Court's findings stated in the Trustee Order

appointing the Chapter 11 Trustee, this Court will now address the legal sufficiency of the

Debtor's Motion.  Pursuant to Fed. R. Civ. P. Rule 59(e) made applicable to these proceedings

by Fed. R. Bankr. P. 9023, a party must rely on one of three grounds: (1) the availability of new

evidence not previously available, (2) an intervening change in controlling law, or (3) the need to

correct a clear error of law or to prevent manifest injustice.  *Burch v. Milberg Factors, Inc.*, 662

F.3d 212, 230 (3d Cir. 2011); *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010); *Max's*

---

[29] This Court afforded no weight to the Debtor's threats to frustrate his estate's reorganization by refusing to provide
assistance to a potential Chapter 11 Trustee.  Despite earning no personal services income, the Debtor is receiving
monthly payments of $17,310 from his estate.  "Postpetition payments to an individual debtor for services rendered
to the estate are administrative expenses."  *In re Herberman*, 122 B.R. 273, 283 (Bankr. W.D. Tex. 1990) (quoting
H.R.Rep. No. 595, 95th Cong., 1st Sess. 355 (1977)).  Accordingly, if the Debtor suspends providing any actual
benefits to his estate, this Court expects that it will be required to revisit whether the Debtor remains eligible to
receive the monthly payments.

*Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (*citing N.*

*River Ins. Co. v. CIGNA Reins. Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995)).  In evaluating whether

reconsideration is warranted, this Court observes that reconsideration is an extraordinary remedy

that should be sparingly granted.  *In re Titus*, 479 B.R. 362, 367 (Bankr. W.D. Pa. 2012).

 The Motion does not allege the occurrence of a change in law or newly discovered

evidence.  The Motion also does not argue that this Court's findings were illogical or

implausible.  The Motion also did not argue that this Court had premised the Trustee Order on

factual determinations outside the adversarial issues presented by the parties.  Without

identifying which of this Court's factual findings were incorrect, the Motion baldly asserted that

this Court's findings were not supported by the record.  It was not until the January 15th hearing

that the Debtor identified this Court's finding with regard to the retention of Mr. Kaplan as a

basis for reconsideration.  No other findings were identified at the January 15th Hearing.

 Despite the Debtor's passing reference to the factual sufficiency of this Court's findings,

the central premise of the Motion relates to alleged injuries caused to Debtor by the public

dissemination of this Court's findings.  The Debtor posits that certain of the factual findings

contained in the Trustee Order will have a deleterious impact on his personal business reputation

thereby frustrating his ability to assist the reorganization of his estate.  Within the context of

Rule 59(e), the Debtor argues that manifest injustice results from the inclusion within the Trustee

Order of factual findings that allegedly hamper the ability of the Debtor to assist his

reorganization.  While the meaning of manifest injustice is not defined, courts have settled on the

following formulation:

> [M]anifest injustice is an error in the trial court that is direct, obvious, and
> observable, such as a defendant's guilty pleas that is involuntary or that is based
> on a plea agreement that the prosecution rescinds.  A party may only be granted
> reconsideration based on manifest injustice if *the error is apparent to the point of*

> *being indisputable*. In order for a court to reconsider a decision due to manifest
> injustice, the record presented must be so patently unfair and tainted that the error
> is manifestly clear to all who view it.

*In re Roemmele*, 466 B.R. 706 (Bankr. E.D. Pa. 2012) (emphasis added and quotations omitted);

*see also In re Green Goblin, Inc.*, Bky. No. 09-11239, 2012 WL 1971143, *1, n.2 (Bankr. E.D.

Pa. May 31, 2012) (quoting *Roemmele* manifest injustice definition); *In re Titus*, 479 B.R. 362,

367-68 (Bankr. W.D. Pa. 2012) (same).

Framed in the context of the manifest injustice inquiry, the Debtor argues that this Court

committed indisputable error by addressing in the Trustee Order the totality of the Debtor's

conduct rather than limiting its factual findings to barest necessary to meet the threshold for

appointment.  Because a Chapter 11 Trustee was appointed to protect the interests of creditors

and his estate, the Debtor argues any order appointing a trustee should not include any factual

findings that may compromise the interests of creditors and the estate.  In effect, the Debtor is

arguing this Court is required to brush under the proverbial carpet his various misdeeds because

disclosure of his conduct could hypothetically harm his estate and creditors.  The Debtor has

failed to cite any authority for this principle and this Court would be ill-advised to adopt a

principle that requires this Court to censor its factual findings.  While bankruptcy courts do serve

as a means to rehabilitate a debtor through the discharge of a debtor's financial obligations, this

Court doubts its powers include the authority to absolve, or otherwise protect, a debtor from the

opinions of him that may arise as a result of his wrongful conduct.[30]

Whether or not this Court's factual findings will cause harm to the Debtor, their inclusion

in the Trustee Order does not constitute indisputable error.  Contrary to the Debtor's arguments,

this Court determines that it was required to identify in its Trustee Order *all of the reasons for*

---

[30]  In fact, this Court recognizes that it is obligated by federal law to report any violation of law relating to insolvent
debtors.  18 U.S.C. §3057(a).

*appointment of a Chapter 11 Trustee*. To determine whether appointment is warranted, bankruptcy courts are required to consider the totality of the circumstances. *See, e.g., In re Sharon Steel Corp.*, 871 F.2d 1217, 1228 (3d Cir. 1989) (observing that bankruptcy court should consider "the totality of the circumstances" to determine whether appointment of a chapter 11 trustee is warranted). It follows that any order appointing a Chapter 11 Trustee must address all of this Court's findings, even those that may be injurious to the Debtor's reputation, that were relevant to whether appointment of a Chapter 11 Trustee was warranted. It also follows from the fact that appointment of a Chapter 11 Trustee is an extreme remedy, *Official Committee of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery, et al.*, 330 F.3d 548, 577 (3d Cir. 2003) ("Appointing a trustee in a Chapter 11 case is an 'extraordinary' remedy"); *In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3d Cir. 1989) (stating that appointment of a trustee "should be the exception rather than the rule"), that an order appointing a trustee should be predicated on findings of extreme conduct that would likely reflect poorly on all parties involved.

At least two policy considerations buttress this Court's determination that inclusion of all of its findings relating to the appointment of a Chapter 11 Trustee was not indisputable error. First, this Court recognizes that public confidence in the openness of bankruptcy proceedings demands that this Court state the reasons for its orders. *See, e.g., In re Cendant Corp.,* 260 F.3d 183, 192 (3d Cir. 2001) ("access to civil proceedings and records promotes 'public respect for the judicial process' and helps assure that judges perform their duties in an honest and informed manner"); *In re Peregrine Systems, Inc.*, 311 B.R. 679, 687 (D. Del. 2004); *In re Food Management Group, LLC*, 359 B.R. 543, 553 (Bankr. S.D.N.Y. 2007) ("The public interest in openness of court proceedings is at its zenith when issues concerning the integrity and

transparency of bankruptcy court proceedings are involved"). Without a fulsome explanation for

its decisions, the public cannot be sure that this Court's decisions are not arbitrary or motivated

by some improper purpose.

Second, the Debtor's proposal would undermine the appellate process. For purposes of

appellate review, this Court is required to enumerate the reasons for its decisions. Fed. R. Civ. P.

52(a)(1); *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970) ("the decision maker should state the

reasons for his determination and indicate the evidence he relied on"); *State Farm Mut. Auto. Ins.*

*Co. v. Midtown Medical Center, Inc.*, 388 Fed. Appx. 125, 129 (3d Cir. 2010) (vacating order

where lack of findings precluded appellate review); *Itel Containers Intern. Corp. v. Atlanttrafik*

*Exp. Service Ltd.*, 909 F.2d 698, 704 (2d Cir. 1990) (same); *Cotter v. Harris*, 650 F.2d 481, 482

(3d Cir. 1981) (requiring administrative law judges "to furnish explanations adequate for the

court to exercise its review function"). If this Court was required by some principle to omit from

its orders the grounds of its decisions, how would any appellate court be able to discern whether

this Court acted within its discretion? Even if the Debtor's ability to reorganize will in fact be

hamstrung by this Court's findings,[31] the interests of creditors or the estate cannot be relied upon

to trump the proper administration of our legal system.

In reaching this result, this Court found guidance from the provisions of 11 U.S.C. §107

and Fed. R. Bankr. P. 9018. Both provisions address when a bankruptcy court may seal

documents. While not before this Court, this Court does find the standard of review applied to

§107 motions illustrative of why the Debtor's alleged harm is an insufficient ground to amend

the Trustee Order. Section 107(b) and Rule 9018 do not define what constitutes "scandalous or

defamatory matter." However, courts applying these provisions have universally recognized that

---

[31] The Debtor has presented no evidence regarding in what regard the business community held him and whether the issuance of the Order would in fact harm his reputation.

the fact that information may be damaging to a debtor's reputation is not sufficient to seal a

document.  *See, e.g., In re Neal*, 461 F.3d 1048, 1054 (8th Cir. 2006) ("the unintended, potential

secondary consequence of negative publicity… is regrettable but not a basis for sealing the

filing."); *In re Gitto Global Corp.*, 422 F.3d 1, 11 (1st Cir. 2005) (holding that filings in

bankruptcy court may not be sealed solely because they have a detrimental impact on a party's

reputation); *In re Food Management Group, LLC*, 359 B.R. 543, 553 (Bankr. S.D.N.Y. 2007)

("Section 107(b) is not intended to save the debtor or creditors from embarrassment.").  If

damage to a debtor's reputation is not sufficient to seal a document, then it is certainly not

sufficient to require this Court amend the Trustee Order to limit the scope of its factual findings.

Contrary to the Debtor's arguments, any harm that may accrue to the interest of creditors

and his estate as a result of this Court's recognition of the Debtor's bad acts does not mandate

that this Court restrict the scope of its findings.  In determining whether appointment of a

Chapter 11 Trustee was warranted, this Court was required to consider the totality of the

circumstances.  Each of the findings contained in the Trustee Order were relevant to this Court's

determination that the Debtor's conduct manifested the extreme circumstances that are a

prerequisite to appointment of a Chapter 11 Trustee pursuant to both §1104(a)(1) and

§1104(a)(2).  Accordingly, this Court believes that its decision to include all of its relevant

findings, rather than some subset, does not constitute indisputable error.

The Debtor's appeal to equity is without merit.  *See, e.g., In re Combustion Engineering,

Inc.*, 391 F.3d 190 (3d Cir. 2004) (recognizing that a bankruptcy's equitable powers provided by

§105 do not "authorize the bankruptcy courts to create substantive rights that are otherwise

unavailable under applicable law, or constitute a roving commission to do equity.").  This Court

can identify no principle that would require this Court to absolve the Debtor from the

consequences of his bad acts.  *See, e.g.*, *In re Firrone*, 272 B.R. 213, 218 (Bankr. N.D. Ill. 2000)

("A debtor who repeatedly fails to comply with the requirements of the Code and Rules cannot

complain of the consequences.").  If the Debtor believes that such a principle does exist, his

remedy lies with the District Court.  Disagreement is not sufficient to justify reconsideration of

the Trustee Order.  *Aybar v. Crispin–Reyes,* 118 F.3d 10, 16 (1st Cir. 1997); *In re Congoleum*

*Corp.*, 414 B.R. 44, 64 (D.N.J. 2009); *In re Titus*, 479 B.R. 362, 367 (Bankr. W.D. Pa. 2012); *In*

*re Carmichael*, 448 B.R. 690, 692 (Bankr. E.D. Pa. 2011).

From this Court's review of the extensive factual record established over three days of

hearings and multiple memoranda submitted by various interested, this Court holds that its

findings contained in the Trustee Order were supported by ample evidence.  However, this Court

now acknowledges that its finding contained in paragraph L(13) of the Trustee Order was outside

the adversarial issues presented by the parties.  Notwithstanding that the Debtor waited until the

January 15th hearing to raise the issue of the propriety of this Court's findings relating to the

employment of Mr. Kaplan, this Court invited all parties in interest to address the issue in post-

hearing briefs, an invitation that all parties have declined, and agreed to take the matter under

advisement.

Upon review of the record, this Court has determined that the issue was not among the

adversarial issues presented by the parties.  While this Court did raise the issues of whether the

Debtor failed to comply with 11 U.S.C. §327 when he retained Bruce Kaplan to provide

accounting services on behalf of the Debtor, the parties did not.  By deciding the issue without

conducting an evidentiary hearing to address it, it appears that this Court may have committed an

error of law that would warrant reconsideration of the Trustee Order.  *See, e.g., U.S. v. Fiorelli*,

337 F.3d 282 (3d Cir. 2003).  Consistent with *Fiorelli*, this Court may consider its failure to

conduct an evidentiary hearing on the issue of whether the Debtor violated §327 by failing to submit to this Court an application to employ Bruce Kaplan to constitute an error of law and therefore grant the Motion on this basis. For this reason, this Court will grant the Motion and strike paragraph L(13) from its Trustee Order. This Court will leave for another day its determination of whether the Debtor was required to obtain this Court's approval of his employment of Mr. Kaplan. The Debtor will be permitted, at a later date, to address whether such an application was required.

**S**UMMARY

For the reasons stated, this Court will grant the Motion to the extent the Debtor requests this Court amend the Trustee Order to remove its findings contained in paragraph L(13) of the Trustee Order. Otherwise, this Court will deny the Motion. An appropriate order will be entered.

By the Court:

_____
MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

Dated: April 4, 2013