UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 7 |
| JOSEPH GRASSO, | : | |
| DEBTOR. | : | BANKRUPTCY NO. 12-11063-MDC |

# <u>MEMORANDUM</u>

BY: MAGDELINE D. COLEMAN, UNITED STATES BANKRUPTCY JUDGE

## <u>INTRODUCTION</u>

Now pending before this Court is the Second Interim and Final Application for Compensation

and Reimbursement of Expenses of the Law Offices of Paul J. Winterhalter, P.C. dated December 28,

2012 (the "Final Application"), wherein the Law Offices of Paul J. Winterhalter, P.C. (the "Firm"),

counsel for Joseph Grasso (the "Debtor"), requested (i) compensation in the amount of $69,468.75 for

actual and necessary services rendered, and (ii) $566.56 for the reimbursement of expenses expended on

behalf of the administration of the Debtor's Chapter 11 estate for the Period of July 1, 2012 through

October 31, 2012.

Previously, the Firm filed a First Interim Application for Compensation and Reimbursement of

Expenses of the Law Offices of Paul J. Winterhalter, P.C. dated July 17, 2012 (the "First Application,"

collectively with the Final Application, the "Applications"), wherein the Firm requested (i) compensation

in the amount of $47,912.50 for actual and necessary services rendered, and (ii) $1,388.66 for the

reimbursement of expenses expended on behalf of the administration of the Debtor's Chapter 11 estate for

the Period February 6, 2012 through June 30, 2012.[1]  The Applications are pending in this Chapter 7

bankruptcy case that was converted from Chapter 11 by this Court's Order dated June 12, 2013, and seek

---

[1] On August 17, 2012, this Court entered an Order (the "First Fee Order") wherein this Court allowed compensation in the amount of $47,912.50 for actual and necessary services and $1,388.66 for reimbursement of expenses in serving the Debtor.

compensation from the estate pursuant to 11 U.S.C. §503 for services rendered prior to this Court's

appointment of a Chapter 11 Trustee.

The Firm received two retainer payments: (1) a prepetition payment in the amount of $25,000

(the "Prepetition Retainer") paid by Avalon Breeze Development, LLC, an entity controlled by the

Debtor;[2] and (2) a postpetition payment in the amount of $30,000 (the "Postpetition Retainer,"

collectively with the Prepetition Retainer, the "Retainer Payments") paid by Curtis Investors, L.P.

("Curtis Investors"), an entity controlled by the Debtor.[3]  All compensation previously paid to the Firm is

subject to disgorgement pending this Court's final §330 determination.  11 U.S.C. §330(a)(5); *In re*

*Mariner Post–Acute Network, Inc*., 257 B.R. 723, 730 (Bankr. D. Del. 2000).

Madison Capital Company, LLC ("Madison") filed an Objection to the Final Application dated

February 5, 2013 (the "Madison Objection").  In the Madison Objection, Madison requested that pursuant

to §328(c) this Court deny the payment of any compensation to the Firm, and pursuant to §330(a)(5)

order the disgorgement of any compensation previously paid to the Firm pursuant to the First Application

because (1) the Firm acquired, during the course of its representation, an interest adverse to the Debtor's

Chapter 11 estate; (2) the Firm billed the Debtor's Chapter 11 estate for services performed on behalf of

15th and Sansom, L.P. (the "Sansom Partnership"); (3) Paul J. Winterhalter, Esq. ("Winterhalter"), the

primary attorney from the Firm representing the Debtor, failed to be forthcoming with the Court when he

denied his involvement in the purchase of the Proof of Claim dated March 15, 2012, filed by Wilmington

Savings Fund Society, FSB ("WSFS") evidencing a secured claim against the Debtor in the amount of

$929,259.69 (the "WSFS Claim"); and (4) the Firm's services injured the Debtor's Chapter 11 estate by

facilitating the diversion of estate assets.

---

[2] The receipt of the Prepetition Retainer was disclosed to this Court on February 7, 2012, in the Application to Employ Paul J. Winterhalter, P.C. as Counsel for the Debtor.

[3] The receipt of the Postpetition Retainer was disclosed to this Court on August 10, 2012, in the Supplemental Statement on the Disclosure of Compensation of Attorneys for Debtor Pursuant to Federal Rule of Bankruptcy Procedure 2016(b).

The Madison Objection was later joined by Christine C. Shubert, the Chapter 7 Trustee (the "Trustee," together with Madison, the "Objecting Parties") who filed an Objection to the Final Application dated May 24, 2013 (the "Trustee Objection," collectively with the Madison Objection, the "Objections"). The Trustee requested that this Court deny the Final Application and grant any such other relief that may be appropriate, including the disgorgement of any compensation previously paid to the Firm pursuant to the First Application, because of (1) the grounds asserted in the Madison Objection; (2) the Debtor's Chapter 11 estate did not receive any actual benefit from the services provided by the Firm; and (3) the Firm's services, whether by act or omission, facilitated the diversion of estate assets and therefore caused injury to the Debtor's Chapter 11 estate.

In its defense, the Firm contends that Winterhalter represented the Debtor in connection with the purchase of the WSFS Claim and therefore did not represent an interest adverse to the Debtor's Chapter 11 estate. Transcript 9/24/2013, 20:21-21:14. Additionally, the Firm argues that Winterhalter's representation, at the time the services were rendered, was beneficial to the administration of the estate.[4] Finally, the Firm argues that any injury to the Debtor's Chapter 11 estate, including the diversion of estate assets, may not be attributed to Winterhalter's conduct.

As discussed below, this Court will sustain the Objections and deny the Applications in their entirety due to, among other reasons, (1) the existence of an actual conflict that arose from Winterhalter's admitted simultaneous representation of the Debtor's estate and the Debtor's adverse personal interests, and (2) Winterhalter's wholesale abdication of his fiduciary and professional obligations that resulted in the diversion of estate assets and substantial harm to the Debtor's estate. This Court is convinced that Winterhalter's conduct is sufficiently extreme so as to warrant a complete denial of compensation and will order that the Firm disgorge to the Trustee any payments, including but not limited to the Retainer

---

[4] Winterhalter attempted to rehash arguments that the purchase of the WSFS Claim benefitted the Debtor's estate, *see, e.g.,* Transcript 9/24/2013, 67:9-68:68:10, an argument previously rejected by this Court. *In re Grasso*, 490 B.R. 500, 510-11 (Bankr. E.D. Pa. 2013) ("Grasso I") (dismissing the merit of the "Debtor's *post hoc* justification for his violation of his fiduciary obligations and his diversion of estate assets).

Payments, previously received as compensation for services performed in the Firm's capacity as counsel for the debtor-in-possession.[5]

## **BACKGROUND**

Consistent with this Court's prior rulings, Winterhalter's involvement in the sale of 1500-1504 Sansom Street, 124, 134 S. 15th Street, 1502-05 Moravian Street, Philadelphia (the "Sansom Property") and the subsequent use of the Debtor's share of the proceeds of that sale to purchase the WSFS Claim is central to this Court's consideration. In this Court's Order dated October 16, 2012 (the "Appointment Order") that was further amplified by its Memorandum Opinion dated April 4, 2013,[6] this Court made substantial findings relating to the conduct of the Debtor while he remained in possession including his involvement with the Sansom Partnership's alleged purchase of the WSFS Claim.[7] The Objecting Parties rely in part on the factual findings contained therein. The findings contained in the Appointment Order are relevant and determinative of this Court's consideration of the Applications and whether, during the course of its representation of the Debtor's estate, the Firm acquired an interest adverse to the estate.[8]

After months of continuances, this Court held a hearing on September 24, 2013 (the "Hearing"), to address the Final Application and the Objections. The Firm, Madison and the Trustee appeared at the

---

[5] This Court limits its decision to the issue of the Firm's entitlement to compensation from the estate and is made without prejudice to any further action that may be required of this Court, or commenced by an appropriate party in interest against the Firm or Winterhalter in connection with their representation of the Debtor in this case.

[6] Grasso I.

[7] This Court notes that it has previously determined that the Sansom Partnership was not the purchaser of the WSFS Claim. Rather, this Court determined that *the Debtor was the purchaser.* Grasso I, 490 B.R. at 507 ("Contrary to the Debtor's characterization of this transaction, this Court found that he, and not the Sansom Partnership, was the purchaser of the WSFS Claim"); Transcript 10/15/2012, 388:1 ("The Debtor bought the claim."); 390:10-16 ("we know he bought it"); 402:23-403:6 ("Mr. Grasso and his counsel talked about how they were going to get this done...He bought it. That's my finding… I find he bought it."). No party has appealed those findings and those findings are now the law of the case. *See, e.g., Pub. Interest Research Group. v. Magnesium Elektron*, 123 F.3d 111, 116 (3d Cir. 1997) ("The law of the case doctrine directs courts to refrain from re-deciding issues that were resolved earlier in the litigation.").

[8] For example, this Court determined that "Debtor's personal interests were adverse to his estate's interest." Grasso I, 490 B.R. at 517. Because the Firm admits that Winterhalter represented the Debtor in connection with the advancement of the Debtor's personal interests pursuant to "an intentional scheme to obscure from this Court and his creditors the nature of his finances," *Id.* at 506, the Firm necessarily admits facts that allow for the imputation of the Debtor's conflict to the Firm. Pa. R.P.C. 1.10.

Hearing.  At the Hearing, this Court heard the testimony of Bonnie R. Golub ("Golub") and the testimony of Charles N. Persing ("Persing").  Golub was called by the Firm in support of its Application.  Persing was called by the Trustee in support of the Objections.

Golub is an experienced bankruptcy attorney licensed to practice in the Commonwealth of Pennsylvania and is employed by Weir & Partners LLP.  Golub represented WSFS in connection with the pre- and postpetition collection of the WSFS Claim.  According to her recollection, Golub testified that her discussions with Winterhalter relating to the purchase of the WSFS Claim were limited to the facilitation of the pre-negotiated purchase of the WSFS Claim.  She was specific in her recollection that no attorney from the Firm was involved in the negotiation of the price paid for the WSFS Claim.  Rather, Golub stated that the purchase of the WSFS Claim, including the purchase price, was negotiated by David Grasso directly with her client.  Golub specifically stated that she could not recall having discussions with Winterhalter regarding the amount of the price to be paid by the Sansom Partnership to acquire the WSFS Claim.  To the extent Golub did discuss with Winterhalter the consideration to be paid, Golub testified that she conveyed to Winterhalter her client's interest in the payment of its attorneys' fees incurred in connection with the collection of the WSFS Claim in addition to the $500,000 purchase price. With regard to the source of the funds, Golub testified that it was her understanding that the funds paid to WSFS originated from Grasso Holdings, an entity controlled by David Grasso.  With regard to Winterhalter's role in the transaction, Golub testified that it was not her belief that Winterhalter was representing the Sansom Partnership in connection with its purchase of the WSFS Claim.  Rather, Golub testified that she only communicated with Winterhalter because the attorney for the Sansom Partnership, David Shafkowitz, was "difficult to communicate with."  Transcript 9/24/2013, 45:3-6.  Golub further testified that she had discussions with Winterhalter wherein they recognized a different attorney would be required to file the notice of transfer evidencing the acquisition of the WSFS Claim by the Sansom Partnership.

Persing is an accountant employed by Bederson & Company LLP, the financial advisor to the

Trustee in both the Debtor's Chapter 11 and 7 cases.  Persing's testimony was consistent with this Court's

prior findings relating to the purchase of the WSFS Claim.  For example, Persing confirmed (1) this

Court's previous determination that $500,000.00 of the Debtor's share of the proceeds of the sale of the

Sansom Property was diverted to fund the purchase of the WSFS Claim, Grasso I, 490 B.R. at 508 ("the

Debtor caused the diversion of at least $500,000.00 of these proceeds by orchestrating the purchase of the

WSFS Claim."); and (2) this Court's previous determination that $156,758.35 of the estate's share of the

proceeds of the sale of the Sansom Property was diverted either to the Debtor or co-mingled among non-

debtor entities he controls.  Grasso I, 490 B.R. at 508-09 ("distributions totaling $156,758.35 were either

made for the Debtor's benefit to non-debtor entities, or issued to the Debtor and diverted by him to the

operating accounts of non-debtor entities that he controls.").

## DISCUSSION

The court may award a professional person "reasonable compensation for actual, necessary

services rendered" and "reimbursement for actual and necessary expenses."  11 U.S.C. §330(a)(1)(A),

(B*).*  However, the court shall not allow compensation for "unnecessary duplication of services" or

services that were not "reasonably likely to benefit the debtor's estate" or "necessary to the administration

of the case."  11 U.S.C. §330(a)(4)(A).  *In re Taxman Clothing Co.*, 49 F.3d 310, 313-15 (7th Cir. 1995);

*In re Wireless Telecommunications Inc.*, 449 B.R. 228, 232 (Bankr. M.D. Pa. 2011); *In re APW Enclosure

Systems, Inc.*, Bky. No. 06-11378, 2007 WL 3112414, *3 (Bankr. D. Del. Oct. 23, 2007).  Further, a court

may deny compensation if, during an attorney's representation, the attorney ceased to be disinterested or

acquired an interest adverse to the estate.  11 U.S.C. §328(c).

### The Firm's Alleged Representation of an Adverse Party

Section 328(c) provides that:

The court may deny allowance of compensation for services and
reimbursement of expenses of a professional person employed under
section 327 or 1103 of this title if, at any time during such professional

6

> person's employment under section 327 or 1103 of this title, such
> professional person is not a disinterested person, or represents or holds
> an interest adverse to the interest of the estate with respect to the matter
> on which such professional person is employed.

11 U.S.C. §328(c).

As defined by the Code, a "disinterested person" is "a person that…does not have an interest materially adverse to the interests of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph, or for any other reason."  11 U.S.C. §101(14)(C); *see also In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 476 (3d Cir. 1998) ("one is a 'disinterested person' only if he has no interest that is materially adverse to a party in interest in the bankruptcy.").  Accordingly, one ceases to be a "disinterested person" when one acquires "an interest adverse to the estate" or "an interest adverse to a creditor."  If an attorney fails to abide by his continuing obligation of disinterestedness, §328(c) commits to the Bankruptcy Court the discretion to deny some or all of an attorney's compensation.  11 U.S.C. §328(c); *In re American Intern. Refinery, Inc.*, 676 F.3d 455, 465 (5th Cir. 2012) (recognizing that §328(c) permits disallowance of all compensation); *Gray v. English*, 30 F.3d 1319, 1324 (10th Cir. 1994) (expressing a preference that a bankruptcy court "should lean strongly toward denial of fees… [inclusive of] disgorgement of compensation previously paid that fiduciary even before the conflict arose."); *In re Angelika Films 57th, Inc.*, 246 B.R. 176, 179 (S.D.N.Y. 2000) (same); *In re United Companies Financial Corp.*, 241 B.R. 521, 529 (Bankr. D. Del. 1999) (same). In determining the proper scope of a §328(c) sanction, this Court considers the rule's underlying purposes.  Sanctions are intended to punish the transgressor, deter future misconduct and preserve confidence in the bankruptcy process.  *Rome v. Braunstein*, 19 F.3d 54, 58 (1st Cir. 1994) (recognizing §328(c) operates as a penalty for a professional's failure to avoid a disqualifying conflict); *In re Granite Partners, L.P.*, 219 B.R. 22, 41 (Bankr. S.D.N.Y. 1998).  All three purposes are implicated by this Court's consideration of the Applications.

The Objecting Parties argue that the Firm's compensation should be denied pursuant to §328(c) because it acquired an adverse interest by representing the Sansom Partnership in connection with its alleged acquisition of the WSFS Claim.  The Firm argues that it did not represent an adverse interest because Winterhalter did not represent the Sansom Partnership.  Rather, the Firm argues that Winterhalter's representation was limited to the Debtor's involvement in this purchase.  Despite claiming that he did not represent the Sansom Partnership, Winterhalter does not state who in fact represented the Sansom Partnership.  Through the testimony of Golub, the Firm suggests that the Sansom Partnership was represented by David Shafkowitz.  *See, e.g.,* Grasso I, 490 B.R. at 509 n.8 (discussing Mr. Shafkowitz's relationship to the Debtor).

In her testimony, Golub stated that it was her belief that Mr. Shafkowitz represented the Sansom Partnership prior to his recruitment to file the claim transfer.  To explain the absence of any evidence of Mr. Shafkowitz's representation, she explained that, due to his intractable unavailability, she was forced to use the Firm as a conduit in order to communicate with Mr. Shafkowitz's alleged client, the Sansom Partnership.  Transcript 9/24/2013, 45:3-18.  However, a review of the record provides no evidence of Mr. Shafkowitz's involvement in the transaction prior to June 4, 2012, when the Firm forwarded to him the documents to be filed with this Court evidencing the transfer of the WSFS Claim.[9]

At a series of hearings held by this Court to address the motions that culminated in this Court's decision to appoint the Chapter 11 Trustee,[10] this Court received into evidence copies of correspondence between Golub and Winterhalter addressing their negotiation of the purchase of the WSFS Claim.[11]  This Court previously relied on these communications to conclude that the Sansom Partnership acted as a straw buyer and the Debtor was in fact the real purchaser of the WSFS Claim.  Grasso I, 490 B.R. at 507.

---

[9] The Firm's time records include an entry for June 4, 2012, that states "Email to D. Shafkowitz, Esquire need to file and issue Notice."

[10] Grasso I.

[11] A bankruptcy court may take judicial notice of the docket entries and orders entered in prior bankruptcy cases filed by a debtor.  *Madera*, 2008 WL 351446, * 1 n. 1; *Dawson*, 2007 WL 4190772, *1 n. 3.

Relying on the same documents, this Court now determines that the suggestions that the Sansom

Partnership was represented by Mr. Shafkowitz and that Golub and Winterhalter were otherwise

uninvolved in the negotiations leading up to the purchase of the WSFS Claim are not credible.  For

example, Golub wrote an email dated May 21, 2012, to the Firm that reads as follows:

> Paul – As a follow-up to our discussion regarding the $500K offer, is that still on the
> table as a possible claim transfer?  The Bank needs to know by 5/23.  B

Exh. 22 (WSFS000027).  To this email, Winterhalter responded:

> Not only is it on the table, I thought it was a done deal from *my end*.  I was waiting to get
> confirmation from you.  If the Bank is good, *I will put together some assignment
> documents to confirm the transfer*.

Exh. 22 (WSFS00028) (emphasis added).

These emails, coupled with time entries appearing in the Firm's First Application, indicate

unequivocally that Winterhalter and Golub were involved in the negotiation of the purchase of the WSFS

Claim.[12]  For example, a time entry dated May 17, 2012, the first day following the sale of the Samson

Partnership property,[13] reads: "Telephone Conference with B. Golup (sic), Esquire *negotiation on issues

with WSFS Claim*."  First Application, Exh. A (emphasis added).  Significantly, none of the

correspondence between Golub and the Firm makes reference to Mr. Shafkowitz.

Winterhalter's role in the purchase of the WSFS Claim is elucidated by reference to a series of

emails that Winterhalter sent to Golub over the course of the morning of May 24, 2013.  On May 24, the

---

[12] This Court observes, but no makes no findings, that a deposition transcript filed with the Court in connection with
the Joinder in the Objections of the Trustee, Madison Capital and Sherman Williams to Motion to Reconvert this
case to one under Chapter 11 dated August 30, 2013, filed by Marshall Katz [Docket No. 833], reflects that the
Debtor, in a deposition that occurred on March 8, 2013, provided a different account of Golub's role in the
transaction.  Deposition 3/8/2013, 53:9-24 (stating Winterhalter and Golub "were negotiating the intricacies of how
the deal was to be put together."); 54:5-55:6 (stating that it was Golub's idea to have the Sansom Partnership act as
the buyer so as to obscure the Debtor's direct involvement in the purchase of the WSFS Claim).  A bankruptcy court
may take judicial notice of docket entries and orders.  *In re Madera*, Bky. No. 07-17296, 2008 WL 351446, *1 n. 1
(Bankr. E.D. Pa. Feb. 7, 2008); *In re Dawson*, Bky. No. 07-15741, 2007 WL 4190772, *1 n. 3 (Bankr. E.D. Pa. Nov.
20, 2007).

[13] On May 16, 2012, the Sansom Partnership sold its real estate located at 1500–1504 Sansom Street, 124, 134 S.
15th Street, 1502–05 Moravian Street, Philadelphia, Pennsylvania.  The proceeds of this sale were used in part to
fund the purchase of the WSFS Claim.  Grasso I, 490 B.R. at 508-09.

parties executed the wire transfer that forwarded to WSFS the $500,000 payment. Prior to completion of

the deal, an issue remained regarding whether the purchaser of the WSFS Claim would be responsible for

the payment of WSFS's attorneys' fees. On May 24, 2013, Winterhalter began the morning by sending

the following email to Golub:

> I spoke to *my client* this morning about your request that your attorney fees be included
> as an add on to the settlement. This is not possible. The partnership only is able to pay
> the $500k and the fees were never included.

Exh. 22 (WSFS000064) (emphasis added). This email is ambiguous in that it does not identify who "my

client" is. A little over an hour later, Winterhalter sent the following message to Golub that clarifies the

identity of his client. The email reads:

> I spoke to *my client* and *he* has told me he cannot get any more from the Partnership and
> *he* does not have the additional funds.

Exh. 22 (WSFS000069) (emphasis added). From this email, this Court can determine that Winterhalter's

reference to his client does not refer to the Sansom Partnership. The Firm's client is a "he" who does not

have additional funds and who must get funds from the "Partnership" to fund the purchase of the WSFS

Claim. Just before noon, Winterhalter sent the following message to Golub:

> I just received a call from David Grasso on behalf of 15th and Sansom, L.P. requesting
> that you confirm that WSFS has signed the documents and that your client is in complete
> agreement with accepting the $500,000. Mr. David Grasso has understandable concern
> to see this before *releasing* the $500,000. Please acknowledge directly to David and copy
> me. Thank you.

Exh. 22 (WSFS000083) (emphasis added).

From these three emails, this Court can confirm that Winterhalter was in fact acting on behalf of

the Debtor in connection with his acquisition of the WSFS Claim and that Winterhalter knew that the

source of the funds was to be drawn by the Debtor from funds held by the Sansom Partnership. However,

the fact that Winterhalter was representing the Debtor does not foreclose the issue of whether he was

concurrently representing the Sansom Partnership. With regard to Winterhalter's representation of the

Sansom Partnership, two options exist. Either the Sansom Partnership was unrepresented, or Winterhalter

10

served as its counsel.

Ultimately, this Court finds that it need not determine whether whatever dealings Winterhalter had with the Sansom Partnership blossomed into an attorney-client relationship.  In addition to addressing the grounds raised in the Objections, this Court has an independent duty to review an attorney's request for compensation.  *In re Busy Beaver Bldg. Ctrs., Inc.*, 19 F.3d 833, 849 (3d Cir. 1994).[14]  As such, relying, in part, upon Winterhalter's admitted representation of the Debtor in connection with his acquisition of the WSFS Claim and consistent with this Court's prior determinations, this Court can determine that Winterhalter ceased to remain disinterested.  Grasso I, 490 B.R. at 514 (finding "the Debtor breached his fiduciary duty owed to his creditors as a debtor-in-possession").

If this case involved a corporate Chapter 11 debtor rather than an individual Chapter 11 debtor, there would be no doubt that Winterhalter's representation of the Debtor in connection with the acquisition of the WSFS Claim would constitute an actual conflict of interest.  *See, e.g., In re Freedom Solar Center, Inc*., 776 F.2d 14 (1st Cir. 1985) (denying fee application based on attorney's dual representation of debtor and debtor's sole shareholder); *Angelika*, 246 B.R. at 18-81 (addressing whether disabling conflict existed as a result of representation of debtor and debtor's principal); *In re Harris Agency, LLC*, 451 B.R. 378, 391-92 (Bankr. E.D. Pa. 2011) ("The duty of the Firm was not to the owners of the Harris Agency and their related entities but rather to the Debtor and to those who would benefit from maximizing the value of the bankruptcy estate."); *In re United Utensils Corp*., 141 B.R. 306, 308 (Bankr. W.D. Pa. 1992) ("An attorney who renders legal advice to an individual associated with the corporation upon matters personally concerning that individual, may render himself in a conflict of

---

[14] This Court notes that other elements in the record demonstrates the egregious failure of Winterhalter to provide his client with competent representation.  Throughout the Debtor's chapter 11 case, this Court repeatedly admonished Winterhalter regarding the Debtor's failure to abide by the requirement of the Bankruptcy Code imposed upon a debtor-in-possession.  *See, e.g.*, Transcript 9/7/2012, 23:7-20 [Docket No. 267].  Among the reasons for this Court's appointment of a Chapter 11 trustee was the Debtor's failure to file timely operating reports or periodic financial reports.  When those documents were filed, they not only contained material omissions, but also conflicted with the contents of the Debtor's schedules.  Grasso I, 490 B.R. at 520-23 (discussing Debtor's delay in filing written disclosure and the conflict of their contents with his prior filings).

11

interest position."). The fact that a debtor is an individual does not obviate the distinction between representation of a debtor personally and representation of a debtor's bankruptcy estate. *In re Powell*, 187 B.R. 642, 647 (Bankr. D. Minn. 1995). Nor does the fact that a debtor is an individual obviate the potential for conflict that arises from an attorney's dual representation of both. *In re Rancourt*, 207 B.R. 338, 361 (Bankr. D.N.H. 1997) (recognizing that conflicts may develop during the representation of an individual Chapter 11 debtor due to the conflict between the Debtor's personal interests and his interests as a debtor-in-possession).

Troubling for this Court, this episode is not the first time Winterhalter's representation of a debtor-in-possession has earned reprimand for his failure to abide by his fiduciary obligations to the estate he represents. In *Harris Agency*, my colleague, Bankruptcy Judge Jean FitzSimon, penned an extensive opinion that should have provided Winterhalter an ample education as to the nature of his obligations. In relevant part, Judge FitzSimon wrote:

> Winterhalter's representation of both Union One and the Debtor also created an actual conflict of interest because it prevented the Firm from having—as it should—an undivided loyalty to Harris and from taking steps that would benefit the Debtor's interests. As counsel to a bankruptcy estate, it is the job of a firm to maximize value for both the debtor and its creditors. *See In re N. John Cunzolo Assoc., Inc.*, 423 B.R. 735, 739 n. 5 (Bankr. W.D. Pa. 2010) (citation omitted) ("Even though the law firm acts as attorney for the debtor-in-possession, it also has certain fiduciary duties to the estate, including ensuring that the rights of the creditors are protected"); *In re Straughn*, 428 B.R. 618, 625-26 (Bankr. W.D. Pa. 2010); *In re Raymond Professional Group, Inc.*, 421 B.R. 891, 903 (Bankr. N.D. Ill. 2009). The duty of the Firm was not to the owners of the Harris Agency and their related entities but rather to the Debtor *and to those who would benefit from maximizing the value of the bankruptcy estate*. While the Affiliates were creditors of the Debtor whose ownership interests may, at times, have been aligned with the Debtor's (though their overall interests were not the same), it is important to note that there are other creditors of Harris, unrelated and unaligned with either the Debtor or the Affiliates. The Firm's loyalties were divided because it would have to choose either between what was best for the estate-all creditors included-*or between remaining loyal to the interests of the Debtor's owners*. *This division created an actual conflict of interest*.

*Harris Agency*, 451 B.R. at 391-92 (emphasis added).

Despite the imposition of sanctions that included the performance of "six hours of Pennsylvania continuing legal education," it appears that Winterhalter has failed to internalize the instructions of my

colleague.  Winterhalter has repeated the same pattern of conduct that warranted sanction in *Harris Agency*.  By representing the Debtor's personal interests to the exclusion of the interests of the Debtor's estate, Winterhalter ceased to be disinterested when he facilitated the diversion of estate assets to fund the Debtor's purchase of the WSFS Claim.

This Court can conceive of no position more materially adverse to a debtor's estate than that of Winterhalter's involvement in the purchase of the WSFS Claim.  Winterhalter's involvement constituted a failure to abide by the requirements of the Bankruptcy Code and his obligations as a fiduciary of the estate.  By facilitating the diversion of estate assets, Winterhalter actively put the Debtor's personal interests ahead of the estate's collective interests.  Not only did Winterhalter fail to make full and spontaneous disclosure of his involvement in the purchase of the WSFS Claim, he, together with Golub, solicited the assistance of another attorney to file documents with this Court evidencing the claim transfer so as to disguise Winterhalter's involvement in the transaction.  Considering Winterhalter's conduct as merely a violation of §327(a) disinterestedness requirements is a euphemism.

This Court remains unswayed by Winterhalter's post-hoc attempts to justify his and the Debtor's failure to abide by the requirements of the Bankruptcy Code.  Contrary to Winterhalter's arguments, an attorney's zealous representation of his client does not obviate an attorney's obligation to ensure his client's compliance with applicable law, inclusive of the Bankruptcy Code.  Pa. R.P.C. 3.1, Comment 1; *In re Source Enterprises, Inc.*, Bky. No. 06-11707, 2008 WL 850229, *14-15 (Bankr. S.D.N.Y. 2008); *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 844 (Bankr. C.D. Cal. 1991) ("Competent representation of one's client is part of an attorney's ethical responsibility to his or her client; failure to act competently willfully or habitually, such as by the failure to use reasonable diligence and his or her best judgment and skill in the application of one's learning, is a breach of the attorney's fiduciary duty to the client.").

When Winterhalter became aware of the opportunity to purchase the WSFS Claim at a discount, he was under an obligation to report the opportunity to this Court.  Grasso I, 490 B.R. at 512-14.  When Winterhalter became aware that estate assets would be used to purchase the WSFS Claim, he was under

13

an obligation to report this use to this Court.  *See, e.g., In re Food Management Group, LLC*, 380 B.R.

677, 708 (Bankr. S.D.N.Y. 2008) (observing that an attorney may violate her fiduciary obligation if she

fails to report her client's misconduct).  Winterhalter may have honestly believed that the transaction

would result in a net benefit to the estate.  However, his honest belief does not obviate the requirement of

disclosure.  The Code does not afford an attorney the discretion to make these determinations outside the

purview of a Bankruptcy court or a debtor's creditors.  *Rancourt*, 207 B.R. at 361 ("The problem for the

debtors' attorneys is… that they 'took it upon themselves' to resolve the arguable issue in favor of the

interest of the individual debtor and at the expense of the bankruptcy estate without any disclosure").

Expediency does not justify such short cuts.  *See, e.g., In re Combustion Engineering, Inc.*, 391 F.3d 190,

236 (3d Cir. 2004) (recognizing that a bankruptcy courts equitable powers cannot trump the express

provisions of the Bankruptcy Code).

     As is amply demonstrated by this case, an attorney does a disservice to his client when he ignores

his professional obligations or applicable law.  Even if the purchase price of the WSFS Claim represents a

fair resolution of the claim, Winterhalter's decision not to advise the Debtor to choose disclosure over

expediency colored the entire course of his client's bankruptcy.  It contributed to the already antagonistic

relationship between the Debtor and his creditors causing every issue to be vigorously litigated which has

in turn led to an explosion of administrative expenses.  On balance, Winterhalter's course of conduct

cannot be said to have resulted in a net benefit to the estate.

### Conduct Relating to Winterhalter's Fiduciary Obligation

     If a court determines that an attorney has breached his fiduciary obligations, that determination

disqualifies the attorney from receiving any compensation for services performed subsequent to the

breach.  *Wolf v. Weinstein*, 372 U.S. 633, 641 (1963) (recognizing bankruptcy rules incorporation "the

historic maxim of equity that a fiduciary may not receive compensation for services trained by disloyalty

or conflict of interest"); *In re New York City Shoes, Inc.*, 89 B.R. 479 (Bankr. E.D. Pa. 1988) (denying

payment of all compensation relating to services performed after employment by purchaser of debtor's

assets).  Where counsel has committed acts that constitute an egregious breach of her fiduciary obligation, a bankruptcy court is within its discretion to deny payment of any compensation.  *In re Futuronics Corp.*, 655 F.2d 463, 470-71 (2d Cir. 1981) (finding that an award of any fees where "a total pattern of conduct which betrays a callous disregard of the professional obligations" was an abuse of bankruptcy court's discretion); *In re Greater Pottstown Community Church of the Evangelical Congregational Church*, 80 B.R. 706 (Bankr. E.D. Pa. 1987) (denying all compensation from the debtor's estate for services rendered for the debtor because he solicited and received small compensation for filing proofs of claim for creditors against the estate).

Contrary to Winterhalter's understanding, his obligations did not only run to the Debtor and his pleas of ignorance do not excuse his role in the diversion of estate assets.  Winterhalter, as a representative of a debtor-in-possession, owed a fiduciary obligation to the Debtor's Chapter 11 estate. *Harris Agency, LLC*, 451 B.R. at 391 ("As counsel to a bankruptcy estate, it is the job of a firm to maximize value for both the debtor *and* its creditors."); *In re Cunzolo*, 423 B.R. 735, 739 n.5 (Bankr. W.D. Pa. 2010) ("An attorney for the debtor-in-possession has a fiduciary duty not only to the debtor, but has a fiduciary obligation to act in the best interest of the entire estate, including creditors."); *Food Management*, 280 B.R. at 708 ("an attorney for the debtor in possession has fiduciary obligations to the estate stemming from his fiduciary obligations to the debtor in possession and his responsibilities as an officer of the court"); *Wilde Horse*, 136 B.R. at 840 ("In a Chapter 11 proceeding, the attorney for debtor in possession, as an officer of the court charged to perform duties in the administration of the case, has a high fiduciary duty to the estate represented.").  In performance of his fiduciary obligation to the Debtor's estate and in performance of his professional obligations,[15] Winterhalter was responsible for supervising his client's conduct and instructing him to ensure compliance with the Bankruptcy Code. *Zeisler & Zeisler, P.C. v. Prudential Ins. Co. of Am. (In re JLM, Inc.)*, 210 B.R. 19, 26 (2d Cir. B.A.P. 1997) ("The debtor's attorney, while not a trustee, nevertheless is charged with the duty of counseling the debtor in

---

[15] Pa. R.P.C. 1.2(d).

possession to comply with its duties and obligations under the law."); *Food Management*, 280 B.R. at 708

(recognizing that an attorney "cannot simply close his or her eyes to matters having an adverse legal and

practical consequence for the estate and creditors."); *Source Enterprises*, 2008 WL 850229, *14

(recognizing that attorney for debtor "was obligated to advise the Debtor of, among other things, its

fiduciary duties as well as of his view that BEGS's control was putting the Debtor in breach of such

duties."); *In re Zagara's Fresh Markets, LLC*, Bky. No. 03-43017, 2006 WL 4452980, *3 (Bankr. D.N.J.

Apr. 13, 2006) (recognizing the obligation of the debtor's attorney to "to supervise clients' conduct for

compliance with the Bankruptcy Code" and "instruct the debtor on the appropriate conduct and must

develop client control"); *In re Berg*, 268 B.R. 250, 261-62 (Bankr. D. Mont. 2001) (recognizing that

debtor's attorney "must instruct the debtor on appropriate conduct and must develop client control"); *In re*

*Whitney Place Partners*, 147 B.R. 619, 620–21 (Bankr. N.D. Ga. 1992) ("[T]he debtor's attorney must

take conceptual control of the case and provide guidance for management of the debtor, not only to

discern what measures are necessary to achieve a successful reorganization, but to assure that, in so

doing, compliance with the Bankruptcy Code and Rules is sought rather than avoided").  Once an attorney

representing a bankruptcy estate becomes aware of his client's misconduct, compliance with the

attorney's fiduciary obligations requires disclosure of his client's misconduct.  *Zeisler*, 210 B.R. at 26

(recognizing that fiduciary obligation requires debtor's counsel to inform the court of any breach by the

debtor-in-possession of its fiduciary duty); *Food Management*, 280 B.R. at 709 (recognizing that

attorney's fiduciary role requires him to report client misconduct to the bankruptcy court); *United*

*Utensils*, 141 B.R. at 309 ("If the debtor is not fulfilling its fiduciary duty to the estate, it is the

responsibility and duty of debtor's counsel to bring such matters to the attention of the court"); *Wilde*

*Horse*, 136 B.R. at 847 (holding that counsel for debtor-in-possession must inform the court of debtor's

breach of fiduciary obligation).

   This Court previously determined that the Debtor breached his fiduciary duty to the creditors of

his estate by (1) diverting the proceeds of the sale of the Sansom Property that should have accrued to his

16

Chapter 11 estate, and (2) participating in the purchase of the WSFS Claim.  Grasso I, 490 B.R. at 511-14.

Unlike an attorney who is merely negligent in her supervision of her client, Winterhalter cannot claim to

be an innocent bystander.  Winterhalter does not disclaim (1) his prior knowledge of the opportunity or

(2) his efforts on behalf of his client to acquire it.  At the Hearing, Winterhalter based the Firm's defense

to the Objections upon his position that he represented the Debtor, and not the Sansom Partnership, in

connection with the Debtor's purchase of the WSFS Claim.  Winterhalter admits and this Court finds that

he counseled the Debtor in connection with this misconduct.  Winterhalter's decision not to comply with

applicable law can only be explained as the result of a strategic decision designed to advance the Debtor's

personal interests.  The Firm's Applications expressly seek compensation for these "services."[16]  Based

on Winterhalter's admissions, this Court can determine that Winterhalter's failure to report the

opportunity to purchase the WSFS Claim and Winterhalter's failure to report his client's participation in

the purchase of the WSFS Claim constitute independent breaches of his fiduciary obligation.  *Food

Management*, 280 B.R. at 709-10 (recognizing that a court may impute to an attorney knowledge of his

client's misconduct when facts establish that the attorney had reason to know of such misconduct).[17]

---

[16] This Court has relied on the following time entries to determine that the Firm had prior knowledge of the sale of
the Sansom Property and the opportunity to purchase the WSFS Claim at a discount: (1) March 13, 2012: "Meeting
with B. Gotlieb, Esquire update on potential sale of property in which WSFS has an interest"; (2) March 13, 2012:
"Telephone Conference with J. Grasso following up on several inquiries made during Creditors Meeting on
ownership of property"; (3) March 14, 2012: "Telephone Conference with B. Kaplan issues on disposition of assets
and possible offer for"; (4) April 24, 2012: "Telephone Conference with J. Grasso and B. Kaplan advising on
potential income distribution from partnership"; (5) May 17, 2012: "Telephone Conference with J. Grasso following
up on discussions with Bank representatives for WSFS"; (6) May 17, 2012: "Telephone Conference with B. Golub,
Esquire negotiation on issues with WSFS claim"; (7) May 17, 2012: "Telephone Conference with J. Grasso update
on discussions with WSFS negotiations"; (8) May 21, 2012: "E-mail to B. Golub, Esquire confirming third party
partnership interested in claim acquisition"; (9) May 21, 2012: "Telephone Conference with B. Golub, Esquire
regarding negotiation on WSFS loan"; (10) May 21, 2012: "Telephone Conference with B. Golub, Esquire inquiring
on issues with 15th and Sansom and practical resolution"; (11) May 21, 2012: "Prepared documents relating to
assignment of WSFS Claim to 15th and Sansom Partnership."  First Application, Exh. A.

[17] Winterhalter's involvement in the purchase of the WSFS Claim came to the attention of this Court as a result of
the efforts of Madison.  It was only after Madison filed its Motion for Appointment of a Trustee dated September
14, 2012 [Docket No. 258], wherein Madison alleged that the Debtor's use of estate assets to purchase the WSFS
Claim constituted grounds for appointment of a Chapter 11 Trustee.

With regard to his client's diversion of estate assets and his alleged participation in those transactions, Winterhalter claims ignorance. He maintains that he had no knowledge that estate assets were diverted to fund the purchase of the WSFS Claim.[18] In this case, this Court finds Winterhalter's pleas of ignorance, even if they were credible,[19] unavailing. Winterhalter was obligated to investigate whether his role in the purchase of the WSFS Claim facilitated the diversion of estate assets.

An attorney for a debtor-in-possession is obligated to investigate matters affecting the estate. *Food Management*, 280 B.R. at 708; *Wilde Horse*, 136 B.R. at 840. At the time Winterhalter learned of the sale of the Sansom Property or that the Sansom Partnership would be the source of the funds used to purchase the WSFS Claim, it was incumbent upon him to review the Sansom Partnership's organizational documents to determine whether any of the proceeds of the sale or the funds used to purchase the WSFS Claim should have accrued to the estate. Winterhalter concedes that he knew that the estate held an interest in the Sansom Partnership. After all, Winterhalter was responsible for filing the Debtor's schedules that identified this interest. However, Winterhalter now claims that he had no prior knowledge of the sale of Sansom Property, the Sansom Partnership's only asset, and therefore had no knowledge whether some portion of the sale's proceeds should accrue to the benefit of the bankruptcy estate. Even if this Court credited his claims, Winterhalter wholly failed to abide by his obligation to supervise his client's conduct for compliance with the Bankruptcy Code. By failing to undertake even a cursory

[18] The Objectors argue that the Firm represented the Sansom Partnership in connection with its acquisition of the WSFS Claim and therefore the Firm represented an interest adverse to the estate. In response to this argument, the Firm stated that Winterhalter represented the Debtor in connection with the Debtor's purchase of the WSFS Claim. This Court has previously determined that the Debtor's involvement in the purchase of the WSFS Claim constituted a breach of his fiduciary obligation as a debtor-in-possession. Grasso I, 490 B.R. at 511-12. By arguing that he represented the Debtor and not the Sansom Partnership, the Firm is conceding the Debtor's breach of his fiduciary obligation was not the result of independent conduct undertaken outside of the Firm's supervision.

[19] A time entry appearing in the First Application appears to make reference to Winterhalter's knowledge of the impending sale of property upon which WSFS asserted a security interest. First Application, Exh. A (March 13, 2012, "Meeting with B. Gotlieb, Esquire update on potential sale of property in which WSFS has an interest."). Assuming that this entry makes reference to the sale of the Sansom Property, it would be clear that, contrary to the Firm's arguments, Winterhalter did have prior knowledge of the sale of the impending sale of the Sansom Property and that the proceeds of the sale would include estate assets. Even if this entry may be read to refer to some other unconsummated sale, the fact that Winterhalter had knowledge that the estate may be entitled to proceeds of the sale of partnership assets put him on inquiry notice that required him to investigate whether other partnerships were considering similar sales. This investigation would have alerted him to the sale of the Sansom Property.

18

investigation, Winterhalter completely abdicated his role as counsel for a debtor-in-possession.  Had

Winterhalter exercised ordinary skill and diligence, he would have been alerted to the estate's interest in

these funds.

Winterhalter's failure to disclose and overt participation in his client's conduct constitutes an

egregious failure to abide by his fiduciary duty and warrants this Court's complete denial pursuant to

§328(c) of the Applications.  *Wolf*, 372 U.S. at 641; *Futuronics*, 655 F.2d at 470-71 (holding a court

abuses its discretion when it fails to deny fees to attorneys who "flagrantly breached their fiduciary

obligations").  This is not the case where a debtor-in-possession undertook some action in contravention

of her fiduciary duty without the knowledge of her counsel.  *See, e.g., Wilde Horse*, 136 B.R. at 840.  In

this case and as admitted by Winterhalter, the Debtor acted with the direct and affirmative assistance of

his counsel.  Winterhalter had knowledge of his client's misconduct.  His obligations required him to take

action to prevent his client's misconduct.  He did not.  Aggravating matters further, the Debtor and

Winterhalter then took purposeful action to obscure their involvement in the purchase of the WSFS

Claim.

### Conduct Relating to Winterhalter's Professional Obligations

This Court's review of the egregiousness of Winterhalter's conduct is further underscored by

Winterhalter's apparent disregard of his professional obligations.  *See, e.g., APW Enclosure*, 2007 WL

3112414 (including an attorney's professionalism among the factors to be considered when determining

the amount of allowable compensation).  In addition to those rules relating to an attorney's obligation to

ensure compliance with applicable law, Rule 3.3(a)(3) of the Pennsylvania Rules of Professional Conduct

provides:

> A lawyer shall not knowingly… offer evidence that the lawyer knows to be false. If a
> lawyer, the lawyer's client, or a witness called by the lawyer, has offered material
> evidence before a tribunal or in an ancillary proceeding conducted pursuant to a
> tribunal's adjudicative authority, such as a deposition, and the lawyer comes to know of
> its falsity, the lawyer shall take reasonable remedial measures, including, if necessary,
> disclosure to the tribunal.  A lawyer may refuse to offer evidence, other than the
> testimony of a defendant in a criminal matter that the lawyer reasonably believes is false.

Pa. R.P.C. 3.3(a)(3).

Over the course of four hearings held before this Court on August 28, 2012, September 5, 2012, September 7, 2012, and October 15, 2012, the Debtor provided testimony regarding his knowledge of the purchase of the WSFS Claim. At a hearing held before this Court on August 28, 2012, the Debtor testified that he was not involved in the negotiation of the purchase of the WSFS Claim. He also testified that he recalled having no conversations with his brother regarding the acquisition of the WSFS Claim. Transcript 8/28/2012, 98:25-99:25. When asked whether the proceeds of the Property were used to funds the purchase of the WSFS Claim, the Debtor stated:

> I don't have personal knowledge of it. I didn't see the transaction happen. I don't have a document that says that. I didn't talk to WSFS. I haven't had a – I don't know who their lawyer is. I have never seen the documents, so I'm not sure.

Transcript 8/28/2012, 103:5-9.

At the September 5, 2012 hearing, the Debtor testified that David Shafkowitz represented the Sansom Partnership. Transcript 9/5/2012, 68:6. The Debtor provided the following testimony:

> Q. Did Mr. Winterhalter represent 15th and Sansom in connection with its purchase of the claim?
> A. No.
> Q. Did he prepare the documents for the transfer of WS's claim to 15th and Sansom?
> A. No.
> Q. Do you know who did?
> A. I believe so.
> Q. Who did?
> A. David Shafkowitz, he's an attorney.
> Q. Do you know if Mr. Winterhalter negotiated the transfer of the claim?
> A. I don't know if he did or didn't. I don't believe he did, though.

Transcript, 9/5/2012, 67:22-68:10.

In the Debtor's initial testimony to this Court, the Debtor denied any knowledge of his involvement or Winterhalter's involvement in the purchase of the WSFS Claim. This testimony was not corrected by Winterhalter. The Debtor did not walk back from this testimony until he was confronted by an adverse party with the Firm's time records that provided incontrovertible evidence of the falsity of his

20

prior testimony.  Grasso I, 490 B.R. at 514.  From the Firm's time records, it is equally incontrovertible

that Winterhalter immediately knew that the Debtor's initial testimony was false.[20]

When an attorney knows that his client has provided false testimony, he is obligated to disclose

his client's perjury.  *Nix v. Whiteside*, 475 U.S. 157, 168 (1986) ("both the Model Code and the Model

Rules do not merely authorize disclosure by counsel of client perjury; they require such disclosure");

*Shade v. Great Lakes Dredge & Dock Co.*, 72 F.Supp.2d 518, 524 (E.D. Pa. 1999) ("This rule safeguards

principles that are basic to the adversarial system of justice: The excesses of this system would likely

overcome its virtues if attorneys were free to represent clients with no regard whatsoever for the truth of

their statements to the court.); *In re Hill*, 437 B.R. 503, 542 (Bankr. W.D. Pa. 2010) ("Once [attorney]

read the transcript and realized she had made false statements to the Court, she was under a duty to take

remedial action by informing the Court as to any misstatements."); *Wilde Horse*, 136 B.R. at 840 ("An

attorney's duty goes beyond not merely putting false evidence before the court; the duty is greater—the

lawyer has a duty to not make misrepresentations to the court.").  Despite the fact that the Debtor has

provided conflicting testimony to this Court, Winterhalter undertook no remedial efforts to inform this

Court of any of the misstatements that were made by the Debtor.  To fulfill his independent obligations to

this Court, Winterhalter may not rest on the efforts of adverse parties to impeach his client.

Because a substantial question exists as to whether Winterhalter has properly complied with his

professional obligations imposed by the Pennsylvania Rules of Professional Conduct, this Court will refer

this matter to the appropriate disciplinary body.  *See, e.g., Eagan v. Jackson*, 855 F.Supp. 765, 791 (E.D.

Pa. 1994) ("Though the Court finds that his conduct rose to a level that may be considered a breach of the

Rules of Professional Conduct, it is not this Court's function to adjudge whether or not [counsel's]

---

[20] In addition to his testimony before this Court, the Debtor has testified at deposition that he and Winterhalter made
the conscious decision prior to the consummation of the purchase of the WSFS Claim to obscure their involvement
in the purchase of the WSFS Claim.  Deposition 3/8/2013, 51:5-11 "I though based on discussions with Paul that
there was a – that at a certain point, I had to stay back from this.  I couldn't convolute it.  It was – and to make it
look as legal as possible and to be as clean as possible on this deal, I had to back off of it and let my brother deal
with it."); 54:5-10 ("The reality is that we papered the deal to be a purchase from the entity.").

conduct should result in some manner of professional discipline.  That determination is properly reserved

to the appropriate disciplinary body.").  Without making that determination, this Court cannot help but

observe that the Debtor's estate could have been spared the considerable expense had Winterhalter been a

bit more assiduous in his observance of his professional obligations.

## CONCLUSION

For the reasons stated, this Court will sustain the Objections.  This Court will leave for another

day and possibly another court the adjudication of the extent of injury that may have been caused to the

Debtor's estate by the failure of counsel to abide by his fiduciary obligation to the bankruptcy estate.

This Court is without doubt that Winterhalter's involvement in the purchase of the WSFS Claim was

sufficiently egregious to warrant pursuant to §328(c) the complete denial of any compensation to the Firm

and the disgorgement to the Trustee[21] of any payments, including but not limited to the Retainer

Payments, previously received as compensation for services performed in its capacity as counsel for the

Debtor while he remained in possession of his Chapter 11 estate.  Because of Winterhalter's failure to

abide by his obligations as a fiduciary of the Debtor's estate, the Firm's services did not result in an

identifiable, tangible, and material benefit to the bankruptcy estate.  To the contrary, Winterhalter's

---

[21] *In re W.T. Mayfield Sons Trucking Co., Inc.*, 225 B.R. 818, 827 (Bankr. N.D. Ga. 1998) (recognizing that it is well-settled that a bankruptcy court may order the disgorgement to the estate of attorneys' fees paid by a third party when it is established that the payments constituted distributions that would have otherwise accrued to the debtor's estate).  This Court has previously stated that an attorney's receipt of postpetition retainer payments without prior court approval is not permissible.  *In re Stein*, Bky. No. 11-10283, 2013 WL 6247438 (Bankr. E.D. Pa. Nov. 25, 2013).  In addition, this Court recognizes that the payment of bankruptcy professionals does not constitute an ordinary-course transaction.  *In re Pannebaker Custom Cabinet Corp.*, 198 B.R. 453, 464 (Bankr. M.D. Pa. 1996) ("payments to professionals are treated separately and specifically under the Bankruptcy Code and are thus without question payments outside the ordinary course of a debtor-in-possession's ordinary financial affairs.").  In determining whether a payment from a related entity constitutes property of a debtor's estate, courts will often collapse the transaction to look at its substance rather than its form.  *HBE Leasing Corp. v. Frank*, 48 F.3d 623 (2d Cir. 1995) (consideration given to 'collapsing the transaction' in an alleged fraudulent conveyance action); *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302 (3rd Cir. 1986) (recognizing the propriety of collapsing multiple transactions and treating them as one integrated transaction for the purpose of assessing a defendant's fraudulent transfer liability); *In re Tribune Co.*, 464 B.R. 126 (Bankr. D. Del. 2011); *Mayfield*, 225 B.R. at 827.  In this light, payment of the Postpetition Retainer to the Firm may be considered a *de facto* distribution to the Debtor by Curtis Investors.  In addition, at least one court has determined that, by receiving funds from a solvent subsidiary, an attorney reduces the value of a debtor's estate and, on that basis, would be found to possess an adverse interest. *Mayfield*, 225 B.R. at 824.

services facilitated the diversion of estate assets and caused the multiplication of the estate's

administrative expenses that may have otherwise been avoided had Winterhalter's honored his obligations

in the first instance.

Dated:  January 17, 2014

_____
MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

23