UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 7 |
| JOSEPH GRASSO, | : | |
| DEBTOR. | : | BANKRUPTCY NO. 12-11063-MDC |

# **OPINION**

## I.    **INTRODUCTION**

By Order dated January 17, 2014, this Court sustained objections to the Second Interim and Final

Application for Compensation and Reimbursement of Expenses (the "Final Application"),[1] filed by the

Law Offices of Paul J. Winterhalter, P.C. (the "Firm"), former counsel for the debtor, Joseph Grasso (the

"Debtor"), and ordered the Firm to disgorge all fees paid to it by the Debtor in connection with this

bankruptcy case (the "Compensation Denial Order").[2]

On July 10, 2014, the United States District Court for the Eastern District of Pennsylvania (the

"District Court") vacated the Compensation Denial Order, and remanded to this Court for consideration

of the benefit the Firm's legal services provided to the Debtor's estate ("District Court's Remand

Order").[3]  As directed by the District Court, this Court identified the areas of concern relating to the

Firm's representation and held several hearings to consider whether the Firm's legal services provided a

benefit to the estate.

After consideration of the pleadings, evidence, testimony, and argument, the Court will sustain

the objections and deny the Firm's Final Application.  The Firm failed to establish that services identified

by the Court, including but not limited to, those relating to (1) preparation of the Debtor's schedules and

statements, monthly operating reports ("MORs"), and the financial reports required by Fed. R. Bankr. P.

---

[1] Bankr. Docket No. 1007.

[2] *In re Grasso*, 506 B.R. 626 (Bankr. E.D. Pa. 2014).

[3] *In re Grasso*, 2014 WL 3389119 (E.D. Pa. July 11, 2014).

2015.3 ("Rule 2015.3 Reports); (2) the sale and transfer of the Wilmington Savings Fund Society claim (the "WSFS Claim");[4] and (3) the Debtor's distributions from his ownership interests in various entities provided any benefit whatsoever to the Debtor's estate.  In addition, to the extent that any services delivered by the Firm provided a benefit to the Debtor's estate, any such benefit is far outweighed by the substantial harm caused to the estate by the poor and inadequate legal services rendered by the Firm and Paul J. Winterhalter, Esquire ("Winterhalter"), the attorney at the Firm primarily responsible for representing the Debtor in this bankruptcy case.  Accordingly, the Court will deny all compensation to the Firm, and order disgorgement of all monies received by the Firm for representation of the Debtor in this bankruptcy case, including the unauthorized payment received during the Debtor's Chapter 11 case.

Further, the Court finds that Winterhalter failed to provide any competent evidence to allay the Court's concerns regarding his actions in this case.  Winterhalter's poor representation of the Debtor combined with his breach of his duty of candor to the Court, in spite of the admonition rendered to him by the Court at the inception of this case, requires a judicial response that goes further than the mere denial of fees.  Although it would much prefer not to undertake this action, the Court is required to forward for review this Opinion to the District Court and the appropriate disciplinary boards for the jurisdictions in which Winterhalter is authorized to practice.

## II.      FACTUAL/PROCEDURAL HISTORY

### A.      The Filing of the Petition, the Reassignment of the Bankruptcy Case, and Employment of the Firm

On February 6, 2012, Winterhalter filed the Debtor's Chapter 11 Voluntary Petition (the "Petition").[5]  The Debtor's case was assigned to now retired Judge Bruce I. Fox.[6]  In the Petition, the

---

[4] On July 6, 2011, WSFS confessed judgment against the Debtor in an action captioned *Wilmington Savings Funds Society, FSB v. Grasso*, Court of Common Pleas, Philadelphia County, Case No. 110700207 in the amount of $875,138.58 plus continuing interest, costs and fees in connection with a loan in the amount of $1,000,000.00 to the Debtor on August 2, 2006.  Proof of Claim 4, Addendum, p. 2 ("WSFS Proof of Claim").

[5] Bankr. Docket No. 1, Petition.

[6] Bankr. Docket No. 5, Notice of Reassignment ("Reassignment"), Paragraph 1.

Debtor listed as "pending cases filed by any spouse, partner or an affiliate of this Debtor," *Saxbys Coffee Worldwide, LLC*, Bky. No. 09-15898 ("*Saxbys*"), a case that was assigned to my colleague Judge Eric L. Frank.[7]  As a result and in accordance with Court procedure, the Debtor's personal bankruptcy case was reassigned to Judge Frank.[8]

The next day, on February 7, 2012, the Debtor submitted an Application to Employ the Law Offices of Paul J. Winterhalter, P.C. (the "Application to Employ").[9]  Winterhalter filed an Affidavit in Support of the Application to Employ disclosing his representation as bankruptcy counsel in *Union Trust Philadelphia, LLC*, Bky. No. 11-12565 ("*Union Trust*") and *WSC 717 Associates, L.P.*, Bky. No. 11-12567 ("*WSC 717*") (the "Related Cases"), both then active cases on this judge's docket and companies in which the Debtor held an ownership interest and served as bankruptcy representative.[10]

On February 14, 2012, Judge Frank issued an Order scheduling a hearing (the "Petition Hearing") to consider (1) whether the Debtor's case should be transferred to the undersigned judge's docket based upon the pending Related Cases; and (2) whether the Application to Employ should be granted in light of the Firm and Winterhalter's representation of the debtors in the Related Cases and the issues raised by same including whether there was "an actual conflict of interest, a potential conflict of interest or neither."[11]  Judge Frank also directed, in relevant part, that at the hearing Debtor's counsel be prepared to (1) explain why the Debtor's petition and amended petition listed *Saxbys* as the only pending case of an affiliate of the Debtor; and (2) address whether the estimated number of creditors, estimated assets and estimated liabilities on the Debtor's disclosure statements were grossly inaccurate given the disclosure statements filed in the *Union Trust* case, and if so, to explain why this occurred.[12]

---

[7] Petition, p. 1.

[8] Reassignment, Paragraph 3.

[9] Bankr. Docket No. 9, Application to Employ.

[10] Bankr. Docket No. 9, Exhibit 1, Affidavit of Paul J. Winterhalter ("Winterhalter Affidavit"), p. 3, Paragraph 9.

[11] Bankr. Docket No. 21, Order dated 2/14/2012 ("Petition Hearing Order").

[12] Petition Hearing Order, n.1.

On March 5, 2012, the Debtor filed a Second Amended Voluntary Petition ("Second Amended Petition") disclosing the Related Cases.[13]  Thereafter, on March 7, 2012, Judge Frank held the Petition Hearing.  The Office of the United States Trustee ("UST") appeared at the Petition Hearing and voiced an objection to the Application to Employ contending, among other things, that the Firm's representation in the Related Cases created an actual conflict of interest.

Following the Petition Hearing, Judge Frank issued an Order (i) overruling the objection of the UST, (ii) approving the Application to Employ, and (iii) transferring the Debtor's bankruptcy case to the undersigned judge's docket for further administration (the "Transfer Order").[14]  In the Transfer Order, Judge Frank noted that Winterhalter's decision to omit any reference to the Related Cases was "entirely inappropriate" and Winterhalter's actions "evidenced a fundamental misconception regarding the scope of his disclosure obligation."[15]  The Court further stated that "Winterhalter would be well advised not to tread further down this path and instead, in the future, err, if he must, on the side of making disclosure."[16]

On March 5, 2012, Winterhalter filed a Disclosure of Compensation of Attorney for the Debtor (the "2016(b) Statement").[17]  In the 2016(b) Statement, Winterhalter disclosed that the Firm had been paid $26,046.00 during the year prior to the Petition Date as a retainer (the "Initial Retainer") for services rendered on behalf of the Debtor in contemplation of or in connection with the administration of the Debtor's bankruptcy estate.[18]  The Initial Retainer was paid by Avalon Breezes Development, LLC ("Avalon Breezes"), a business entity owned and controlled by the Debtor.[19]  Winterhalter further disclosed that payment of monies beyond the Initial Retainer "shall only be made from the Debtor or on

---

[13] Bankr. Docket No. 49.

[14] Bankr. Docket No. 53, Transfer Order.

[15] *Id.* at p. 2 and n.1.

[16] *Id.*

[17] Bankr. Docket No. 46.

[18] *Id.* at Paragraph 1.

[19] Transcript 12/8/2014, 57:2-4.

behalf of the Debtor from family or related business interests only after Court approval of an interim and or final fee application filed with and approved by the Bankruptcy Court."[20]

On July 17, 2012, the Firm filed the First Interim Application for Compensation (the "First Interim Application," collectively with the Final Application, the "Applications"), seeking approval of interim compensation in the amount of $47,912.50 for 137.1 hours of legal services rendered and $1,388.66 for the reimbursement of expenses for the period February 6, 2012 to June 30, 2012.[21]

On August 10, 2012, Winterhalter filed a Supplemental Statement on the Disclosure of Compensation of Attorney for Debtors Pursuant to Federal Rule of Bankruptcy Procedure 2016(b) (the "Supplemental Statement").[22]  In the Supplemental Statement, Winterhalter revealed that on July 16, 2012, one day prior to filing the First Interim Application, "counsel for the Debtor had received an additional payment from Curtis Investors, L.P. on behalf of the Debtor on account of services rendered and fees incurred during the legal representation in the amount of $30,000.00" (the "Unauthorized Post-Petition Payment").[23]  At the time of the payment, no Court order approving the First Interim Application had been entered.  An order approving the First Interim Application was entered as unopposed on August 17, 2012.[24]

### B. The Motion to Convert Case, Appointment of Chapter 11 Trustee and Conversion to Chapter 7

On July 23, 2012, Madison Capital Company, LLC ("Madison"), a substantial unsecured creditor in the case, filed a Motion to Convert the Debtor's case from Chapter 11 to Chapter 7 (the "Conversion Motion").[25]  On July 24, 2012, Madison filed the *Ex Parte* Motion to (A) Seal Certain Documents, (B) Limit Access to those Documents to Court Employees and (C) Waive any Requirements Under Federal

---

[20] 2016(b) Statement, Paragraph 2.

[21] Bankr. Docket No. 164.

[22] Bankr. Docket No. 208.

[23] Supplemental Statement, Paragraph 4.

[24] Bankr. Docket No. 223.

[25] Bankr. Docket No. 181.

Rules of Bankruptcy Procedure requesting, among other things, that the Court seal the exhibits to the

Conversion Motion because they included personal financial information of the Debtor (the "Motion to

Restrict").[26]  On July 25, 2012, the Court entered an Order granting the Motion to Restrict and directed

Madison to file a redacted version of the Conversion Motion on or before August 8, 2012.[27]  On August 2,

2012, Madison filed the redacted Conversion Motion.[28]

     In the Conversion Motion, Madison sought conversion of the Debtor's case to Chapter 7 for

several reasons including the Debtor's alleged (1) failure to file any of the required monthly operating

reports including the Rule 2015.3 Reports; (2) dissipation of at least $105,000.00 of property of the estate

to fund a "lavish lifestyle;" (3) failure and refusal to produce documents regarding the value of the

financial condition of any of his businesses; and (4) breach of his fiduciary duty to his creditors by

allowing Sansom Street Partnership to use the Debtor's distribution from the sale of the partnership's real

estate to purchase the WSFS Claim.[29]  The Debtor opposed the Conversion Motion, arguing that he had

diligently provided documentation and information regarding his numerous business interests, filed

monthly operating reports, pursued claim objections, and would be able to propose a viable reorganization

plan ("Opposition to Conversion Motion").[30]

     The Court held a series of hearings on August 28, September 5, and September 7, 2012, on the

Conversion Motion.  During the hearings, Debtor testified that his (1) monthly income was $16,000.00

derived solely from "Distributions from various business interests," and (2) monthly expenses were

$15,625.00 as detailed in his filed Schedule J.[31]  On September 7, 2012, the Court entered an Order (1)

denying the Conversion Motion without prejudice and, in relevant part, (2) permitting the Debtor to use

---

[26] Bankr. Docket No. 183.

[27] Bankr. Docket No. 185.

[28] Bankr. Docket No. 193, Conversion Motion.

[29] Conversion Motion, pp. 6-15.

[30] Bankr. Docket No. 210, Opposition to Conversion Motion, Paragraphs 5, 6, and 10.

[31] Transcript 8/28/2012, 45:12-15; 46:20-24.

$17,000.00 in monthly income for the expenditures set forth on Schedule J only and for no other purpose without prior Court approval (the "Conversion Denial Order").[32] The Court further ordered that Debtor's MORs include additional details regarding all income received during the applicable month including: (i) the type of income (e.g. loan repayment or distribution); (ii) the name of the source of the income; (iii) the amount received; and (iv) the date received.[33] Debtor was also ordered to amend all previously filed MORs to include such details on or before October 1, 2012.[34] The Debtor timely filed the amended operating reports for February 2012 through July 2012 ("Amended MORs").[35]

On September 14, 2012, following the court's denial of the Conversion Motion, Madison filed a motion for the appointment of a Chapter 11 Trustee (the "Chapter 11 Trustee Motion").[36] The Debtor filed an opposition to the Chapter 11 Trustee Motion ("Opposition to Chapter 11 Trustee Motion").[37] Following a hearing on the Chapter 11 Trustee Motion on October 15, 2012, this Court issued an Order dated October 16, 2012, appointing a Chapter 11 Trustee ("Chapter 11 Trustee Order").[38] On December 18, 2012, Christine C. Shubert, Esquire ("Shubert") was appointed Chapter 11 Trustee (the "Chapter 11 Trustee").

The Chapter 11 Trustee commenced an investigation of the Debtor's affairs and filed a Status Report dated February 26, 2013, disclosing, among other things, that the Debtor had omitted from his bankruptcy schedules his ownership interests in at least twenty-six corporate entities, certain real property and a variety of motor vehicles.[39] The Status Report further disclosed that the Debtor had diverted (1) estate assets to fund the post-petition acquisition of at least three motor vehicles, and (2) approximately

---

[32] Bankr. Docket No. 251, Conversion Denial Order, Paragraph 5.

[33] Conversion Denial Order, Paragraph 3.

[34] *Id.*

[35] Bankr. Docket Nos. 273-78.

[36] Bankr. Docket No. 258.

[37] Bankr. Docket No. 270.

[38] Bankr. Docket No. 301. The reasons for this Court's decision are summarized in its Memorandum dated April 4, 2013. *In re Grasso*, 490 B.R. 500 (Bankr. E.D. Pa. 2013).

[39] Bankr. Docket No. 454 (hereinafter "Status Report").

$497,329.40 in distributions from non-debtor entities that apparently should have accrued to the Debtor's

bankruptcy estate.[40]

On May 28, 2013, the Court held an evidentiary hearing to address Madison's renewed request to

convert the Debtor's case to Chapter 7 ("Renewed Conversion Motion"). The Court concluded that

circumstances warranted conversion of the Debtor's bankruptcy case and issued an Order on June 12,

2013, converting the Debtor's case from Chapter 11 to Chapter 7 ("Chapter 7 Conversion Order").[41]

Shubert was appointed to serve as the Chapter 7 Trustee ("Shubert" or "Chapter 7 Trustee").[42]

### C.    The Firm's Final Fee Application

After the appointment of the Chapter 11 Trustee and prior to conversion of the case to Chapter 7,

the Firm filed the Final Application[43] on December 28, 2012, requesting (i) interim compensation in the

amount of $69,468.75 for actual and necessary expenses of 185.25 hours of legal services rendered; and

$566.56 for the reimbursement of expenses expended on behalf of the administration of the Debtor's

Chapter 11 estate for the period of July 1, 2012 through October 31, 2012; and (ii) a final order approving

all compensation paid to date.[44]

Madison filed an Objection to the Final Application dated February 5, 2013 (the "Madison

Objection").[45] Madison requested that, pursuant to §328(c) and §330(a)(5) of the Bankruptcy Code, this

Court deny the payment of any compensation to the Firm and order the disgorgement of any

compensation previously paid to the Firm because Winterhalter (1) held an interest adverse to the Chapter

11 estate of the Debtor; (2) failed to be forthcoming with the Court when he denied his involvement in the

---

[40] Status Report, pp. 9-10.

[41] Bankr. Docket No. 652. The reasons for this Court's decision are summarized in its Memorandum dated July 11, 2013. *In re Grasso*, 497 B.R. 448 (Bankr. E.D. Pa. 2013).

[42] Bankr. Docket No. 658.

[43] Bankr. Docket No. 395.

[44] The Firm's request includes the previously approved First Interim Application. In sum, the Firm seeks a final order approving payment of $117,381.25 for 322.35 hours of legal services rendered and $1,955.22 for the reimbursement of expenses.

[45] Bankr. Docket No. 435.

purchase of the WSFS Claim; (3) billed the Debtor's Chapter 11 estate for work performed on behalf of 15th and Sansom, L.P. ("Sansom Street Partnership"); and (4) Winterhalter's services injured the Debtor's Chapter 11 estate by facilitating the Debtor's diversion of estate assets.[46]

The Madison Objection was later joined by the Chapter 7 Trustee (together, the "Objecting Parties") who filed an Objection to the Final Application dated May 24, 2013 (the "Chapter 7 Trustee Objection," and together with the Madison Objection, the "Objections").[47]  The Chapter 7 Trustee requested that this Court deny the Final Application and grant any such other relief that might be appropriate, including the disgorgement of any compensation previously paid to the Firm pursuant to the First Interim Application.  In support of this request, the Chapter 7 Trustee relied upon (1) the grounds asserted in the Madison Objection; and (2) the Trustee's belief that the Debtor's Chapter 11 estate did not receive any actual benefit from the services provided by the Firm.[48]  After a hearing on the Applications and Objections, this Court entered the Compensation Denial Order denying the Applications and ordering the disgorgement of all fees paid to date.[49]  Thereafter, the Firm appealed the Compensation Denial Order to the District Court.[50]

**D.    Appeal of this Court's Prior Memorandum**

On July 10, 2014, the District Court issued its Memorandum overruling the Compensation Denial Order.  In its decision, the District Court determined that, notwithstanding the scope or gravity of

---

[46] *Id.* at pp. 6-8.

[47] Bankr. Docket No. 636.

[48] *Id.* at Paragraphs 2, 3.

[49] Bankr. Docket No. 1007.

[50] Bankr. Docket No. 1016.  On February 18, 2014, this Court held an expedited hearing to address the Firm and Winterhalter's request for stay pending their appeal [Bankr. Docket No. 1047].  Specifically, the Firm requested this Court stay the requirement that the Firm disgorge the fees that had been previously paid.  After this Court imposed a stay conditioned upon the posting of a *supersedeas* bond, the Chapter 7 Trustee addressed the issue of Winterhalter's continued representation of the Debtor in pending §727 actions.  In response, Winterhalter addressed the effect of the malpractice action filed by the Chapter 7 Trustee against the Firm on February 5, 2014, Adversary No. 14-00065 (the "Malpractice Action"), on his Firm's capacity to represent the Debtor in the §727 actions.  Winterhalter recognized that the Malpractice Action could raise a conflict of interest that prevented his continued representation of the Debtor.  Notwithstanding the possible conflict of interest, Winterhalter continued to represent the Debtor in his personal capacity in connection with the administration of the Debtor's chapter 7 bankruptcy.

Winterhalter's alleged misconduct, the Firm should be provided an opportunity to demonstrate whether its services nonetheless resulted in a net benefit to the estate.[51]  For this reason, the District Court vacated this Court's Compensation Denial Order and remanded the Applications for consideration by this Court consistent with the District Court's instructions in an Order dated July 10, 2014.[52]

### E.    The Hearings after Remand

Following remand, and in accordance with the District Court's instructions, this Court entered an Order dated August 12, 2014 (the "Appraisal Order"), identifying and providing the Firm with the opportunity to address the various issues and concerns relating to the Court's consideration of the Applications.[53]  The Appraisal Order enumerated thirty-five separate issues that this Court had identified in the course of its consideration of the Applications.  Among the myriad of issues identified by this Court, this Court identified the following concerns as being integral to its present decision: (1) whether the Firm provided competent legal advice relating to the Debtor's representation in his schedules that he owned certain partnership interests with his wife, Donna Grasso, as tenants by the entirety; (2) whether the Firm provided competent legal advice relating to the Debtor's interest in Curtis Investors, L.P. and specifically relating to the undisclosed receipt of cash distributions from that entity; (3) whether the failure of the Debtor to perform his basic obligations as a debtor-in-possession indicated that the Firm failed to provide competent representation; and (4) whether the Firm provided competent representation of the Debtor when Winterhalter facilitated the undisclosed negotiation and discounted sale of the WSFS Claim to an insider.[54]

After several continued hearings and an unsuccessful attempt at mediation, the first evidentiary hearing on the Applications and the Court's Appraisal Order was held on December 8, 2014 (the "December 8th Hearing").  On that date, Madison did not appear to prosecute its objections to the

---

[51] *In re Grasso*, Civ. No. 14-1741, 2014 WL 3389119, *5 (E.D. Pa. July 11, 2014).

[52] *In re Grasso*, Civ. No. 14-1741, Docket No. 18.

[53] Bankr. Docket No. 1272, a copy of the Appraisal Order is attached to this Opinion as Attachment 1.

[54] *Id.*

Applications.  However, the Chapter 7 appeared and elected to proceed with her objections to the

Applications solely on the issue of whether the Firm's services provided a "benefit" to the estate (the

"Limited Objections").  Thereafter, the Firm began its presentation of evidence in support of the

Applications.  First, the parties stipulated to the admission of the prior testimony of Bonnie Golub,

Esquire, counsel for Wilmington Savings Fund Society ("WSFS").  Ms. Golub had previously testified

regarding her role in the sale of the WSFS Claim against the Debtor to Sansom Street Partnership.

Thereafter, the Firm called Winterhalter personally to testify in support of its Applications.  Winterhalter

testified regarding (1) the involvement of Bruce Kaplan, the Debtor's accountant ("Kaplan") in the

preparation of the Debtor's schedules; (2) Winterhalter's awareness of the 15th and Sansom Street

Property; (3) what interests, if any, the Debtor held as property in the entireties with his wife; (4) the

purchase of the WSFS Claim (the "WSFS Claim Purchase"); and (5) his billing and engagement in this

case more generally.  The December 8th Hearing concluded at the end of Winterhalter's direct testimony.

Thereafter, a series of continued hearings were held on March 30, 2015, May 26, 2015, and May

27, 2015 (collectively, and together with the December 8th Hearing, the "Hearings").  At the March 30,

2015 hearing, the Trustee cross-examined Winterhalter and the parties concluded their examination of

Winterhalter.  Thereafter, the Firm called David Grasso, the Debtor's brother and the managing member

of Sansom Street Partnership, in support of the Applications.  David Grasso testified regarding Sansom

Street Partnership's purchase of the WSFS Claim.  At the close of David Grasso's testimony, this Court

scheduled its consideration of the Applications to resume on May 26, 2015 (the "May 26th Hearing").

At the beginning of the May 26th Hearing, the Firm continued with the presentation of evidence

in support of its Applications.  To that end, the Firm called the Debtor to testify regarding who prepared

his schedules and his awareness of the sale of the WSFS Claim.  The Firm recalled Winterhalter for a

brief examination regarding his obligations to file reports on behalf of the Debtor under Rule 2015.3.

After its exhibits were entered into evidence, the Firm rested.

The Chapter 7 Trustee then began her opposition to the Applications.  The Chapter 7 Trustee

called Kaplan as her first witness.  Kaplan testified regarding what responsibility he had for the Debtor's

schedules, whether he knew that the Debtor needed to open a Debtor-in-Possession account, and his

knowledge regarding the WSFS Claim Purchase.  The May 26th Hearing ended with Kaplan's testimony.

The next day, May 27, 2015 (the "May 27th Hearing"), the hearing on the Applications resumed

with the Chapter 7 Trustee's next witness, Charles Persing.  Mr. Persing had been hired as an accountant

by the Chapter 11 Trustee to aid in her administration of the Debtor's bankruptcy estate.  Mr. Persing

testified regarding facts he learned during the course of his retention and the basis for several revisions

that were made to the Debtor's previously filed MORs.  Mr. Persing testified that the changes were due to

the discovery that those reports omitted reference to "numerous payments that were made from various

entities for Joe Grasso's -- Mr. Grasso's direct benefit…"[55]  Mr. Persing broadly described his efforts to

correct the information contained in the Debtor's MORs filed on behalf of the Debtor while he remained

in possession.  As described by Mr. Persing, the various inaccuracies contained in the Debtor's MORs

caused the Debtor's income to be under-reported by approximately $261,000.00 and his expenses to be

under-reported by approximately $562,000.00.[56]

Finally, the Firm recalled Winterhalter to enable him to provide additional testimony regarding

issues relating to the Applications that were identified during the course of the other witnesses' testimony.

During his brief testimony, Winterhalter disclaimed possessing any prior knowledge of his client's post-

petition purchase of a Hummer vehicle.  Addressing the Debtor's diversion of distributions from Curtis

Investors, L.P. to pay for the copper roof on his personal residence, Winterhalter testified that he advised

Kaplan as follows:

> I told him it was completely inappropriate to allow for transfers being made from a non-
> debtor entity for the benefit of Joseph Grasso while he was a debtor-in-possession.  I told
> him specifically that the proper way to account for that transaction was for any
> distribution that's used for Joe's personal benefit, to be deposited into the DIP account
> and then paid out of the DIP account.[57]

---

[55] Transcript 5/27/2015, 10:17-24.

[56] Transcript 5/27/2015, 11:5-19; 21:15-22:20.

[57] Transcript 5/27/2015, 125:9-15.  In quoting the advice of counsel, this Court does not vouch for its validity.
Rather, as explained later in this Opinion, this Court expresses its significant doubt that merely depositing a secured
creditor's cash collateral in a DIP account does not alleviate the other requirements imposed by the Code with

At the close of Winterhalter's testimony, the parties rested.

A final hearing on the matters was scheduled for December 22, 2015 (the "Final Hearing"), to address the Malpractice Action[58] and the Applications. Shortly before the Final Hearing, the parties reported that the Malpractice Action had been settled. As evidenced by the Motion of Chapter 7 Trustee Pursuant to Rule 9019 for Approval of Consent Judgment dated December 16, 2015 (the "Settlement Motion"), the parties agreed to a mutual release of all claims asserted in the Malpractice Action in consideration of a payment of $100,000.00 from the Firm and Winterhalter to the Chapter 7 Trustee.[59] The parties' settlement specifically reserved for this Court's determination any issues relating to the Applications.[60]

On January 8, 2016 (the "January 8th Hearing"), this Court held a hearing on the Settlement Motion. After the Chapter 7 Trustee rested, counsel for the Firm indicated that his clients intended, consistent with their conduct to this point, to vigorously contest any further adjudication of the Malpractice Action. For that reason and because of the substantial fees that all parties would be likely to incur absent approval of the proposed settlement, the Firm argued approval of the Settlement Motion was warranted. At the close of the January 8th Hearing on the Settlement Motion, this Court reiterated its position that the proposed settlement of the Malpractice Action would not affect its consideration of the Applications. With that caveat stated, this Court took the Settlement Motion under advisement pending its receipt of the parties' post-trial briefing and its ultimate resolution of the Applications. Thereafter, the parties submitted post-trial briefings on the Applications only.

---

regard to a Debtor's post-petition use of cash collateral.  11 U.S.C. §363(a) and (c)(2); *In re Jefferson Business Center Assoc.*, 135 B.R. 676, 680-82 (Bankr. D. Colo. 1992) (holding that a Chapter 11 debtor may not use a creditor's cash collateral for the post-petition payment of a retainer absent (1) consent of the creditor, or (2) prior court approval.).

[58] *See*, n.50, *supra*.

[59] Bankr. Docket No. 1627, Settlement Agreement and Release of Claims ("Settlement Agreement"), Paragraph 2.

[60] Settlement Agreement, Paragraph 10.

## III.    FINDINGS OF FACT[61]

### Filing of the Debtor's Bankruptcy Petition and Schedules

1.    Winterhalter was the primary attorney for the Firm representing the Debtor in this bankruptcy case.[62]

2.    Winterhalter is an experienced bankruptcy lawyer and has been practicing in this area since 1984.[63]

3.    The Debtor is a sophisticated real-estate developer with interest in partnerships owning multi-million dollar real estate properties.[64]

4.    Winterhalter prepared, reviewed, and filed the Debtor's Petition.[65]

5.    At the time he prepared, reviewed, and filed the Debtor's Petition, Winterhalter was serving as bankruptcy counsel for Saxbys, Union Trust, and WSC 717 (collectively, the "Related Entities"), entities that the Debtor either owned and controlled or previously held an interest, in three (3) separate bankruptcy cases, all of which were then open cases in this bankruptcy court.[66]

6.    Winterhalter did not advise the Debtor to list or disclose the *Union Trust* and *WSC 717* bankruptcy cases on the Debtor's Petition.[67]

7.    On March 5, 2012, Winterhalter filed the Debtor's Schedule A dated March 5, 2012 (the "Schedule A"), and the Debtor's Schedule B dated March 5, 2015, listing, among other things, numerous partnerships in which the Debtor held an ownership interest (the "Schedule B").[68]

---

[61] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Fed. R. Bankr. P. 7052 and 9014. To the extent any of the findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law constitute findings of fact, they are adopted as such.

[62] Transcript 12/8/2014, 53:12-17.

[63] Transcript 12/8/2014, 43:8.

[64] *See*, Bankr. Docket No. 34, Schedule B, Line 14 and Attached Exhibit.

[65] Bankr. Docket No. 164, First Interim Application, Ex. A, Detailed Time Sheet, p.1.

[66] Transcript 12/8/2014, 44:23-45:17; 48:2-18; Winterhalter Affidavit, Paragraph 9.

[67] Transcript 5/26/2015, 29:10-14.

[68] Bankr. Docket Nos. 33 and 34.

8.      In lieu of performing an independent investigation in connection with the preparation of the Debtor's schedules, Winterhalter relied upon his general familiarity with the Debtor's financial condition resulting from Winterhalter's prior handling of the bankruptcy cases of the Related Entities.[69]

9.      In connection with his preparation of the Debtor's schedules, Winterhalter reviewed the Debtor's personal tax returns.[70]

10.     The Debtor's personal tax returns for the years 2009 and 2010 identified that Debtor held interests in real property that were not identified on the Debtor's Schedule A.[71]

11.     The Debtor's personal tax returns for the years 2009 and 2010 identified that Debtor held interests in partnerships that were not identified on the Debtor's Schedule B.[72]

12.     In the Debtor's Schedule B, the Debtor disclosed his interest in WSC 717 and that he held this interest as tenants by the entirety with his wife, Donna Grasso.[73]

13.     In the *WSC 717* Bankruptcy, Winterhalter filed with this Court a List of Equity Security Holders dated April 14, 2011 (the "WSC List of Equity Holders").[74]

14.     In the WSC List of Equity Holders, the Debtor was identified as the holder of a "25% Limited Partner" interest.[75]

15.     The WSC List of Equity Holders made no reference to Donna Grasso's alleged interest or whether the Debtor's 25% interest was held with his wife as tenants by the entirety.[76]

16.     Winterhalter knew his client's description of his ownership interests in *WSC 717* was

---

[69] Transcript 3/30/2015, 12:14-21.

[70] Transcript 3/30/2015, 12:8-13:4.

[71] Transcript 3/30/2015, 30:20-31:8; 32:23-33:14.

[72] Transcript 3/30/2015, 32:13-19; 33:16-34:2.

[73] Schedule B, Line 14 and Attached Exhibit.

[74] Bky. No. 11-12567, Docket No. 24.

[75] *Id.*

[76] In this Court's Memorandum dated April 4, 2013, this Court originally identified the inconsistencies between the WSC List of Equity Holders filed in the WSC 717 Bankruptcy and the Debtor's Schedule B filed by Winterhalter in the Debtor's present bankruptcy case. *In re Grasso*, 490 B.R. 500, 515 n.12 (Bankr. E.D. Pa. 2013).

inaccurate.

17.    In the Debtor's Schedule B, the Debtor disclosed his interest in Sansom Street Partnership and stated that he held this interest as tenants by the entirety with his wife, Donna Grasso and valued at $1 million.[77]

18.    Aside from what was disclosed in the Debtor's Schedule B, Winterhalter had no independent knowledge of the Debtor's interest in Sansom Street Partnership.[78]

19.    Winterhalter admits that as of the time he filed the Petition and the Schedule B on behalf of the Debtor he had little to no knowledge about the assets held by Sansom Street Partnership, but he was aware that Sansom Street Partnership was the owner of an office building.[79]

20.    At the time Winterhalter filed the Debtor's schedules, Winterhalter did no investigation of the value of the Debtor's interest in Sansom Street Partnership or its office building.[80]

21.    In the Debtor's Schedule B, the Debtor disclosed his interest in Curtis Investors, L.P. and stated that he held this interest as tenants by the entirety with his wife, Donna Grasso and that it was valued at $5,000,000.00.[81]

22.    In the Debtor's Schedule I, the Debtor disclosed his primary source of income as "Disbursements from various business interests."[82]

### The Debtor's Entireties Interests

23.    In the Debtor's Schedule B, the Debtor listed that he and his wife, Donna Grasso, owned certain partnership interests as tenants by the entirety.[83]

24.    The Debtor repeatedly testified to the Court that he transferred his interest in certain

---

[77] Schedule B, Line 14 and Attached Exhibit.

[78] Transcript 12/8/2014, 58:16-59:4.

[79] Transcript 3/30/2015, 67:13-20.

[80] Transcript 3/30/2015, 68:19-22.

[81] Schedule B, Line 14 and Attached Exhibit.

[82] Bankr. Docket No. 37, Schedule I, Line 13.

[83] Schedule B, Line 14 and Attached Exhibit.

partnership entities, inclusive of Curtis Investors, L.P. and Sansom Street Partnership, to himself and his

wife as tenants by the entirety pursuant to a transaction that occurred in 2008 whereby he and his wife

contributed to these partnerships $2,000,000.00 in operating capital drawn from the equity in their marital

home.[84]

26. As consideration for her portion of this contribution, the Debtor claimed that his

partnership interests were retitled as entireties property.[85]

26. Despite claiming to be in possession of the agreements memorializing these transfers, the

Debtor only produced to this Court two agreements: (1) an Assignment and Assumption of Partnership

Interests dated August 15, 2008, whereby the Debtor transferred to himself and his wife as tenants by the

entireties the Debtor's interest in Sansom Street Partnership;[86] and (2) an Assignment and Assumption of

Partnership Interests dated August 15, 2008, whereby the Debtor transferred to himself and his wife as

tenants by the entireties the Debtor's interest in Curtis Investors, L.P.[87]

27. Winterhalter performed no investigation to substantiate his client's statement that he

owned his interests in Sansom Street Partnership, WSC 717 Associates, L.P., Curtis Investors, L.P., and

PLB Partners, L.P. as tenants by the entirety with his wife, Donna Grasso.[88]

28. Winterhalter admits that, at the time he prepared and filed the Debtor's Schedule B, he

"had some concerns" regarding the accuracy of the Debtor's assertion that he owned certain partnership

interests with his wife as tenants by the entireties.[89]

29. Winterhalter admits that, at the time he prepared and filed the Debtor's schedules, he

knew that the Debtor's characterization of his partnership interests as entireties properties conflicted with

---

[84] Transcript 8/28/2012, 62:7-21; 64:5-9.

[85] *Id.*

[86] Opposition to Chapter 11 Trustee Motion, Ex. 1.

[87] Bankr. Docket No. 624, Bancorp's Limited Objection/Reservation of Rights Objection to Chapter 11 Trustee's Motion to Assign Pledge, Ex. A.

[88] Transcript 12/8/2014, 59:9-16.

[89] Transcript 12/8/2014, 61:17-62:18.

statements appearing in relevant tax returns.[90]

30.    Winterhalter admits that, at the time he prepared and filed the Debtor's schedules, he did not believe that the Debtor's characterization of his partnership interests as entireties properties had legal merit.[91]

31.    Due to the issues Winterhalter identified with regard to the Debtor's characterization of his partnership interests as entireties properties, this Court does not find credible Winterhalter's later testimony in which he stated he had no reason to doubt the information provided by his client.[92]

**Representation of the Debtor at his Initial Meeting of Creditors**

32.    The Debtor's initial meeting of creditors was held on March 13, 2012.[93]

33.    During the meeting of creditors, Winterhalter appeared in his capacity as counsel for the debtor-in-possession.[94]

34.    During the meeting of creditors, the Assistant United States Trustee and Bonnie Golub, counsel for WSFS, questioned the Debtor about the basis for his wife's alleged interests in certain entities identified by the Debtor's Schedule B.[95]

35.    Ms. Golub questioned why the Debtor, at the time the Debtor and WSFS executed a Revolving Credit Agreement dated August 2, 2006, did not disclose in certain loan documents his wife's interest.[96]

36.    In response to this questioning, the Debtor admitted that he made a false statement in the Assignment of Distributions, Income and Proceeds of Partnership Interests and Security Agreement dated March 31, 2011 (the "Assignment Agreement"), the agreement that conferred upon WSFS a security

---

[90] *Id.*

[91] Transcript 12/8/2014, 63:10-14.

[92] Transcript 12/8/2014, 167:18-23.

[93] Bankr. Docket No. 507, Ex. C, Transcript of Meeting of Creditors, cited hereinafter as "Transcript 3/13/2012."

[94] First Interim Application [Bankr. Docket No. 164], March 13, 2012: "Attend Chapter 11 Meeting of Creditors."

[95] Transcript 3/13/2012, 22:20-23:9.

[96] Transcript 3/13/2012, 23:2-4.

interest in the Debtor's right to distributions from Curtis Investors, L.P. and PLB Partners, L.P.[97]

37.     In response to this questioning, Winterhalter admitted that he was not aware of WSFS's

security interest in the Debtor's right to distributions from Curtis Investors, L.P. and PLB Partners, L.P.[98]

38.     At the meeting of creditors, the Debtor was asked whether he was in possession of the

organizational documents for the partnerships in which the Debtor held an interest.[99]

39.     After the completion of the Debtor's meeting of creditors, Winterhalter held a telephone

conference with his client to discuss "inquiries made during Creditors Meeting on ownership of

property."[100]

40.     As of March 13, 2012, and as a result of his client's admission that the Debtor provided a

false description of his interest in the collateral securing the WSFS Claim, Winterhalter had reason to

investigate the validity of WSFS's security interest.

41.     Winterhalter did not request from the Debtor or Kaplan copies of the Curtis Investors,

L.P. organizational documents until October 11, 2012.[101]  Prior to that date, Winterhalter performed no

investigation to substantiate whether the Debtor had the authority to confer a security interest in the

Debtor's right to distributions from Curtis Investors, L.P. and PLB Partners, L.P.

### Monthly Operating Reports

42.     Kaplan, the Debtor's accountant, prepared the Debtor's MORs and forwarded them to

Winterhalter for review and filing with the Bankruptcy Court.

43.     On August 6, 2012, Winterhalter reviewed the monthly operating reports for March,

April and May.[102]

---

[97] Transcript 3/13/2012, 23:7-9.

[98] Transcript 3/13/2012, 23:15-23.

[99] Transcript 3/13/2012, 29:12-30:18.

[100] First Interim Application, March 13, 2012: "Telephone Conference with J. Grasso following up on several
inquiries made during Creditors Meeting on ownership of property."

[101] Final Application, October 11, 2012: "Telephone Conference with B. Kaplan requesting he follow up on locating
Curtis Partners Agreement and Operating Agreement."

[102] Final Application, August 6, 2012: "Reviewed drafts of monthly operating reports prepared by B. Kaplan for J.

44.    On August 7, 2012, Winterhalter filed the March 2012 MOR ("Original March 2012 MOR"). The Original March 2012 MOR listed the Debtor's income for that month as $25,000.00 from loan repayments and $4,000.00 from partnership distributions along with expenses of $7,386.76 for the Debtor and $17,051.93 for Debtor's wife. The Original March 2012 MOR was reported incorrectly on the "Initial Monthly Operating Report" form.[103]

45.    On August 7, 2012, Winterhalter filed the April 2012 MOR (the "Original April 2012 MOR"). The Original April 2012 MOR listed the Debtor's income for that month as $10,000.00 from loan repayments along with expenses of $8,581.73 for the Debtor and $13,684.24 for Debtor's wife. The Original April 2012 MOR was reported incorrectly on the "Initial Monthly Operating Report" form.[104]

46.    On August 7, 2012, Winterhalter filed the May 2012 MOR (the "Original May 2012 MOR"). The Original May 2012 MOR listed the Debtor's income for that month as $17,000.00 from loan repayments and $8,141.00 from partnership distributions along with expenses of $10,301.71 for the Debtor and $13,317.61 for Debtor's wife. The Original May 2012 MOR was reported incorrectly on the "Initial Monthly Operating Report" form.[105]

47.    On August 27, 2012, Winterhalter reviewed and filed the June 2012 MOR (the "Original June 2012 MOR"). The Original June 2012 MOR listed the Debtor's income as $20,000.00 from loan repayments and $5,000.00 from partnership distributions along with expenses of $8,238.77 for the Debtor and $12,324.75 for Debtor's wife.[106]

48.    The Original June 2012 MOR included the June bank statement for the Debtor's debtor-in-possession account at TD Bank, N.A. (the "DIP Account") reflecting a deposit of $350.00 with a prior balance of $75.00 as of May 30, 2012. Also attached was the June bank statement for the Debtor's pre-

---

Grasso."

[103] Final Application, August 27, 2012: "Reviewed draft of June monthly operating report for Debtor individually prepared by B. Kaplan; Bankr. Docket No. 198.

[104] Bankr. Docket No. 199.

[105] Bankr. Docket No. 200.

[106] Bankr. Docket No. 229.

petition bank account at PNC Bank, N.A. (the "PNC Account"). The Debtor deposited $25,000.03 into the PNC Account during June 2012.[107]

49.     On August 27, 2012, Winterhalter reviewed and filed the July 2012 MOR (the "Original July 2012 MOR"). The Original July 2012 MOR listed the Debtor's income as $10,000.00 from loan repayments and $4,000.00 from partnership distributions along with expenses of $7,754.76 for the Debtor and $10,080.36 for Debtor's wife.[108]

50.     The Original July 2012 MOR included the July bank statement for the DIP Account reflecting no activity including $0.00 deposits into the account. Also attached was the July 2012 statement for the PNC Account reflecting deposits of $14,189.28, a beginning balance of $6,303.40 and deductions of $17,835.11.[109]

51.     On August 30, 2012, Winterhalter reviewed and filed the February 2012 MOR covering the period February 6-28, 2012 (the "Original February 2012 MOR," and together with the Original March 2012 MOR, the Original April 2012 MOR, the Original May 2012 MOR, the Original June 2012 MOR, the Original July 2012 MOR, and the August 2012 MOR, the "Original MORs"). The Original February 2012 MOR listed the Debtor's income as of the Petition Date of $14,000.00 from loan repayments and $4,000.00 from partnership distributions along with expenses of $10,160.42 for the Debtor and $13,614.81 for Debtor's wife. The Original February 2012 MOR was not reported on the "Initial Monthly Operating Report" form.[110]

52.     On October 1, 2012, Winterhalter reviewed and filed the Debtor's Amended MORs for the months of February 2012 to July 2012, as ordered by the Court in the Conversion Denial Order. The Amended MORs listed several of the Debtor's partnerships as the source of the loan repayments, and

---

[107] Id.

[108] Final Application, August 27, 2012: "Reviewed and revised draft of July monthly operating report for Debtor; prepared for filing." Bankr. Docket No. 230.

[109] Id.

[110] Final Application, August 30, 2012: "Reviewed and revised February 2012 Stub Operating Report; Modified and filed." Bankr. Docket No. 236.

Grasso Family Partnership as the source of the partnership distributions.[111]

53.    On October 4, 2012, Winterhalter reviewed and filed the August 2012 MOR (the "August 2012 MOR"). The August 2012 MOR, listed the Debtor's income as $28,000.00 from partnership distributions, including $24,000.00 from Curtis Investors, L.P. and $4,000.00 from Grasso Family Partnership along with expenses of $9,220.41 for the Debtor and $12,889.72 for Debtor's wife. The August 2012 MOR did not list any income from loan re-payments.[112]

54.    The August 2012 MOR included the August bank statement for the Debtor's DIP Account reflecting no activity including $0.00 deposits into the account. The August bank statement for the Debtor's PNC Account reflected deposits of $29,032.44, including the $28,000.00 in income received by the Debtor during August 2012.[113]

### Rule 2015.3 Reports

55.    On July 26, 2012, three days after Madison filed the Motion to Convert, Winterhalter provided legal advice and instructions to Kaplan regarding the preparation and filing of the financial reports of financial information required by Rule 2015.3 for the first time.[114]

56.    The Debtor filed the initial Rule 2015.3 Reports on September 21 and 28, 2012, as ordered by the Court in the Conversion Denial Order.[115]

57.    The Rule 2015.3 Reports did not include information covering any time period after December 31, 2011.

58.    The Debtor did not file any additional Rule 2015.3 Reports.

---

[111] Final Application, October 1, 2012: "Reviewed report prepared by B. Kaplan detailing income/revenue; telephone conference with B. Kaplan requesting separate pages for each month." Bankr. Docket Nos. 273-278.

[112] Final Application, October 4, 2012: "Reviewed draft of Grasso monthly operating report for August, made adjustments to print formatting." Bankr. Docket No. 279.

[113] *Id.*

[114] *See*, Final Application, July 26, 2012: "Telephone conversation with B. Kaplan review of report requirements for K-1s, status of operating reports."

[115] Bankr. Docket Nos. 264 and 268.

**Sale of the Sansom Street Property**

59.     Sansom Street Partnership is organized pursuant to an Agreement of Limited Partnership

of 15th and Sansom, L.P. dated November 27, 2000 (the "Partnership Agreement").[116]

60.     Section 4.A of the Partnership Agreement provides:

The *sole* purpose of the Partnership is to acquire, develop, lease and manage that
certain office building, located at 124-134 S.15th Street, in the City and County of
Philadelphia, PA ("Partnership Property"). …

Agreement of Limited Partnership of 15th and Sansom, L.P. dated November 27, 2000 (emphasis

added).[117]

61.     Section 7.6 of the Partnership Agreement provides:

Upon sale or refinancing of the Partnership Property, the cash available for distribution
(after payment of expenses and any previously outstanding indebtedness of the
Partnership) *shall be distributed* to all Partners, pro rata amongst them, in accordance
with their Percentage Interests.

Agreement of Limited Partnership of 15th and Sansom, L.P. dated November 27, 2000 (emphasis

added).[118]

62.     The Debtor held a one-third interest in Sansom Street Partnership.[119]

63.     As of the Petition Date, Sansom Street Partnership was the owner of certain real property

located at 1500–1504 Sansom Street, 124-134 S. 15th Street, and 1502–05 Moravian Street, Philadelphia,

Pennsylvania (the "Sansom Street Property").[120]

64.     On May 16, 2012, Sansom Street Partnership sold its only asset, the Sansom Street

Property to Goodsam 1500, L.P. and Sansom and Sons, LLC. (the "Sansom Street Sale").[121]

---

[116] Chapter 11 Trustee Motion Hearing, Madison Trial Ex. 10, Agreement of Limited Partnership of 15th and
Sansom, L.P.

[117] *Id.*

[118] *Id.*

[119] Bankr. Docket No. 34, Schedule B, p. 3.

[120] Chapter 11 Trustee Motion Hearing, Madison Trial Ex. 10, Agreement of Limited Partnership of 15th and
Sansom, L.P.

[121] Transcript 3/30/2015, 213:13-16.

65.     The Sansom Street Sale was negotiated over a period of months.[122]

66.     Prior to the Sansom Street Sale, David Grasso, the Debtor's brother, informed the Debtor of the amount of the sale price of the Sansom Street Property and that the net proceeds of the sale would be available for distribution.[123]

67.     Prior to the Sansom Street Sale, and during the course of the Debtor's administration of his bankruptcy estate, the Debtor had conversations with Winterhalter regarding the potential sale of the Sansom Street Property.[124]

68.     After the Sansom Street Sale, the Debtor negotiated with WSFS for a compromise of the WSFS Claim.[125]

69.     On the date of the Samson Street Sale, Sansom Street Partnership received net proceeds of $2,410,593.64 (the "Sale Proceeds").[126]

70.     At the time of the closing on the Sansom Street Sale, David Grasso was aware of the pendency of his brother's bankruptcy.[127]

71.     After the payment of $114,963.67 to the Debtor and $347,388.67 to David Grasso for the repayment of partner loans and other expenses, $1,861,895.29 in distributions was available to the Debtor ($620,631.76) ("Debtor's Share of the Sale Proceeds") and David Grasso ($1,241,263.53) ("David Grasso's Share of the Sale Proceeds").[128]

72.     The Debtor's Share of the Sale Proceeds was distributed to him (i) on May 24, 2012, in the amount of $500,000.00 via wire transfer to WSFS;[129] (ii) on June 11, 2012, by checks in the amounts

---

[122] Transcript 3/30/2015, 212:5-16.

[123] Transcript 3/30/2015, 213:25-214:16.

[124] Transcript 3/30/2015, 72:13-19.

[125] Transcript 3/30/2015, 74:13-16.

[126] Transcript 3/30/2015, 214:23-25; Trustee's Trial Ex. 12.

[127] Transcript 3/30/2015, 215:16-216:4.

[128] 3/30/2015 Hearing, Trustee's Trial Ex. 13, 15th & Samson, LP "Cash Summary from sale of property" ("Original Cash Summary").

[129] 3/30/2015 Hearing, Trustee's Trial Ex. 16, Firstrust Bank Account for 15th and Sansom ("Firstrust Bank

of $32,758.35 and $30,000.00 respectively, and (iii) on July 9, 2012, by a check in the amount of

$94,000.00.[130]

73.    As of June 9, 2012, $78,837.08 of the Debtor's Share of the Sale Proceeds remained in

the possession of Sansom Street Partnership.  No Sansom Street Partnership document has been produced

evidencing a distribution of the remaining monies to the Debtor or his estate.[131]

74.    On July 23, 2012, Sansom Street Partnership distributed $1,611,029.48 of the Sale

Proceeds to David Grasso.[132]

75.    None of the Debtor's Share of the Sale Proceeds distributed to Debtor was deposited into

the DIP Account.[133]

76.    None of the Debtor's Share of the Sale Proceeds distributed to the Debtor was deposited

into the PNC Account.[134]

77.    None of the Debtor's Share of the Sale Proceeds distributed to the Debtor was disclosed

in the Original June 2012 MOR or Amended June 2012 MOR.[135]

### The Diversion of Sale Proceeds

78.    During his assistance with the administration of the Debtor's bankruptcy estate,

Winterhalter was aware that the Debtor's interest in Sansom Street Partnership was one of his estate's

most significant asset.[136]

79.    Despite Winterhalter's awareness of the significance of Sansom Street Partnership to the

---

Account"), Statement for Month of May 2012, p.1.

[130] 3/30/2015 Hearing, Trustee's Trial Ex. 17, Firstrust Bank Account, Statement for Month of June 2012, p.1 and Statement for Month of July 2012, p.2.

[131] 3/30/2015 Hearing, Trustee's Trial Ex. 13, Original Cash Summary.

[132] Trustee's Trial Ex. 17, Firstrust Bank Account, Month of July 2012, p.2.

[133] Bankr. Docket No. 229, Original June 2012 MOR; Bankr. Docket No. 277, Amended June 2012 MOR; Bankr. Docket No. 230, Original July 2012 MOR; and Bankr. Docket No. 278, Amended July 2012 MOR.

[134] *Id.*

[135] *Id.*

[136] Transcript 3/30/2015, 67:6-12.

administration of the Debtor's bankruptcy estate, Winterhalter did not undertake any review of the Partnership Agreement to determine the scope of his client's rights and interests in Sansom Street Partnership.[137]

80.     Despite his knowledge of the Sansom Street Sale and his client's interest in the Sale Proceeds, Winterhalter performed no investigation of whether his client was entitled to or received a distribution of the Sale Proceeds.[138]

81.     As the basis for his legal advice to the Debtor relating to the administration of the Debtor's interest in Sansom Street Partnership, Winterhalter concluded that his client lacked any control over Sansom Street Partnership.[139]

82.     Winterhalter performed no investigation of fact or law to substantiate his legal conclusion that his client lacked any control over Sansom Street Partnership.[140]

83.     Winterhalter did not review the Partnership Agreement or otherwise attempt to obtain a copy of the Partnership Agreement in order to substantiate his client's interests or to confirm his legal conclusion that his client lacked any control over Sansom Street Partnership.[141]

84.     Winterhalter performed no investigation of fact or law to substantiate his legal conclusion regarding Sansom Street Partnership's authority to purchase the WSFS Claim and that Debtor's consent was not required.[142]

85.     The Debtor's bankruptcy estate did not receive a distribution of any of the Sale

---

[137] Transcript 12/8/2014, 67:1-69:8.

[138] Final Application, September 7, 2012: "E-mail to client and B. Kaplan requesting copies of Partnership Agreement and Capital Account information for 15th and Sansom, L.P." It appears the genesis of this request was a series of questions asked of the Debtor at a hearing held before this Court on September 5, 2012. During the September 5th hearing, counsel for Madison specifically asked the Debtor whether he had consented to the sale of the Sansom Street Property or whether Sansom Street Partnership was required to obtain his consent, as a minority partner, prior to acquiring the WSFS Claim. Transcript 9/5/2012, 77:19-78:5.

[139] Transcript 12/8/2014, 60:6-23.

[140] *See*, n.138, *supra*.

[141] *Id.*

[142] *Id.*

Proceeds.[143]

86.     The Debtor directed Sansom Street Partnership to transfer $500,000.00 of the Debtor's

Share of the Sale Proceeds to WSFS for the purchase of the WSFS Claim.[144]

87.     The Debtor, together with Winterhalter and David Grasso, orchestrated a scheme where

Sansom Street Partnership was deemed the purchaser of the WSFS Claim.[145]

88.     At the Debtor' direction, at least $156,758.35 of the Debtor's Share of the Sale Proceeds

were distributed either directly to him or non-debtor entities that he controls that in turn made transfers

for the benefit of the Debtor.[146]

89.     Winterhalter's testimony that he was not aware whether the Debtor received distributions

from Sansom Street Partnership because he never communicated with the Debtor regarding the subject is

not credible.[147]

### Purchase of the WSFS Claim

90.     On August 2, 2006, the Debtor and WSFS executed a Revolving Credit Agreement

whereby WSFS advanced to the Debtor up to $1,000,000.00 to be used for real estate investments (the

"WSFS Loan").[148]

---

[143] Transcript 3/30/2015, 239:9-22; 241:24-243:11. *See*, Bankr. Docket No. 1654, Settlement between Chapter 7 Trustee, 15th and Sansom, L.P. and David Grasso. The estate received a $10,000.00 payment in exchange for its settlement of its claims against Sansom Street Partnership and David Grasso. It is not clear whether this payment was intended as a distribution of the remaining Debtor's Share of the Sale Proceeds owed by Sansom Street Partnership to the estate or a settlement of the estate's claims against David Grasso. *See, e.g.,* 11 U.S.C. §362(k).

[144] The Court does not find credible David Grasso's testimony that Sansom Street Partnership used $500,000.00 of the Sale Proceeds to purchase the WSFS Claim rather than providing a distribution to the Debtor for the purchase of the WSFS Claim. Transcript 3/30/2015, 239:8-10; 245:13-16. *See*, 3/30/2015 Hearing, Trustee's Trial Ex.13, Original Cash Summary, $500,000.00 distribution to Debtor.

[145] The Court does not find credible David Grasso's testimony that Sansom Street Partnership's distribution and the Samson Street Partnership's revised cash summary from the sale of property dated as of 10-30-2013 ("Revised Cash Summary") provided the true and correct account for the distribution of the Sale Proceeds (Trustee's Trial Ex. 14) wherein Sansom Street Partnership attempts to re-characterize the distribution of $500,000.00 from the Debtor's Share of the Sale Proceeds as an expenditure by Sansom Street Partnership for the purchase of the WSFS Claim. Transcript 3/30/2015, 239:8-10; 245:13-16.

[146] Transcript 3/30/2015, 239:15-16-242:1-6, Trustee's Trial Ex. 17, Firstrust Bank Account, Statement for Month of June 2012, p.1; Statement for Month of July 2012, p. 2.

[147] Transcript 3/30/2015, 166:6-13.

[148] WSFS Proof of Claim Ex. 1, Revolving Credit Agreement.

91.     As further evidence of the WSFS Loan, the Debtor executed a Promissory Note dated August 2, 2006, in the principal amount of $1,000,000.00 (the "Note") and two Partnership Interest Pledge Agreements dated August 2, 2006 (the "Pledge Agreements"), whereby the Debtor granted a security interest to WSFS in his interests in Sansom Street Partnership and 1111 Spring Garden Associates, L.P.[149]

92.     As originally contemplated, the Debtor was obligated to repay the WSFS Loan on or before February 2, 2008, subject to one automatic extension for a period of one year.[150]

93.     The Debtor failed to repay the WSFS Loan by February 2, 2009, following the automatic extension.[151]

94.     On March 31, 2011, WSFS and the Debtor executed a Forbearance Agreement (the "Forbearance Agreement") that extended the term of the WSFS Loan to June 30, 2011.[152]

95.     As consideration for WSFS's forbearance, the Debtor executed an Assignment of Distributions, Income and Proceeds of Partnership Interests and Security Agreement dated March 31, 2011 (the "Assignment Agreement"), that granted to WSFS a security interest in the Debtor's rights to distributions due from Curtis Investors, L.P. and PLB Partners, L.P. that might be generated as a result of a sale of the real estate owned by each.[153]

96.     Despite the Forbearance Agreement, the Debtor ultimately defaulted on his obligation to repay the WSFS Loan.

97.     Thereafter, WSFS obtained the Confessed Judgment.[154]

98.     Over a period of time commencing prior to the filing of the Debtor's Petition, the Debtor

---

[149] WSFS Proof of Claim Ex. 2, Promissory Note; Ex. 3, Partnership Interest Pledge Agreement.

[150] WSFS Proof of Claim Ex. 1, Revolving Credit Agreement, Paragraph 13.1.

[151] WSFS Proof of Claim Ex. 5, Forbearance Agreement, Paragraph C.

[152] WSFS Proof of Claim Ex. 5, *Id*.

[153] WSFS Proof of Claim, Ex. 6.

[154] WSFS Proof of Claim, Addendum.

and Kaplan negotiated with WSFS for a compromise of the WSFS Claim.[155]

99.    According to the Firm's time records, the Debtor called Winterhalter on February 21, 2012, to discuss the validity of the lien held by WSFS in the Debtor's "Curtis Center interest."[156]

100.    On May 17, 2012, one day after the Sansom Street Sale, the Debtor and Kaplan telephoned Winterhalter to obtain legal advice regarding the potential settlement of the WSFS Claim.[157]

101.    At the time of this conversation, Winterhalter knew of the occurrence of the Sansom Street Sale.[158]

102.    During this conversation, the Debtor informed Winterhalter that the Debtor had personally negotiated the settlement of the WSFS Claim for $500,000.00.[159]

103.    During this conversation, the Debtor requested Winterhalter provide legal advice regarding whether the Debtor would be personally able to acquire the WSFS Claim or could otherwise personally cause a settlement of the claim outside of a plan of reorganization.[160]

104.    The Debtor was in favor of consummating the settlement because he believed that it would lower his total indebtedness.[161]

105.    Winterhalter admits that, in response to his client's inquiries, he did not know how to cause the proposed settlement of the WSFS Claim.[162]

---

[155] Transcript 5/26/2015, 87:13-88:24.

[156] First Interim Application, February 21, 2012: "Telephone Conference with J. Grasso inquiring as to legitimacy of WSFS obtaining lien in Curtis Center interest."

[157] First Interim Application, May 17, 2012: "Telephone Conference with client and accountant evaluating how to deal with WSFS obligation and whether claim can be compromised outside of Plan."

[158] *Id.*

[159] Kaplan, the Debtor's accountant and David Grasso, the Debtor's brother, testified that the Debtor had informed Winterhalter that the Debtor had personally negotiated the settlement of the WSFS Claim. Transcript 3/30/2015, 207:2-9; 217:6-9; Transcript 5/26/2015, 89:1-12. Whereas, Winterhalter testified that it was his belief, based upon information provided to him during his initial call to Golub, that the deal had been negotiated by David Grasso. Transcript 12/8/2014, 80:11-25. This Court does not find Winterhalter's version of events to be credible.

[160] Transcript 12/8/2014, 109:1-14 ("a Chapter 11 debtor can't just pay a creditor, and that's what it contemplated at that given point."); Transcript 5/26/2015, 16:1-14.

[161] Transcript 5/26/2015, 102:19-103:4.

[162] Transcript 3/30/2015, 92:21-94:14.

106.    Winterhalter specifically admits that, in response to his client's inquiries, he concluded that the proposed settlement of the WSFS Claim "cannot be accomplished outside of a plan."[163]

107.    Winterhalter admits that in response to the proposed settlement, he concluded that the Debtor could not personally acquire the WSFS Claim.[164]

108.    Winterhalter admits that he had no idea how to address the proposed settlement of the WSFS Claim outside of a plan.[165]

109.    At the close of the conversation with his client, Winterhalter states that the Debtor instructed him to "Call the girl."[166]

110.    At the direction of the Debtor, Winterhalter contacted Bonnie Golub, counsel for WSFS.[167]

111.    Bonnie Golub had previously appeared at the Debtor's initial meeting of creditors and questioned the Debtor about his claim that he held certain partnership interests, including but not limited to Curtis Investors, L.P., as entireties property.

112.    In her capacity as counsel for WSFS, Bonnie Golub was adverse to the Debtor and the Debtor's bankruptcy estate.

113.    On May 17, 2012, Winterhalter and Bonnie Golub discussed how their clients could effectuate the compromise of the WSFS Claim.[168]

114.    Winterhalter testified that during this conversation, Bonnie Golub informed him that (1) the proposed compromise could be accomplished through a claim transfer, and (2) Sansom Street Partnership would be the purchaser.[169]

---

[163] Transcript 3/30/2015, 92:2-25.

[164] Transcript 12/8/2014, 109:1-14.

[165] Transcript 12/8/2014, 107:1-108:3; 109:1-18.

[166] Transcript 12/8/2014, 79:4-15; 107:11-15; Transcript 3/30/2015, 76:20-77:5; 92:2-10.

[167] Transcript 12/8/2014, 107:17-108:3

[168] *Id.*

[169] Transcript 12/8/2014, 108:11-109:18; Transcript 3/30/2015, 77:3-5; 92:17-93:5; 146:9-10.

115.    Relying exclusively upon the opinion of adverse counsel and despite his allegedly

existing misgivings regarding the legality of the proposed settlement, Winterhalter concluded "Wow,

that'll work. That would work. It's legitimate."[170]

116.    Winterhalter performed no independent analysis of whether the proposed settlement of

the WSFS Claim could be accomplished through a claim transfer.

117.    Winterhalter performed no independent analysis of whether an insider of a debtor may

acquire at a discount a claim against the estate.

118.    Winterhalter performed no independent analysis to determine what his client's

obligations were with regard to the Debtor's involvement in the discounted sale of a claim against the

estate to an insider.

119.    Winterhalter admitted that, when he was informed by Bonnie Golub that Sansom Street

Partnership would be acquiring the WSFS Claim, "I did not give it much thought."[171]

120.    At the time Winterhalter learned of the proposed settlement of the WSFS Claim and that

said settlement would be effectuated through a sale of the WSFS Claim to Sansom Street Partnership,

Winterhalter knew that Sansom Street Partnership was an insider of the Debtor.[172]

121.    At the time Winterhalter learned of the proposed settlement of the WSFS Claim,

Winterhalter knew that the Debtor intended to use $500,000.00 from the Debtor's Share of the Sale

Proceeds to fund the settlement.[173]

---

[170] Transcript 12/8/2014, 80:24-25; 86:4-18; 109:11-110:18.

[171] Transcript 3/30/2015, 145:20-22.

[172] Transcript 12/8/2014, 82:25-83:1 ("15th and Sansom was an insider entity…"); Transcript 3/30/2015, 98:23-99:1; 118:17-24 ("It was an insider entity.").

[173] In support of his Applications, Winterhalter gave conflicting testimony as to this point. He alternatively testified that (1) he believed David Grasso or "Grasso Holdings, L.P." was the source of the funds and (2) Sansom Street Partnership was the source of the funds. Ultimately, this Court does not find credible Winterhalter's testimony that Grasso Holdings, L.P. was the source of the payment or that he did not otherwise know that Sansom Street Partnership was the source of the funds. To the contrary, this Court finds that, at the time he learned of the proposed settlement, Winterhalter knew that the estate's share of the proceeds of the sale of the Sansom Street Property would be used to fund the deal. For example, Winterhalter testified that he believed the diversion of the $500,000.00 was warranted because otherwise WSFS would have been entitled to payment of the full amount of the estate's share of the proceeds of the Sansom Street Sale. Transcript 12/8/2014, 85:4-17.

122.     On July 6, 2012, David M. Shafkowitz on behalf of Sansom Street Partnership filed a Transfer of Claim Other Than For Security Pursuant to B.R. 3001(e)(2) (the "Claim Transfer").[174]

123.     Winterhalter recruited David M. Shafkowitz in order to obscure Winterhalter's involvement in the WSFS Claim Purchase by Sansom Street Partnership.[175]

124.     The Court does not find credible Winterhalter's characterization of his involvement in the WSFS Claim Purchase as being merely an intermediary between WSFS and Sansom Street Partnership.

125.     Winterhalter specifically advised the Debtor that he could not appear to be involved in the sale of the WSFS Claim.[176]

126.     On May 24, 2012, Sansom Street Partnership paid $500,000.00 from the Debtor's Share of the Sale Proceeds to WSFS for the alleged purchase of WSFS Claim pursuant to a wire transfer made on May 24, 2012, from Sansom Street Partnership's Firstrust Bank Account.[177]

127.     Winterhalter did not request copies of Sansom Street Partnership's organizational documents from the Debtor or Kaplan until September 7, 2012.[178]

128.     In connection with his representation of the Debtor as to the Claim Transfer, Winterhalter did not review Sansom Street Partnership's organizational documents in order to confirm whether Sansom Street Partnership had the authority to purchase the WSFS Claim.

129.     Winterhalter did not review the Debtor's minority partnership interests in Sansom Street Partnership until September 28, 2012.[179]

130.     Winterhalter performed no legal research to confirm whether the Debtor's involvement in

---

[174] Bankr. Docket No. 152.

[175] In testimony to this Court, Winterhalter stated that it was Bonnie Golub who suggested that Winterhalter recruit Mr. Shafkowitz. Transcript 3/30/2015, 128:16-129:12; 151:23-152:10.

[176] Transcript 3/30/2015, 143:9-19.

[177] 3/30/2015 Hearing, Trustee's Trial Ex. 16, Firstrust Bank Account Statement for Month of May 2012, p.2.

[178] *See*, n.138, *supra*.

[179] Final Application, September 28, 2012: "Reviewed financial information fwd by C. Graf on behalf of minority partnerships."

the so-called settlement of the WSFS Claim violated any of the Debtor's fiduciary obligations.[180]

### Testimony Regarding Purchase of the WSFS Claim

131.    In his testimony to this Court in support of the Applications, Winterhalter stated that he believed that the proposed settlement of the WSFS Claim effectuated through the sale to Sansom Street Partnership would result in a benefit of $462,000.00 accruing to the benefit of the Debtor's estate.[181]

132.    With regard to his explanation of the benefits of the proposed settlement of the WSFS Claim, Winterhalter testified:

> [t]he $962,000.00 are the net proceeds that would have been paid or could have been paid or should have been paid, would not become property of the estate, it would go directly to WSFS on its claim.
>
> A secured creditor's claim to collateral does make that property, property of the estate. WSFS had a first right to those monies.  That money wasn't coming to the estate, that money -- if the $500,000.00 deal was not transacted -- that money -- all of it or nine hundred and sixty-two thousand, plus any accrued interest that to the date of payment, would have went to WSFS.[182]

133.    Winterhalter testified that he believed that this net benefit would be achieved by relying on the efforts of Madison and/or creditor, Marshall Katz to argue that the WSFS Claim should be equitably subordinated to the estate's general unsecured creditors.[183]

134.    Winterhalter believed that as a result of the sale of the WSFS Claim to an insider of the Debtor, the Debtor's estate would be benefitted by the "elimination" of a secured creditor that held a lien on the Debtor's primary asset, Curtis Investors, L.P.[184]

135.    Winterhalter testified that he believed that David Grasso, through Sansom Street

---

[180] The only time entry relating to Winterhalter's legal research of the Debtor's obligations occurred after this Court identified the Debtor's obligation to disclose his knowledge of an opportunity to purchase a claim at a discount. Final Application, October 29, 2012: "Research *Papercraft* and *Brown v. Presbyterian Ministers* decisions by Third Circuit."

[181] Transcript 3/30/2015, 99:22-100:1.

[182] Transcript 3/30/2015, 104:9-19.

[183] Transcript 3/30/2015, 100:2-18; 187:10-16.

[184] Transcript 3/30/2015, 115:10-117:3.

Partnership, would not attempt to collect the full amount of the WSFS Claim.[185]

136.    Winterhalter testified that prior to May 23, 2012, he had never communicated with David Grasso in any manner whatsoever.[186]

137.    Winterhalter testified that prior to May 23, 2012, he did not discuss the terms of the sale of the WSFS Claim to Sansom Street Partnership with David Grasso at any time prior to the preparation of the sale documents.[187]

138.    Winterhalter testified that he did not discuss at any time nor did David Grasso agree that Sansom Street Partnership would not attempt to collect the full amount of the WSFS Claim.[188]

139.    David Grasso testified that he did not negotiate the settlement of the WSFS Claim including the price.[189]

140.    David Grasso learned of the settlement of the WSFS Claim after May 17, 2012, and after the telephone discussions between Winterhalter and Golub regarding the details for finalizing the settlement.[190]

141.    By acquiring the WSFS Claim, David Grasso believed that Sansom Street Partnership would be entitled to the full repayment of the WSFS Claim that was secured by a lien on the Debtor's interest in distributions from Curtis Investors, L.P.[191]

142.    As a result of the purchase of the WSFS Claim by an entity in which the Debtor held a one-third interest, David Grasso believed that the Debtor would be entitled to one-third of any amounts collected by Sansom Street Partnership as a result of its enforcement of the WSFS Claim.[192]

---

[185] Id.

[186] Transcript 3/30/2015, 109:18-111:9; 112:6-12.

[187] Id.

[188] Transcript 3/30/2015, 116:2-23.

[189] Transcript 3/30/2015, 219:12-220:8.

[190] Transcript 3/30/2015, 206:25-207:24; 216:5-217:9.

[191] Transcript 3/30/2015, 229:20-230:13; 252:14-253-21.

[192] Transcript 3/30/2015, 249:15-22.

143.    David Grasso did not agree to reduce the WSFS Claim to any amount less than the $929,259.69, the amount originally asserted by WSFS.[193]

144.    During the administration of the Debtor's bankruptcy estate, Sansom Street Partnership continued to assert the liens securing the WSFS Claim in 1111 Spring Garden Associates, L.P., Curtis Investors, L.P., and PLB Partners, L.P.[194]

145.    As a result of its purchase of the WSFS Claim, Sansom Street Partnership did not release or otherwise agree to remove the liens securing the WSFS Claim in 1111 Spring Garden Associates, L.P., Curtis Investors, L.P., and PLB Partners, L.P.[195]

146.    At the time of the August 28, 2012 hearing, Winterhalter knew that the Debtor had negotiated the purchase, including the agreement on price, of the WSFS Claim Purchase.[196]

147.    At the time of the August 28, 2012 hearing, Winterhalter knew that the Debtor knew the identity of counsel for WSFS.[197]

148.    At the time of the August 28, 2012 hearing, Winterhalter knew that the Debtor's testimony that the sale and purchase of the WSFS Claim had been negotiated exclusively by his brother, David Grasso, was false.[198]

149.    At the time of the August 28, 2012 hearing, Winterhalter knew that the WSFS Claim Purchase by Sansom Street Partnership was a sham transaction designed to obscure the Debtor's

---

[193] Transcript 3/30/2015, 252:19-254:4.

[194] Adv. No. 13-528, *Shubert v. The Bancorp Bank, et. al.*, Docket No. 6, 15th & Sansom Answer to Complaint to Determine Validity, Priority and Extent of Lien.

[195] *Id.*

[196] Transcript 5/26/2015, 88:9-89:12.

[197] Transcript 12/8/2014, 79:11-24.

[198] At the hearing held before this Court on August 28, 2012, the Debtor testified that he was not involved in the negotiation of any portion of the Claim Transfer. When asked what the sale price was, the Debtor stated "you tell me, I'm not sure exactly the amount." Transcript 8/28/2012, 92:1-10. When asked a second time whether he knew what the sale price was, the Debtor stated "[n]ot at all." Transcript 8/28/2012, 102:3-5. When asked about his involvement in the negotiation with WSFS, the Debtor stated that "I didn't talk to WSFS. I haven't had a – I don't know who their lawyer is." Transcript 8/28/2012, 103:5-9. Winterhalter, was present at and actively participated in the August 28, 2012 hearing in his capacity as counsel for the Debtor.

settlement of the WSFS Claim.[199]

150.     At the time of the August 28, 2012 hearing, Winterhalter knew that the source of the

proceeds for purchase of the WSFS Claim was the Debtor's Share of the Sale Proceeds[200]

### Debtor's Use of Cash Collateral and Diversion of Curtis Investors, L.P. Distributions

151.     During his representation of the Debtor, Winterhalter provided to his client certain advice

regarding the Debtor's use of cash collateral and specifically his ability to use any distributions received

on account of the Debtor's partnership interests.[201]

152.     During his representation of the Debtor, Winterhalter was aware that the Debtor's

interests in distributions from his partnership interests were subject to at least three pre-petition liens held

by the following entities: (1) The Bancorp Bank ("Bancorp");[202] (2) NexTier Bank ("NexTier");[203] and (3)

WSFS.[204]

153.     During his representation of the Debtor, Winterhalter was aware that WSFS was asserting

a security interest in the Debtor's right to distributions from the Sansom Street Partnership and Curtis

Investors, L.P.[205]

154.     On March 15, 2012, WSFS filed the WSFS Proof of Claim asserting a claim against the

Debtor in the amount of $929,259.69 and secured by certain of the Debtor's partnership interests,

---

[199] Transcript 3/30/2015, 143:3-19.

[200] *See*, First Interim Application, April 24, 2012: "Telephone conference with J. Grasso and B. Kaplan advising on potential income distribution from partnerships."  Transcript 3/30/2015, 104:5-19.

[201] Transcript 5/26/2015, 17:12-18:20.

[202] Bancorp Proof of Claim No. 33-1 and Proof of Claim No. 35-1 (together, "Bancorp Proof of Claim").

[203] NexTier Proof of Claim No. 29-1 ("NexTier Proof of Claim"); Bankr. Docket No. 195, Ex. E, Amendment to Line of Credit dated June 30, 2009, attached to NexTier's Motion to Enjoin Use of Cash Collateral.  Pursuant to an Amendment to a Line of Credit dated June 30, 2009, the Debtor pledged to execute on or before July 10, 2009, an amendment to the NexTier Loan documents that would grant to NexTier a security interest in the Debtor's equity interest and right to receive distributions from Curtis Partners JV, L.P., Curtis Investors L.P., J. Grasso Properties, LLC and all other entities in which the Debtor has an equity interest or a right to receive distributions.

[204] Transcript 3/13/2012, 23:10-24:2.

[205] *Id.*

inclusive of his interest in both Curtis Investors, L.P. and Sansom Street Partnership.[206]

155.    No later than March 15, 2012, Winterhalter had reason to know that WSFS was asserting

a security interest in the Debtor's distributions from Curtis Investors, L.P. and Sansom Street Partnership.

156.    On May 3, 2012, NexTier filed the NexTier Proof of Claim asserting a claim against the

Debtor in the amount of $496,030.13 and secured by the Debtor's partnership interests.[207]

157.    No later than May 3, 2012, Winterhalter had reason to know that NexTier was asserting a

security interest in all of the Debtor's partnership interests and that any partnership distribution may

constitute the cash collateral of NexTier.

158.    On May 4, 2012, Bancorp filed a Proof of Claim asserting claims against the Debtor in

the amount of $544,575.46, and secured by all of the Debtor's partnership interests in Curtis Investors,

L.P., PLB Investors, L.P. and JGKM Assoc., LLC.[208]

159.    On May 4, 2012, Bancorp filed a Proof of Claim asserting claims against the Debtor in

the amount of $299,216.42 and secured by all of the Debtor's partnership interests in Curtis Partners JV,

L.P. and Curtis Investors, L.P.[209]

160.    No later than May 4, 2012, Winterhalter had reason to know that Bancorp was asserting a

security interest in certain of the Debtor's partnership interests including Curtis Investors, L.P. and that

any partnership distribution from those partnerships may constitute the cash collateral of Bancorp.

161.    Despite his knowledge of at least the existence of the WSFS lien on the Debtor's interest

in distributions from Curtis Investors, L.P. and Sansom Street Partnership, NexTier's assertion of a lien

on all of the Debtor's partnership interests, and Bancorp's assertion of a lien on certain of the Debtor's

partnership interests, Winterhalter did not advise the Debtor as to whether the post-petition use of

distributions received from Curtis Investors, L.P. or any other of his partnerships required the consent of

---

[206] WSFS Proof of Claim.

[207] NexTier Proof of Claim.

[208] Bancorp Proof of Claim, No. 33-1.

[209] Bancorp Proof of Claim, No. 35-1.

secured creditors or the approval of this Court.

162.     On August 3, 2012, NexTier filed a Motion to Enjoin Use of Cash Collateral and/or for

Adequate Protection ("NexTier Motion to Enjoin Use of Cash Collateral").[210]

163.     On August 29, 2012, more than six (6) months after the Petition Date, the Debtor and

NexTier entered into a stipulation permitting the Debtor to use NexTier's cash collateral until further

order of the Court and after a hearing on the Motion to Enjoin Use of Cash Collateral.[211]

164.     On November 12, 2012, Bancorp filed a Response and/or in the Alternative Objection to

the Motion of NexTier Bank, N.A. d/b/a Radnor Trust Company to Enjoin Use of Cash Collateral and/or

for Adequate Protection ("Bancorp Objection to Use of Cash Collateral"), seeking to enjoin the Debtor's

use of Bancorp's cash collateral.[212]

165.     The Debtor and Bancorp never entered into a cash collateral agreement.[213]

166.     The Debtor's pre-petition business practice was not to report the diversion of

distributions from one entity to another entity as income to the Debtor.[214]

167.     Winterhalter knew of the Debtor's pre-petition business practice to direct the payment of

distributions he received personally from Curtis Investors, L.P. and other partnerships to other business

entities controlled by the Debtor without recognizing such distributions as income to the Debtor.[215]

168.     Winterhalter advised Kaplan that the post-petition diversion of distributions from one

entity to another entity was not required to be reported on the Debtor's MORs because the Debtor "didn't

spend the money on something personally."[216]

---

[210] Bankr. Docket No. 195.

[211] Bankr. Docket No. 235.

[212] Bankr. Docket No. 334.

[213] Bankr. Docket No. 699, Trustee's Motion for Authority to Make Adequate Protection Payments to the Bancorp Bank.

[214] Transcript 5/26/2015, 63:18-64:20; 78:13-25.

[215] 3/30/2015 Hearing, Status Report; Transcript 5/26/2015, 18:15-20.

[216] Transcript 5/26/2015, 79:1-81:6.

169.   Kaplan relied upon the advice of Winterhalter when Kaplan failed to report the diversion of distributions due to the Debtor to other non-debtor entities controlled by the Debtor on the MORs.[217]

170.   Prior to filing the Debtor's Petition, Winterhalter was aware of the Debtor's interest in Curtis Investors, L.P.[218]

171.   As alleged by the Debtor's Schedule B, the Debtor, with Donna Grasso, held as tenants by the entirety, a 90% interest in Curtis Investors, L.P.[219]

172.   During his assistance with the administration of the Debtor's bankruptcy estate, Winterhalter knew that the Debtor, in his personal capacity, received periodic distributions resulting from the Debtor's interest in Curtis Investors, L.P.[220]

173.   Winterhalter knew that the Debtor's receipt of distributions from Curtis Investors, L.P. was one of Debtor's sources of income.[221]

174.   Winterhalter knew that the Debtor's interest in distributions from Curtis Investors, L.P. was one of his estate's most significant assets.[222]

175.   Winterhalter knew that the Debtor controlled, in his sole discretion, whether Curtis Investors, L.P. made distributions.[223]

176.   Winterhalter knew that the Debtor's interest in Curtis Investors, L.P. would be required to fund a potential Chapter 11 plan.[224]

177.   Winterhalter did not conduct any investigation of the assets held by Curtis Investors,

---

[217] Transcript 5/26/2015, 79:22-82:21.

[218] Transcript 3/30/2015, 34:16-25.

[219] Schedule B, Line 14 and Attached Exhibit.

[220] Transcript 3/30/2015, 35:1-18.

[221] Transcript 12/8/2014, 106:17-22; Transcript 3/30/2015, 35:9-15.

[222] Transcript 12/8/2014, 101:18-20; Transcript 3/30/2015, 66:20-67:5.

[223] Transcript 3/30/2015, 39:4-9.

[224] Transcript 3/30/2015, 181:2-8.

L.P.[225]

178.    Winterhalter never requested the Debtor provide Winterhalter any financial information

relating to Curtis Investors, L.P.[226]

179.    No later than February 21, 2012, the Debtor had requested legal advice from Winterhalter

regarding whether the Debtor's interest in Curtis Investors, L.P. was subject to a security interest.[227]

180.    During the month of June 2012, Kaplan disclosed to Winterhalter that the Debtor was

causing Curtis Investors, L.P. to make distributions directly to third parties in order to fund the renovation

of the Debtor's personal residence, including a distribution of at least $125,000.00 to fund the installation

of a copper roof on the Debtor's personal residence (the "Roofing-Repair Distribution").[228]

181.    After learning of the Roofing-Repair Distribution, Winterhalter allegedly instructed the

Debtor and Kaplan that any distributions made by Curtis Investors, L.P. on the Debtor's behalf must be

deposited into the estate's DIP Account prior to being disbursed for any purpose and disclosed on the

MORs.[229]

182.    Winterhalter also allegedly again instructed the Debtor and Kaplan that any distributions

made by Curtis Investors, L.P. directly to other entities owned or controlled by the Debtor, and not made

for the Debtor's personal benefit, need not be disclosed or otherwise deposited into the estate's DIP

Account prior to being disbursed to the non-debtor entity.[230]

183.    After Winterhalter allegedly instructed Debtor and Kaplan on the method for addressing

partnership distributions made on behalf of Debtor, the Debtor caused distributions totaling at least

$377,549.90 to be made directly to third parties on his behalf including, $38,482.57 by JGKM Associates,

---

[225] Transcript 3/30/2015, 37:16-18; 40:12-14.

[226] Transcript 3/30/2015, 40:15-16.

[227] First Interim Application, February 21, 2012: "Telephone Conference with J. Grasso inquiring as to legitimacy of WSFS obtaining lien in Curtis Center interest."

[228] Transcript 3/30/2015, 43:8-16; 5/27/2015, 124:7-22; 135:24-136:3.

[229] Transcript 3/30/2015, 43:17-23; Transcript 5/26/2015, 97:17-98:20; Transcript 5/27/2015, 125:9-21.

[230] Transcript 3/30/2015, 52:1-15; 53:21-54:1.

L.P.; $37,600.00 by WSC and $301,467.33 by Curtis Investors, L.P.[231]  The Curtis Investors, L.P.

distributions included the Unauthorized Post-Petition Payment to Winterhalter.[232]

184.    During the month of June 2012, Winterhalter did not advise the Debtor whether the post-

petition use of distributions received from Curtis Investors, L.P. required the consent of secured creditors

or the approval of this Court.

185.    None of the Original MORs, including the Original June 2012 MOR, made any reference

to the Roofing-Repair Distribution.[233]

186.    Winterhalter reviewed the Original MORs, prior to filing them on behalf of the Debtor

but failed to advise the Debtor or Kaplan to include the Roofing-Repair Distribution.[234]

187.    None of the Amended MORs, including the amended June 2012 MOR ("Amended June

2012 MOR"), included any reference to the Roofing-Repair Distribution or any of the distributions to

third parties made for the Debtor's benefit primarily for renovations and repairs to the Debtor's residence

(the "Renovation Payments").

188.    Winterhalter reviewed the Amended MORs prior to filing them but made no inquiry to

the Debtor or Kaplan regarding the absence of the Roofing-Repair Distribution or whether there were any

additional partnership distributions made to third parties for the Debtor's benefit.[235]

189.    At the hearings before this Court, Winterhalter evaded questions about his actions and

failed to provide any explanation regarding the omission of the Roofing-Repair Distribution from the

MORs.[236]

---

[231] Trustee's Trial Ex. 7.

[232] Transcript 3/30/2015, 44:19-21.

[233] Transcript 5/27/2015, 135:24-136:15.

[234] Transcript 5/27/2015, 136:12-15, Winterhalter admitted to reviewing the June 2012 MOR, but offered no explanation for why the June 2012 MOR omitted reference to the Roofing-Repair Distribution.

[235] *Id.*

[236] Transcript 5/27/2015, 136:12-15.

## The Unauthorized Post-Petition Payment

190.    Winterhalter requested the Debtor cause Curtis Investors, L.P. to pay the Unauthorized Post-Petition Payment to the Firm.[237]

191.    At the request and on the advice of Winterhalter, the Debtor caused Curtis Investors, L.P. to pay the Unauthorized Post-Petition Payment to the Firm for legal services provided to the Debtor.[238]

192.    At the time Winterhalter requested the Debtor make payment of the Unauthorized Post-Petition Payment to him, Winterhalter had reason to investigate whether the Debtor's interest in distributions from Curtis Investors, L.P. was collateral securing the claims of Bancorp and NexTier.[239]

193.    At the time Winterhalter requested the Debtor make payment of the Unauthorized Post-Petition Payment to the Firm, Winterhalter did not advise the Debtor that the payment of the Unauthorized Post-Petition Payment from the cash collateral of Bancorp and NexTier required either (i) the consent of Bancorp and NexTier; or (ii) the approval of this Court.

194.    At the time Winterhalter requested the Debtor make payment of the Unauthorized Post-Petition Payment to the Firm, the Debtor had not contested the validity of the liens asserted by Bancorp and NexTier in the Debtor's interest in distributions from Curtis Investors, L.P.

195.    On July 16, 2012, Curtis Investors, L.P. paid the Unauthorized Post-Petition Payment directly to the Firm.[240]

196.    At the time Winterhalter received the Unauthorized Post-Petition Payment, Winterhalter had reason to know that the Debtor's interest in distributions made by Curtis Investors, L.P., including the distribution that funded the Unauthorized Post-Petition Payment, was Bancorp and NexTier's cash collateral.[241]

---

[237] Transcript 3/30/2015, 82:4-8.

[238] Transcript 8/28/2012, 106:9–11, Transcript 3/30/2015, 82:4-8.

[239] *See*, Bancorp Proof of Claim; NexTier Proof of Claim.

[240] Transcript 3/30/2015, 58:8-21.

[241] *See*, Bancorp Proof of Claim, NexTier Proof of Claim.

197.    At the time Winterhalter requested the Debtor make payment of the Unauthorized Post-Petition Payment to the Firm, Winterhalter knew that the Firm had not filed any application for compensation, including the First Interim Application.

198.    The First Interim Application was filed on July 17, 2012, one day after Winterhalter received the Unauthorized Post-Petition Payment.

199.    At the time Winterhalter requested the Debtor make payment of the Unauthorized Post-Petition Payment to the Firm, the Firm had not filed a motion with this Court seeking authority to modify the terms of his original retention by the Debtor's bankruptcy estate.

200.    At the time Winterhalter requested the Debtor make payment of the Unauthorized Post-Petition Payment to the Firm, Winterhalter knew that the Debtor was to receive a distribution from Curtis Investors, L.P.[242]

201.    At the time Winterhalter requested the Debtor make payment of the Unauthorized Post-Petition Payment to the Firm, Winterhalter knew that the contents of the estate's DIP Account were insufficient to fund the Unauthorized Post-Petition Payment.[243]

202.    The Unauthorized Post-Petition Payment was funded by a distribution made by Curtis Investors, L.P. on behalf of the Debtor and was not deposited in the estate's DIP Account prior to its payment to the Firm.

203.    Based upon Winterhalter's receipt and the Firm's retention of the Unauthorized Post-Petition Payment, this Court does not find credible Winterhalter's testimony that he instructed Kaplan that any distributions from Curtis Investors, L.P. made on behalf of the Debtor must be deposited into and disbursed from the estate's DIP Account.

204.    Winterhalter did not seek or obtain this Court's approval of the Firm's receipt of the Unauthorized Post-Petition Payment. [244]

---

[242] Transcript 3/30/2015, 86:3-12.

[243] Transcript 3/30/2015, 86:3-6.

[244] Transcript 3/30/2015, 54:17-55:15.

205.    Winterhalter explained the Firm's failure to seek prior approval of its receipt of the

Unauthorized Post-Petition Payment by reference to his belief that attorneys are only required to seek

approval of post-petition payments received directly from a debtor-in-possession.[245]

206.    Winterhalter further explained the Firm's failure to seek prior approval of its receipt of

the Unauthorized Post-Petition Payment by reference to his belief that the payment of the Unauthorized

Post-Petition Payment by an affiliated, non-debtor entity obviates the requirement of prior approval by the

bankruptcy court.[246]

207.    In connection with the Firm's receipt of the Unauthorized Post-Petition Payment,

Winterhalter performed no investigation of whether Curtis Investors, L.P. was authorized to make

payment of the Unauthorized Post-Petition Payment.

208.    In connection with the Firm's receipt of the Unauthorized Post-Petition Payment,

Winterhalter performed no investigation of whether the Firm's receipt of the Unauthorized Post-Petition

Payment constituted an unauthorized use of cash collateral.

209.    Winterhalter made no investigation of whether the Debtor violated his duties as a debtor-

in-possession when the Debtor directed Curtis Investors, L.P. to make payment of the Unauthorized Post-

Petition Payment.

**The Discharge Litigation and Services for Non-Debtor Entities**

210.    During his involvement in this bankruptcy case, Winterhalter represented the Debtor in

defending against adversary actions objecting to the Debtor's discharge filed by the UST (*DeAngelis v.*

*Grasso*, Adversary No. 13-00477), the Chapter 7 Trustee (*Shubert v. Grasso*, Adversary No. 13-00479),

Madison (*Madison Capital Company, LLC v. Grasso*, Adversary No. 13-00438) and Michael Katz (*Katz*

*v. Grasso*, Adversary No. 13-00481) (collectively the "Discharge Litigation"), and objecting to the

dischargeability of a debt filed by Sherwin Williams Company (*Sherwin Williams Company v. Grasso*,

---

[245] *Id.*

[246] *Id.*

Adversary No. 12-00394) (the "Dischargeability Litigation," together with the Discharge Litigation, the "Litigation").

211.    Winterhalter filed various pleadings and engaged in discovery on behalf of the Debtor in the Litigation, including opposing a Motion for Summary Judgment in the Discharge Litigation.[247]

212.    As set forth in Debtor's Schedule B, the Debtor held ownership interests in numerous partnerships and limited liability corporations.[248]  During the Debtor's bankruptcy, several of these entities, including JGKM Associates, L.P., Warminster Plaza Associates, York & Swam Assoc., L.P., and Positive Dining Experiences, Inc. (collectively, the "Distressed Entities") were suffering financial difficulties and defending against numerous collection efforts by various lenders including foreclosure upon real estate, set-off against bank accounts and enforcement of mechanics liens, or debtors in on-going Chapter 11 bankruptcy cases, the Related Entities.

213.    Winterhalter provided legal services at the Debtor's request directly to the Distressed Entities by reviewing various complaints against the Distressed Entities, negotiating with creditors of the Distressed Entities, and representing the Distressed Entities in state court litigation.[249]

### The Firm's Legal Services

214.    The Firm seeks compensation for 322.35 hours of legal services provided to the Debtor.

215.    The Court finds that 35.95 hours of time in the Applications are related to filing the Debtor's schedules and petition.[250]

216.    The Court finds that 9.6 hours of time included in the Applications are related to filing

---

[247] Adv. No. 12-00394, Docket No. 109; Adv. No. 13-00438, Docket Nos. 199 and 200.

[248] Schedule B, Line 14 and Attached Exhibit.

[249] For example, First Interim Application, February 23, 2012: "Telephone Conference with J. Grasso desire to also file Warminster Plaza to forestall Bank from sweeping accounts;" April 18, 2012: "Reviewed Notice of Sheriff's Sale issued by Vist Bank on account of Doylestown Raw Land at York and Swamp Roads;" May 8, 2012: "Reviewed Praecipe to Enter Default on Mechanics Lien Claims sought by Sunlight v. WSC717;" October 22, 2012: "Telephone Conference with J. Grasso re: follow up to discussions on Sherwin Williams historic tax credit at Union Trust;" October 23, 2012: "Telephone Conference with client update on his negotiations with Bank on Positive Dining Experience interests."

[250] A schedule setting forth the hours attributable to the Firm's services relating to the Debtor's petition and schedules is appended to the Opinion as Attachment 2.

the Debtor's MORs.[251]

217.    The Court finds that 50.45 hours of time included in the Applications are related to defense of the Conversion Motion.[252]

218.    The Court finds that 11.6 hours of time included in the Applications are for services relating to the Cash Collateral.[253]

219.    The Court finds that 6.7 hours of time included in the Applications are for services relating to the Rule 2015.3 Reports.[254]

220.    The Court finds that 46.6 hours of time included in the Applications are related to service provided to the Debtor in his personal capacity (e.g. representation of Debtor in defense against the discharge litigation and representative of separate non-debtor entities).[255]

221.    The Court finds that 19.50 hours of time included in the Applications are related to the sham purchase of the WSFS Claim.[256]

222.    The Court finds 141.9 hours of the hours set forth in the Applications are attributable to legal services provided for the general administration of the Debtor's bankruptcy case.[257]

---

[251] A schedule setting forth the hours attributable to the Firm's services relating to the MORs is appended to the Opinion as Attachment 3.

[252] A schedule setting forth the hours attributable to the Firm's services relating to the Conversion Motion is appended to the Opinion as Attachment 4.

[253] A schedule setting forth the hours attributable to the Applicant's service relating to cash collateral is appended to the Opinion as Attachment 5.

[254] A schedule setting forth the hours attributable to the Firm's services relating to the Rule 2015.3 Reports is appended to the Opinion as Attachment 6.

[255] A schedule setting forth the hours attributable to the Firm's services relating to the personal services provided to the Debtor is appended to the Opinion as Attachment 7.

[256] A schedule setting forth the hours attributable to the Firm's services relating to the WSFS Claim Purchase is appended to the Opinion as Attachment 8.

[257] A schedule setting forth the hours attributable to the Applicant's service relating to the administration of the Debtor's estate is appended to the Opinion as Attachment 9.

## IV.    CONCLUSIONS OF LAW

### A.    Standard for Compensation

This Court may award a professional person "reasonable compensation for actual, necessary

services rendered" and "reimbursement for actual, necessary expenses," but may not award compensation

for "services that were not ... reasonably likely to benefit the debtor's estate[ ] or necessary to the

administration of the case."  11 U.S.C. §330(a)(1) and (a)(4).  The burden of proof remains with the

attorney applicant.  *Woods v. City Nat. Bank. & Trust Co. of Chicago*, 312 U.S. 262, 268 (1941) ("[the

attorney] has the burden of proving their worth."); *Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.*,

50 F.3d 253, 261 (3d Cir. 1995) ("The fee applicant has the burden of proving it has earned the fees it

requests, and that the fees are reasonable.").

In determining the amount of reasonable compensation, §330(a)(3) requires a bankruptcy court to

consider "the nature, the extent, and the value of [the legal] services" taking into consideration "all

relevant factors" including but not limited to those listed in §330(a)(3)(A) through (F).  As elaborated by

the Third Circuit, this Court must consider:

> (1) the time spent performing the services;
> (2) the rates charged;
> (3) whether the services were necessary to the administration of, or beneficial toward the
> completion of the case;
> (4) whether the services were performed within a reasonable amount of time commensurate with
> the complexity or importance of the task(s) completed;
> (5) whether the attorney demonstrated skill and experience in the bankruptcy field; and
> (6) whether the compensation is reasonable based on the customary compensation charged by
> comparably skilled practitioners in non-bankruptcy cases.

*In re Jade Management Services*, 386 Fed. Appx. 145, 151 (3d Cir. 2010).

Generally speaking, this Court must satisfy itself that the attorney's services were actual and

necessary by determining whether, if at the time services were rendered, the attorney reasonably believed

such services would benefit the estate.  *See, e.g., Barron & Newburger, P.C. v. Texas Skyline, Ltd. (In re

Woerner)*, 783 F.3d 266, 277 (5th Cir. 2015); *In re Top Grade Sausage, Inc.*, 227 F.3d 123, 131-32 (3d

Cir. 2000) (abrogated on other grounds by *Larmie v. U.S. Trustee*, 540 U.S. 526 (2004)).  Next, the Court

must assess the value of those services. *In re APW Enclosure Systems, Inc.*, Bky. No. 06-11378, 2007 WL 3112414, *3 (Bankr. D. Del. Oct. 23, 2007). If this Court determines that the amount of proposed compensation exceeds the reasonable value of the Firm's services, the Court may order the return to the estate of a fee paid to an attorney for the debtor to the extent compensation exceeded the reasonable value of services. 11 U.S.C. §329(b). Significantly, this test must be applied without the benefit of hindsight. *Top Grade Sausage, Inc.*, 227 F.3d at 131-32.

The reasonable value of an attorney's services is typically evaluated by considering the amount of time spent, the rates charged and the market rate of similarly skilled attorneys. 11 U.S.C. §330(a)(3). To calculate value, this Court is instructed to rely on a market approach that looks to the amounts typically charged by similarly situated professionals. *See, e.g., In re Busy Beaver Building Centers, Inc.*, 19 F.3d 833, 848 (3d Cir. 1994) (stating that courts should "rely on the market" to assess reasonableness of fees); *In re Dubin Paper Co.*, 169 B.R. 115, 122 (Bankr. E.D. Pa. 1994). In reciting this standard, this Court is careful to note that this formulation presumes that the services were competent. Typically, the issue of competence is addressed when considering the reasonableness of an attorney's billable rate or the amount of time spent on any given task. For instance, if a bankruptcy court determines that a particular service did not require special skills, a bankruptcy court may determine that it was unreasonable to charge an above-average billable rate or to accrue a significant amount of time. *See, e.g., In re Dublin Paper Co.*, 169 B.R. at 123.

Here, the issue is not whether the Debtor's case was simple or did not otherwise present enough complexity to justify the payment of the billable rates charged by the Firm. Rather, both this Court and the parties who objected to the Applications called into questioned whether Winterhalter provided competent representation of the Debtor resulting in a benefit to the Debtor's estate. While no mention of competence is made by §330(a), it is generally presumed that the competent performance of services is a prerequisite to the §330(a) inquiry. *In re Glemaud*, 2013 WL 4498677 (Bankr. D. Ct. 2013) (When determining whether attorney fees are reasonable under the circumstances, the Court must consider the nature of the services and the competence of the performance); *Matter of Grant*, 14 B.R. 567, 569 (Bankr.

S.D.N.Y. 1981) (same). "Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Pa. R.P.C. 1.1. *See, In re Dean,* 401 B.R. 917, 924 (Bankr. D. Idaho 2008) (When determining whether an attorney provided competent legal services a court may consider several factors including whether (1) the attorney impressed upon the debtor the critical importance of accuracy in the preparation of documents to be presented to the Court; (2) did the attorney seek from the debtor, and then review, whatever documents were within the debtor's possession, custody or control in order to verify the information provided by the debtor; and (3) did the attorney employ such external verification tools as were available and not time or cost prohibitive (e.g., on-line real estate title compilations, on-line lien search, tax "scripts")).

As discussed below, Winterhalter failed to provide competent legal representation to the Debtor in his bankruptcy case. Winterhalter failed to undertake any material investigation of the facts of his client's case. Winterhalter's time records and his testimony to this Court revealed that he made no material effort to counsel his client. The evidence indicates that, at best, Winterhalter did nothing more than simply provide curt reminders to the Debtor that he must undertake certain actions such as the creation and use of a DIP Account or that he must ensure disclosures are accurate. Emails reciting rote instructions are insufficient. Advice should be tailored to a client's individual circumstances. As is evidenced by the circumstances of this case, the failure of Winterhalter to perform any investigation of his client's circumstances, or his willful disregard of the same, rendered his services valueless.

In evaluating the value the Firm's services, this Court has been careful not to apply the benefit of hindsight. *See, e.g., Top Grade Sausage, Inc.,* 227 F.3d 123 at 132 ("Accordingly, the debtor's attorney must show that the representation was reasonably likely to benefit the debtor's estate."); *In re Taxman Clothing Co.,* 49 F.3d 310, 313-15 (7th Cir. 1995); *In re Molycorp, Inc.,* 562 B.R. 67, 81 (Bankr. Del. 2017) ("For the same reasons, the bankruptcy court cannot allow compensation for services that were not reasonably likely to benefit the estate or were not necessary to the administration of the case."). Instead, this Court has premised its evaluation of the quality of Winterhalter's services upon whether, at the time his services were rendered, a reasonably prudent counsel would have undertaken the same course. *See,*

*e.g., In re Smith Technology Corp.*, Civ. No. 99-132, 1999 WL 1427681, \*6-7 (D. Del. Dec. 23, 1999).

B.      **Benefit to the Estate**

1.      **Services Relating to the Preparation of the Debtor's Initial Petition and Schedules**

Several categories of this Court's inquiries implicate Winterhalter's initial representation of the

Debtor in his preparation of his petition and his schedules.[258]  Pursuant to §521 and Fed. R. Bankr. P.

1007, a debtor is obligated to prepare and file his schedules.  *See, e.g., In re Matthews*, 154 B.R. 673, 678

(Bankr. W.D. Tex. 1993).  The duties imposed by §521 are considered to be among the most significant

imposed upon a debtor and have been read to extend to debtor's counsel.  *See, e.g., In re Daw*, Bky. No.

09-00690, 2011 WL 231362, \*7 (Bankr. D. Idaho Jan. 24, 2011) ("few rules in bankruptcy are as

essential as proper client review, and execution, of petitions, schedules and statements."); *In re Engel*, 246

B.R. 784, 794 (Bankr. M.D. Pa. 2000) ("Regardless of who drafted the schedules, Bressett's obligation to

competently represent his client required him to review these documents with his clients before they

became a part of the public record.").  Because a debtor's creditors are expected to rely upon the accuracy

of a debtor's initial financial disclosures, an attorney is generally entitled to compensation for any

services incurred in connection with an attorney's assistance with a debtor's preparation of complete and

accurate schedules.  *In re Matthews*, 154 B.R. 673, 679 (Bankr. W.D. Tex. 1993).

While a debtor-in-possession who is an individual is under no obligation to investigate its assets,

it cannot be said that this exception absolves an attorney for a debtor-in-possession from the need to

conduct any reasonable investigation necessary to provide competent legal advice to his client.  *See, e.g.,*

Fed. R. Bankr. P. 9011(b)(3), Pa. R.P.C. 1.1(5).  In furtherance of a debtor's significant disclosure

obligations, a debtor's attorney may not operate as a purely passive conduit.  A debtor's attorney is not

hired merely to file documents with this Court.  Pursuant to an attorney's obligations to the judicial

system as embodied by Rule 9011(b)[259] as well as an attorney's professional obligations to her client, a

---

[258] Appraisal Order, Questions D.1 and D.2.

[259] By filing documents on behalf of his client, Winterhalter made a certification within the meaning of Fed. R. Bankr. P. 9011(b) that "the allegations and other factual contentions have evidentiary support, or if specifically so

debtor's attorney must conduct a reasonable inquiry into the facts set forth in her client's schedules. *In re Kayne*, 453 B.R. 372, 383 (9th Cir. BAP 2011); *In re Withrow*, 405 B.R. 505, 512 (1st Cir. BAP 2009); *In re Stomberg*, 487 B.R. 775, 811 (Bankr. S.D. Tex. 2013); *In re Bellows-Fairchild*, 322 B.R. 675, 681 (Bankr. D. Or. 2005); *In re Matthews*, 154 B.R. 673, 680 (Bankr. W.D. Tex. 1993). A debtor's attorney cannot (1) ignore information otherwise known or available to him or (2) allow the filing of schedules that a debtor's attorney has reason to suspect are inaccurate. *In re Parikh*, 508 B.R. 572, 590 (Bankr. E.D.N.Y. 2014); *In re Cuomo*, Bky. No. 10-14813, 2013 WL 3155425, *9-10 (Bankr. D. Nev. June 20, 2013); *In re Tufano*, Bky. No. 10-07692, 2011 WL 1473384, *5 (Bankr. M.D. Pa. Apr. 19, 2011).

Crediting Winterhalter's testimony, this Court cannot confirm Winterhalter acted reasonably or otherwise satisfied his duty of inquiry with regard to his filing of the Debtor's petition and schedules. A reasonably prudent counsel is entitled to rely on the representations of his client. *See, e.g., Reis v. Barley, Snyder, Senft & Cohen LLC*, 667 F. Supp. 2d 471, 489 (E.D. Pa. 2009) ("An attorney is entitled to rely in good faith upon the statement of facts made to him by his client, and is not under a duty to institute an inquiry for the purpose of verifying his statement before giving advice thereon."). However, when an attorney has reason to doubt his client, blind reliance ceases to be reasonable. *United States v. Kauffman*, 109 F.3d 186, 190 (3d Cir. 1997) ("While counsel is entitled to substantial deference with respect to strategic judgment, an attorney must investigate a case, when he has cause to do so, in order to provide minimally competent professional representation."); *In re Ingram*, Bky. No. 13-35756, 2014 WL 1278160, *3-4 (Bankr. E.D. Wis. Mar. 27, 2014) (relying on attorney's admission that she had failed to perform legal research relating to her client's bankruptcy objectives to conclude that her fees were not reasonable).

---

identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Bankr. P. 9011(b); *see also In re Withrow*, 405 B.R. 505, 512 (1st Cir. BAP 2008) (recognizing Rule 9011 imposes an obligation on debtor's attorneys to perform a reasonable investigation of the information contained in a debtor's bankruptcy schedules); *In re Armwood*, 175 B.R. 779, 788 (Bankr. N.D. Ga. 1994) (recognizing that Rule 9011 establishes the standard for determining whether an attorney's inquiry is reasonable under the circumstances).

In his testimony to this Court, Winterhalter stated that he relied exclusively on the Debtor and his accountant Kaplan, to prepare the Debtor's initial filings and that he warned them repeatedly of the requirement of full and accurate disclosure. This Court has received no evidence that Winterhalter asked either the Debtor or Kaplan probing questions designed to elicit his client's accurate and honest disclosure. Rather, it appears that in spite of his own misgivings regarding the accuracy of the Debtor's schedules, including Debtor's claim that he owned his partnership interest as tenants by the entirety, Winterhalter merely recited boilerplate advice regarding the need for complete and accurate disclosure. The absence of any evidence of a more fulsome effort to advise his client as to the nature of his disclosure obligations indicates he failed to fulfill his duty of inquiry.

While Winterhalter stated that he reviewed the Debtor's tax returns, the record confirms that he failed to notice that the Debtor's Petition and Schedules contained facial inconsistencies with other publicly filed documents known to Winterhalter. At the very least, his Rule 11 obligations included a duty to confirm that the Debtor's statements in his Schedule B were consistent with the Debtor's statements in the WSC List of Equity Holders.

From the evidence, this Court may conclude that facial inconsistencies between the contents of the Debtor's Petition and Schedules with other documents known to Winterhalter indicate that he failed to ensure the contents of the Petition and Schedules were internally and externally consistent. *See, e.g., In re Parikh*, 508 B.R. 572, 590-94 (Bankr. E.D.N.Y. 2014) (finding that counsel's failure to review prior petitions to ensure accuracy of disclosures in new petitions constituted sanctionable conduct); *In re Cuomo*, Bky. No. 10-14813, 2013 WL 3155425, *18 (Bankr. D. Nev. June 20, 2013) ("His practice of deliberately ignoring his clients' prior bankruptcy schedules reflects poorly on the legal profession, as it engenders distrust and the perception that attorneys are inattentive to clients' particular circumstance.").

2.     **Services Relating to the Preparation of the Debtor's Monthly Operating Reports**

Another concern identified by the Court related to whether the Firm instituted sufficient client controls to ensure the Debtor's compliance with his obligations as debtor-in-possession.[260]  One area of concern raised by the Court related to the Debtor's MORs and whether Winterhalter had instituted sufficient controls to ensure that the Debtor filed timely, accurate and complete MORs.  A Chapter 11 debtor is obligated to file the reports and summaries required by §704(a)(8) of the Bankruptcy Code. 11 U.S.C. §1107(a); Fed. R. Bankr. P. 2015.  The procedures for filing the MORs are established by the UST and set forth in the Operating Guidelines for Chapter 11 Case (the "Guidelines").  The Guidelines provide, in relevant part, that a debtor file an initial report within 15 days after the petition date and a monthly report thereafter by the 20th day following the end of the month.  *See In re Kholyavka*, 2008 WL 3887653, *1 (Bankr. E.D. Pa. 2008) (describing the Guidelines).  The "[m]onthly operating reports are the 'life blood of Chapter 11, enabling creditors to keep tabs on the debtor's post-petition operations.'"  *In re Domiano*, 442 B.R. 97, 105 (Bankr. M.D. Pa. 2010) (*citing In re Kholyavka*, 2008 WL 3887653 at *4).

As Debtor's counsel, Winterhalter was required to implement a procedure that ensured that the Debtor satisfied his obligations to file MORs that complied with the Guidelines.  At the Hearings, Winterhalter testified that he established sufficient controls to ensure that the Debtor fulfilled his obligation to timely file accurate, truthful and complete MORs by (1) instructing Kaplan on the requirements for preparing the MORs, and (2) advising Kaplan that all of the Debtor's income and expenses including partnership distributions "made on behalf of the Debtor personally" were to be disclosed on the MORs.  The record in this case belies Winterhalter's assertions.

A simple review of the Debtor's MORs reveals that whatever controls, if any, that Winterhalter installed were inadequate.  The MORs were not timely filed nor properly prepared, included contradictory information and were incomplete.  The Debtor did not file the Initial Report for February 2012 until

---

[260] *See* Appraisal Order, Question B.1.

August 30, 2012. The MORs for the months of March, April and May were filed on August 7, 2012, and June and July on August 27, 2012. The August 2012 MOR was not filed until October 4, 2012.

Several of the MORs were not prepared correctly and failed to comply with the Guidelines. The Original March 2012 and Original April 2012 MORs were submitted on the "Initial Report" form. As set forth in the Guidelines, this form is used to report the time period shortly after the petition date.

The Debtor's source of income was listed as "Loan Repayments" in all of the MORs except the August 2012 MOR. The Debtor's Schedule I, prepared and filed by Winterhalter, states the source of Debtor's income as "partnership distributions." No credible evidence was offered regarding the discrepancy. Indeed, the MORs included no information regarding the loans, including the amounts or terms. Furthermore, the MORs were incomplete and, among other things, did not include the statements for all of the Debtor's bank accounts. The bank statements for the DIP Account reflect it was opened in May 2012 at TD Bank. However, the Debtor failed to include a copy of the DIP bank statement for the May 2012 MOR. The August 2012 MOR included a copy of a bank statement for an account at Firstrust Bank. This was the Debtor's first disclosure of this particular bank account on the MORs.

Similarly, the Debtor's MORs did not disclose all of his income and expenses. In June 2012, Winterhalter learned from Debtor's accountant, Kaplan, that the Debtor was directing distributions to third parties for the Debtor's own personal benefit including the Roofing-Repair Distribution. Winterhalter allegedly instructed the Debtor that the distributions to third parties for the Debtor's "personal" benefit must be deposited into the DIP Account prior to disbursement and reported as income to the Debtor[261]. On August 7, 27, and 30, 2012, Winterhalter reviewed and filed the MORs for the months of February thru July 2012. None of the filed MORs included the Roofing-Repair Distribution totaling $125,000.00. The Debtor filed Amended MORs on October 1, 2012. The Amended MORs, likewise, did not disclose the Roofing-Repair Distribution.

---

[261] Transcript 5/27/2015, 125:9-15.

Winterhalter admitted to reviewing the MORs prior to filing them. As an experienced Chapter 11 practitioner, Winterhalter should have easily recognized the errors and omissions and provided additional instructions to both Debtor and Kaplan on the reporting requirements and the necessity that the Debtor's MORs be filed timely and include accurate and complete information. There is no evidence in the Firm's time records or from the Hearings that Winterhalter took sufficient action to correct the discrepancies or to adjust the client controls he allegedly put into place to ensure that the Debtor complied with his reporting requirement obligations. Rather, it appears that Winterhalter conducted nothing more than a cursory review, if any at all, and gave short shrift to the MORs before filing them with the Court. The Court finds that Winterhalter failed to act reasonably or otherwise provide adequate legal advice to ensure that the Debtor complied with his obligation to file accurate MORs. Winterhalter's failure warrants denial of any compensation for hours related to these services, as they were not likely to provide any benefit to the estate.

**3.      Services Relating to the Preparation of the Debtor's Rule 2015.3 Reports**

The Court identified as another concern that the Firm failed to act reasonably or otherwise provide adequate legal advice with regard to the Debtor's filing of the Rule 2015.3 Reports.[262]

Rule 2015.3 applies in all Chapter 11 cases and requires all Chapter 11 debtors in possession and Chapter 11 Trustees to file periodic reports of the value, operations and profitability of each entity in which the estate holds a substantial or controlling interest. Fed R. Bankr. P. 2015.3(a). For purposes of the rule, an estate is presumed to have a "substantial or controlling interest" in any entity in which the estate controls or owns at least a 20 percent interest. Rule 2015.3(c). The reports must be filed in accordance with the prescribed appropriate official form and "based upon the most recent information reasonably available to the trustee or debtor in possession." Rule 2015.3(a).

According to the Debtor's Schedule B, he owned 20 percent interest or more in numerous partnerships including Sansom Street Partnership and Curtis Investors, L.P. The Debtor was required to

---

[262] *See* Appraisal Order, Question D.6.

file his initial Rule 2015.3 Reports "no later than seven days before the first date set for the meeting of

creditors" and "no less frequently than every six months thereafter ..." Fed. R. Bankr. 2015.3(b). The

Debtor's meeting of creditors was held on March 13, 2012. Therefore, his first Rule 2015.3 Reports

should have been filed no later than March 6, 2012 and his second Rule 2015.3 Reports should have been

filed no later than September 6, 2012.[263] The Debtor did not file any of the required reports until ordered

to do so by this Court.[264] As a result, the Debtor filed his first Rule 2015.3 Reports on September 21,

2012. Thereafter, as ordered, seven days later on September 28, 2012, the Debtor filed his first periodic

report in which he provided financial information with regard to entities in which he held a minority

interest. The Debtor failed to file any additional Rule 2015.3 Reports.

In addition to being filed long after the applicable deadline, the contents of the Debtor's Rule

2015.3 Reports were also deficient. As provided by Official Form 26, Rule 2015.3 Reports are to include

financial information for the most recent six-month period of the current fiscal year and for the prior

fiscal year.[265] The Debtor's Rule 2015.3 Reports Periodic contained no information relating to the most

recent six-month period. The omission of that information is of particular significance as it would have

disclosed the Sansom Street Sale, the source of the monies used to purchase the WSFS claim, and the

source of the monies used to fund the loan repayments that the Debtor relied upon to fund his post-

petition expenses.

---

[263] Rule 2015.3(b) provides that the first report must be filed no later than seven days before the date first set for the meeting of creditors under section 341 of the Code. Subsequent reports must be filed no less frequently than every six months thereafter until either the effective date of a plan or the case is dismissed or converted. The reports must be served on the United States Trustee, on any creditors' committee, and on any party in interest that files a request for service of the reports.

[264] *See*, Conversion Denial Order, paragraph 6.

[265] Official Form 26, replaced effective December 1, 2017, by Official Form 426, included "Specific Instructions" and required that (1) each entity subject to the reporting requirement be listed in the table contained on the first page of the form, (2) reports for each entity be placed behind separate tabs, and (3) each such report shall consist of three exhibits, Exhibit A providing valuation information, Exhibit B providing financial statements, and Exhibit C providing a description of operations. Official Form 26 also required that the statement of valuation of the estate's interest in the entity include the basis, date and method for valuation. The financial statements, while unaudited, were required to include a balance sheet, a statement of income or loss, a change in cash flow, a statement of changes in shareholders'/partner' equity.

Winterhalter did not discuss or provide any instruction to the Debtor or Kaplan regarding the 2015.3 Reports until July 26, 2012, three days after Madison filed the Motion to Convert citing Debtor's failure to comply with Rule 2015.3 requirements as a basis for conversion to Chapter 7.[266] The Firm offered no evidence or reasonable explanation why Winterhalter failed to instruct or provide the Debtor with legal advice regarding his obligation to timely and properly prepare the 2015.3 Reports prior to July 26, 2012. Winterhalter's failure to provide the Debtor with timely advice and instructions did not benefit the Debtor's estate. Rather, Winterhalter's failure deprived creditors of critical information regarding the Debtor's partnership interests, and Debtor's receipt and use of the partnership distributions created suspicion among the creditors, contributed to the multiple litigation between the Debtor and his creditors at almost every juncture of his Chapter 11 case, and ultimately contributed to the conversion of the Debtor's case from Chapter 11 to Chapter 7.[267]

4.      **Services Relating to Administration of the WSFS Claim**

A dozen or more of the questions this Court put forward to the Firm required it to provide evidence sufficient to find a benefit to the estate relating to the WSFS Claim and its purchase by an insider of the debtor.[268] In response to the Court's inquiry, the Firm offered Winterhalter's testimony that his involvement in the WSFS Claim Purchase resulted in a benefit to the Debtor's estate by (1) reducing the WSFS Claim from $962,000.00 to $462,000.00, and (2) the subordination of the WSFS Claim that would likely occur as a result of anticipated creditor opposition to the purchase by an insider.[269]

The WSFS Claim Purchase did not result in any reduction in the WSFS Claim. Following its alleged purchase of the WFSF Claim, Sansom Street Partnership demanded payment of the full amount of the WSFS Claim. Sansom Street Partnership also claimed that, as the owner of the WSFS

---

[266] *See*, Findings of Fact, No. 55, *supra*.

[267] Madison asserted that the Debtor's failure to file the Rule 2015.3 Reports was a basis for conversion of the Debtor's bankruptcy from Chapter 11 to Chapter 7. *See*, Conversion Motion, pp 10-12.

[268] Appraisal Order, Questions A.1, A.2, A.3, A.4, B.5, B.6, B.7, C.2, C.3, C.4, D.4, H.1 and H.2.

[269] Transcript 3/30/2015, 99:22-100:2-1; 104:9-19; 115:10-24; 187:10-16.

Claim, it held a secured interest in the Debtor's partnership interest in and distributions from Curtis

Investors, L.P.  The Firm has identified no factual or legal basis that Winterhalter relied upon for his

conclusion that Sansom Street Partnership would seek payment of a lesser amount for the WSFS

Claim.  Winterhalter and David Grasso never discussed nor did David Grasso ever agree that

Sansom Street Partnership would accept less than the entire amount of the WSFS Claim, or

relinquish any security interest in Debtor's partnership interest in Curtis Investors, L.P.

 Even if the Court were to credit the Firm's arguments, any alleged benefit provided to the

estate by Winterhalter is insufficient to overcome the substantial harm that Winterhalter's poor legal

advice caused to the Debtor's estate.  As an initial matter, Winterhalter's advice was not rendered for

the benefit of the Debtor's estate.  Rather, it was provided for the exclusive purpose of assisting the

Debtor in a scheme he orchestrated, aided by his brother, David Grasso, for whatever reasons,[270] and

designed to (1) conceal the Debtor's settlement of the WSFS Claim; (2) deprive the Debtor's

creditors of the benefits resulting from the settlement of the WSFS Claim (the elimination of

$500,000.00 in secured claim against the Debtor's estate); (3) allow the Debtor to receive

undisclosed loan repayments and partnership distributions from Sansom Street Partnership; and (4)

preserve for the benefit of Debtor and David Grasso only the expected partnership distributions from

the Debtor's interest in Curtis Investors, L.P.  Winterhalter's advice substantially harmed the

Debtor's estate because the Debtor was able to secrete more than $156,758.35 from his bankruptcy

estate, the monies he received from Sansom Street Partnership for loan repayments and partnership

distributions.[271]  These payments were property of the Debtor's estate and which the Debtor had no

authority to use without the consent of his secured creditors or the approval of the bankruptcy court.

*See e.g., In re Dupell*, 235 B.R. 783, 794 (Bankr. E.D. Pa. 1999) (holding that "[p]ursuant to section

363(c)(2)(A) & (B), a debtor may only use cash collateral with the consent of the creditor or the

---

[270] Transcript 3/30/2015, 253:17-21.

[271] *See*, n.130, *supra*.

approval of the bankruptcy court based on a determination that the creditor's interest is adequately protected.").[272]

This Court remains unswayed by Winterhalter's "value" to the estate claims. They are simply post-hoc attempts by Winterhalter to justify his failure to comply with his obligations as counsel for a Chapter 11 debtor. When Winterhalter became aware of the opportunity to purchase the WSFS Claim at a discount, he was under an obligation to report the opportunity to this Court. *Grasso I*, 490 B.R. at 512–14. When Winterhalter became aware that estate assets would be used to purchase the WSFS Claim, he was under an obligation to report this use to this Court. *See, e.g., In re Food Management Group, LLC*, 380 B.R. 677, 708 (Bankr. S.D.N.Y. 2008) (observing that an attorney may violate her fiduciary obligation if she fails to report her client's misconduct). The Code does not afford an attorney the discretion to make these determinations outside the purview of a Bankruptcy court or a debtor's creditors. *Rancourt*, 207 B.R. at 361 207 B.R. 338, 361 (Bankr. D. N.H. 1997) ("The problem for the debtors' attorneys [is] ... that they 'took it upon themselves' to resolve the arguable issue in favor of the interest of the individual debtor and at the expense of the bankruptcy estate without any disclosure"). Expediency does not justify such short cuts. *See, e.g., In re Combustion Engineering, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004) (recognizing that a bankruptcy courts equitable powers cannot trump the express provisions of the Bankruptcy Code).

In addition, contrary to Winterhalter's beliefs, an attorney's zealous representation of his client does not obviate an attorney's obligation to ensure his client's compliance with applicable law, inclusive of the Bankruptcy Code. Pa. R.P.C. 3.1, Comment 1; *In re Source Enterprises, Inc.*, Bky. No. 06–11707, 2008 WL 850229, *14–15 (Bankr. S.D.N.Y. 2008); *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 844 (Bankr. C.D. Cal. 1991) ("Competent representation of one's client is part of an attorney's ethical responsibility to his or her client; failure to act competently, willfully or

---

[272] The Debtor was not granted permission to use partnership distributions until September 7, 2012, when the Court entered the Conversion Denial Order and only in the amount of $17,000.00.

habitually, such as by the failure to use reasonable diligence and his or her best judgment and skill in the application of one's learning, is a breach of the attorney's fiduciary duty to the client.").

As is amply demonstrated by this case, an attorney does a disservice to his client when he ignores his professional obligations or applicable law.  Even if the purchase price of the WSFS Claim represents a fair resolution of the claim, Winterhalter's decision not to advise the Debtor to choose disclosure over expediency colored the entire course of his client's bankruptcy.  It also contributed to the already antagonistic relationship between the Debtor and his creditors causing every issue to be vigorously litigated which in turn led to an explosion of administrative expenses.

On balance, Winterhalter's legal advice and course of conduct in connection with the WSFS Claim cannot be said to have been performed with any expectation or likelihood that it would result in a benefit to the estate.  In fact, it resulted in no net benefit to the Debtor's estate.  The harm Winterhalter's actions inflicted on the Debtor's estate negate any finding that the Firm's services provided a benefit to the Debtor's estate for which compensation is warranted.

## 5.    Services Relating to the Debtor-in-Possession and the Post-Petition Use of Cash Collateral

Another set of concerns this Court expressed to the Firm relate to the clear confusion Winterhalter has regarding his role as attorney for a debtor-in-possession, and the use of post-petition cash collateral by the Debtor.[273]  To obtain a fresh start and escape the burden of debt, a debtor submits to the jurisdiction of the bankruptcy court.  In order to obtain the privileges of bankruptcy, full and frank disclosure is required.  While Winterhalter was entitled to frame his client's case in a manner that best advanced the Debtor's interests, Winterhalter remained obligated to ensure that his client did not engage in conduct prohibited by the Bankruptcy Code.[274]  Rather than follow the instructions previously provided to him by Judge Frank and err on the side of disclosure, Winterhalter admits to advising his client to make

---

[273] Appraisal Order, Questions B.1, B.2, B.3, B.4, B.8, B.9, B.10, B.11, B.12, C.1, D.3, D.5, D.6, E.1, E.2, F.1, F.2, G.1, and G.2.

[274] *See, e.g.*, Pa. R.P.C. 3.1, Comment 1; *In re Turner*, 326 B.R. 328, 333-34 (Bankr. W.D. Pa. 2005).

unilateral decisions as to whether his client's post-petition financial activity, including the use and

disposition of cash collateral, should be disclosed to this Court and his client's creditors. As a result of

Winterhalter's purported advice, the Debtor set about engaging in a series of transactions outside of the

purview of this Court that ultimately resulted in the diversion of assets consisting of creditors' cash

collateral. As an experienced bankruptcy practitioner should know, the Bankruptcy Code significantly

restricts a debtor's use of cash collateral. 11 U.S.C. §363(c)(2); *In re Heritage Highgate, Inc.*, 679 F.3d

132, 136, n.1 (3d Cir. 2012).

Despite having reason to know that the distributions generated by Curtis Investors, L.P. were cash

collateral, Winterhalter's advice wholly failed to account for the Debtor's obligations under §363(c)(2).

Even if the Debtor had deposited the distributions into his DIP Account, the Debtor did not have the

discretion to subsequently direct the payment of those distributions to unrelated third parties. If the

Debtor desired to continue to use his creditors' cash collateral, it was incumbent upon Winterhalter to file

a motion seeking either (1) a determination that the distributions were not the cash collateral of WSFS,

Bancorp or NexTier, or (2) authority to use the distributions upon providing adequate protection to

WSFS, Bancorp or NexTier. Winterhalter offered no credible evidence and the record contains no

credible evidence that the Debtor or Winterhalter ever sought the consent of WSFS, Bancorp or NexTier

to the Debtor's continuing use of their cash collateral prior to August 29, 2012.[275]  Not only did

Winterhalter fail to undertake these efforts, it appears from the record that Winterhalter never even

considered whether the Debtor's use of the distributions constituted the unauthorized use of cash

collateral.

Winterhalter's failure to consider the Debtor's obligations under §363(c)(2) is magnified by

reference to Winterhalter's receipt of the Unauthorized Post-Petition Payment. On August 10, 2012,

Winterhalter filed his Supplemental Statement revealing that the Firm received the Unauthorized Post-

Petition Payment, a payment on or about July 16, 2012, from Curtis Investors, L.P. on behalf of the

---

[275] Bankr. Docket No. 235, Stipulated Order Authorizing Interim Use of NexTier Cash Collateral.

Debtor in the amount of $30,000.00. As an initial matter, the fact that Winterhalter requested and

received from his client the payment of the Unauthorized Post-Petition Payment is improper in and of

itself. *Marshall v. Fenstermacher*, 388 F. Supp. 2d 536, 553 (E.D. Pa. 2005) ("if an attorney counsels a

client to act in a manner that violates the rights of a third party, the attorney may be liable to the extent

that a non-lawyer would be in the same situation."); *In re Rivers*, 167 B.R. 288, 304 (Bankr. N.D. Ga.

1994) ("It is elementary that a professional may not solicit or accept compensation from a fiduciary

without prior court approval and that compensation may be awarded only after notice to parties in interest

and a hearing."). "As the Debtor's counsel, [the debtor's attorney] had a duty to inform his client about

the general obligations and limitations on debtors, including that professionals may not be paid without

court order." *In re Bronx 439 E. 135th Street D.T. Building Corp.*, Bky. No. 11-15855, 2014 WL 200996,

*7 (Bankr. S.D.N.Y. Jan. 17, 2014).

Further, and perhaps of more significance, the Firm's 2016(b) Statement filed by Winterhalter

provided that no additional payments would be made by the Debtor or any family member or entity on

Debtor's behalf prior to court approval of an interim or final fee application. The Firm received the

Unauthorized Post-Petition Payment on July 16, 2012, one day before the Firm filed its First Interim

Application. By advising his client to make this payment without seeking prior court approval,

Winterhalter failed to provide competent representation of the Debtor.

Further, based on the failure to account for the impact of the various creditors who alleged a

security interest in the Debtor's distributions generated by Curtis Investors, L.P., this Court cannot

conclude that Winterhalter provided competent advice to his client. His advice was simply wrong. A

debtor cannot avoid the obligations regarding the post-petition use of cash collateral simply by depositing

said cash collateral in its DIP Account. Winterhalter's approach to his client's unauthorized use of cash

collateral is not without significant repercussions. Assuming his client's case had not been converted, the

unauthorized use of cash collateral may have been considered a reason for denial of confirmation of a

Chapter 11 plan. *See, e.g., In re Cothran*, 45 B.R. 836, 838 (S.D. Ga. 1984). In addition, the recipients of

these payments, having not been authorized by this Court, could be held liable to the estate pursuant to

§549(a). Finally, and most significantly to the Debtor's circumstances, the unauthorized use of cash collateral was a significant factor for this Court's finding of cause for appointment of a Chapter 11 Trustee. *Matter of Anchorage Boat Sales, Inc.*, 4 B.R. 635 (Bankr. E.D.N.Y. 1980). By failing to account for the Debtor's obligations regarding the post-petition use of cash collateral, Winterhalter failed to provide competent legal advice to his client, and when performed, had no likelihood of providing any benefit to the estate.

### A.      Services Provided to the Debtor Individually

Another area of inquiry identified by the Court was whether the Firm was required to disclose its representation of the Debtor, individually and whether the services provided to the Debtor personally provided a benefit to the Debtor's estate.[276] The Firm did not offer any evidence or advance any argument to address the Court's concern.

As discussed above, an applicant seeking compensation bears the burden of proving that it has earned the fees sought because they were actual and necessary expenses that provided a benefit to the debtor's estate. *Woods v. City Nat. Bank. & Trust Co. of Chicago*, 312 U.S. 262, 268 (1941) ("[the attorney] has the burden of proving their worth."); *Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.*, 50 F.3d 253, 261 (3d Cir. 1995) ("The fee applicant has the burden of proving it has earned the fees it requests, and that the fees are reasonable."). The Firm was provided an opportunity to address this Court's concerns that were explicitly detailed in the Appraisal Order. The Firm failed to produce a factual predicate for this Court to conclude that the services performed by Winterhalter for the Debtor, individually, were necessary and provided a benefit to the Debtor's estate. The Firm's failure to produce any evidence that indicates that these services met the applicable standard for an award of compensation renders them non-compensable.

Further, even in the absence of the Firm's failure to prove that the services were compensable, there are no facts in the record to support a finding by this Court that Winterhalter's representation of the

---

[276] *See* Appraisal Order, Question E.1 and E.2.

Debtor, individually provided a benefit to the Debtor's estate requiring an allowance of compensation.

Section 330(a)(4) of the Bankruptcy Code prohibits the Court from allowing compensation for, among

other things, "services that were not (I) reasonably likely to benefit the debtor's estate, or (II) necessary to

the administration of the case. 11 U.S.C. §330(a)(4)(A)(I), (II). *See, In re Lederman Enterprises, Inc.,*

*997* F.2d 1321, 1323 (10th Cir. 1993) (stating that "[a]n element of whether the services were 'necessary'

is whether they benefitted the bankruptcy estate."). The legal services provided by Winterhalter in the

Discharge Litigation, or to third parties were solely for their benefit. They were not necessary for the

administration of the Debtor's bankruptcy case, or reasonably likely to provide a benefit to the Debtor's

estate in any manner whatsoever. *In re Kitts Development, LLC*, 474 B.R. 712, 720 (Bank. N.M. 2012)

("Fees that benefit the debtor, but not the estate in a Chapter 11 case, are not compensable."); *In re*

*Kloubec,* 251 B.R. 861, 864 (Bankr. N.D. Iowa 2000) ("Attorney fee applications for debtors' attorneys in

bankruptcy will be denied to the extent the services rendered were for the benefit of the debtor and did not

benefit the bankruptcy estate."); *In re Spanjer Bros.*, 203 B.R. 85, 92 (Bankr. N.D. Ill. 1996) (disallowing

compensation for various phone calls and conferences with insiders and agents of the Debtors because,

while they may have provided some benefit to various parties, there was inadequate and insufficient

information to summarily conclude that merely because they were performed there was a benefit to the

estate); *In re Greene,* 138 B.R. 403, 408 (Bankr. S.D.N.Y. 1992) (stating that "fees awarded to an

attorney for the debtor are determined in the light of the benefits those services produced for or in

connection with the estate only, because fees are not allowed for services that benefit the debtor but not

the estate.").

  **B.**    **Reduction/Disallowance of the Firm's Fees**

     Yet another area of inquiry the Court identified in the Appraisal Order required the Firm to

address whether any failures in the representation of the Debtor required a reduction of any compensation

allowed, or, assuming such failures were found to be egregious, the denial of payment of any

compensation to the Firm.[277]

The Court has determined that the Firm is not entitled to compensation for 180.45 of the 322.35 hours requested because the Firm failed to prove that the legal services it provided was a benefit to the Debtor's estate.[278]  There remains only 141.9 of hours for legal services relating to the administration of the Debtor's bankruptcy estate for which the Court must determine whether compensation should be allowed, and, if so, whether reduction or disallowance of any payment for these services is required.

Pursuant to §330(a)(2) of the Bankruptcy Code, a Court may "award compensation that is less than the amount of compensation that is requested."  11 U.S.C. §330(a)(2).  A decision to reduce fees should be exercised with "great care and fairness."  *In re Wildman*, 72 B.R. 700, 705 (Bankr. N.D. Ill 1987).  A court must evaluate the "quality of the legal services" even if a service is determined to be necessary, *In re APW Enclosure Systems, Inc.*, 2007 WL 3112414, *4 (Bankr. D. Del. 2007).  As a result, "[c]ourts have consistently reduced attorneys' fees for failure to meet the quality of representation expected of competent counsel."  *Id.  See, In re Maxine's, Inc.*, 304 B.R. 245, 247–48 (Bankr. D. Md. 2003) (fee reduced where counsel was so unprepared that her earlier efforts amounted to spinning wheels, resulting in the debtor failing to meet the deadline for filing a plan of reorganization); *In re Fleming Companies, Inc.*, 304 B.R. 85, 92 (Bankr. D. Del. 2003) (fees reduced where abysmal coordination and administration of the case led to wasteful case management); *In re Net 2000 Commc'ns., Inc.*, 2004 WL 2249487, *4 (Bankr. D. Del. Sept. 17, 2004) (fees reduced where debtor's counsel prevented the efficient administration of the case by failing to reject certain leases, which were effectively worthless to the estate after the debtor had sold all its assets), *In re Spanjer Bros., Inc.*, 203 B.R. 85, 92 (Bankr. N.D. Ill. 1996) (fees reduced because counsel failed to assist the debtor in fulfilling its duties under section 521, and failed to promote the efficient administration of the debtor's case).

---

[277] *See*, Appraisal Order, Questions D.6, F.2, H.2, and I.1.

[278] Schedules and Petitions-35.95 hours; MORs-9.6 hours; Conversion Motion-50.45 hours; Cash Collateral-11.6 hours; Rule 2015.3 Reports-6.7 hours; Personal-46.6 hours; and WSFS Claim-19.5 hours.

An attorney may be compensated for services relating to administration of a debtor's estate if they are "necessary and a benefit to the estate." 11 U.S.C. §330(a)(1)(A). "Necessary services are those that aid the professional's client in fulfilling its duties under the Code." *In re Ben Franklin Retail Stores, Inc.*, 227 B.R. 268, 270 (Bankr. N.D. Ill. 1998), *quoting In re Lifschultz Fast Freight, Inc.*, 140 B.R. 482, 485 (Bankr. N.D. Ill. 1992). The Firm had the burden of proving to the Court that these services were necessary and provided a benefit to the Debtor's estate. It failed to do so. The Firm's failure requires the Court to find that the fees for legal services for administration of the estate are not compensable.

Even if the Court were to find that the legal fees sought by the Firm for administration of the Debtor's estate are compensable, Winterhalter's representation of the Debtor failed "to meet the quality of representation expected of competent counsel" and requires a reduction of the requested compensation. *See*, *In re Maxine's, Inc.*, 304 B.R. 245, 248 (Bankr. D. Md. 2003) ("The quality of legal representation for which compensation is sought is always the most important consideration."). As a result of Winterhalter's poor performance, the Court's finding that the services provided no benefit to the Debtor's estate, and the substantial harm resulting from Winterhalter's shorting comings, the Court will reduce the amount of compensation sought for the administration of the estate to zero. *See*, *Lederman Enterprises, Inc.*, 997 F.3d at 1323 (finding that actual benefit to the estate is a significant factor to be considered in determining the value of services).

Winterhalter failed to perform any reasonable investigation of the applicable law and facts when providing legal services to the Debtor. The record in this matter is replete with evidence of Winterhalter's incompetent representation of the Debtor including poor legal advice Winterhalter provided in connection with (1) the filing and preparation of the Debtor's petition and schedules; (2) the filing of the Rule 2015.3 Reports; (3) the settlement and purchase of the WSFS Claim; (4) the Debtor's use of secured creditors' cash collateral; (5) the Debtor's use of partnership distributions, including those made by Curtis Investors, L.P., to fund payments directly to the Debtor's non-debtor partnerships and third parties for the Roofing-Repair Distribution and renovations to the Debtor's residence; and (6) the Debtor's responsibility to file

accurate and complete MORs including disclosure of the Debtor's use of the partnership distributions to fund payments to third parties.

As counsel for the Debtor, Winterhalter was responsible for supervising his client's conduct and instructing him to ensure compliance with the Bankruptcy Code. *Zeisler & Zeisler, P.C. v. Prudential Ins. Co. of Am. (In re JLM, Inc.)*, 210 B.R. 19, 26 (2d Cir. BAP 1997) ("The debtor's attorney, while not a trustee, nevertheless is charged with the duty of counseling the debtor in possession to comply with its duties and obligations under the law."); *In re Food Management Group, LLC*, 380 B.R. 677, 708 (Bankr. S.D.N.Y. 2008) (recognizing that an attorney "cannot simply close his or her eyes to matters having an adverse legal and practical consequence for the estate and creditors."); *In re Source Enterprises*, 2008 WL 850229, *14 (Bankr. S.D.N.Y. March 27, 2008) (recognizing that attorney for debtor "was obligated to advise the Debtor of, among other things, its fiduciary duties as well as of his view that BEGS's control was putting the Debtor in breach of such duties."). As found by this Court, Debtor settled the WSFS Claim and together with his accountant, Kaplan, immediately telephoned Winterhalter to obtain legal advice and assistance in consummating the settlement. Winterhalter was obligated to provide the Debtor with competent legal advice regarding the settlement of the WSFS Claim. Pursuant to Fed. R. Bankr. P. 9014 the Debtor was required to provide notice to all creditors and seek Court approval of the settlement. Winterhalter failed to advise the Debtor to comply with this bankruptcy obligation. Instead, Winterhalter elected to participate in a scheme designed to shield the Debtor's involvement, structure the settlement as a purchase by Samson Street Partnership, and allow monies to be paid directly to the Debtor without disclosure, consent of creditors, or Court approval.

Winterhalter also either negligently or willfully failed to implement sufficient client control to ensure that the Debtor complied with the Bankruptcy Rules and Code in connection with Debtor's use of cash collateral. *In re Zagara's Fresh Markets, LLC*, Bky. No. 03–43017, 2006 WL 4452980, *3 (Bankr. D. N.J. Apr. 13, 2006) (recognizing the obligation of the debtor's attorney "to supervise clients' conduct for compliance with the Bankruptcy Code" and "instruct the debtor on the appropriate conduct and must develop client control"); *In re Berg*, 268 B.R. 250, 262 (Bankr. D. Mont. 2001) (recognizing that debtor's

attorney "must instruct the debtor on appropriate conduct and must develop client control"); *In re Whitney Place Partners*, 147 B.R. 619, 620–21 (Bankr. N.D. Ga. 1992) ( "[T]he debtor's attorney must take conceptual control of the case and provide guidance for management of the debtor, not only to discern what measures are necessary to achieve a successful reorganization, but to assure that, in so doing, compliance with the Bankruptcy Code and Rules is sought rather than avoided.").

As an experienced Chapter 11 practitioner, Winterhalter knew or should have known that a debtor does not have unfettered use of cash without consent of a secured creditor or approval by the Court. 11 U.S.C. §363. In the case of an individual Chapter 11 debtor, post-petition income is property of the Debtor's estate and is subject to use as provided by the Bankruptcy Code. 11 U.S.C. §1115(a)(1) (property of the estate for an individual Chapter 11 debtor includes "all property of the kind specified in section 541 that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under Chapter 7, 12, or 13"); *In re Villalobos*, No. BAP NV-11-1061-HKWJU, 2011 WL 4485793, *8 (B.A.P. 9th Cir. Aug. 19, 2011); *In re Irwin*, 558 B.R. 743, 748 (Bankr. E.D. Pa. 2016) ("It is a fundamental concept in chapter 11 law that post-petition income generated by estate property distributions constitutes property of the estate."); *In re Arnold*, 471 B.R. 578, 608–09 (Bankr. C.D. Cal. 2012).

The Debtor's Schedule I reflects that the partnership distributions were his only source of income. The Debtor's schedules and the WSFS, Bancorp and NexTier proofs of claims reflect that several creditors were asserting a security interest in the partnership distributions. As a result, contrary to Winterhalter's advice, the Debtor was required to deposit all partnership distributions into the DIP Account and use them only either with the consent of secured creditors, or approval of the Court. 11 U.S.C. §363(c)(2). While it may have been the Debtor's pre-petition practice to direct Curtis Investors, L.P. to make direct distribution to his other partnerships, Winterhalter's legal advice that the Debtor was permitted to continue this practice post-petition was simply wrong. Winterhalter identified no legal rationale that he relied upon for his conclusion that the Debtor's right to direct his partnerships to

make distributions from one partnership to another remained unchanged after the Debtor commenced this bankruptcy case.

Similarly, Winterhalter's control or procedure for the Debtor's use of partnership distributions for his "personal" benefit was deficient. In June 2012, Kaplan advised Winterhalter of the Curtis Investors, L.P.'s Roofing-Repair Distribution. At that time, Winterhalter knew that whatever instructions he provided to the Debtor and Kaplan regarding controls for partnership distributions had failed. Winterhalter claimed that in response, he instructed Kaplan that all partnership distributions made for the Debtor's personal benefit must be deposited into and disbursed from the DIP Account. In July 2012, after the alleged June 2012 instructions, Winterhalter received the Unauthorized Post-Petition Payment from Curtis Investors, L.P. and for the Debtor's "personal" benefit. Winterhalter knew or should have known that the payment directly contradicted his instructions to Kaplan. Winterhalter took no action or made any inquiry regarding the Unauthorized Post-Petition Payment. Winterhalter did not contact Kaplan or the Debtor to inquire why the check was issued in spite of his alleged clear instructions, whether Kaplan remained unclear regarding the procedure for use of partnership distributions, or whether the Debtor or Kaplan simply elected to ignore his instructions. Whatever the reason for the issuance of the Unauthorized Post-Petition Payment, once Winterhalter became aware of the Debtor's failure to comply with his fiduciary obligations, Winterhalter was required to disclose the Debtor's misconduct. *In re JLM*, 210 B.R. at 26 (recognizing that fiduciary obligation requires debtor's counsel to inform the court of any breach by the debtor-in-possession of its fiduciary duty); *Food Management*, 380 B.R. at 709 (recognizing that attorney's fiduciary role requires him to report client misconduct to the bankruptcy court); *In re United Utensils Corp.*, 141 B.R. 306, 309 (Bankr. W.D. Pa. 1992) ("If the debtor is not fulfilling its fiduciary obligation to the estate, it is the responsibility and duty of Debtor's counsel to bring such matters to the attention of the court"); *Wilde Horse*, 136 B.R. at 847 (holding that counsel for debtor-in-possession must inform the court of debtor's breach of fiduciary obligation). Winterhalter elected to do nothing. As a consequence, Curtis Investors, L.P. continued to make distributions on the Debtor's

behalf from July 18, 2012 through October 16, 2012, totaling $301,467.33, all of which belonged to the

Debtor's estate.[279]

### C.    **Unauthorized Post-Petition Payment**

Another area of inquiry identified by the Court related to the post-petition payment from Curtis

Investors. L.P. to the Firm and whether (1) the source of the payment was estate assets and (2) the Firm

was required to obtain Court approval prior to the payment.[280]  In response to the Court's inquiry, the

Firm argued that the Unauthorized Post-Petition Payment was not property of the Debtor's estate, but the

assets of Curtis Investors, L.P., a third party.  The Firm further argued that Curtis Investors L.P. "was not

a debtor" and no approval was required from the Court in connection with its payment of the additional

retainer.[281]  The Firm's arguments are contrary to both the facts in this case and applicable law.

The Unauthorized Post-Petition Payment was property of the Debtor's estate.  11 U.S.C. §1115;

*In re Terry Roscoe Johnson*, 565 B.R. 835, 841 (Bankr. S.D. Ohio 2017) (debtor's interest in partnership

is an asset of the bankruptcy estate); *In re Dedrick C. Doddy*, 164 B.R. 276, 279 (Bankr. S.D. Ohio 1994)

(debtor's interest in partnership distribution is property of estate).  When determining whether a payment

from a related entity constitutes property of a debtor's estate, courts will often collapse the transaction to

look at its substance rather than its form.  *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 625 (2d Cir. 1995)

(consideration given to 'collapsing the transaction' in an alleged fraudulent conveyance action); *United

States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302 (3rd Cir. 1986) (recognizing the propriety of

collapsing multiple transactions and treating them as one integrated transaction for the purpose of

assessing a defendant's fraudulent transfer liability); *In re Tribune Co.*, 464 B.R. 126, 165 (Bankr. D. Del.

2011); *In re W.T. Mayfield Sons Trucking Co., Inc.*, 225 B.R. 818, 827 (Bankr. N.D. Ga. 1998).  No such

analysis is required in this case.  Here, in spite of the Firm's arguments, Winterhalter conceded that the

---

[279] Transcript 3/30/2015, 43:8-16, Trustee's Trial Ex. 7.

[280] *See*, Appraisal Order, Questions G.1 and G.2.

[281] Transcript 5/26/15, 121:16-122:6.

Unauthorized Post-Petition Payment was property of the Debtor's estate and should have been deposited

into the Debtor's DIP Account prior to being paid to the Firm.[282]

The Firm was required to obtain prior Court approval before receiving and retaining the

Unauthorized Post-Petition Payment. This Court has previously found that an attorney's receipt of post-

petition retainer payments without prior court approval is not permissible. *In re Stein*, 2013 WL 6247438

(Bankr. E.D. Pa. 2013) (finding that Winterhalter was not entitled to receive post-petition payment of

attorney fees from a Chapter 13 debtor without prior Court approval). In addition, this Court recognizes

that the payment of bankruptcy professionals does not constitute an ordinary-course transaction. *In re

Pannebaker Custom Cabinet Corp.*, 198 B.R. 453, 464 (Bankr. M.D. Pa. 1996) ("payments to

professionals are treated separately and specifically under the Bankruptcy Code and are thus without

question payments outside the ordinary course of a debtor-in-possession's ordinary financial affairs.").

The facts in this case, also, do not require the Court to consider its prior rulings or other decisions on the

propriety of counsel's receipt of a post-petition retainer without prior court approval. The Firm was not

entitled to the Unauthorized Post-Petition Payment pursuant to the terms of its employment by the Debtor

and as approved by the Court. The Firm's Rule 2016(b) statement disclosing the terms of its engagement

by the Debtor for representation in this bankruptcy case specifically provided that any additional retainer

"shall only be made from the Debtor or on behalf of the Debtor from family or related business interests

only after Court approval of an interim and or final fee application filed with and approved by the

Bankruptcy Court."[283] At the time the Firm received and retained the Unauthorized Post-Petition, the

Firm had yet to file any application or make any request to the Court for allowance and payment of fees.

Further, no order had been entered by the Court awarding fees to the Firm either on an interim or final

basis.

The Court having found that the Firm was not entitled to receive any additional retainer under the

---

[282] Transcript 3/27/2015, 132:9-22.

[283] 2016(b) Statement, Paragraph 2.

terms of its employment by the Debtor, will order the Firm to disgorge the Unauthorized Post-Petition

Payment to the Debtor's estate. *W.T. Mayfield Sons Trucking Co., Inc.*, 225 B.R. at 827 (recognizing that

it is well-settled that a bankruptcy court may order the disgorgement to the estate of attorneys' fees paid

by a third party when it is established that the payments constituted distributions that would have

otherwise accrued to the debtor's estate). Further, the Court having found that the Firm is not entitled to

any compensation because Winterhalter's services provided no benefit to the estate or caused substantial

harm in excess of any possible benefit, will order the Firm to disgorge the Initial Retainer to Avalon

Breezes.[284] *In re Toms*, 229 B.R. 646, 660 (Bankr. E.D. Pa. 2009) ("[A] bankruptcy court can order all or

part of a retainer disgorged to the entity that tendered the payment if the value of the retainer paid

exceeded the value of the services provided".).

### D.    Candor to the Court

An area of concern identified by the Court in the Appraisal Order was whether Winterhalter

breached his duty of candor to the Court.[285]  Pennsylvania Rule of Professional Conduct 3.3 ("Rule 3.3")

provides, in relevant part, that:

> "A lawyer shall not knowingly: make a false statement of material fact or law to a
> tribunal or fail to correct a false statement of material fact or law previously made to the
> tribunal by the lawyer . . . or offer evidence that the lawyer knows to be false.  If a
> lawyer, the lawyer's client, or a witness called by the lawyer, has offered material
> evidence before a tribunal or in an ancillary proceeding conducted pursuant to a
> tribunal's adjudicative authority, such as a deposition, and the lawyer comes to know of
> its falsity, the lawyer shall take reasonable remedial measures, including, if necessary,
> disclosure to the tribunal."

The Third Circuit has defined a material fact which an attorney must disclose as one which could

"conceivably affect an outcome" of a dispute. *In re Universal Minerals, Inc.*, 755 F.2d 309, 313 (3d Cir.

1985) (citing *Fusari v. Steinberg*, 419 U.S. 379, 391 (1975) (Burger, C.J., concurring)).

---

[284] For example, as a result of Winterhalter's advice and actions, the Debtor concealed and diverted payments from
Sansom Street Partnership totaling $156,758.35, all of which was property of the estate.  This amount far exceed the
$49,006.30 in fees sought by the Firm for administration of the estate.

[285] *See*, Appraisal Order, Questions H.1 and H.2.

One of the overarching facts material to the Court's decision regarding the Conversion Motion,

Motion to Appoint Chapter 11 Trustee, the Renewed Conversion Motion and Denial of Debtor's

Discharge was the events surrounding the WSFS Claim Purchase.  At the August 28, 2012 hearing on the

Conversion Motion, the Debtor falsely testified that he (1) had not discussed the WSFS Claim Purchase

with his brother, David Grasso; (2) had no personal knowledge of the details of the WSFS Claim

Purchase; (3) that Sansom Street Partnership purchased the WSFS Claim; and (4) the proceeds used for

the WSFS Claim Purchase belonged to Sansom Street Partnership.[286]  At the continued hearing on

September 5, 2012, Winterhalter cross-examined the Debtor regarding his prior testimony regarding the

WSFS Claim Purchase.  The Debtor admitted only that he had discussed the WSFS Claim Purchase with

David Grasso, and again testified that he did not control the WSFS Claim Purchase "at all".[287]

Winterhalter did not question the Debtor, nor did the Debtor admit to the falsity of his other prior

testimony regarding the WSFS Claim Purchase.

Winterhalter knew that the Debtor's testimony was false and misleading.  When an attorney

knows that his client has provided false testimony, he is obligated to disclose his client's perjury.  *Nix v.*

*Whiteside*, 475 U.S. 157, 168, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986) ("Both the Model Code and the

Model Rules do not merely authorize disclosure by counsel of client perjury; they require such

disclosure"); *Shade v. Great Lakes Dredge & Dock Co.*, 72 F. Supp. 2d 518, 524 (E.D. Pa. 1999) ("This

rule safeguards principles that are basic to the adversarial system of justice: The excesses of this system

would likely overcome its virtues if attorneys were free to represent clients with no regard whatsoever for

the truth of their statements to the court."); *In re Hill*, 437 B.R. 503, 542 (Bankr. W.D. Pa. 2010) ("Once

[attorney] read the transcript and realized she had made false statements to the Court, she was under a

duty to take remedial action by informing the Court as to any misstatements."); *Wilde Horse*, 136 B.R. at

840 ("An attorney's duty goes beyond not merely putting false evidence before the court; the duty is

---

[286] Transcript 8/28/2012, 92:1-10; 93:6-20; 98:25-99:25; 103:5-9.

[287] Transcript 9/5/2012, 21:5-17.

greater—the lawyer has a duty to not make misrepresentations to the court."). To fulfill his independent

obligations to this Court, Winterhalter was required to correct the record regarding all of the Debtor's

false testimony or disclose them to the Court. Winterhalter failed to correct the record or disclose to the

Court that contrary to the Debtor's testimony (1) the Debtor had settled the WSFS Claim;[288] (2) the

Debtor's distribution from the Sansom Street Sale was the source of the payment for the WSFS Claim;

and,[289] (3) the Debtor, and not David Grasso, was in control of the transaction.[290]

An attorney's duty of candor to the Court is not limited to Rule 3.3. Rather, "[e]ven beyond the

requirements of Rule 3.3(d), an attorney, as an officer of the Court, has an overarching duty of candor to

the Court." *Eagan by Keith v. Jackson*, 855 F. Supp. 765, 790 (E.D. Pa. 1994). *See Malautea v. Suzuki*

*Motor Co.*, 987 F.2d 1536, 1546 (11th Cir. 1993); *Beam v. IPCO Corp.*, 838 F.2d 242, 249 (7th Cir.

1988); *United States v. Associated Convalescent Enters., Inc.*, 766 F.2d 1342, 1346 (9th Cir. 1985); *Itel*

*Containers Int'l Corp. v. Puerto Rico Marine Management, Inc.*, 108 F.R.D. 96, 104 (D. N.J. 1985); *Virzi*

*v. Grand Trunk Warehouse & Cold Storage Co.*, 571 F. Supp. 507, 512 (E.D. Mich. 1983). As recently

described by the Fourth Circuit Court of Appeals in *United States v. Shaffer Equip. Co.*, 11 F.3d 450 (4th

Cir. 1993), this duty is founded on the preservation of the integrity of the judicial process:

> Our adversary system for the resolution of disputes rests on the
> unshakable foundation that truth is the object of the system's process
> which is designed for the purpose of dispensing justice. However,
> because no one has an exclusive insight into truth, the process depends
> on the adversarial presentation of evidence, precedent and custom, and
> argument to reasoned conclusions—all directed with unwavering effort
> to what, in good faith, is believed to be true on matters material to the
> disposition. Even the slightest accommodation of deceit or a lack of
> candor in any material respect quickly erodes the validity of the
> process....
>
> While no one would want to disagree with these generalities about the
> obvious, it is important to reaffirm, on a general basis, the principle that

---

[288] Kaplan, Debtor's accountant, and David Grasso, Debtor's brother, testified that the Debtor had informed
Winterhalter that the Debtor had personally negotiated the settlement of the WSFS Claim. Transcript 3/30/2012,
207:2-9; 217:6-9; Transcript 5/26/2015, 89:1-12.

[289] First Interim Application, April 24, 2012: "Telephone conference with J .Grasso and B. Kaplan advising on
potential income distribution from partnership."

[290] Transcript 3/30/2015, 138:7-139:15; 140:9-141:21.

lawyers, who serve as officers of the court, have the first line task of assuring the integrity of the process.... The system can provide no harbor for clever devices to divert the search, mislead opposing counsel or the court, or cover up that which is necessary for justice in the end. It is without note, therefore, that we recognize that the lawyer's duties to maintain the confidences of a client and advocate vigorously are trumped ultimately by a duty to guard against the corruption that justice will be dispensed on an act of deceit.

*Id., at 457–58. Accord, Eagan by Keith v. Jackson*, 855 F. Supp. at 790.

For his part, Winterhalter represented to the Court that (1) he did not know of the Sansom Street Sale; (2) had no knowledge of whether the Debtor was entitled to a distribution from the Sansom Street Partnership following the Sansom Street Sale; (3) had no knowledge that the Debtor negotiated the settlement of the WSFS Claim; (4) had no knowledge that the source of the $500,000.00 used to fund the WSFS Claim Purchase was the Debtor's distribution resulting from the Sansom Street Sale; and (5) he served merely as a "facilitator" to Sansom Street Partnership to document and complete the WSFS Claim Purchase.[291] Winterhalter's representations were false. Winterhalter knew of the Sansom Street Sale as early as March 13, 2012.[292] Winterhalter knew that following the Sansom Street Sale the Debtor was entitled to a distribution in excess of $500,000.00.[293] Winterhalter knew that the Debtor negotiated the settlement with WSFS Claim and that the source of the payment was the Debtor's partnership distribution from Sansom Street Partnership.[294] Winterhalter was not a mere facilitator, but Winterhalter represented the Debtor in connection with the WSFS Claim Purchase and acted with the express purpose of obfuscating the Debtor's involvement.[295]

---

[291] Transcript 3/30/2015, 71:6-72:17; 74:8-75:8; 76:20-78:5; 111:22-112:12.

[292] First Interim Application, March 13, 2012: "Meeting with B. Golub, Esquire update on potential sale of property in which WSFS has an interest."

[293] First Interim Application, April 24, 2012: "Telephone conference with J .Grasso and B. Kaplan advising on potential income distribution from partnership."

[294] Kaplan and David Grasso testified regarding Winterhalter's knowledge of Debtor's settlement of WSFS Claim; Transcript 12/8/2014, 80:11-25; Transcript 3/30/2015, 207:2-9; 217:6-9; Transcript 5/26/2015, 89:1-12; whereas Winterhalter's testified regarding his belief, based upon information provided to him during his initial call to Golub, that the deal had been negotiated by David Grasso. This Court does not find Winterhalter's version of events to be credible.

[295] First Interim Application, May 17, 2012: "Telephone Conference with client and accountant evaluating how to deal with WSFS obligation and whether claim can be compromised outside of Plan." Transcript 3/30/2015, 128:16-

Overall, Winterhalter's actions in this case were nothing more than "clever devices to divert the search, mislead opposing counsel or the court, or cover up that which is necessary for justice in the end." The Court can reach no other conclusion - Winterhalter breached his duty of candor to this Court.

## V.      **CONCLUSION**

From this Court's review of the record and its findings of fact, this Court concludes that Winterhalter incompetently performed his services relating to the Debtor's case. The Firm and Winterhalter were hired by the Debtor to provide legal advice in furtherance of the Debtor's administration of his bankruptcy estate. *See, e.g., Baker Botts L.L.P. v. Asarco LLC*, 135 S.Ct. 2158, 2164 (2015) ("§327(a) professionals are hired to serve the administrator of the estate for the benefit of the estate."). The essential purpose of the Firm and Winterhalter's retention was the task of insuring that the Debtor's administration of his bankruptcy estate complied with the Bankruptcy Code, 11 U.S.C. §101, *et. seq.* The Firm and Winterhalter argued that Winterhalter did provide adequate legal advice to ensure the Debtor's compliance with applicable law, the Debtor simply chose to ignore it. Even if this Court were to credit Winterhalter's pleas of ignorance of the Debtor's misconduct, this Court finds that Winterhalter still failed to perform the essential purpose of his and the Firm's retention.

This Court does not expect either itself or the attorneys before it to be infallible. However, this Court holds an expectation that attorneys will undertake at least some minimum level of preparation necessary to ensure the delivery of effective client services as well as to ensure the effective administration of the estate. Winterhalter's representation of the Debtor and his bankruptcy estate failed to satisfy this basic duty of care owed by all attorneys to their clients.

For these reasons, this Court will (1) deny the Applications in their entirety, (2) order the Firm to disgorge (i) the Unauthorized Post-Petition Payment to the Chapter 7 Trustee, and (ii) the Initial Retainer to Avalon Breezes Development LLC, and (3) forward this Opinion to the District Court and the appropriate disciplinary boards for the jurisdictions in which Winterhalter is authorized to practice.

---

129:12; 151:23-152:10.

An Order consistent with this Opinion will be entered.

Dated: June 15, 2018

MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

# ATTACHMENT 1

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| Joseph Grasso, | : | |
| Debtor. | : | Bankruptcy No. 12-11063-MDC |

# O R D E R

**AND NOW**, the District Court by Memorandum Opinion dated July 10, 2014 (the "District Court Memorandum") having remanded to this Court for consideration, consistent with its decision, the Second Interim and Final Application for Compensation and Reimbursement of Expenses of the Law Offices of Paul J. Winterhalter, P.C. dated December 28, 2012 (the "Fee Application"), it is hereby **ORDERED** that:

I.        An evidentiary hearing **de novo** shall be held on **September 29, 2014, at 10:30 a.m.,** in **Bankruptcy Courtroom No. 5, U.S. Bankruptcy Court, 900 Market Street, Philadelphia, PA** (the "Hearing") to consider the Fee Application and the objections to the Fee Application filed by Madison Capital Company, LLC and Chapter 7 Trustee Christine C. Shubert (the "Fee Objections").

II.        At the hearing, this Court will require the Law Offices of Paul J. Winterhalter, P.C. (the "Firm") and Paul J. Winterhalter, Esquire ("Winterhalter") to address, in addition to the Fee Objections, the following in order to determine whether the Firm is entitled to compensation:

   A.        **The following questions that were identified by the District Court Memorandum:**

   1.        Whether the Firm's involvement in the purchase of the Proof of Claim dated March 15, 2012, filed by the Wilmington Savings Fund Society FSB ("WSFS") evidencing a secured claim against the Debtor only in the amount of $929,259.69 (the "WSFS Claim") rendered it not "disinterested" and therefore not entitled to fees under 11 U.S.C. §328(c)?[1]

---

[1] In its Application for Compensation dated July 17, 2012, the Firm appears to have disclosed that Mr. Winterhalter provided a total of 12.85 hours of services valued at $4,818.75 relating to the WSFS claims purchase. The Firm *should be prepared to address the following time entries: (1) February 21, 2012: "Telephone Conference with J.*

Grasso inquiring as to legitimacy of WSFS obtaining lien in Curtis Center interest;" (2) March 13, 2012: "Meeting with B. Gotlieb, Esquire update on potential sale of property in which WSFS has an interest;" (3) March 13, 2012: "Telephone Conference with J. Grasso following up on several inquiries made during Creditors Meeting on ownership of property;" (4) March 14, 2012: "Telephone Conference with B. Kaplan issues on disposition of assets and possible offer for;" (5) April 24, 2012: "Telephone Conference with J. Grasso and B. Kaplan advising on potential income distribution from partnership;" (6) May 17, 2012: "Telephone Conference with client and accountant evaluating how to deal with WSFS obligation and whether claim can be compromised outside of Plan;" (7) May 17, 2012: "Reviewed documents relating to WSFS Claim;" (8) May 17, 2012: "Telephone Conference with J. Grasso following up on discussions with Bank representatives for WSFS;" (9) May 17, 2012: "Telephone Conference with B. Golub, Esquire negotiation on issues with WSFS claim;" (10) May 17, 2012: "Telephone Conference with J. Grasso update on discussions with WSFS negotiations;" (11) May 21, 2012: "Review e-mail from B. Golub, Esquire regarding WSFS loan obligation;" (12) May 21, 2012: "E-mail to B. Golub, Esquire confirming third party partnership interested in claim acquisition;" (13) May 21, 2012: "Telephone Conference with B. Golub, Esquire regarding negotiation on WSFS loan;" (14) May 21, 2012: "Telephone Conference with B. Golub, Esquire inquiring on issues with 15th and Sansom and practical resolution;" (15) May 21, 2012: "Prepared documents relating to assignment of WSFS Claim to 15th and Sansom Partnership;" (16) May 21, 2012: "E-mail to B. Golub, Esquire fwd draft Claim Transfer Notice of Claim Transfer and Assignment of Claim documents;" (17) May 21, 2012: "Telephone Conference with B. Golub, Esquire responding to her e-mail which crossed with draft documents fwd to her;" (18) May 21, 2012: "Telephone Conference with client review of WSFS issues reaction to voluminous document request sought under BR 2004 Exam;" (19) May 23, 2012: "Reviewed e-mail from B. Golub, Esquire advising funding must occur before noon tomorrow and attorney fees to be paid;" (20) May 23, 2012: "E-mail to client fwd communication from WSFS counsel on status of their intent to sell/assign claim;" (21) May 24, 2012: "Reviewed Proposed Purchase Agreement for WSFS Secured Claim;" (22) May 24, 2012: "E-mail to B. Golub, Esquire advising suggesting fees are extra is inconsistent with Proposed Agreement;" (23) May 24, 2012: "Reviewed proposed Bill of Sale Allonge and Instrument of Assumption also proposed by B. Golub, Esquire on behalf of WSFS;" (24) May 24, 2012: "Telephone Conference with client following up on discussions between 15th and Sansom, L.P. and WSFSs on acquiring Claim dispute over counsel fees;" (25) May 24, 2012: "E-mail to client re: fwd wiring instruction for funding WSFS Claim Assignment which must be fwd to purchaser;" (26) May 24, 2012: "E-mail to 15th and Sansom, L.P. fwd proposed documents and wiring instructions;" (27) May 24, 2012: "Telephone Conference with B. Golub, Esquire negotiation on WSFS assigning Claim;" (28) May 24, 2012: "Telephone Conference with J. Grasso WSFS seeking to demand payment of fees from Debtor or assignor requiring additional discussions;" (29) May 24, 2012: "Telephone Conference with B. Kaplan, Accounting Department (Carl) for partnership coordinating;" (30) May 24, 2012: "Telephone Conference with B. Golub, Esquire final negotiations on Claim Assignment; telephone conference with client advising WSFS Claim will be assigned;" (31) May 24, 2012: "Telephone Conference with D. Grasso on behalf of 15th and Sansom, L.P. advising he will refuse to fund unless Bank signs Agreement;" (32) May 24, 2012: "E-mail to B. Golub, Esquire advising Transferee wants written confirmation Bank committed;" (33) May 24, 2012: "Telephone Conference with B. Golub, Esquire following up on revisions to documents in sale;" (34) May 24, 2012: "E-mail to client advising WSFS Claim sold;" (35) May 25, 2012: "Reviewed e-mail from B. Golub, Esquire inquiring whether I was awake when transferee documents delivered;" (36) May 29, 2012: "Telephone Conference with B. GOlub, Esquire regarding WSFS loan obligation;" (37) June 4, 2012: "Telephone Conference with B. Golub, Esquire questioning status of transferee filing required Notice of Claim Transfer;" (38) June 4, 2012: "Email to D. Shafkowitz, Esquire need to file and issue Notice;" (39) June 21, 2012: "Telephone Conference with D. Shafkowitz, Esquire inquiring whether 15th and Sansom claim acquisition was filed;" (40) June 21, 2012: "Telephone Conference with B. Golub, Esquire questioning if bankruptcy Notice of Claim Transfer was issued;" (41) June 21, 2012: "Telephone Conference with J. Grasso issues with recording Assignments of WSFS claim as mandated;" (42) June 21, 2012: "Prepared documents to permit WSFS Assignment to be recordable with Philadelphia Recorder of Deeds;" (43) June 21, 2012: "E-mail to D. Shafkowitz, Esquire following up on need for claim transfer to be filed and notice issued;" (44) June 21, 2012: "Telephone Conference with B. Kaplan re: forwarding notary to D. Grasso for signature;" (45) June 22, 2012: "Correspondence letter to B. Golub, Esquire fwd original Assignment to obtain notarized signature;" (46) June 29, 2012: "Reviewed e-mail from B. Golub, Esquire following up on WSFS claims transfer documentation;" and (47) June 29, 2012: "Telephone Conference with client WSFS status, operating reports."

2.    Whether the Firm, by representing both Joseph Grasso (the "Debtor") individually and the Debtor's bankruptcy estate (the "Estate") in connection with the WSFS claim purchase, represented an interest adverse to the Estate?

3.    Whether the Firm's involvement in the WSFS claim purchase is a breach of its fiduciary obligations to the Estate?

4.    Whether Winterhalter's involvement in the WSFS claim purchase is a breach of his ethical obligations as a lawyer?

**B.    The Firm's Representation as counsel to the Debtor-in-Possession.**

1.    Whether the Firm, as counsel to a fiduciary,[2] was obligated to institute sufficient client controls to ensure the Debtor's compliance with his obligations as a debtor-in-possession?[3]

2.    Whether the Firm was required to investigate and advise the Debtor with regard to the Estate's interest in the Sansom Partnership?

3.    Whether the Firm was required to investigate and advise the Debtor with regard to the Estate's interest in the proceeds of the sale of 1500-1504 Sansom Street, 124, 134 S. 15th Street, 1502-05 Moravian Street, Philadelphia (the "Property")?

---

[2] 11 U.S.C. §1106.

[3] As this Court previously recognized, the Debtor while he remained in possession was culpable for mismanagement of its assets. In support of this determination, this Court identified the Debtor's failure to perform a multitude of tasks required by law relating to the administration of his estate. Order dated October 16, 2012, ¶L [Docket No. 301] (among other omissions, this Court found (1) the Debtor failed to establish and use a DIP bank account; (2) the Debtor failed to file timely operating reports; (3) the Debtor failed to file timely reports of financial information). To the extent the Firm was hired to assist the Debtor in carrying out his obligations imposed by law as a debtor-in-possession, the Firm should be prepared to explain how the Debtor's various omissions may be reconciled with the Firm's claim that it provided competent representation. *See, e.g., In re Zagara's Fresh Markets, LLC*, Bky. No. 03-43017, 2006 WL 4452980, *3 (Bankr. D.N.J. Apr. 13, 2006) (stating attorney for debtor-in-possession "must instruct the debtor on the appropriate conduct and must develop client control."); *In re Whitney Place Partners*, 147 B.R. 619, 620-21 (Bankr. N.D. Ga. 1992) ("[T]he debtor's attorney must take conceptual control of the case and provide guidance for management of the debtor, not only to discern what measures are necessary to achieve a successful reorganization, but to assure that, in so doing, compliance with the Bankruptcy Code and Rules is sought rather than avoided").

3

4.      Whether the Firm was required to investigate and advise the Debtor whether the

Estate should have received a distribution upon the sale of the Property?[4]

5.      Whether the Firm was obligated to investigate whether the purchase of the WSFS

Claim was funded by Estate assets?

6.      Whether the Firm advised the Debtor as to the impact of his claim that he owned

the Sansom Partnership with his wife as tenants by the entirety upon the enforceability of the WSFS

Claim?[5]

7.      Whether any rule prevented the Firm from (i) assisting with the transfer of the

WSFS Claim, or (ii) preparing the documents evidencing the transfer?

8.      Whether the Firm was required to investigate and advise the Debtor with regard

to the Estate's interest in Curtis Investors, LP?

9.      Whether the Firm was required to investigate and advise the Debtor whether the

Estate should have received the distributions from Curtis Investors, LP?[6]

10.      Whether the Firm was required to investigate and advise the Debtor whether he

should have disclosed his receipt and retention of distributions from Curtis Investors, LP?

11.      Whether the Firm was required to investigate and advise the Debtor whether his

receipt and retention of the distributions from Curtis Investors, LP may have violated this Court's Order

dated October 16, 2012 [Docket No. 301], wherein this Court "permitted [the Debtor] to distribute

$17,310 monthly to himself"?

---

[4] In this context, the Firm should be prepared to explain its time entry dated March 13, 2013, appearing in the First
Interim Application for Compensation dated July 17, 2012, that states: "Telephone Conference with J. Grasso and B.
Kaplan advising on potential income distribution from partnership."

[5] In this context, the Firm should be prepared to explain how it could have provided competent advice to the Debtor
without first obtaining copies of documents evidencing the Debtor's claim of joint ownership. *See, e.g.,* Transcript
10/16/2012; 107:15-18 (testimony that Debtor did not obtain agreements evidencing transfer until sometime after
September 7, 2012).

[6] *See, e.g., In re Grasso,* 497 B.R. 448, 452-53 (Bankr. E.D. Pa. 2013) (discussing the Debtor's receipt of three
payments from Curtis Investors, LP in the total amount of $341,500); Transcript 10/15/2012, 56:23-57:10
(*testimony of Mr. Grasso admitting that distributions received by Curtis Investors, LP should have passed through to
his estate*); 327:9-328:16 (testimony of Mr. Kaplan admitting that approximately $500,000 was diverted from Curtis
Investors, LP to JGKM Associates, LLC and WSC Warminster Plaza Mezz Associates).

12.     Whether the Firm's services to the Debtor-in-Possession provided a benefit to the Estate.

**C.     The Nature of the Firm's obligations to the Estate.**

1.     Whether, in addition to the Firm's obligations to the Debtor-in-Possession, the Firm was also a fiduciary of the Estate and its creditors?[7]

2.     Whether the Firm had an obligation to disclose to this Court and the Estate's creditors Winterhalter's knowledge of the existence of the opportunity to purchase the WSFS Claim at a discount?[8]

3.     Whether the Firm had an obligation to disclose to this Court and the Estate's creditors Winterhalter's knowledge of an insider's intent to purchase the WSFS Claim at a discount?[9]

4.     Whether the Firm had an obligation to investigate whether the purchase of the WSFS Claim was funded by the Estate assets?[10]

---

[7] See, e.g., In re Taxman Clothing Co., 49 F.3d 310, 314 (7th Cir. 1995) ("A lawyer hired by a trustee in bankruptcy to do legal work for the estate, like the trustee himself, is a fiduciary of the estate."); In re Imperial "400" Nat'l, Inc., 456 F.2d 926, 929 (3d Cir. 1972) (stating that counsel for bankruptcy trustee is a fiduciary of the bankruptcy estate and its creditors); In re Pacific Forest Indus., Inc., 95 B.R. 740, 743 (Bankr. C.D. Cal. 1989).

[8] See, e.g., In re JLM, Inc., 210 B.R. 19, 26 (2d Cir. BAP 1997).

[9] In this context, the Firm should be prepared (1) to explain a series of time entries dated May 17, 2012, that suggest that Winterhalter had advance knowledge of the purchase of the WSFS Claim and (2) to address the implications of that knowledge. See, e.g., In re Papercraft Corp., 160 F.3d 982, 988 (3d Cir.1998) (holding that an insider of a bankrupt entity may not purchase a discounted claim without first disclosing its availability to the estate's creditors); Zeisler & Zeisler, PC v. Prudential Ins. Co. of Am. (In re JLM, Inc.), 210 B.R. 19, 26 (2d Cir. B.A.P. 1997) (recognizing that attorney for debtor-in-possession owes an obligation to inform the court of the debtor's failure to abide by his duties as a debtor-in-possession). In addition, the Firm should be prepared to address the Debtor's testimony wherein the Debtor described the Firm's efforts to obscure the Debtor's involvement in the purchase of the WSFS Claim. See, e.g., Deposition 3/8/2013, 51:5-11; 54:5-10.

[10] In this context, the Firm should be prepared to explain whether, in furtherance of his obligation to provide competent representation to the Debtor while he remained in possession, he should have advised the Debtor with regard to the authority of the Sansom Partnership to purchase the WSFS Claim. See, e.g., Transcript 10/16/2012, 89:20-95:16 (testimony by Debtor stating that he lacked knowledge as to whether the purchase of the WSFS Claim was authorized by the Sansom Partnership's organizational documents and that he was not made aware of the issue until he hired new counsel); In re Southmark Corp., 163 F.3d 925, 927-28 (5th Cir. 1999) (recognizing that bankruptcy professionals are obligated to investigate estate's interests); In re Food Management, 280 B.R. 677, 708 (Bankr. S.D.N.Y. 2008) (recognizing that an attorney "cannot simply close his or her eyes to matters having an adverse legal and practical consequence for the estate and creditors.").

### D.     The Firm's duty to investigate the Estate assets.[11]

1.      Whether the Firm conducted a reasonable inquiry to verify the information contained in the schedules the Firm filed on behalf of the Debtor?

2.      Whether the Firm performed a reasonable inquiry into the Debtor's claim that his partnership interests identified in the Debtor's Schedule B were held with his wife as tenants by the entirety?

3.      Whether the Firm performed a reasonable inquiry to determine whether the Debtor or Estate was entitled to receive a distribution upon the sale of the Property?

4.      Whether the Firm performed a reasonable inquiry to determine whether the purchase of the WSFS Claim by 15th and Sansom, L.P (the "Sansom Partnership") was funded by Estate assets?

5.      Whether the Firm performed a reasonable inquiry to determine whether any post-petition distributions received by the Debtor from Curtis Investors, LP should have accrued to the Estate?

6.      Whether the Firm failed to assist the Debtor with (i) timely filing of the reports required by F.R.B.P. 2015.3 ("Rule 2015.3"), (ii) providing the information required by Rule 2015.3, and (iii) filing updated reports required by Rule 2015.3, and if such failure, requires a reduction in any allowed compensation?

### E.     The Firm's Representation of the Debtor, Individually.

1.      Whether the Firm may be compensated from Estate assets for services that provided a reasonable benefit to the Debtor personally and not the Estate?[12]

---

[11] *This Court expects that the Firm will present specific evidence to substantiate any investigation, if any in fact occurred, of the Debtor's assets including, but not limited to, the Estate's interest in: (i) Curtis Investors, LP; (ii) J. Grasso Properties, LLC; (iii) 15th and Sansom, L.P.; (iv) Avalon Breeze Development, LLC. In consideration of such evidence, this Court notes that the Debtor's failure to provide a coherent explanation of (i) his ownership interest in various entities and (ii) his right to receive distributions from them resulted in significant litigation. See, e.g., Transcript 10/15/2012; Order dated October 16, 2012 [Docket No. 301] (discussing the debtor's inability to provide his creditors adequate disclosure regarding his estate's assets).*

[12] *See, e.g., Hansen, Jones & Leta, P.C. v. Segal, 220 B.R. 434, 467 (D. Utah 1998) ("Redirecting the inquiry from a possible breach of counsel's fiduciary duty to the estate to one of compensation based on services which reasonably benefit the estate…").*

6

2.     Whether the Firm's services to the Debtor personally provided a benefit to the

Debtor's Estate as required by 11 U.S.C. §327(a)(4)?

**F.    The Firm's Compliance with F.R.B.P. 2014(b).**

1.     Whether the Firm was required to disclose its representation of the Debtor,

individually?

2.     If the Firm failed to comply with the requirement of F.R.B.P. 2014(b), whether

reduction of any allowed compensation is required?

**G.    Post-Petition Fee Payments.**

1.     Whether the source of the post-petition payment of attorney fees from Curtis

Investors, LP to the Firm was Estate assets?

2.     If the source of the payment was Estate assets, whether the Firm was required to

obtain Court approval prior to such payment?

**H.    Duty of Candor.**

1.     Whether Winterhalter breached his duty of candor to the Court by failing to

correct misleading testimony given by the Debtor regarding the purchase of the WSFS Claim?[13]

---

[13] Over the course of the four hearings held before this Court on August 28, 2012, September 5, 2012, September 7, 2012, and October 15, 2012, the Debtor provided testimony regarding his knowledge of the purchase of the WSFS Claim. At a hearing held before this Court on August 28, 2012, the Debtor testified that he was not involved in the negotiation of the purchase of the WSFS Claim. He also testified that he recalled having no conversations with his brother regarding the acquisition of the WSFS Claim. Transcript 8/28/2012, 98:25-99:25. When asked whether the proceeds of the Property were used to fund the purchase of the WSFS Claim, the Debtor stated:

> I don't have personal knowledge of it. I didn't see the transaction happen. I don't have a
> document that says that. I didn't talk to WSFS. I haven't had a – I don't know who their lawyer
> is. I have never seen the documents, so I'm not sure.

Transcript 8/28/2012, 103:5-9.

At the September 5, 2012 hearing, the Debtor testified that David Shafkowitz represented the Sansom Partnership. Transcript 9/5/2012, 68:6. The Debtor provided the following testimony:

> Q. Did Mr. Winterhalter represent 15th and Sansom in connection with its purchase of the claim?
> A. No.
> Q. Did he prepare the documents for the transfer of WS's claim to 15th and Sansom?
> A. No.
> Q. Do you know who did?
> A. I believe so.
> Q. Who did?

2.      If Winterhalter breached his duty of candor to the Court, is a reduction in the compensation allowed to the Firm required?

### I.      Allowance of Compensation.

1.      Assuming this Court determines that the Firm failed to fulfill its obligations as counsel to the Debtor-in-Possession, the Estate and/or this Court, whether the totality of the Firm's acts and omissions indicate that the Firm's conduct was sufficiently egregious to deny payment of any compensation?[14]

III.      In the event that Winterhalter intends to testify on behalf of the Firm or himself at the Hearing, he shall appear with counsel to present his testimony.

Dated:  August 12, 2014

*Magdeline D. Coleman*

_____
MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

Paul J. Winterhalter, Esquire
Law Offices of Paul J. Winterhalter, P.C.
1717 Arch Street, Suite 4110
Philadelphia, PA  19103

Joseph Grasso
649 Dodds Lane
Gladwyn, PA  19035

Steven D. Usdin, Esquire
Harry J. Giacometti, Esquire
Flaster/Greenberg, P.C.
Four Penn Center, 2nd Floor
1600 John F. Kennedy Boulevard
Philadelphia, PA  19103

_____

A. David Shafkowitz, he's an attorney.
Q. Do you know if Mr. Winterhalter negotiated the transfer of the claim?
A. I don't know if he did or didn't.  I don't believe he did, though.

Transcript, 9/5/2012, 67:22-68:10.

[14] *See, e.g., Wolf v. Weinstein*, 372 U.S. 633, 641 (1963) (recognizing "the historic maxim of equity that a fiduciary may not receive compensation for services tainted by disloyalty or conflict of interest"); *In re Futuronics Corp.*, 655 F.2d 463, 470-71 (2d Cir. 1981) (finding that an award of any fees where "a total pattern of conduct which betrays a callous disregard of the professional obligations" was an abuse of bankruptcy court's discretion).

Christine C. Shubert, Esquire
10 Teaberry Drive
Medford, NJ  08055

Dave P. Adams, Esquire
Kevin P. Callahan, Esquire
George M. Conway, Esquire
Hugh J. Ward, Esquire
United States Trustee
833 Chestnut Street, Suite 500
Philadelphia, PA  19107

Jeffrey Kurtzman, Esquire
Klehr Harrison Harvey Branzburg LLP
1835 Market Street, Suite 1400
Philadelphia, PA  19103

Roger G. Jones, Esquire
Austin L. McMullen, Esquire
Bradley Arant Boult Cummings
1600 Division Street, Suite 700
Nashville, TN  37203

Robert D. Cheifetz, Esquire
Sperling & Slater PC
55 W. Monroe Street, Suite 2300
Chicago, IL  60603

Dimitri L. Karapelou, Esquire
Law Offices of Dimitri L. Karapelou, LLC
1600 Market Street, 25th Floor
Philadelphia, PA  19103

Aaron S. Applebaum, Esquire
Gary D. Bressler, Esquire
McElroy Deutsch Mulvaney & Carpenter LLP
1617 John F. Kennedy Boulevard, Suite 1500
Philadelphia, PA  19103

Jeffrey Baddeley, Esquire
1660 W. 2nd Street, Suite 1100
Cleveland, OH  44113-1448

Monique B. DiSabatino, Esquire
Saul Ewing LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA  19102

9

Brian M. Kile, Esquire
Grenen & Birsie, P.C.
One Gateway Center, Ninth Floor
420 Fort Duquesne Boulevard
Pittsburgh, PA  15222

Courtroom Deputy
Eileen Godfrey

# ATTACHMENT 2

| Date | Explanation | Hours | Rate | Total |
|---|---|---|---|---|
| 2/6/12 | Telephone Conference with client- reviewing Engagement Letter and conflicts issues, particulars for filing personal bankruptcy | 0.75 | 375 | $281.25 |
| 2/6/12 | Prepared Chapter 11 Petition- with client's assistance; prepared required ancillary documents | 0.5 | 375 | $187.50 |
| 2/6/12 | E-mail to client- fwd formal Chapter 11 voluntary petition for personal bankruptcy | 0.25 | 375 | $93.75 |
| 2/6/12 | Meeting with client signing Chapter 11 Petition and Engagement Letter | 0.25 | 375 | $93.75 |
| 2/6/12 | Prepared Statement of Social Security Number; reviewed petition exhibit D and credit counseling certificate for filing | 1 | 375 | $375.00 |
| 2/6/12 | Telephone Conference with B. Kaplan CPA coordinating deliveryof retainer and signing petition and engagement letter | 0.25 | 375 | $93.75 |
| 2/7/12 | Reviewed Notice issued by Court reassigning case to Judge Frank | 0.1 | 375 | $37.50 |
| 2/7/12 | Reviewed Order directing deadlines for filing missing documents | 0.1 | 375 | $37.50 |
| 2/7/12 | Reviewed and revised Application to Employ PJW, P.C. as counsel for Joe Grasso individually | 0.5 | 375 | 187.5 |
| 2/7/12 | Prepared revisions to Verified Statement supporting Application to Employ modified proposed Order and certificate of service | 0.75 | 375 | 281.25 |
| 2/7/12 | E-mail to F. Baker, Esquire copy to client providing Notice of Filing of Application to Employ | 0.25 | 375 | 93.75 |
| 2/13/12 | Prepared creditors claims for schedules to create preliminarymatrix | 3 | 375 | $1,125.00 |
| 2/13/12 | E-mail to client and accountant requesting they provide detailed information regarding personal creditors | 0.2 | 375 | $75.00 |
| 2/13/12 | E-mail to client- fwd copy of matrix as filed- fwd draft versions of Schedules and Statement of Financial Affairs | 0.25 | 375 | $93.75 |
| 2/13/12 | Reviewed email from P. Winterhalter requesting I prepare motion to extend time to file schedules | 0.1 | 250 | $25.00 |
| 2/14/12 | Telephone Conference with B. Kaplan following up on collecting information for Schedules | 0.2 | 375 | $75.00 |
| 2/14/12 | Prepared first draft of motion to extend time to file bankruptcy documentation, proposed order | 1.25 | 250 | $312.50 |
| 2/15/12 | Reviewed Order entered by Judge Frank scheduling Hearing on whether case should be transferred or whether conflict exists | 0.2 | 375 | 75 |
| 2/15/12 | E-mail to client fwd copy of Order scheduling Hearing on Application to Employ | 0.2 | 375 | 75 |
| 2/21/12 | Telephone Conference with J. Grasso inquiring as to legitimacy of WSFS obtaining lien in Curtis Center interest | 0.2 | 375 | $75.00 |
| 2/22/12 | Telephone Conference with B. Kaplan emphasizing need to get Schedules completed first before attempting to address individual matters | 0.25 | 375 | $93.75 |
| 2/24/12 | Research Third Circuit Opinions cited by Judge Frank in Orderscheduling Hearing on Retention Application | 0.75 | 375 | 281.25 |
| 3/1/12 | Telephone Conference with B. Kaplan update on information forBankruptcy Schedules | 0.25 | 375 | $93.75 |
| 3/2/12 | Telephone Conference with J. Grasso and B. Kaplan reviewing information on Bankruptcy Schedules, listing of antique cars | 0.4 | 375 | $150.00 |
| 3/2/12 | Telephone Conference with Bruce Kaplan further review and collection of information for bankruptcy schedules | 0.75 | 375 | $281.25 |
| 3/2/12 | Prepared further modifications to Schedules reviewed materials fwd by B. Kaplan | 1.25 | 375 | $468.75 |
| 3/2/12 | Telephone Conference with J. Grasso and B. Kaplan reviewed and adjusted for Schedules | 1.5 | 375 | $562.50 |
| 3/4/12 | Prepared revisions to draft Schedules and Statement of Financial Affairs, prepared revisions to detailed listing ofpartnerships | 4 | 375 | $1,500.00 |
| 3/4/12 | E-mail to client- fwd updated draft of property listing | 0.25 | 375 | $93.75 |
| 3/4/12 | E-mail to client- fwd draft of Statement of Financial Affairs | 0.25 | 375 | $93.75 |
| 3/5/12 | Prepared revisions to Schedules; prepared BR 2016(b) Statement; Prepared CMI modified | 4.5 | 375 | $1,687.50 |
| 3/5/12 | Reviewed e-mails from D. Shafkowitz, Esquire and B. Kaplan providing updated information to supplement Schedules | 0.25 | 375 | $93.75 |
| 3/5/12 | E-mail to client- fwd copy of Schedules and Statement of Financial Affairs filed with Bankruptcy Court | 0.25 | 375 | $93.75 |
| 3/7/12 | Court Appearance attend Hearing scheduled by Bankruptcy Courton Motion to approve PJW, P.C. as counsel for Debtor | 3.25 | 375 | 1218.75 |
| 3/13/12 | Reviewed Order from J. Frank approving retention of firm but transferring case to Judge Coleman | 0.2 | 375 | 75 |
| 3/13/12 | Meeting with J. Grasso reviewing order issued by Judge Frank approving Firm's retention but transferring case to Judge Coleman | 0.3 | 375 | 112.5 |
| 3/13/12 | Reviewed order entered on application to employ counsel | 0.2 | 250 | 50 |
| 3/14/12 | Telephone Conference with B. Kaplan issues on disposition of assets and possible offer for | 0.25 | 375 | 93.75 |

| | | | | |
|---|---|---|---|---|
| 4/2/12 | Telephone Conference with J. Grasso and B. Kaplan review of information required for amended schedules; request for BR2004 Exam | 0.5 | 375 | $187.50 |
| 4/2/12 | E-mail to client detailing information following Meeting of Creditors to be supplemented on schedules | 0.25 | 375 | $93.75 |
| 4/17/12 | E-mail to client and B. Kaplan about the need to follow up onschedules, fwd copy of e-mail | 0.25 | 250 | $62.50 |
| 4/17/12 | Telephone Conference with B. Kaplan following up on e-mail and need to get amended schedules filed | 0.2 | 250 | $50.00 |
| 4/17/12 | E-mail to K. Callahan, Esquire from Office of the United States Trustee acknowledging his e-mail and assuring him Debtor will get amendments filed | 0.2 | 250 | $50.00 |
| 4/20/12 | Telephone Conference with B. Kaplan, CPA and C. Graff, CPA reviewing information required to accurately respond to question 18 of Statement of Affairs | 0.25 | 250 | $62.50 |
| 4/20/12 | Telephone Conference with B. Kaplan, CPA update on status of supplementation to Schedules and Statement of Financial Affairs | 0.25 | 250 | $62.50 |
| 4/23/12 | Prepared revisions to Schedules focusing on detailed ScheduleH listing co-debtors | 3 | 250 | $750.00 |
| 4/23/12 | E-mail to client and B. Kaplan fwd revised draft of SchedulesF and H for review and approval before filing | 0.25 | 250 | $62.50 |
| 4/24/12 | Telephone Conference with B. Kaplan review necessary for amended Schedules and list of co-debtors | 0.2 | 250 | $50.00 |
| 4/30/12 | Telephone Conference with B. Kaplan questioning whether he has reviewed revised Schedule F with J. Grasso | 0.2 | 250 | $50.00 |
| 5/2/12 | Telephone Conference with B. Kaplan, CPA regarding futher modifications to Schedules- real estate | 0.25 | 375 | $93.75 |
| 9/28/12 | Telephone Conference with B. McVan, Esquire questioning what documents J. Grasso is required to produce on transfer of interests to wife | 0.25 | 375 | 93.75 |
| 10/5/12 | Telephone Conference with K. Callahan, Esquire lengthy discussion on likely reasons why Court listed hearing; his error on schedule | 0.3 | 375 | 112.5 |
| 10/5/12 | Reviewed Order scheduling hearing on status of PJW, P.C. continuing as counsel for Debtor J. Grasso | 0.1 | 375 | 37.5 |
| 10/5/12 | E-mail to client fwd copy of Order scheduling hearing on Court's initiate to PJW, P.C. representation of J. Grasso | 0.25 | 375 | 93.75 |
| 10/18/12 | Reviewed e-mail questioning source of income to J. Grasso | 0.1 | 375 | $37.50 |
| | | 35.95 | | $12,687.50 |

# ATTACHMENT 3

| Date | Description | Hours | Rate | Amount |
|---|---|---|---|---|
| 2/9/12 | Reviewed e-mail from Office of the United States Trustee on initial instructions and Monthly Operating Report forms | 0.25 | 375 | 93.75 |
| 2/9/12 | E-mail to client- fwd initial instructions and Monthly Operating Report forms | 0.2 | 375 | 75 |
| 4/24/12 | E-mail to Debtor and Accountant advising that Monthly Operating Reports for February and March need to be filed | 0.2 | 250 | 50 |
| 4/25/12 | Telephone Conference with B. Kaplan questioning proper forms of Monthly Operating Report for individual Debtor | 0.2 | 250 | 50 |
| 4/25/12 | Prepared individual Monthly Operating Report for Chapter 11 Debtor in E.D.Pa | 0.5 | 250 | 125 |
| 7/6/12 | Telephone Conference with B. Kaplan following up on need to prepare and file Monthly Operating Reports for personal Chapter 11 case discussing transfers between partnerships | 0.25 | 375 | 93.75 |
| 7/24/12 | Reviewed preliminary information collected by Bruce Kaplan for Grasso Monthly Operating Reports | 0.3 | 375 | 112.5 |
| 7/24/12 | E-mail to Bruce Kaplan confirming income/revenue sources mustbe identified | 0.25 | 375 | 93.75 |
| 7/30/12 | Telephone Conference with B. Kaplan questioning how to appropriately list income/loan repayments on individual Monthly Operating Reports | 0.2 | 375 | 75 |
| 8/6/12 | Reviewed drafts of monthly operating reports prepared by B. Kaplan for J. Grasso | 0.75 | 375 | 281.25 |
| 8/7/12 | E-mail to client fwd copies of Monthly Operating Report filedfor March, April, and May; requesting Bruce prepare June and July before Hearing | 0.25 | 375 | 93.75 |
| 8/27/12 | Reviewed draft of June Monthly Operating Report for Debtor individually prepared by B. Kaplan | 0.3 | 375 | 112.5 |
| 8/27/12 | Reviewed and revised draft of July Monthly Operating Report for Debtor; prepared for filing | 0.4 | 375 | 150 |
| 8/30/12 | Reviewed and revised February 2012 Stub Operating Report; Modified and filed | 0.5 | 375 | 187.5 |
| 8/30/12 | E-mail to client fwd modified February Monthly Operating Report as filed | 0.2 | 375 | 75 |
| 9/7/12 | Reviewed Order entered by Judge Coleman directing compliance with reporting and supplementing prior reports | 0.3 | 375 | 112.5 |
| 9/10/12 | Telephone Conference with J. Grasso and B. Kaplan following up on Debtor's Supplemental Reporting requirements followingconference with Judge | 0.3 | 375 | 112.5 |
| 9/21/12 | E-mail to B. Kaplan reminding him Debtor's Monthly Operating Report is due; supplemental Monthly Operating Reports due byOctober 1, 2012 | 0.2 | 375 | 75 |
| 9/21/12 | Telephone Conference with B. Kaplan reviewed and revised modified reports; prepared for filing | 1.5 | 375 | 562.5 |
| 10/1/12 | Reviewed materials required for amended Monthly Operating Reports; prepared revised information | 0.5 | 375 | 187.5 |
| 10/4/12 | Reviewed draft of Grasso Monthly Operating Report for August,made adjustments to print formatting | 0.4 | 375 | 150 |
| 10/4/12 | E-mail to B. Kaplan requesting he confirm all accounts are detailed and identified in Monthly Operating Report | 0.25 | 375 | 93.75 |
| 10/4/12 | E-mail to B. Kaplan advising monthly report requires identification as to source of income/receipts | 0.2 | 375 | 75 |
| 10/1/12 | Telephone Conference with J. Grasso need to modify/supplementGrasso Monthly Operating Reports | 0.2 | 375 | 75 |
| 10/1/12 | Reviewed Report prepared by B. Kaplan detailing income/revenue; telephone conference with B. Kaplan requesting separate pages for each month | 0.25 | 375 | 93.75 |
| 10/1/12 | Telephone Conference with J. Grasso advising that a new coversheet will be required for amended Monthly Operating Reports | 0.2 | 375 | 75 |
| 10/2/12 | Telephone Conference with B. Kaplan inquiring as to status ofGrasso Monthly Operating Report for August need to be exact and careful | 0.3 | 375 | 112.5 |
| 10/2/12 | Telephone Conference with client following up on need to accurately and promptly prepare all Monthly Operating Reports | 0.25 | 375 | 93.75 |
| | | 9.6 | | 3487.5 |

# ATTACHMENT 4

| Date | Explanation | Hours | Rate | Total |
|------|-------------|-------|------|-------|
| 7/25/12 | Reviewed Office of U.S. Trustee Motion to Convert or Dismiss for failure to file Monthly Operating Reports | 0.3 | 375 | $112.50 |
| 7/25/12 | Reviewed Order signed by Judge Coleman directing Madison Capital to refile Motion to Convert with proper redacting | 0.2 | 375 | $75.00 |
| 7/25/12 | Reviewed Notice of Motion filed by Madison Capital seeking toconvert Answer due by August 6, 2012, hearing August 28, 2012 | 0.1 | 375 | 37.5 |
| 7/30/12 | Telephone Conference with client following up on his calls onMadison Capital Motion to Convert | 0.2 | 375 | $75.00 |
| 7/30/12 | Telephone Conference with J. Grasso confirming settlement with Origin Capital issues with Madison Capital Motion to Convert | 0.2 | 375 | $75.00 |
| 7/31/12 | E-mail to R. Jones, Esquire advising I have not received service of Madison Capital Motion for conversion; requestingservice copy | 0.2 | 375 | $75.00 |
| 7/31/12 | E-mail to client requesting she fwd hard copy of Madison Capital Motion to Convert filed with Bankruptcy Court | 0.2 | 375 | $75.00 |
| 8/3/12 | Reviewed Katz Joinder to U.S. Trustee Motion to Convert or Dismiss | 0.25 | 375 | $93.75 |
| 8/3/12 | E-mail to client fwd Katz pleading to increase heat and join Motions to Dismiss | 0.25 | 375 | $93.75 |
| 8/7/12 | Prepared draft of Response to Motion of U.S. Trustee to Convert case | 1.25 | 375 | $468.75 |
| 8/7/12 | Prepared proposed Form of Order denying Relief sought in U.S.Trustee's Motion to Convert Grasso personal Bankruptcy | 0.2 | 375 | $75.00 |
| 8/8/12 | Reviewed e-mail from R. Jones, Esquire inquiring as to whether Debtor intends to oppose Madison Motion to Convert | 0.1 | 375 | $37.50 |
| 8/8/12 | E-mail to R. Jones, Esquire advising Answer not due on 8/6 because Motion stricken by Court Order | 0.2 | 375 | $75.00 |
| 8/9/12 | Reviewed Joinder of Madison Capital to U.S. Trustee Motion toConvert | 0.25 | 375 | $93.75 |
| 8/20/12 | E-mail to R. Jones, Esquire suggesting Hearings on Motions toConvert should be deferred until after B.R. 2004 Exam; not opposite | 0.25 | 375 | $93.75 |
| 8/20/12 | Reviewed e-mail from D. Karapelou, Esquire advising Hearings on Madison Objections to Claim to be continued | 0.2 | 375 | $75.00 |
| 8/27/12 | Reviewed Madison Motion to Convert Chapter 11 individual bankruptcy case to prepare for hearing tomorrow | 0.4 | 375 | $150.00 |
| 8/27/12 | E-mail to B. Kaplan follow up on information required for hearing tomorrow on Madison Capital Motion to Convert | 0.3 | 375 | $112.50 |
| 8/27/12 | Telephone Conference with client and B. Kaplan evaluating issues likely to be raised during hearing tomorrow | 0.4 | 375 | $150.00 |
| 8/27/12 | E-mail to K. Callahan, Esquire suggesting 60 day adjournment to U.S. Trustee's Motion to Convert | 0.25 | 375 | $93.75 |
| 8/27/12 | Telephone Conference with D. Karapelou, Esquire questioning whether intending to go forward with hearing on Madison Capital Motion to Convert | 0.2 | 375 | $75.00 |
| 8/27/12 | Reviewed e-mail from R. Jones, Esquire inquiring whether J. Grasso will be present for hearing tomorrow | 0.1 | 375 | $37.50 |
| 8/27/12 | Telephone Conference with client following up on issues for hearings tomorrow and Wednesday | 0.1 | 375 | $37.50 |
| 8/28/12 | Reviewed file prepare for hearing on Motion to Convert soughtby Madison Capital | 1.25 | 375 | $468.75 |
| 8/28/12 | Court Appearance attend hearing on Madison Motion to Convert (Day 1) | 5 | 375 | $1,875.00 |
| 8/28/12 | Telephone Conference with K. Callahan, Esquire confirming hisconsent to continuing hearing on U.S. Trustee's Motion to Convert, discussions with counsel | 0.25 | 375 | $93.75 |
| 9/4/12 | Telephone Conference with J. Grasso and B. Kaplan following up on hearing for tomorrow | 0.2 | 375 | $75.00 |
| 9/5/12 | Court Appearance attend continued hearing on Motion to Convert case sought by Madison Capital before Judge Coleman | 4.5 | 375 | $1,687.50 |
| 9/5/12 | Reviewed e-mail from J. Baddeley, Esquire requesting ability to participate in hearing | 0.1 | 375 | $37.50 |
| 9/5/12 | E-mail to J. Baddeley, Esquire advising will not agree to participation in hearing but could monitor | 0.1 | 375 | $37.50 |
| 9/6/12 | Research and review standards for 1104 Trustee | 0.75 | 375 | $281.25 |
| 9/7/12 | Research standards and issues on appointment of Chapter 11 Trustee in preparation of telephone conference with Judge Coleman | 1 | 375 | $375.00 |
| 9/7/12 | Telephone Conference with Judge Coleman following up on her issues with Hearing on Motion to Convert comments on appointment of Chapter11 Trustee | 0.75 | 375 | $281.25 |
| 9/7/12 | Telephone Conference with client explaining content and context of Court's concerns and directives | 0.4 | 375 | $150.00 |
| 9/17/12 | Reviewed in detail Madison's Motion to appoint Chapter 11 Trustee based solely on conjecture and argument, not factually supported | 0.5 | 375 | $187.50 |
| 9/17/12 | E-mail to client fwd copy of Motion filed by Madison Capital seeking appointment of Chapter 11 Trustee; confirmation of pay | 0.25 | 375 | $93.75 |
| 9/17/12 | Reviewed M. Katz Joinder to Madison Capital Motion to AppointChapter 11Trustee | 0.2 | 375 | $75.00 |
| 9/21/12 | Reviewed Order docketed on hearing on appointment of Trustee | 0.1 | 375 | $37.50 |
| 9/27/12 | Telephone Conference with client following up on meeting withBancorp; response required to Motion to Convert | 0.2 | 375 | $75.00 |
| 9/28/12 | Reviewed Order issued by Judge Rufe extending time for Madison Capital to file brief until Court disposes of Chapter 11 Trustee Motion | 0.1 | 375 | $37.50 |
| 9/28/12 | Prepared Response to Motion of Madison Capital to Appoint Chapter 11 Trustee | 4 | 375 | $1,500.00 |
| 10/2/12 | E-mail to client fwd copy of 9/7 telephone conference with J.Coleman following up after 9/5/2012 Bench Rulings | 0.25 | 375 | $93.75 |

| Date | Description | Hours | Rate | Amount |
|---|---|---|---|---|
| 10/2/12 | Reviewed motion filed by Madison Capital to District Court todelay need to file Brief of Co-Appellee based on agreement with Katz | 0.25 | 375 | $93.75 |
| 10/5/12 | E-mail to K. Callahan, Esquire providing copies of hearing transcripts on Madison Motion to Convert | 0.25 | 375 | $93.75 |
| 10/8/12 | Telephone Conference with J. Matour, Esquire background to case and Motion by Madison Capital for appointment of Chapter 11 Trustee | 0.75 | 375 | $281.25 |
| 10/8/12 | Reviewed Memorandum of Law filed on behalf of Sherwin Williams seeking to join Madison Capital Motion to Appoint Chapter 11 Trustee | 0.25 | 375 | $93.75 |
| 10/8/12 | E-mail to client fwd copy of Sherwin Williams Memorandum supporting Motion to Appoint Chapter 11 Trustee | 0.2 | 375 | $75.00 |
| 10/10/12 | Reviewed file; review Madison Motion for Appointment of Chapter 11 Trustee; prepare for meeting with client | 0.75 | 375 | $281.25 |
| 10/10/12 | Meeting with client and J. Matour, Esquire on status of case preparation for hearing on Madison Capital Motion to AppointChapter 11 Trustee | 4 | 375 | $1,500.00 |
| 10/11/12 | Telephone Conference with J. Matour, Esquire further discussions on proceeding with hearing | 0.2 | 375 | $75.00 |
| 10/12/12 | Telephone Conference with J. Grasso and J. Matour re: preparation and issues for Monday | 0.75 | 375 | $281.25 |
| 10/12/12 | Reviewed e-mail from R. Jones, Esquire requesting ability forhis client to listen in on Court hearing | 0.1 | 375 | $37.50 |
| 10/15/12 | Reviewed response opposing Madison Motion to Appoint Chapter 11 Trustee; prepare for hearing | 0.75 | 375 | $281.25 |
| 10/15/12 | Telephone Conference with E. Godfrey confirming hearing will begin at 10:30 on Madison Capital Motion | 0.1 | 375 | $37.50 |
| 10/15/12 | Court Appearance attend hearing before Judge Coleman on Madison Capital Motion to appoint Chapter 11 Trustee | 10.5 | 375 | $3,937.50 |
| 10/16/12 | Reviewed Order and Opinion granting Madison Capital Motion toAppoint Chapter 11 Trustee in case with conditions | 0.2 | 375 | $75.00 |
| 10/16/12 | Telephone Conference with J. Grasso advising on entry of Order appointing Chapter 11 Trustee | 0.25 | 375 | $93.75 |
| 10/16/12 | Telephone Conference with J. Grasso follow up on content and effect of Court Order appointing Trustee options, alternatives, and consequences | 0.5 | 375 | $187.50 |
| 10/16/12 | Telephone Conference with J. Grasso questioning operational issues following yesterday's hearing | 0.25 | 375 | $93.75 |
| 10/17/12 | Telephone Conference with J. Grasso following up on Court's Order appointing Trustee; inquiring how to respond and how Trustee will proceed | 0.25 | 375 | $93.75 |
| 10/18/12 | Telephone Conference with D. Braverman, Esquire re: J. Grasso; follow up e-mail on Court Order appointing Chapter 11 Trustee | 0.1 | 375 | $37.50 |
| 10/19/12 | Telephone Conference with J. Grasso meeting today to discuss options and recommendations for appointment of Chapter 11 Trustee | 0.2 | 375 | $75.00 |
| 10/22/12 | Telephone Conference with J. Grasso numerous calls evaluatingprocess for U.S. Trustee's selection of Chapter 11 Trustee's selection of Chapter 11 Trustee | 0.4 | 375 | $150.00 |
| 10/22/12 | Telephone Conference with G. Schildhorn, Esquire, D. Braverman, Esquire and K. Callahan of Trustee's Office re: selection process | 0.3 | 375 | $112.50 |
| 10/23/12 | E-mail to J. Matour, Esquire fwd copy of e-mail from Office of the U.S. Trustee questioning whether he has any opinion on appointment of candidate for Chapter 11 Trustee | 0.2 | 375 | $75.00 |
| 10/25/12 | Telephone Conference with J. Grasso evaluating options with Bankruptcy counsel; timing for appointment of Trustee and timing for appeal | 0.25 | 375 | $93.75 |
| 10/25/12 | Telephone Conference with desire to terminate Hangley Aronchick and hire Braverman Kaskey wants PJW, P.C. to file appeal of Trustee appointment | 0.3 | 375 | 112.5 |
| 10/29/12 | Reviewed Court Memorandum Order on Appointment of Chapter11 Trustee | 0.4 | 375 | $150.00 |
| 10/30/12 | E-mail to client fwd copy of filed Notice of Appeal | 0.2 | 375 | $75.00 |
| 10/30/12 | Reviewed correspondence from J. Matour, Esquire suggesting Motion for Reconsideration may be better approach | 0.2 | 375 | $75.00 |
| 10/30/12 | Telephone Conference with client following up on appeal; effect on who pursues | 0.25 | 375 | $93.75 |
| 10/30/12 | Prepared Notice of Appeal to Bankruptcy Court Order Appointing Chapter 11 Trustee; filed with Bankruptcy Court | 0.75 | 375 | $281.25 |
| 10/31/12 | Reviewed U.S. Trustee's filing disclosing C. Shubert at Chapter 11 Trustee | 0.2 | 375 | $75.00 |
| 10/31/12 | Telephone Conference with J. Grasso advising of filing by U.S. Trustee appointing Christine Shubert as Chapter 11 Trustee | 0.3 | 375 | $112.50 |
| 10/31/12 | Reviewed e-mail from D. Smith, Esquire counsel to JGKM inquiring who is appointed Trustee | 0.1 | 375 | $37.50 |
| | | 50.45 | | $18,918.75 |

# ATTACHMENT 5

| Date | Explanation | Hours | Rate | Total |
|------|-------------|-------|------|-------|
| 7/12/12 | Telephone Conference with J. Grasso negotiation with Vist Bank | 0.25 | 375 | $93.75 |
| 7/13/12 | Prepared multiple e-mails to B. Kile, Esquire fwd e-mail transmittals 1 and 4 which he reported not to have received | 0.25 | 375 | $93.75 |
| 8/3/12 | Reviewed e-mail from B. Kile, Esquire suggesting Nextier has s/i in various partnerships | 0.1 | 375 | $37.50 |
| 8/3/12 | E-mail to B. Kile, Esquire advising not familiar with Nextier's loan | 0.25 | 375 | $93.75 |
| 8/3/12 | Reviewed Nextier's proof of claim; reviewed Motion filed by Nextier seeking to prohibit use of cash collateral | 0.5 | 375 | $187.50 |
| 8/3/12 | E-mail to client fwd e-mail and copy of Motion filed by Nextier seeking to prohibit use of cash collateral | 0.25 | 375 | $93.75 |
| 8/6/12 | Telephone Conference with J. Grasso following up on Nextier Bank Motion | 0.2 | 375 | $75.00 |
| 8/7/12 | Telephone Conference with J. Grasso and B. Kaplan attempting to clarify loan arrangement with Radnor Trust for 3M and Nextier current position | 1 | 375 | $375.00 |
| 8/21/12 | Reviewed Motion filed by Nextier Bank seeking to restrict Useof Cash Collateral or provide adequate protection; review loan documents | 1.5 | 375 | $562.50 |
| 8/21/12 | Prepared draft of Response to Nextier Bank Motion to prohibitUse of Cash Collateral | 1.75 | 375 | $656.25 |
| 8/21/12 | E-mail to client commenting on Nextier Loan documents and suggesting preparation for Hearing | 0.25 | 375 | $93.75 |
| 8/21/12 | E-mail to B. Kile, Esquire fwd copy of response and suggesting Hearing be Continued to allow B.R. 2004 Exam to be completed | 0.25 | 375 | 93.75 |
| 8/22/12 | Telephone Conference with B. Kile, Esquire re: scheduling Hearing on Nextier Cash Collateral Claims | 0.2 | 375 | $75.00 |
| 8/27/12 | E-mail to B. Kile, Esquire following up on e-mail from last week questioning his desire to proceed with either B.R. 2004or CC Hearing | 0.2 | 375 | $75.00 |
| 8/27/12 | Telephone Conference with B. Kile, Esquire hearing on Wednesday by NexTier Bank | 0.1 | 375 | $37.50 |
| 8/27/12 | Telephone Conference with B. Kile, Esquire advising of desireto proceed with Cash Collateral Motion | 0.2 | 375 | $75.00 |
| 8/28/12 | Telephone Conference with B. Kile, Esquire negotiation on NexTier Bank claimed interest in Cash Collateral | 0.25 | 375 | $93.75 |
| 8/28/12 | Reviewed NexTier Bank loan documents on $3M LOC Facility issued in March 2007 | 0.75 | 375 | $281.25 |
| 8/28/12 | Reviewed e-mail and Proposed Cash Collateral Stipulated Orderfwd by B. Kile on behalf of NexTier Bank | 0.3 | 375 | $112.50 |
| 8/28/12 | Telephone Conference with B. Kile, Esquire negotiation on NexTier Claim to be Secured/Cash Collateral | 0.3 | 375 | $112.50 |
| 8/28/12 | Telephone Conference with client negotiation with NexTier Bank on Cash Collateral issues | 0.25 | 375 | $93.75 |
| 8/29/12 | Reviewed e-mail from B. Kile, Esquire advising Courtroom Deputy is requiring appearance to present Order | 0.1 | 375 | $37.50 |
| 8/29/12 | Telephone Conference with B. Kile, Esquire suggesting signatures be added to Stipulated Order | 0.2 | 375 | $75.00 |
| 8/29/12 | Prepared revised Form of Stipulated Order authorizing use of Cash Collateral | 0.25 | 375 | $93.75 |
| 8/29/12 | E-mail to B. Kile, Esquire fwd revised Form of Order permitting continued use of Cash Collateral | 0.2 | 375 | $75.00 |
| 8/29/12 | Court Appearance attend Hearing on NexTier Cash Collateral request | 1.25 | 375 | $468.75 |
| 8/30/12 | Reviewed Order signed by Court granting NexTier post-petitionlien in whatever valid collateral held pre-petition | 0.2 | 375 | $75.00 |
| 8/30/12 | Telephone Conference with J. Grasso following up on inquiry made on behalf of Hill International; discussion of interests by NexTier Bank | 0.3 | 375 | $112.50 |
| | | 11.6 | | $4,350.00 |

# ATTACHMENT 6

| Date | Explanation | Hours | Rate | Total |
|------|-------------|-------|------|-------|
| 7/26/12 | Reviewed file to confirm R. 2015.3 report requirements; prepare draft of K1s report consistent with Court's directives | 1 | 375 | 375 |
| 9/10/12 | E-mail to B. Kaplan and client fwd text of B.R. 2015.3 along with official Form 26 which details information required by under Rule | 0.25 | 375 | 93.75 |
| 9/13/12 | Telephone Conference with B. Kaplan careful review of requirements and obligations for preparing exhibits to Form 26 Reports under R2015.3 | 1.25 | 375 | 468.75 |
| 9/19/12 | Telephone Conference with B. Kaplan reviewing form and required content for B.R. 2015.3 Reports | 0.2 | 375 | 75 |
| 9/19/12 | Reviewed preliminary form of financial data presentation for controlled corporations on B.R. 2015 Report | 0.3 | 375 | 112.5 |
| 9/19/12 | E-mail to B. Kaplan making limited suggestions on format for presentation of financials per B.R. 2015.3 Reports | 0.25 | 375 | 93.75 |
| 9/19/12 | Reviewed and revised cover page of form 2015.3 Reports, tailored for client signature | 0.3 | 375 | 112.5 |
| 9/19/12 | E-mail to client fwd copy of form 2015.3 Report for client's signature | 0.2 | 375 | 75 |
| 9/20/12 | Telephone Conference with C. Graff and B. Kaplan reviewing requirements under B.R.2015.3 for Financial Reports from non-controlled entities | 0.5 | 375 | 187.5 |
| 9/21/12 | E-mail to client fwd completed copy of Rule 2015.3 Report as filed with Court | 0.2 | 375 | 75 |
| 9/21/12 | Telephone Conference with B. Kaplan confirming Report filed; reviewed issues and corrections in format to improve future filings | 0.25 | 375 | 93.75 |
| 9/21/12 | Telephone Conference with B. Kaplan reviewed drafts of 14 partnership financial reports recommended modifications and adjusted formatting for filing | 0.5 | 375 | 187.5 |
| 9/28/12 | Prepared revised B.R. 2015.3 Report for partnerships in whichDebtor has minority interest | 0.5 | 375 | 187.5 |
| 9/28/12 | Telephone Conference with J. Grasso re reviewing draft of B.R. 2015.3 Report; update on financing through Bancorp | 0.3 | 375 | 112.5 |
| 9/24/12 | Telephone Conference with B. Kaplan following up on outstanding reports due in next seven days | 0.2 | 375 | 75 |
| 9/28/12 | Telephone Conference with J. Grasso (numerous calls) re: B.R.2015.3 Report filing | 0.5 | 375 | 187.5 |
| | | 6.7 | | 2512.5 |

# ATTACHMENT 7

| 2/17/12 | Reviewed Proposed Forbearance sought by CIBC, Inc. for WSC Warminster Plaza Loan | 0.25 | 375 | 93.75 |
|---|---|---|---|---|
| 2/23/12 | Telephone Conference with J. Grasso desire to also file Warminster Plaza to forestall Bank from sweeping accounts | 0.25 | 375 | 93.75 |
| 2/29/12 | Telephone Conference with J. Grasso and D. Shafkowitz, Esquire issues with Warminster Plaza and desire to coordinate bankruptcy filing | 0.3 | 375 | 112.5 |
| 3/5/12 | Telephone Conference with J. Grasso following up on new lawsuits having been commenced by Vist Bank for York and Swamp property | 0.2 | 375 | 75 |
| 3/28/12 | Telephone Conference with B. Kaplan call from Sherwin Williams looking at 2010 tax return | 0.25 | 375 | 93.75 |
| 3/29/12 | Telephone Conference with B. Kaplan lender on Spring Avenue is demanding access to inspect property advised no reason not to allow access | 0.2 | 375 | 75 |
| 4/18/12 | Reviewed Notice of Sheriff's Sale issued by Vist Bank on account of Doylestown Raw Land at York and Swamp Roads | 0.25 | 250 | 62.5 |
| 4/18/12 | Telephone Conference with J. Grasso- review of issues with York and Swamp actions by Vist to schedule Sheriff's Sale and Origin Capital Claim | 0.5 | 250 | 125 |
| 4/18/12 | Reviewed complaint filed by City of Philadelphia for Saxbys Coffee Worldwide related taxes | 0.3 | 250 | 75 |
| 4/25/12 | Telephone Conference with G. Santamour, Esquire negotiating treatment of York and Swamp interest in Doylestown | 0.25 | 250 | 62.5 |
| 4/25/12 | Telephone Conference with Joe advising on result of discussions with VIST counsel | 0.25 | 250 | 62.5 |
| 4/27/12 | Telephone Conference with J. Grasso and M. Mitts, Esquire regarding Origin Capital litigation against Coffee Shops International on trial calendar | 0.25 | 250 | 62.5 |
| 5/8/12 | Telephone Conference with J. Grasso update on discussion with Origin Capital issues | 0.5 | 375 | 187.5 |
| 5/8/12 | Reviewed Praecipe to Enter Default on Mechanics Lien Claims sought by Sunlight v. WSC717 | 0.25 | 375 | 93.75 |
| 5/8/12 | Telephone Conference with B. Kaplan advising that Stonebridgeis again seeking to inspect Reading, PA property questioning whether to allow | 0.25 | 375 | 93.75 |
| 5/14/12 | Reviewed filed Affidavit of Service of Adversary Complaint filed by Sherman Williams against J. Grasso | 0.1 | 375 | 37.5 |
| 5/14/12 | E-mail to G. Bressler, Esquire advising that fwd Complaint toC. Samler, Esquire at Klehr Harrison is erroneou | 0.1 | 375 | 37.5 |
| 5/15/12 | Reviewed e-mail from B. Kaplan following up on separate Subpoena served MEPT for related claims | 0.1 | 375 | 37.5 |

| 5/18/12 | Reviewed Complaint filed by Sherman Williams seeking to Object to Dischargeability of Debt | 0.3 | 375 | 112.5 |
|---|---|---|---|---|
| 5/24/12 | E-mail to and from B. Golub, Esquire issues with Motion to Extend Time to Object to Discharge | 0.25 | 375 | 93.75 |
| 5/25/12 | Prepared draft of Response to Nextier Bank Motion for Extension to file Complaint Objecting to Dischargeability | 0.75 | 375 | 281.25 |
| 5/25/12 | Prepared proposed Form of Order limiting extension solely to Nextier Bank | 0.2 | 375 | 75 |
| 5/25/12 | E-mail to client fwd copy of Response to Nextier Bank Motion to Extend Time to Object to Discharge | 0.2 | 375 | 75 |
| 5/25/12 | E-mail to client fwd copy of Objection filed to | 0.25 | 375 | 93.75 |
| 5/29/12 | Telephone Conference with client following up on various openissues with Vist Bank, T.D. Bank issues relating to interestsin Coffee Shops | 0.3 | 375 | 112.5 |
| 6/4/12 | Telephone Conference with J. Grasso following up on American Express and Vist loan issues at York and Swamp | 0.5 | 375 | 187.5 |
| 6/4/12 | E-mail to G. Santamour, Esquire requesting meeting to discuss York and Swamp project | 0.25 | 375 | 93.75 |
| 6/4/12 | E-mail to and from W. Levant, Esquire agreeing to permit Singer until July 31, 2012 to file Complaint as to Dischargeability | 0.2 | 375 | 75 |
| 6/5/12 | Telephone Conference with B. Kaplan confirming Sale postponed Hearings aso pushed off until end of month | 0.2 | 375 | 75 |
| 6/5/12 | Court Appearance attend Hearings on Nextier and WSFS Motions to extend time to file Complaint Objecting to Dischargeability of Debt | 1.5 | 375 | 562.5 |
| 6/6/12 | Reviewed Orders signed by Judge Coleman extending deadlines for Singer and Nextier to file Complaints | 0.2 | 375 | 75 |
| 6/6/12 | Telephone Conference with B, Kaplan questions regarding property of Corporate Financial Transactions | 0.2 | 375 | 75 |
| 6/11/12 | Prepared Answer to Complaint objecting to dischargeability ofdebt claimed due to Larson and Greg Bayer | 1.25 | 375 | 468.75 |
| 6/13/12 | Prepared Answer to Sherwin Williams Complaint Objecting to Dischargeability | 1.25 | 375 | 468.75 |
| 6/13/12 | E-mail to D. Karapelou, Equire requesting his consent to one week extension to file Answer to Dischargeability Complaint | 0.1 | 375 | 37.5 |
| 6/13/12 | E-mail to D. Karapelou, Esquire acknowledging his courtesy togranting two week extension | 0.1 | 375 | 37.5 |

| 6/18/12 | Reviewed e-mail from D. Shafkowitz, Esquire land use consel confirming his availability to meet with Vist Bank | 0.1 | 375 | 37.5 |
|---|---|---|---|---|
| 6/18/12 | E-mail to G. Santamour, Esquire advising that land use attorney is available for wednesday's meeting | 0.1 | 375 | 37.5 |
| 6/18/12 | Telephone Conference with J. Grasso setting up telephone conference to discuss various issues on business operations and planning | 0.2 | 375 | 75 |
| 6/20/12 | Meeting at Vist Bank in Blue Bell negotiation on Doylestown project | 2.5 | 375 | 937.5 |
| 6/21/12 | Telephone Conference with B. Kaplan re: forwarding notary to D. Grasso for signature | 0.2 | 375 | 75 |
| 6/25/12 | Correspondence letter to S. Libroli, Esquire counsel to Stonebridge Bank advising actions of attempt to take possession of property are erroneous | 0.25 | 375 | 93.75 |
| 6/27/12 | Prepared Answer to Complaint Ojbecting to Dischargeability ofAlleged Katz Claim | 3.5 | 375 | 1312.5 |
| 6/27/12 | E-mail to client fwd copy of Answer filed to Katz Dischargeability Complaint | 0.25 | 375 | 93.75 |
| 6/27/12 | Reviewed Orders entered by Judge Coleman transferring Larson and Katz Dischargeability Adversaries to Judge Frank | 0.1 | 375 | 37.5 |
| 6/28/12 | Reviewed Pre-Trial Scheduling Order issued by Bankruptcy Court in Sherwin Williams Adversary; calendared dates | 0.25 | 375 | 93.75 |
| 6/28/12 | Reviewed and calendared dates set in Pre-Trial Scheduling Order set by Judge Frank in Larso Dischargeability Adversary | 0.25 | 375 | 93.75 |
| 6/28/12 | Reviewed Order issued by Judge Frank compelling Plaintiff to file Motion for Default | 0.1 | 375 | 37.5 |
| 6/28/12 | Telephone Conference with P. Blalock, Courtroom Deputy to Judge Frank advising Answer was filed to Katz Complaint | 0.1 | 375 | 37.5 |
| 6/28/12 | Reviewed e-mail from D. Karapelou, Esquire consenting to Proposed Form of Order | 0.1 | 375 | 37.5 |
| 7/2/12 | E-mail to client following up on status/issues outstanding from June 20 meeting with Vist Bank on Doylestown property | 0.25 | 375 | 93.75 |
| 7/2/12 | Reviewed e-mail from W. Levant, Esquire fwd Proposed Stipulation consenting to further extension on 523 Complaint | 0.2 | 375 | 75 |
| 7/2/12 | Reviewed Singer Motion requesting 60 day extension to time tofile complaint objecting to discharge | 0.2 | 375 | 75 |
| 7/2/12 | E-mail to W. Levant, Esquire advising Debtor will not object to request to further extend time to object to dischargeability of Singer debt | 0.1 | 375 | 37.5 |

| 7/2/12 | E-mail to W. Levant, Esquire returning signed Stipulation permitting further extension of time for Singer to file Complaint | 0.2 | 375 | 75 |
|---|---|---|---|---|
| 7/3/12 | E-mail to client reporting on discussions with M. Dorval, Esquire this morning on T.D. Bank loan | 0.25 | 375 | 93.75 |
| 7/5/12 | E-mail to M. McGowen, Esquire at Becket & Lee following up on request to reinstate American Express Card | 0.25 | 375 | 93.75 |
| 7/5/12 | Reviewed Pre-Trial Scheduling Order and calendared dates | 0.2 | 375 | 75 |
| 7/5/12 | E-mail to client a copy of Pre-Trial Scheduling Order | 0.2 | 375 | 75 |
| 7/10/12 | Telephone Conference with J. Grasso issues with Katz enforcement actions against various persons and entities | 0.25 | 375 | 93.75 |
| 7/10/12 | Telephone Conference with J. Grasso evaluation of issues for York and Swamp property in Doylestown | 0.25 | 375 | 93.75 |
| 7/10/12 | Telephone Conference with Gretchen Santamour, Esquire inquiring as to what are Debtor's intentions | 0.25 | 375 | 93.75 |
| 7/10/12 | Reviewed e-mail from D. Karapelou, Esquire advising his client is amenable to submitting discharge obj. to mediation | 0.1 | 375 | 37.5 |
| 7/11/12 | Meeting with D. Karapelou, Esquire advising Debtor would not agree to mediation | 0.25 | 375 | 93.75 |
| 7/11/12 | Reviewed e-mail from J. Baddeley, Esquire seeking to scheduletime to coordinate Rule 26(f) Conference | 0.1 | 375 | 37.5 |
| 7/11/12 | E-mail to J. Baddeley, Esquire attempting to coordinate Sherwin Williams Pre-Trial Discovery Conference | 0.2 | 375 | 75 |
| 7/12/12 | Telephone Conference with G. Santamour, Esquire following up on Vist Bank foreclosure action for tomorrow on Doylestown property | 0.2 | 375 | 75 |
| 7/12/12 | Telephone Conference with G. Santamour on Doylestown Sheriff's Sale negotiations on continuiing sale of property | 0.3 | 375 | 112.5 |
| 7/12/12 | Telephone Conference with S. White, Esquire confirming Vist Bank will agree to continue Sheriff's Sale based on negotiated agreement | 0.2 | 375 | 75 |
| 7/12/12 | Telephone Conference with J. Grasso negotiation with counsel for Vist Bank on postponing Sheriff's Sale on Doylestown property | 0.2 | 375 | 75 |
| 7/12/12 | Telephone Conference with B. Kaplan and S. White coordinating payment to avoid Sheriff's Sale | 0.2 | 375 | 75 |
| 7/12/12 | Reviewed e-mail from J. Milano at Stradley fwd copy of lettersent to Sheriff confirming sale postponed | 0.2 | 375 | 75 |

| 7/12/12 | Telephone Conference with J. Baddeley, Esquire detailed discussions on initial discovery conference; trial issues | 0.6 | 375 | 225 |
|---|---|---|---|---|
| 7/16/12 | E-mail to A. Applebaum, Esquire local counsel to Sherwin Williams fwd draft of proposed Joint Statement declining mediation | 0.2 | 375 | 75 |
| 7/16/12 | Prepared proposed Joint Statement declining to participate inCourt annexed mediation for Katz Adversary | 0.3 | 375 | 112.5 |
| 7/16/12 | E-mail to D. Karapelou, Esquire fwd draft of Joint Stipulation declining Court annexed mediation | 0.2 | 375 | 75 |
| 7/16/12 | Reviewed e-mail from D. Karapelou, Esquire requesting Debtor's and Madison Capital Objection be set for same day | 0.1 | 375 | 37.5 |
| 7/16/12 | E-mail to D. Karapelou, Esquire advising would not oppose consolidating objections for Hearing purposes | 0.25 | 375 | 93.75 |
| 7/16/12 | Reviewed e-mail from M. Gigliotti, Esquire on Larson v. Grasso Pre-Trial Scheduling Order | 0.1 | 375 | 37.5 |
| 7/16/12 | E-mail to M. Gigliotti, Esquire suggesting times for confering on Pre-Trial dates | 0.2 | 375 | 75 |
| 7/17/12 | E-mail to J. Baddeley, Esquire and A. Applebaum, Esquire following up on whether they are ok with proposed Joint Stipulation | 0.25 | 375 | 93.75 |
| 7/17/12 | Reviewed e-mail from D. Karapelou, Esquire suggesting stipulation should reflect Katz does not oppose mediation | 0.2 | 375 | 75 |
| 7/17/12 | Prepared revisions to Joint Statement on submission to mediation | 0.2 | 375 | 75 |
| 7/17/12 | E-mail to D. Karapelou, Esquire fwd revised Joint Statement regarding refusal to submit dischargeability objection to mediation | 0.2 | 375 | 75 |
| 7/17/12 | Reviewed e-mail from A. Applebaum, Esquire approving form of proposed Joint Statement declining mediation but requesting he sign document | 0.1 | 375 | 37.5 |
| 7/17/12 | Prepared revisions to Joint Statement declining participationin mediation for Sherwin Williams Adversary | 0.25 | 375 | 93.75 |
| 7/17/12 | E-mail to A. Applebaum, Esquire fwd copy of electronically filed Joint Statement declining to participate in mediation in Sherwin Williams | 0.2 | 375 | 75 |
| 7/17/12 | Telephone Conference with J. Grasso follow up on meeting withBancorp over financing with various entities and its consequential effect | 0.25 | 375 | 93.75 |
| 7/18/12 | Reviewed Larson Complaint filed in Philadelphia Court of Common Pleas with forms foundation for 523(a)(4) Complaint against Grasso | 0.3 | 375 | 112.5 |
| 7/18/12 | Telephone Conference with D. Karapelou, Esquire discussing Pre-Trial dates for Dischargeability Adversary in Katz | 0.3 | 375 | 112.5 |

| | | | | |
|---|---|---|---|---|
| 7/18/12 | Telephone Conference with M. Gigliotti, Esquire reviewing Pre-Trial Order and determining whether dates need to be adjusted | 0.25 | 375 | 93.75 |
| 7/18/12 | Prepared draft of Joint Statement declining to submit Larson Adversary to mediation | 0.3 | 375 | 112.5 |
| 7/18/12 | E-mail to M. Gigliotti, Esquire confirming we conducted Discovrey conference and fwd proposed Joint Statement declining mediation | 0.25 | 375 | 93.75 |
| 7/18/12 | Reviewed e-mail from M. Gigliotti, Esquire approving Joint Stipulation for filing | 0.1 | 375 | 37.5 |
| 7/18/12 | Prepared draft of proposed revisions to Joint Pre-Trial deadlines in Larson Adversary | 0.5 | 375 | 187.5 |
| 7/18/12 | E-mail to M. Gigliotti, Esquire fwd draft of proposed revisedPre-Trial dates, Statement | 0.25 | 375 | 93.75 |
| 7/20/12 | Reviewed Avalon Breezes Operating Agreement and Corporate Formation documents of Positive Dining Experience, Inc. | 0.3 | 375 | 112.5 |
| 7/20/12 | Reviewed Operating Agreement for Coffee Shops International, LLC | 0.3 | 375 | 112.5 |
| 7/24/12 | Reviewed and calendared Amended Pre-Trial Scheduling Order inLarson Adversary | 0.3 | 375 | 112.5 |
| 7/30/12 | Prepared draft of Stipulated Order outlining agreed modified dates for Pre-Trial deadlines in Sherwin Williams | 0.4 | 375 | 150 |
| 7/30/12 | Reviewed e-mail from J. Baddeley, Esquire inquiring who was responsible for preparing revision to suggested pre-trial dates | 0.1 | 375 | 37.5 |
| 7/30/12 | Telephone Conference with J. Baddeley, Esquire confirming limited modifications to Consent Order on Pre-Trial dates | 0.1 | 375 | 37.5 |
| 7/30/12 | Reviewed e-mail from M. Mitts, Esquire on his negotiations with Origin Capital | 0.1 | 375 | 37.5 |
| 8/9/12 | Reviewed e-mail from B. Kaplan asking for status of additional work to resolve American Oak Liquor License and First Trust Bank deposit account | 0.1 | 375 | 37.5 |
| 8/10/12 | E-mail to R. Gottschalk, CPA following up on request for WSC Warminster Plaza K1s | 0.25 | 375 | 93.75 |
| 8/10/12 | Reviewed e-mail from R. Gottschalk, CPA advising his firm didnot prepare WSC Warminster Plaza Returns | 0.1 | 375 | 37.5 |
| 8/20/12 | E-mail to P. Blalock, Courtroom Deputy to Judge Frank desirous of scheduling telephone conference call on various adversaries | 0.2 | 375 | 75 |
| 8/20/12 | E-mail to client advising of Judge Frank's request for conference | 0.2 | 375 | 75 |

| | | | | |
|---|---|---|---|---|
| 8/21/12 | Court Appearance conference call with Judge Frank on adjusting Pre-Trial Conference Dates | 0.3 | 375 | 112.5 |
| 8/27/12 | Reviewed and revised Pre-Trial Scheduling Order entered in Katz Dischargeability Adversary | 0.2 | 375 | 75 |
| 8/27/12 | E-mail to client fwd copy of revised Pre-Trial Scheduling Order | 0.25 | 375 | 93.75 |
| 9/5/12 | Telephone Conference with J. Grasso and B. Kaplan fwd copy ofletter received from U.S. Bank seeking to appoint receiver in Lansdale | 0.25 | 375 | 93.75 |
| 9/5/12 | Telephone Conference with R. Quaglia, Esquire counsel to U.S.Bank following up on letter to Judge Sanchez requesting appointment of receiver | 0.2 | 375 | 75 |
| 9/5/12 | E-mail to R. Quaglia, Esquire providing contact information and requesting he confer if Judge schedules hearing | 0.25 | 375 | 93.75 |
| 9/5/12 | Reviewed e-mail from R. Quaglia, Esquire on Lansdale propertysuggesting offer be made on JGKM loan | 0.1 | 375 | 37.5 |
| 9/5/12 | E-mail to client fwd communication from Bank counsel on JGKM | 0.2 | 375 | 75 |
| 9/6/12 | Telephone Conference with J. Grasso following up on issues with JGKM need for counsel to enter appearance in Federal Court action; approach following yesterday's hearing | 0.25 | 375 | 93.75 |
| 9/7/12 | Telephone Conference with client updating on his discussions with Lender's interest andcommitment in Lansdale; further discussion on call | 0.2 | 375 | 75 |
| 9/7/12 | Telephone Conference with Carol from Judge Sanchez's Chambersadvising Judge wants to schedule conference call | 0.2 | 375 | 75 |
| 9/7/12 | Telephone Conference with J. Grasso re need counsel name for JGKM matter; alerting him received call from Judge Sanchez Clerk | 0.25 | 375 | 93.75 |
| 9/7/12 | Telephone Conference with Liam O'Shaughnessy, Esquire associate of Dan McCarthy on US Bank matter in Lansdale | 0.25 | 375 | 93.75 |
| 9/7/12 | Telephone Conference with Carol, Law Clerk to Judge Sanchez confirm she received proper contact from counsel to JGKM Associates | 0.2 | 375 | 75 |
| 9/7/12 | Telephone Conference with J. Grasso and Dan McCarthy evaluating options in light of Court | 0.25 | 375 | 93.75 |
| 9/7/12 | Telephone Conference with J. Grasso evaluating how to proceedwith JGKM in the likely event Court appoints receiver; recommend Bank call | 0.2 | 375 | 75 |
| 9/11/12 | Telephone Conference with B. Kaplan inquiring whether FederalCourt entered Order in JGKM litigation, questioned service of tax authority on sale | 0.2 | 375 | 75 |
| 9/11/12 | Telephone Conference with J. Grasso issues with JGKM development in Lansdale, PA negotiations with lending servicer | 0.25 | 375 | 93.75 |

| | | | | |
|---|---|---|---|---|
| 9/12/12 | Telephone Conference with J. Grasso and B. Kaplan Order entered by Judge Sanchez | 0.4 | 375 | 150 |
| 9/12/12 | E-mail to client and D. Smith, Esquire fwd copy of Order appointing receiver in JGKM matter | 0.25 | 375 | 93.75 |
| 9/12/12 | Telephone Conference with client communications with separate counsel on filing Bankruptcy for JGKM; call with G. Schildhorn, Esquire | 0.25 | 375 | 93.75 |
| 9/19/12 | Telephone Conference with J. Grasso update on discussions with T.D. Bank's counsel on negotiations/meeting | 0.2 | 375 | 75 |
| 9/21/12 | Telephone Conference with J. Grasso issues with Lansdale Center and negotiations with servicer | 0.25 | 375 | 93.75 |
| 9/25/12 | Reviewed e-mail from A. Applebaum, Esquire seeking to coordinate Initial Discovery Disclosures for Friday | 0.1 | 375 | 37.5 |
| 9/25/12 | E-mail to A. Applebaum, Esquire suggesting Initial Discovery Disclosures be deferred to October 5, 2012 | 0.2 | 375 | 75 |
| 9/25/12 | Reviewed e-mail from A. Applebaum, Esquire confirming InitialDiscovery Disclosures to be exchanged on October 5, 2012 | 0.1 | 375 | 37.5 |
| 9/27/12 | Telephone Conference with J. Madden, Esquire Mid Penn Bank desire to negotiate loan forebearance for Palace Bowling Alley in Downingtown | 0.3 | 375 | 112.5 |
| 9/27/12 | Telephone Conference with client follow up on proposal being considered for Positive Dining/negotiations on Lansdale | 0.25 | 375 | 93.75 |
| 10/2/12 | Telephone Conference with B. Kaplan and J. Grasso issues with Lansdale communications with David Smith's office | 0.2 | 375 | 75 |
| 10/2/12 | Telephone Conference with D. Smith, Esquire inquiring as to discussions on Lansdale with W.C. Capital | 0.1 | 375 | 37.5 |
| 10/5/12 | Prepared Initial Discovery Disclosures for Sherman Williams Adversary | 1.25 | 375 | 468.75 |
| 10/5/12 | Telephone Conference with B. Kaplan following up on Sherwin Williams Initial Discovery Disclosures, inquiring whether any other persons should be included | 0.2 | 375 | 75 |
| 10/5/12 | E-mail to client fwd copy of Initial Discovery Disclosures prepared | 0.25 | 375 | 93.75 |
| 10/5/12 | E-mail to A. Applebaum, Esquire and J. Baddeley, Esquire fwd copy of Debtor's Initial Discovery Disclosures | 0.25 | 375 | 93.75 |
| 10/15/12 | Prepared Motion to Extend Time to File Response to Katz Motion for Summary Judgment | 0.75 | 375 | 281.25 |
| 10/15/12 | Telephone Conference with J. Matour, Esquire confirming status of State Court actions against Debtor on Katz litigation | 0.2 | 375 | 75 |

| | | | | |
|---|---|---|---|---|
| 10/22/12 | Reviewed Sherwin Williams Complaint on Objection to Dischargeability Complaint | 0.25 | 375 | 93.75 |
| 10/22/12 | E-mail to J. Grasso fwd analysis of conference call with J. Baddeley, Esquire counsel to Sherwin Williams on status of historic tax credit | 0.25 | 375 | 93.75 |
| 10/22/12 | Telephone Conference with J. Grasso re: follow up to discussions on Sherwin Williams historic tax credit at UnionTrust | 0.25 | 375 | 93.75 |
| 10/22/12 | Telephone Conference with J. Baddeley, Esquire apprising counsel of discussions | 0.25 | 375 | 93.75 |
| 10/23/12 | Telephone Conference with J. Madden, Esquire counsel to Mid-Penn Bank on claim against JGDG, LLC/Positive Dining | 0.1 | 375 | 37.5 |
| 10/23/12 | Telephone Conference with client update on his negotiations with Bank on Positive Dining Experience interests | 0.2 | 375 | 75 |
| 10/23/12 | Reviewed e-mail from A. Applebaum, Esquire on motions deadline date in Sherwin Williams Adversary | 0.2 | 375 | 75 |
| 10/23/12 | E-mail to A. Applebaum, Esquire advising would not object to extending motions date in Sherwin Williams Adversary | 0.25 | 375 | 93.75 |
| 10/23/12 | Reviewed deed and title report fwd by J. Madden, Esquire on behalf of Mid-Penn Bank | 0.25 | 375 | 93.75 |
| 10/24/12 | Reviewed D. Smith, Esquire correspondence to Judge Sanchez | 0.1 | 375 | 37.5 |
| 10/24/12 | Telephone Conference with D. Smith, Esquire status of U.S. Bank litigation in Lansdale | 0.1 | 375 | 37.5 |
| 10/24/12 | Telephone Conference with B. Kaplan re: operational issues | 0.25 | 375 | 93.75 |
| 10/24/12 | Reviewed proposed Pre-Trial Order in Sherwin Williams Adversary adjusting deadline for Motion to Amend Pleadings | 0.1 | 375 | 37.5 |
| 10/24/12 | E-mail to A. Applebaum, Esquire approving proposed Form of Order | 0.1 | 375 | 37.5 |
| 10/29/12 | Reviewed e-mail from J. Baddeley, Esquire inquiring as to status of discussions with IRS on tax credit certification | 0.2 | 375 | 75 |
| 10/29/12 | E-mail to J. Baddeley, Esquire advising that repairs are being made consistent with requirements for historic tax credit | 0.25 | 375 | 93.75 |
| 10/29/12 | Reviewed further e-mails from J. Baddeley, Esquire on historic tax credits prepared futher replies | 0.2 | 375 | 75 |
| 10/29/12 | Reviewed e-mail from J. Baddeley, Esquire seeking to participate by telephone if hearings go forward on 10/30 | 0.2 | 375 | 75 |

| 10/31/12 | E-mail to D. Smith, Esquire reporting status and options with JGKM, L.P. | 0.2 | 375 | 75 |

46.6

17250

# ATTACHMENT 8

| Date | Explanation | Hours | Rate | Total |
|------|-------------|-------|------|-------|
| 3/13/12 | Meeting with B. Gotlieb, Esquire update on potential sale of property in which WSFS has an interest | 0.25 | 375 | $93.75 |
| 4/12/12 | Telephone Conference with client BR 2004 issues obtaining copies of prior depositions transcripts update on sale of 1500 Locust | 0.3 | 250 | 75 |
| 4/13/12 | Meeting with client, evaluation of issues involved with disposition of assets on various investments | 1.5 | 250 | 375 |
| 5/17/12 | Telephone Conference with client and accountant evaluating how to deal with WSFS obligation and whether claim can be compromised outside of Plan | 0.5 | 375 | $187.50 |
| 5/17/12 | Reviewed documents relating to WSFS Claim | 0.3 | 375 | $112.50 |
| 5/17/12 | Telephone Conference with J. Grasso following up on discussions with Bank representatives for WSFS | 0.2 | 375 | $75.00 |
| 5/17/12 | Telephone Conference with B. Golup, Esquire negotiation on issues with WSFS Claim | 0.2 | 375 | $75.00 |
| 5/17/12 | Telephone Conference with J. Grasso update on discussions with WSFS negotiations | 0.2 | 375 | $75.00 |
| 5/21/12 | Reviewed e-mail from B. Golub, Esquire regarding WSFS loan obligation | 0.2 | 375 | $75.00 |
| 5/21/12 | E-mail to B. Golub, Esquire confirming third party partnership interested in claim acquisition | 0.25 | 375 | $93.75 |
| 5/21/12 | Telephone Conference with B. Golub, Esquire regarding negotiation on WSFS loan | 0.25 | 375 | $93.75 |
| 5/21/12 | Telephone Conference with B. Golub, Esquire inquiring on issues with 15th and Sansom and practical resolution | 0.2 | 375 | $75.00 |
| 5/21/12 | Prepared documents relating to assignment of WSFS Claim to 15th and Sansom Partnership | 1.25 | 375 | $468.75 |
| 5/21/12 | E-mail to B. Golub, Esquire fwd draft Claim Transfer Notice of Claim Transfer and Assignment of Claim documents | 0.25 | 375 | $93.75 |
| 5/21/12 | Telephone Conference with B. Golub, Esquire responding to here-mail which crossed with draft documents fwd to her | 0.25 | 375 | $93.75 |
| 5/21/12 | Telephone Conference with client review of WSFS issues reaction to voluminous document request sought under BR 2004Exam | 0.25 | 375 | $93.75 |
| 5/23/12 | Reviewed e-mail from B. Golub, Esquire advising funding must occur before noon tomorrow and attorney fees be paid | 0.2 | 375 | $75.00 |
| 5/23/12 | E-mail to client fwd communication from WSFS counsel on status of their intent to sell/assign claim | 0.2 | 375 | $75.00 |
| 5/24/12 | Reviewed proposed Purchase Agreement for WSFS Secured Claim | 0.3 | 375 | $112.50 |
| 5/24/12 | E-mail to B. Golub, Esquire advising suggesting fees are extra is inconsistent with Proposed Agreement | 0.2 | 375 | $75.00 |
| 5/24/12 | Reviewed proposed Bill of Sale allonge and Instrument of Assumption also proposed by B. Golub, Esquire on behalf of WSFS | 0.4 | 375 | $150.00 |
| 5/24/12 | Telephone Conference with client following up on discussions between 15th and Sansom, L.P. and WSFSs on acquiring Claim dispute over counsel fees | 0.2 | 375 | $75.00 |
| 5/24/12 | E-mail to client re: fwd wiring instruction for funding WSFS Claim Assignment which must be fwd to purchaser | 0.1 | 375 | $37.50 |
| 5/24/12 | E-mail to 15th and Sansom, L.P. fwd proposed documents and wiring instructions | 0.25 | 375 | $93.75 |
| 5/24/12 | Telephone Conference with B. Golub, Esquire negotiation on WSFS assigning Claim | 0.2 | 375 | $75.00 |
| 5/24/12 | Telephone Conference with J. Grasso WSFS seeking to demand payment of fees from Debtor or assignor requiring additionaldiscussions | 0.2 | 375 | $75.00 |
| 5/24/12 | Telephone Conference with B. Kaplan, Accounting Department (Carl) for partnership coordinating | 0.2 | 375 | $75.00 |
| 5/24/12 | Telephone Conference with B. Golub, Esquire final negotiations on Claim Assignment; telephone conference with client advising WSFS Claim will be assigned | 0.3 | 375 | $112.50 |
| 5/24/12 | Telephone Conference with D. Grasso on behalf of 15th and Sansom, L.P. advising he will refuse to fund unless Bank signs Agreement | 0.2 | 375 | $75.00 |
| 5/24/12 | E-mail to B. Golub, Esquire advising Transferee wants writtenconfirmation Bank committed | 0.2 | 375 | $75.00 |
| 5/24/12 | Telephone Conference with B. Golub, Esquire following up on revisions to documents in sale | 0.4 | 375 | $150.00 |
| 5/24/12 | E-mail to client advising WSFS Claim sold | 0.25 | 375 | $93.75 |
| 5/25/12 | Reviewed e-mail from B. Golub, Esquire inqiring whether I wasawake when transferee documents delivered | 0.1 | 375 | $37.50 |
| 5/29/12 | Telephone Conference with B. Golub, Esquire regarding WSFS loan obligation | 0.2 | 375 | $75.00 |
| 6/4/12 | Telephone Conference with B. Golub, Esquire questioning status of transferee filing required Notice of Claim Transfer | 0.2 | 375 | $75.00 |
| 6/4/12 | E-mail to D. Shafkowitz, Esquire need to file and issue Notice | 0.2 | 375 | $75.00 |

| Date | Description | Hours | Rate | Amount |
|---|---|---|---|---|
| 6/12/12 | E-mail to Siobhan C. Murphy, Esquire fwd information on WSFS Claim and issues with lien on Curtis partners interests | 0.25 | 375 | 93.75 |
| 6/13/12 | Telephone Conference with J. Grasso questioning status of issues with Curtis Investors documents, WSFS Assignment; Americna Express and Vist Bank meeting | 0.25 | 375 | $93.75 |
| 6/14/12 | Telephone Conference with D. Shafkowitz, Esquire following upon Notice of Claim transfer filing and meeting to discuss zoning issues in Doylestown | 0.2 | 375 | $75.00 |
| 6/21/12 | Reviewed WSFS documents to ascertain filing requirements to accomodate Curtis Partners, L.P. requests | 0.5 | 375 | $187.50 |
| 6/21/12 | Telephone Conference with D. Shafkowitz, Esquire inquiring whether 15th and Sansom claim acquisition was filed | 0.1 | 375 | $37.50 |
| 6/21/12 | Telephone Conference with B. Golub, Esquire questioning if bankruptcy Notice of Claim Transfer was issued | 0.1 | 375 | $37.50 |
| 6/21/12 | Telephone Conference with J. Grasso issues with recording Assignments of WSFS claim as mandated | 0.2 | 375 | $75.00 |
| 6/21/12 | Prepared documents to permit WSFS Assignment to be recordablewith Philadelphia Recorder of Deeds | 1.5 | 375 | $562.50 |
| 6/21/12 | E-mail to D. Shafkowitz, Esquire following up on need for claim transfer to be filed and notice issued | 0.2 | 375 | $75.00 |
| 6/22/12 | Correspondence letter to B. Golub, Esquire fwd original Assignment to obtain notarized signature | 0.25 | 375 | $93.75 |
| 6/22/12 | E-mail to S. Murphy, Esquire counsel to Curtis Partners L.P. fwd information on Assignment of WSFS interests | 0.25 | 375 | $93.75 |
| 6/29/12 | Reviewed e-mail from B. Golub, Esquire following up on WSFS claims transfer documentation | 0.1 | 375 | $37.50 |
| 6/29/12 | Telephone Conference with client WSFS status, operating reports | 0.2 | 375 | $75.00 |
| 7/2/12 | Telephone Conference with D. Shafkowitz, Esquire inquiring towhether 15th and Sansom, L.P. filed Notice of Claim Transfer | 0.1 | 375 | $37.50 |
| 7/2/12 | E-mail to D. Shafkowitz, Esquire request he advise on whetherhe filed claim transfer for 15th and Sansom, L.P. | 0.2 | 375 | $75.00 |
| 7/5/12 | Reviewed e-mail from B. Golub, Esquire inquiring whether WSFSClaim Transfer filed | 0.1 | 375 | $37.50 |
| 7/17/12 | Telephone Conference with B. Golub, Esquire relaying call from R. Jones, Esquire claiming assignment of claim is underhanded | 0.2 | 375 | $75.00 |
| 7/17/12 | E-mail to client fwd copy of HUD-1 Settlement Sheet from saleof 15th and Locust Street | 0.25 | 375 | $93.75 |
| 7/17/12 | Reviewed e-mail from B. Golub, Esquire requesting Debtor verify no monies received from 15th Street real estate closing | 0.1 | 375 | $37.50 |
| 7/17/12 | E-mail to B. Golub, Esquire fwd correspondence from B. Kaplanconfirming Debtor did not receive funds from real estate closing | 0.2 | 375 | $75.00 |
| 7/17/12 | Reviewed follow up e-mail from B. Golub, Esquire asking for information on Grasso Holdings, L.P. | 0.1 | 375 | $37.50 |
| 8/6/12 | Telephone Conference with B. Kaplan and B. Goldstein, Esquireissues with sale of Liquor License by 15th and Sansom held upby J. Goldstein | 0.3 | 375 | 112.5 |
| 8/8/12 | Reviewed subpoenas of Madison Capital served on WSFS, 15th and Sansom, LLC and Keystone Agency, Inc. | 0.3 | 375 | $112.50 |
| 8/22/12 | Telephone Conference with J. Kurtzman, Esquire advising of receipt of Subpoena | 0.2 | 375 | $75.00 |
| 9/7/12 | Reviewed documents produced by WSFS to Madison Capital subpoena on 15th and Sansom, L.P. acquisition of WSFS Claim | 0.4 | 375 | $150.00 |
| 9/7/12 | E-mail to client and B. Kaplan requesting copies of Partnership Agreement and Capital Account information for 15th and Sansom, L.P. | 0.25 | 375 | $93.75 |
| 9/7/12 | Reviewed documents fwd to B.R. 2004 counsel confirming 15th and Sansom, L.P. P.A. fwd in August | 0.25 | 375 | $93.75 |
| 9/10/12 | Telephone Conference with B. Golub, Esquire providing background and discussion on what is transpiring in Grasso case | 0.25 | 375 | $93.75 |
| 9/10/12 | Telephone Conference with J. Kurtzman, Esquire re background to Judge Coleman Order | 0.25 | 375 | $93.75 |
| 9/18/12 | Telephone Conference with B. Kaplan following up with obtained non-controlled financial information from C. Graff | 0.2 | 375 | $75.00 |
| 9/19/12 | Telephone Conference with B. Kaplan following up with conference call with Carl Graff to review non-controlled entities | 0.2 | 375 | $75.00 |
| 9/27/12 | Reviewed multiple e-mails between C. Graf and B. Kaplan on coordinating financial information required for non-controlled entities | 0.2 | 375 | $75.00 |
| 9/28/12 | Reviewed financial information fwd by C. Graf on behalf of minority partnerships | 0.5 | 375 | $187.50 |
| | | 19.5 | | $7,087.50 |

# ATTACHMENT 9

| 2/6/12 | E-mail to E. Barenbaum, Esquire, D. Shafkowitz, Esquire, D. Hogan, Esquire and B. Zieske, Esquire advising of Grasso Personal Chaper 11 | 0.25 | 375 | 93.75 |
|---|---|---|---|---|
| 2/6/12 | E-mail to D. Braverman, Esquire advising him of personal bankruptcy filing for J. Grasso | 0.1 | 375 | 37.5 |
| 2/6/12 | Reviewed e-mail from E. Barenbaum, Esquire forwarding Notice to Sheriff on Joe Grasso filing | 0.1 | 375 | 37.5 |
| 2/6/12 | Telephone Conference with D. Shafkowitz, Esquire following upon Grasso's personal bankruptcy- needs to advise adversarial counsel in litigation matters | 0.2 | 375 | 75 |
| 2/6/12 | Meeting with P. Winterhalter re assignment to prepare application to employ PJWPC as counsel for debtor | 0.2 | 250 | 50 |
| 2/6/12 | Prepared first draft of application to employ PJWPC as attorney for debtor, proposed order, notice, and verified statement | 0.7 | 250 | 175 |
| 2/6/12 | Meeting with P. Winterhalter re preparation of application toemploy, possible issues in case, and meeting with client | 0.2 | 250 | 50 |
| 2/7/12 | Reviewed Notices filed pursuant to BR2002 for certain creditors Singer Equipment and WSFS | 0.2 | 375 | 75 |
| 2/7/12 | Telephone Conference with Joe conveying report of what transpired in Chicago at Katz Prove Up | 0.2 | 375 | 75 |
| 2/10/12 | Reviewed Notice of Appearance of G. Santamour, Esquire as counsel for Vist Bank | 0.1 | 375 | 37.5 |
| 2/14/12 | Reviewed Notice of Meeting of Creditors set for March 13, 2012 | 0.2 | 375 | 75 |
| 2/15/12 | Telephone Conference with J. Grasso following up on Hearing set by Court to discuss potential conflicts | 0.1 | 375 | 37.5 |
| 2/15/12 | Reviewed motion to extend time to file/order granting and notice of hearing set in case | 0.2 | 250 | 50 |
| 2/17/12 | Reviewed e-mail from E. Barenbaum, Esquire forward Notice that Superior Court Stayed Appeal as a result of Bankruptcy | 0.2 | 375 | 75 |
| 2/17/12 | Reviewed correspondence from J. Bookman, CPA seeking to schedule an Initial Debtor's Interivew for next Tuesday | 0.2 | 375 | 75 |
| 2/17/12 | E-mail to J. Bookman advising cannot attend Initial Debtor's Interview he scheduled for Tuesday after Holiday, must reschedule | 0.25 | 375 | 93.75 |
| 2/17/12 | E-mail to client fwd  copy of United States Trustee's requestto schedule Initiatl Debtor's Interivew | 0.2 | 375 | 75 |
| 2/17/12 | E-mail to client- advising that client as Debtor is not authorized to use post petition asset for pre petition obligation | 0.25 | 375 | 93.75 |

| Date | Description | | | |
|---|---|---|---|---|
| 2/17/12 | Telephone Conference with B. Kaplan confirming J. Grasso is not permitted to sign CIBC, Inc. forbearance agreement | 0.2 | 375 | 75 |
| 2/20/12 | Reviewed e-mail from D. Shafkowit, Esquire inquiring whether Suggestions of Bankruptcy should be filed; e-mail to Dave requesting list of open litigation | 0.25 | 375 | 93.75 |
| 2/21/12 | Reviewed Notice of Case Management Conference Notice issued in Dunfee Litigation; added to Statement of Affairs | 0.2 | 375 | 75 |
| 2/21/12 | Reviewed e-mail from D. Shafkowitz, Esquire fwd documentationon litigation involving DDP Roofing Services, Inc. | 0.1 | 375 | 37.5 |
| 2/21/12 | Meeting with P. Winterhalter re suggestion of bankruptcy to be filed in case | 0.1 | 250 | 25 |
| 2/21/12 | Prepared and filed Suggestion of Bankruptcy with Court of Common Pleas in Dunfee matter | 0.4 | 250 | 100 |
| 2/22/12 | E-mail to J. Grasso- following up on rescheduling Initial Debtor's Interview suggesting new dates | 0.25 | 375 | 93.75 |
| 2/22/12 | Telephone Conference with Bruce confirming Joe's availabilityfor Initial Debtor's Interview | 0.1 | 375 | 37.5 |
| 2/22/12 | Telephone Conference with J. Bookman, CPA rescheduling Initial Debtor's Interview checking for available dates | 0.2 | 375 | 75 |
| 2/22/12 | E-mail to J. Bookman, CPA at Office of the United States Trustee confirming Initial Debtor's Interview with Joe Grasso | 0.2 | 375 | 75 |
| 2/23/12 | Telephone Conference with case management office to confirm bankruptcy filing/rescheduling or canceling of hearing | 0.2 | 250 | 50 |
| 2/23/12 | Correspondence to case management office to confirm cancellation of hearing | 0.3 | 250 | 75 |
| 2/23/12 | Reviewed notice from court scheduling case management conference | 0.1 | 250 | 25 |
| 2/27/12 | Telephone Conference with B. Kaplan confirming Initial Debtor's Interview; required documents | 0.2 | 375 | 75 |
| 2/27/12 | Attend Initial Debtor's Interview with Jeff Bookman | 2.5 | 375 | 937.5 |
| 3/1/12 | E-mail to B. Kaplan fwd copies PFS filed on behalf of J. Grasso with Bankruptcy Court in prior cases | 0.25 | 375 | 93.75 |
| 3/1/12 | Reviewed Court of Common Pleas docket to confirm Dunfee case management conference cancelled | 0.2 | 250 | 50 |
| 3/1/12 | Reviewed Entry of Appearance filed by Cohen, Esquire on behalf of Bank of America | 0.1 | 375 | 37.5 |

| 3/6/12 | Telephone Conference with B. Kaplan confirming accountant is not required at tomorrow's Hearing | 0.1 | 375 | 37.5 |
|---|---|---|---|---|
| 3/6/12 | Telephone Conference with B. Kile, Esquire counsel to NextierBank inquiring as to Plan | 0.2 | 375 | 75 |
| 3/6/12 | Reviewed letter from PA Revenue advising of outstanding tax returns for Debtor | 0.1 | 375 | 37.5 |
| 3/6/12 | Correspondence letter to Debtor and Accountant fwd copy of Notice issued by Revenue on outstanding returns | 0.2 | 375 | 75 |
| 3/7/12 | Reviewed file; prepare for Hearing on Motion to Employ PJW, P.C.; review Pillowtex and Marvel Entertainment | 0.75 | 375 | 281.25 |
| 3/8/12 | E-mail to J. Grasso fwd copy of Notice of Meeting of Creditors | 0.25 | 375 | 93.75 |
| 3/9/12 | Telephone Conference with B. Kaplan coordinating meeting to prepare Debtor for Meeting of Creditors | 0.2 | 375 | 75 |
| 3/9/12 | Telephone Conference with Ethel Powell at PA Department of Revenue requesting K1's for 2009 and 2010 PA Tax Return | 0.2 | 375 | 75 |
| 3/12/12 | Meeting with J. Grasso reviewing schedules and preparing for Meeting of Creditors | 0.75 | 375 | 281.25 |
| 3/13/12 | Attend Chapter 11 Meeting of Creditors | 2.5 | 375 | 937.5 |
| 3/13/12 | Meeting with P. Winterhalter re preparation of motion to establish deadline for filing proofs of claim | 0.2 | 250 | 50 |
| 3/13/12 | Telephone Conference with J. Grasso following up on several inquiries made during Creditors Meeting on ownership of property | 0.2 | 375 | 75 |
| 3/15/12 | Prepared motion to set last day to file proofs of claim, proposed order, and certificate of service | 0.5 | 250 | 125 |
| 3/20/12 | Reviewed voicemail and email from A. McMullen re 2004 examination request | 0.2 | 250 | 50 |
| 3/20/12 | E-mail to P. Winterhalter re email and voicemail from A. McMullen re examination request | 0.2 | 250 | 50 |
| 3/22/12 | Reviewed email from A. McMillan again requesting 2004 examination | 0.1 | 250 | 25 |
| 3/29/12 | Telephone Conference with B. Kaplan lender on Spring Avenue is demanding access to inspect property advised no reason not to allow access | 0.2 | 375 | 75 |
| 3/30/12 | Telephone Conference with B. Kaplan update on PLB and Curtis negotiations | 0.2 | 375 | 75 |

| Date | Description | | | |
|---|---|---|---|---|
| 4/2/12 | E-mail to J. Grasso and B. Kaplan providing copies of purported delinquent tax return Notices issued by IRS and PARevenue | 0.25 | 375 | 93.75 |
| 4/3/12 | Reviewed Proofs of Claim filed on behalf of John Larson and G. Bayer | 0.2 | 250 | 50 |
| 4/5/12 | Telephone Conference with J. Grasso advising State Court in Illinois denied Post-Trial Motion | 0.2 | 250 | 50 |
| 4/10/12 | Telephone Conference with J. Grasso update on efforts to contact Santamour counsel to Vist Agreement for WSFS and G. Miller issues | 0.25 | 250 | 62.5 |
| 4/11/12 | Reviewed Order establishing Bar Date for Claims- directed service be effectuated on all persons | 0.2 | 250 | 50 |
| 4/11/12 | Reviewed response filed by Singer Equipment Co. seeking to join Madison Capital request for BR2004 Examination | 0.25 | 250 | 62.5 |
| 4/12/12 | Prepared response to Motion for Rule 2004 Exam sought by Madison Capital and proposed Form of Order | 1.5 | 250 | 375 |
| 4/12/12 | E-mail to client- fwd copy of respone filed to Madison Capital request for BR 2004 Exam | 0.25 | 250 | 62.5 |
| 4/18/12 | Reviewed multiple documents enter by Debtor with Vist Bank prior to Chapter 11 filing including ninth alonge to note and forbearance agreement | 0.5 | 250 | 125 |
| 4/18/12 | Reviewed Proof of Claim filed on behalf of Origin Capital including several modification agreements | 0.4 | 250 | 100 |
| 4/19/12 | E-mail to B. Anders at Plexus Capital acknowledging that Plexus Capital Claim filed in Grasso individual case | 0.2 | 250 | 50 |
| 4/19/12 | Reviewed e-mail from B. Anders of Plexus Capital requesting confirmation that his companys claim was received | 0.1 | 250 | 25 |
| 4/20/12 | Reviewed M. Katz Objection to Debtor's Response to Madison Capital Motion for 2004 Examination | 0.3 | 250 | 75 |
| 4/20/12 | E-mail to client fwd Katz Objection to Response made for B.R.2004 Examination | 0.2 | 250 | 50 |
| 4/23/12 | Telephone Conference with J. Grasso concern over Claims against Garrett Miller and perfecting right to offset Claims | 0.25 | 250 | 62.5 |
| 4/23/12 | Telephone Conference with Gretchen Santamour inquiring whether Vist has interest in negotiating some type of resolution | 0.25 | 250 | 62.5 |
| 4/23/12 | Telephone Conference with J. Grasso follow up to discussion with counsel to Vist Financial | 0.25 | 250 | 62.5 |
| 4/24/12 | Reviewed Proof of Claim filed on behalf of Thomas Mackin | 0.2 | 250 | 50 |

| | | | | |
|---|---|---|---|---|
| 4/24/12 | Court Appearance attend Hearing on Madison Capital Corp. Motion for BR 2004 Exam before Judge Coleman | 3.5 | 250 | 875 |
| 4/24/12 | Telephone Conference with J. Grasso and B. Kaplan advising onpotential income distribution from partnership | 0.3 | 250 | 75 |
| 4/24/12 | Telephone Conference with Gretchen Santamour, Esquire following up on issues with VIST Financial Claim | 0.1 | 250 | 25 |
| 4/24/12 | Reviewed bank statements fwd for three months prior to DOP; reviewed materials evidencing opening of DIP Account | 0.3 | 250 | 75 |
| 4/24/12 | E-mail to B. Kaplan requesting he fwd voided check for DIP Account and recommended Account be used | 0.25 | 250 | 62.5 |
| 4/24/12 | E-mail to K. Callahan, Esquire fwd DIP Account Statement and copies of pre-petition bank statements | 0.25 | 250 | 62.5 |
| 4/25/12 | Meeting at Bancorp with A. Birenbaum, G. Schildhorn, K. Meakim, and J. Grasso regarding Bancorp loans | 2 | 250 | 500 |
| 4/25/12 | Reviewed Commonwealth of PA Proof of Claim filed | 0.2 | 250 | 50 |
| 4/25/12 | E-mail to client- inquiring whether Hill International has Claim against J. Grasso questioning review of | 0.2 | 250 | 50 |
| 4/25/12 | Telephone Conference with B. Kaplan advising of action instituted by Sunlight; Commonwealth Proof of Claim, review of Schedules and Hill Claim | 0.25 | 250 | 62.5 |
| 4/25/12 | E-mail to B. Kaplan fwd copy of Proof of Claim filed by Commonwealth of PA Revenue requesting he review | 0.2 | 250 | 50 |
| 4/25/12 | Reviewed numerous e-mails with Bruce following up on alleged assessments made against Joe by Commonwealth of PA | 0.3 | 250 | 75 |
| 5/8/12 | Reviewed subpoena served upon Joe Grasso in connection MEPT Arch litigation in State Court | 0.2 | 375 | 75 |
| 5/8/12 | Telephone Conference with D. Shafkowitz, Esquire requesting Suggestion of Bankruptcy forms for filing against Rewards Network Claim | 0.2 | 375 | 75 |
| 5/8/12 | Prepared Suggestion of J. Grasso Personal Bankruptcy filing | 0.25 | 375 | 93.75 |
| 5/8/12 | E-mail to D. Shafkowitz, Esquire fwd form Suggestion of Bankruptcy and copy of Notice of Filing for his filing with Common Pleas Court | 0.2 | 375 | 75 |
| 5/8/12 | Reviewed e-mail and proposed Form of Order submitted by A. McMullen, Esquire at Bradley Arant in Nashville, TN | 0.25 | 375 | 93.75 |
| 5/8/12 | Reviewed briefly document list fwd by L. Mester of Grossman Law Firm to be appended to BR2004 Order | 0.25 | 375 | 93.75 |

| Date | Description | | | |
|---|---|---|---|---|
| 5/8/12 | E-mail to A. McMullen, Esquire advising No Objection to content of Order Approving Deposition but directing documentlist be appended | 0.25 | 375 | 93.75 |
| 5/15/12 | E-mail to Bruce advising must discuss along with BR 2004 document requests | 0.2 | 375 | 75 |
| 5/17/12 | Telephone Conference with J. Grasso confirming several Claimsfiled by Bancorp; update on status of negotiations with Origin Capital | 0.2 | 375 | 75 |
| 5/17/12 | Reviewed Entry of Appearance filed by D. Braverman, Esquire on behalf of his firm | 0.1 | 375 | 37.5 |
| 5/17/12 | Reviewed Notice of Appearance A. Applebaum on behalf of Sherman Williams | 0.2 | 375 | 75 |
| 5/21/12 | Correspondence letter to P. Mooney, Esquire questioning basisfor subpoena against Grasso | 0.3 | 375 | 112.5 |
| 5/21/12 | Telephone Conference with Bruce Kaplan regarding open issues on Origin Capital | 0.1 | 375 | 37.5 |
| 5/21/12 | E-mail to client and B. Kaplan fwd copy of proposed documentssought to be produced in connection with BR 2004 Exam | 0.25 | 375 | 93.75 |
| 5/23/12 | Telephone Conference with B. Kaplan serious concern with magnitude of documents sought by BR 2004 Exam | 0.25 | 375 | 93.75 |
| 5/24/12 | Telephone Conference with B. Kaplan and J. Grasso reviewing detailed document request propounded by select creditors | 2 | 375 | 750 |
| 5/25/12 | Prepared Objections to Creditors document requests for 2004 Exam | 2 | 375 | 750 |
| 5/29/12 | Telephone Conference with Gretchen Santamour, Esquire advising that Vist is required to | 0.2 | 375 | 75 |
| 5/31/12 | Telephone Conference with J. Grasso following up on negotiations with IRS | 0.2 | 375 | 75 |
| 5/31/12 | Telephone Conference with Bruce Kaplan, CPA reporting on status of documents required pursuant to B.R.2004 Order | 0.25 | 375 | 93.75 |
| 6/1/12 | Prepared draft of Response to Katz Motion for Relief | 4 | 375 | 1500 |
| 6/1/12 | Reviewed Objection to Katz request to be grated Relief from Bankruptcy Stay filed by Madison Capital | 0.4 | 375 | 150 |
| 6/1/12 | E-mail to client fwd copy of Response to Katz Motion for Relief and Madison Capital Objection to Katz Motion | 0.25 | 375 | 93.75 |
| 6/1/12 | Research case law cited by Katz in support to his Motion for Relief | 0.75 | 375 | 281.25 |

| Date | Description | | | |
|---|---|---|---|---|
| 6/4/12 | Telephone Conference with G. Santamour, Esquire coordinating access to residence for full appraisal | 0.2 | 375 | 75 |
| 6/4/12 | E-mail to client updating on discussions with Vist Bank's counsel | 0.25 | 375 | 93.75 |
| 6/4/12 | Reviewed draft of Stipulation sought by Singer Equipment Co. returned to paralegal for W. Levant, Esquire | 0.25 | 375 | 93.75 |
| 6/4/12 | Reviewed e-mail from B. Kaplan reporting on documents which can be produced | 0.2 | 375 | 75 |
| 6/4/12 | Telephone Conference with B. Kaplan following up on his e-mail relating to documents issues with other materials Hearing scheduled this week | 0.5 | 375 | 187.5 |
| 6/4/12 | Reviewed e-mail from R. Jones, Esquire confirming Discovery issues will be continued | 0.1 | 375 | 37.5 |
| 6/4/12 | Telephone Conference with B. Kaplan confirming Hearing on document production requirements off for tomorrow | 0.1 | 375 | 37.5 |
| 6/4/12 | E-mail to R. Jones, Esquire on rescheduling Hearing for Tuesday and Wednesday | 0.2 | 375 | 75 |
| 6/5/12 | Reviewed e-mail from H. Ward at Office of the U.S. Trustee onoutstanding Quarterly Fees | 0.1 | 375 | 37.5 |
| 6/5/12 | E-mail to client alerting Quarterly Fee must be paid today | 0.1 | 375 | 37.5 |
| 6/5/12 | E-mail to H. Ward at Office of the U.S. Trustee advising Quarterly Fee for individual Debtor will be paid today | 0.2 | 375 | 75 |
| 6/5/12 | Court Appearance conference call with Court on scheduling Hearings on B.R.2004, document production and Hearing on Katz Motion for Relief | 0.75 | 375 | 281.25 |
| 6/6/12 | Reviewed e-mail frm H. Ward at Office of the U.S. Trustee advising that Quarterly Fees not paid for Joe Grasso case fwd to client | 0.1 | 375 | 37.5 |
| 6/6/12 | E-mail to B. Kaplan, CPA requesting he confirm Quarterly Feesfor individual Chapter 11 case paid | 0.1 | 375 | 37.5 |
| 6/8/12 | Telephone Conference with B. Kaplan issues with case administration | 0.1 | 375 | 37.5 |
| 6/12/12 | E-mail to T. Carey of Appollo r/e advising no impediments to Curtis business operations | 0.2 | 375 | 75 |
| 6/12/12 | Reviewed e-mails between T. Carey and B. Kaplan on Curtis Investors, L.P. operations | 0.25 | 375 | 93.75 |
| 6/12/12 | Telephone Conference with B. Kaplan and J. Grasso regarding Curtis Investors, L.P. business/refinancing issues | 0.25 | 375 | 93.75 |

| 6/14/12 | E-mail to G. Santamour, Esquire proposing meeting for next Wednesday on Vist Bank obligations | 0.2 | 375 | 75 |
|---------|-----------------------------------------------------------------------------------------------|------|-----|--------|
| 6/14/12 | Telephone Conference with J. Grasso issues with meeting with Shafkowitz schedule for next week | 0.2 | 375 | 75 |
| 6/14/12 | Reviewed draft of authorizations involving Curtis Partners, L.P. and constituent members | 0.5 | 375 | 187.5 |
| 6/14/12 | Telephone Conference with client evaluation actions and discussions among Curtis Partners, L.P. and constituent members | 0.25 | 375 | 93.75 |
| 6/18/12 | Telephone Conference with B. Kaplan setting up conference call on operations and litigations issues | 0.1 | 375 | 37.5 |
| 6/18/12 | Reviewed e-mail from G. Santamour, Esquire confirming she andbank are still available for meeting Wednesday; e-mail to clients | 0.1 | 375 | 37.5 |
| 6/19/12 | Telephone Conference with Bruce Kaplan following up on various issues and conference call with J. Grasso | 0.1 | 375 | 37.5 |
| 6/19/12 | Telephone Conference with M. McGowen, Esquire negotiation on American Express claimed post-petition/administrative claim | 0.2 | 375 | 75 |
| 6/19/12 | Telephone Conference with J. Grasso and B. Kaplan, CPA reviewof numerous issues involving business interests | 1 | 375 | 375 |
| 6/20/12 | Reviewed file on Curtis Partners information requirements andrequest by Boston counsel | 1.25 | 375 | 468.75 |
| 6/21/12 | Reviewed Katz reply to response filed in opposition to his Motion for Relief | 0.5 | 375 | 187.5 |
| 6/21/12 | Telephone Conference with B. Kaplan confirming Hearings on Tuesday and need to be present for Hearing on required document production | 0.4 | 375 | 150 |
| 6/22/12 | Reviewed e-mails from B. Kaplan confirming payments to IRS, Rewards Network and T.D. Bank | 0.2 | 375 | 75 |
| 6/22/12 | Reviewed e-mail from A. Applebaum, Esquire requesting consentto participate in B.R. 2004 Exam | 0.1 | 375 | 37.5 |
| 6/22/12 | E-mail to A. Applebaum, Esquire advising will not object to his participation in B.R. 2004 Exam | 0.25 | 375 | 93.75 |
| 6/25/12 | Telephone Conference with client believes that Stonebridge Bank is preventing access to property in Reading | 0.25 | 375 | 93.75 |
| 6/26/12 | Court Appearance attend Hearing and Oral Argument on MarshallKatz Motion for Relief | 1.75 | 375 | 656.25 |
| 6/26/12 | Reviewed files; prepare for Hearings and Arguments on Katz Motion for Relief and Madison Capital et al. Motion for 2004Exam | 1.5 | 375 | 562.5 |

| | | | | |
|---|---|---|---|---|
| 6/26/12 | Court Appearance attend Hearing and Oral Argument on Debtor'sObjections to documents sought to be produced prior to B.R. 2004 Exam | 1.75 | 375 | 656.25 |
| 6/27/12 | Prepared Proposed Form of Order as directed by Court denying Katz Motion for Relief and setting deadline | 0.5 | 375 | 187.5 |
| 6/27/12 | E-mail to counsel fwd draft of Proposed Order Denying Katz Relief | 0.25 | 375 | 93.75 |
| 6/28/12 | Telephone Conference with client follow up to Answers filed to various Complaints, results of Hearing on Katz Motion forRelief and WSFS | 0.25 | 375 | 93.75 |
| 6/28/12 | Reviewed e-mail from R. Jones, Esquire consenting to proposedOrder denying Katz Motion for Relief | 0.1 | 375 | 37.5 |
| 6/28/12 | Telephone Conference with D. Karapelou, Esquire following up with whether he is ok with Proposed Order on denial of Katz Relief Motion | 0.1 | 375 | 37.5 |
| 6/28/12 | Prepared proposed Confidentiality Agreement to protect from dissemination of documents | 1.25 | 375 | 468.75 |
| 6/28/12 | E-mail to counsel fwd proposed draft of Confidentiality Agreement | 0.25 | 375 | 93.75 |
| 6/28/12 | Telephone Conference with E. Godfrey alerting Court that Proposed Form of Order denying Katz request for relief has been filed | 0.1 | 375 | 37.5 |
| 6/28/12 | E-mail to D. Karapelou, Esquire advising that I contacted P. Blalock about erroneous Orders for Katz to File Motion for Default | 0.25 | 375 | 93.75 |
| 6/28/12 | Reviewed e-mail from R. Jones, Esquire counsel to Madison Capital suggesting he has multiple issues with Confidentiality Agreement | 0.1 | 375 | 37.5 |
| 6/28/12 | E-mail to R. Jones, Esquire disputing his statements and requesting he identify what are his concerns with C.A. | 0.25 | 375 | 93.75 |
| 6/28/12 | E-mail to other counsel fwd copy of communications with R. Jones, Esquire over content of Confidentiality Agreement | 0.1 | 375 | 37.5 |
| 6/29/12 | Telephone Conference with J. Grasso following up on B.R. 2004document issues | 0.2 | 375 | 75 |
| 6/29/12 | Reviewed notes from Hearing on document requests objection identified materials already produced with what has not beendelivered | 0.2 | 375 | 75 |
| 6/29/12 | Prepared detailed e-mail to B. Kaplan outlining what materials must be collected and produced | 0.3 | 375 | 112.5 |
| 6/29/12 | Reviewed follow up e-mail from R. Jones, Esquire attempting to further substantiate his conduct | 0.1 | 375 | 37.5 |
| 6/29/12 | E-mail to Jones again inquiring if he would be available to discuss his unspecified concerns prior to conference | 0.1 | 375 | 37.5 |

| | | | | |
|---|---|---|---|---|
| 6/29/12 | E-mail to Jones following up on inquiry if he opposes sendingJudge Proposed Confidentiality Agreement | 0.1 | 375 | 37.5 |
| 6/29/12 | E-mail to E. Godfrey Courtroom Deputy forwarding draft of Confidentiality Agreement to Judge Coleman | 0.25 | 375 | 93.75 |
| 6/29/12 | E-mail to C. Pyle Judge Coleman's secretary forwarding copy of e-mail sent to Eileen Godfrey | 0.1 | 375 | 37.5 |
| 6/29/12 | E-mail to B. Kaplan forwarding four financial statements fwd by R. Jones, Esquire concerning assets which | 0.25 | 375 | 93.75 |
| 6/29/12 | Reviewed e-mail from K. Corbett, Esquire outlining her concerns to proposed Confidentiality Agreement | 0.2 | 375 | 75 |
| 6/29/12 | E-mail to K. Corbett, Esquire advising her comments are not meritorious | 0.25 | 375 | 93.75 |
| 6/29/12 | Reviewed comments from R. Jones, Esquire outlining a sundry of petty issues and unnecessary concerns with language of proposed Confidentiality Agreement | 0.25 | 375 | 93.75 |
| 6/29/12 | Telephone Conference with conference call with Judge Coleman on Madison Objections to proposed Confidentiality Agreement | 1.25 | 375 | 468.75 |
| 6/29/12 | Reviewed e-mail from K. Callahan, Esquire advising operating reports are outstanding | 0.1 | 375 | 37.5 |
| 6/29/12 | E-mail to client fwd copy of U.S. Trustee's e-mail and advising that monthly operating reports must be filed | 0.2 | 375 | 75 |
| 7/2/12 | E-mail to client fwd copy of Bankruptcy Court Order denying Katz Motion for Relief | 0.1 | 375 | 37.5 |
| 7/2/12 | Reviewed multiple e-mails among counsel commenting on Proposed Order attempting to resolve issues with B.R.2004 Document Order | 0.25 | 375 | 93.75 |
| 7/2/12 | Reviewed draft of revised Scheduling Order on Deposition | 0.25 | 375 | 93.75 |
| 7/2/12 | E-mail to all counsel consenting to Proposed Form of Order onConfidentiality | 0.25 | 375 | 93.75 |
| 7/2/12 | Reviewed e-mail from W. Levant, Esquire to all counsel suggesting objections should be overruled | 0.2 | 375 | 75 |
| 7/2/12 | E-mail to all counsel advising of Debtor's express objectionsto Singer's proposed revisions | 0.2 | 375 | 75 |
| 7/2/12 | E-mail to B.R.2004 counsel delivering documents provided by client to date including financial statements and tax returns | 0.25 | 375 | 93.75 |
| 7/3/12 | Reviewed Order on document production providing for methodology to preserve confidential information | 0.2 | 375 | 75 |

| Date | Description | Hours | Rate | Amount |
|---|---|---|---|---|
| 7/3/12 | E-mail to client fwd copy of Order on documents and remindingof additional materials which need to be produced | 0.25 | 375 | 93.75 |
| 7/6/12 | E-mail to R. Jones, Esquire cc all other counsel advising that the Debtor is diligently working on document production | 0.25 | 375 | 93.75 |
| 7/6/12 | Reviewed e-mail from R. Jones, Esquire suggesting documents produced to date are woefully short | 0.1 | 375 | 37.5 |
| 7/9/12 | Telephone Conference with B. Kaplan seeking update on his review of analysis of Madison Capital financial statements | 0.2 | 375 | 75 |
| 7/11/12 | Reviewed revised financial statement analysis prepared by B. Kaplan detailing disposition of assets off Madison Capital Financial Statements | 0.4 | 375 | 150 |
| 7/11/12 | Telephone Conference with B. Kaplan reviewing his modifications to Personal Financial Statement analysis | 0.25 | 375 | 93.75 |
| 7/11/12 | E-mail to all counsel fwd copy of analysis prepared reflecting what occured with assets and additional documentswhich are forthcoming | 0.25 | 375 | 93.75 |
| 7/11/12 | E-mail to B. Kaplan advising that status conference on documents set for tomorrow- would like to produce additionalmaterials in advance | 0.25 | 375 | 93.75 |
| 7/11/12 | Telephone Conference with B. Kaplan regarding documents required to be produced | 0.5 | 375 | 187.5 |
| 7/11/12 | E-mail to J. Baddeley, Esquire confirming Discovery Status Conference is with only B.R. 2004 participating counsel | 0.25 | 375 | 93.75 |
| 7/11/12 | Reviewed latest condescending e-mail from R. Jones, Esquire on documents | 0.1 | 375 | 37.5 |
| 7/11/12 | E-mail to R. Jones, Esquire advising him Debtor is doing his best and it is expected he will act professionally | 0.25 | 375 | 93.75 |
| 7/11/12 | Telephone Conference with B. Kaplan desirous of reviewing hisdraft of financial statement analysis | 0.4 | 375 | 150 |
| 7/12/12 | Telephone Conference with R. Jones, Esquire, K. Corbett, Esquire, and B. Kile, Esquire heated exchange over adequacy of doucments produced | 0.5 | 375 | 187.5 |
| 7/12/12 | Telephone Conference with B. Kaplan relaying contect of telephone conference with B.R. 2004 counsel over document production | 0.25 | 375 | 93.75 |
| 7/12/12 | Reviewed four Personal Financial Statements by R. Jones, Esquire previously submitted to Madison Capital; prepare forconference call with counsel | 0.5 | 375 | 187.5 |
| 7/13/12 | Reviewed documents fwd by B. Kaplan on behalf of Debtor including Bank Statements and K1s, Deeds and HUD-1 | 0.5 | 375 | 187.5 |
| 7/13/12 | Prepared and effectuated service of documents upon counsel for participating B.R. 2004 creditors in multiple e-mails | 0.5 | 375 | 187.5 |

| 7/13/12 | E-mail to B. Kaplan recapping documents produced and currently outstanding; confirming Hearing Tuesday | 0.25 | 375 | 93.75 |
|---|---|---|---|---|
| 7/13/12 | Telephone Conference with B. Kaplan confirming documents produced thus far; continuing to work on production | 0.25 | 375 | 93.75 |
| 7/13/12 | Telephone Conference with B. Kaplan following up on his additional report reflecting each business managing officer | 0.25 | 375 | 93.75 |
| 7/16/12 | Prepared Objection to Katz Proof of Claim, Proposed Order andNotice of Objection to Claim | 3.5 | 375 | 1312.5 |
| 7/16/12 | E-mail to client fwd copy of objection filed to M. Katz Proofof Claim confirming Hearing for August 28 | 0.25 | 375 | 93.75 |
| 7/16/12 | Prepared Joint Statement declining to participate in Court annexed mediation | 0.3 | 375 | 112.5 |
| 7/16/12 | E-mail to J. Baddeley, Esquire fwd draft of Joint Statement declining Court annexed mediation | 0.2 | 375 | 75 |
| 7/16/12 | E-mail to client advising Katz has filed an appeal to Judge Coleman ruling denying Katz request to be granted Stay Relief | 0.25 | 375 | 93.75 |
| 7/16/12 | Reviewed draft of First Interim Fee Application; prepared supplementation and revisions | 0.5 | 375 | 187.5 |
| 7/16/12 | Reviewed e-mails from R. Jones, Esquire and K. Corbett, Esquire on documents confirming additional status conferencenot necessary | 0.2 | 375 | 75 |
| 7/17/12 | Court Appearance attend Hearing on further objections to extent of documents produced by Debtor to B.R. 2004 Exam counsel | 3 | 375 | 1125 |
| 7/17/12 | Prepared format for business ownership report required to be submitted to counsel and Court following Document Objection Hearing | 0.75 | 375 | 281.25 |
| 7/17/12 | E-mail to client suggesting monthly operating reports must bepriority for Debtor | 0.3 | 375 | 112.5 |
| 7/18/12 | E-mail to B. Kaplan fwd draft of report on business ownershipreporting what transpired during Status Hearing | 0.3 | 375 | 112.5 |
| 7/18/12 | Reviewed Entry of Appearance filed by A. Sagnor, Esquire and T. Arndt on behalf of Stonebridge Bank | 0.2 | 375 | 75 |
| 7/18/12 | Telephone Conference with J. Grasso advising what transpired at Hearing on document production | 0.5 | 375 | 187.5 |
| 7/18/12 | Telephone Conference with B. Kaplan follow up on information which has been directed to be provided | 0.25 | 375 | 93.75 |
| 7/18/12 | Prepared draft of proposed order following status conference before Court on B.R. 2004 document production | 1.25 | 375 | 468.75 |

| | | | | |
|---|---|---|---|---|
| 7/18/12 | E-mail to counsel circulating proposed Form of Order on document production | 0.25 | 375 | 93.75 |
| 7/19/12 | Reviewed e-mail from K. Corbett, Esquire fwd her proposed significant revisions to Proposed Order on document reports | 0.2 | 375 | 75 |
| 7/19/12 | Prepared blacklined comparison document showing K. Corbett, Esquire proposed modifications | 0.3 | 375 | 112.5 |
| 7/19/12 | E-mail to K. Corbett, Esquire and other counsel fwd comments on proposed changes | 0.25 | 375 | 93.75 |
| 7/19/12 | Reviewed e-mail from R. Jones, Esquire advising he agrees with K. Corbett's revisions prepared reply reconfirming objections | 0.2 | 375 | 75 |
| 7/19/12 | E-mail to B. Kaplan outlining exact request which needs to bemade to each | 0.25 | 375 | 93.75 |
| 7/19/12 | Reviewed and organized materials; prepare for meeting with client on various pending affairs | 1.25 | 375 | 468.75 |
| 7/19/12 | Reviewed e-mail from B. Kaplan fwd copy of e-mail sent to C. Graff, CPA requesting copies of agreements not in his possession | 0.1 | 375 | 37.5 |
| 7/19/12 | Meeting with client review numerous pending issues including need to produce all proofs of claim so Court has clear appreciation for his being completely forthright and transparent | 1.5 | 375 | 562.5 |
| 7/20/12 | Reviewed search Montgomery County records to obtain copy of deeds for 735 East Hector Street and 631 East Elm Street | 0.75 | 375 | 281.25 |
| 7/20/12 | Telephone Conference with B. Kaplan following up on his e-mails questioning whether he has produced all required information | 0.2 | 375 | 75 |
| 7/20/12 | E-mail to 2004 counsel transmitting business ownership reportand copies of correspondence confirming requests and status of documents delivered | 0.3 | 375 | 112.5 |
| 7/20/12 | E-mail to counsel transmitting corporate documents in three e-mails | 0.3 | 375 | 112.5 |
| 7/20/12 | Telephone Conference with B. Kaplan following up on documentsconfirming materials fwd to counsel | 0.2 | 375 | 75 |
| 7/20/12 | Reviewed Joinder Agreement dated 5/21/2002 when K. Meakim joind JGDG, LLC | 0.2 | 375 | 75 |
| 7/20/12 | Reviewed materials provided by client relating to Warminster Plaza property, CIBC, Inc financing and Madison Capital | 1.25 | 375 | 468.75 |
| 7/20/12 | E-mail to B. Kaplan following up on review of WSC Warminster Plaza Mezz Assoc, L.P. Agreement | 0.3 | 375 | 112.5 |
| 7/20/12 | Telephone Conference with B. Kaplan re Warminster Plaza documents- requesting he contact M. Russell, Esquire for other partnership documents | 0.25 | 375 | 93.75 |

| 7/20/12 | Reviewed organizational documents for JGKM, LLC | 0.25 | 375 | 93.75 |
|---|---|---|---|---|
| 7/20/12 | Correspondence letter to Judge Coleman fwd courtesy copy of Grasso business organizations Compliant | 0.25 | 375 | 93.75 |
| 7/26/12 | E-mail to B. Kaplan, CPA fwd draft of K-1 report and requesting he complete the document | 0.3 | 375 | 112.5 |
| 7/26/12 | Telephone Conference with B. Kaplan review of report requirements for K1s, status of operating reports | 0.25 | 375 | 93.75 |
| 7/31/12 | Telephone Conference with B. Kaplan, CPA reviewing and correcting revised draft of K-1 report | 0.5 | 375 | 187.5 |
| 7/31/12 | E-mail to B. Kaplan returning copy of updated K-1 schedule following revisions | 0.2 | 375 | 75 |
| 7/31/12 | E-mail to R. Jones, K. Corbett and B. Kile fwd documents responsive to Court Directive on K-1s | 0.25 | 375 | 93.75 |
| 7/31/12 | E-mail to R. Jones, K. Corbett, and B. Kile fwd copies of First Trust Bank statements from 2008 | 0.25 | 375 | 93.75 |
| 7/31/12 | E-mail to B. Kaplan inquiring as to status of his completing K-1 analysis | 0.1 | 375 | 37.5 |
| 8/6/12 | Telephone Conference with D. Shafkowitz, Esquire isues with GE Capital Claim seeking to bifurcate claims process | 0.2 | 375 | 75 |
| 8/6/12 | Telephone Conference with B. Kaplan and J. Grasso questioningDebtor in Possession account usage; statements not identifiedon reports | 0.4 | 375 | 150 |
| 8/7/12 | E-mail to K. Callahan, Esquire fwd courtesy copy of response and suggesting Hearing be continued in consideration of conflicting | 0.25 | 375 | 93.75 |
| 8/7/12 | E-mail to B. Kaplan alerting him he used wrong cover for Operating Reports fwd correct sheet for future use | 0.2 | 375 | 75 |
| 8/9/12 | Reviewed e-mail fwd by client evidencing First Trust refusingto allow access to safe deposit box | 0.2 | 375 | 75 |
| 8/9/12 | E-mail to R. McCanus at First Trust Bank advising improper toprohibit access to Debtor's property | 0.25 | 375 | 93.75 |
| 8/9/12 | Telephone Conference with B. Kaplan questioning whether it isfunctionally proper to issue personal financial statement forJoe Grasso | 0.2 | 375 | 75 |
| 8/10/12 | Reviewed Docketing Notice confirming transmission of record regarding Katz Appeal denying Stay Relief | 0.25 | 375 | 93.75 |
| 8/10/12 | Telephone Conference with B. Kaplan advising he must have been mistaken with accountant, will check on another accountant for WSC | 0.2 | 375 | 75 |

| 8/10/12 | E-mail to B.R. 2004 counsel fwd additional copies of Partnership Agreements and K1s for Spring-Ridge | 0.25 | 375 | 93.75 |
|---|---|---|---|---|
| 8/10/12 | Prepared updates to K1 Schedule | 0.3 | 375 | 112.5 |
| 8/10/12 | E-mail to B. Kaplan fwd updated K1 Report | 0.25 | 375 | 93.75 |
| 8/10/12 | Telephone Conference with client questioning whether Madison can subpoena private/proprietary information of non-debtor | 0.25 | 375 | 93.75 |
| 8/10/12 | Reviewed additional partnership documents | 0.5 | 375 | 187.5 |
| 8/20/12 | Telephone Conference with P. Blalock and M. Gigliotti, Esquire confirming everyones availability for conference | 0.2 | 375 | 75 |
| 8/20/12 | Reviewed e-mail from R. Jones, Esquire seeking to further delay B.R. 2004 Exams until after Disposition of Conversion Motions | 0.2 | 375 | 75 |
| 8/22/12 | Reviewed Court Order Approving First Interim Fee Application | 0.1 | 375 | 37.5 |
| 8/22/12 | Reviewed e-mail from R. Jones, Esquire advising Madison has decided not to proceed with B.R. 2004 Examination | 0.2 | 375 | 75 |
| 8/22/12 | E-mail to client advising Madison has decided not to proceed with B.R. 2004 Examination | 0.25 | 375 | 93.75 |
| 8/27/12 | Reviewed e-mail from S. Forbes at Office of the U.S. Trustee advising Debtor is delinquent in certain reports and quarterly fee payment | 0.2 | 375 | 75 |
| 8/27/12 | Telephone Conference with E. Godfrey attempting to clarify hearings on various Motions over next two days | 0.2 | 375 | 75 |
| 8/27/12 | Reviewed Order signed by Judge Rufe granting extension of twoweeks for Katz to file Appellate Brief | 0.25 | 375 | 93.75 |
| 8/27/12 | E-mail to D. Karapelou, Esquire confirming his Brief to District Court is due September 11 on Stay Appeal | 0.25 | 375 | 93.75 |
| 8/27/12 | E-mail to client fwd copy of Jones e-mail on Grasso will be present- reminding him of hearing | 0.25 | 375 | 93.75 |
| 8/27/12 | E-mail to client fwd copy of Court Order approving First Interim Fee Application | 0.2 | 375 | 75 |
| 8/27/12 | E-mail to S. Forbes at Office of the U.S. Trustee fwd courtesy copies of June and July Monthly Operating Reports requesting she confirm quarterly fee payments | 0.25 | 375 | 93.75 |
| 8/27/12 | Telephone Conference with B. Kaplan follow up on detailed analysis he prepared as to sourcing deposits into Debtor's accounts | 0.25 | 375 | 93.75 |

| 8/27/12 | Reviewed receipts schedule detailing source of deposits into Debtor's account | 0.2 | 375 | 75 |
|---|---|---|---|---|
| 8/28/12 | Telephone Conference with E. Godfrey alerting Courtroom Deputy that both hearings tomorrow are resolved/continued | 0.1 | 375 | 37.5 |
| 8/28/12 | E-mail to R. Jones, Esquire, K. Corbett, Esquire, and B. Kile, Esquire confirming that will not appear at deposition tomorrow | 0.2 | 375 | 75 |
| 8/28/12 | Reviewed e-mail from K. Corbett, Esquire advising Singer not interested in proceeding with B.R. 2004 Examination | 0.1 | 375 | 37.5 |
| 8/28/12 | E-mail to client and B. Kaplan, CPA confirming all hearings tomorrow are continued, reminding Bruce to prepare Monthly Operating Report for February | 0.25 | 375 | 93.75 |
| 8/30/12 | Reviewed e-mail from I. Clement, Esquire inquiring when Grasso Bankruptcy may be completed; reviewed Order in GE Litigation | 0.2 | 375 | 75 |
| 8/30/12 | Telephone Conference with A. Margolis, Esquire advising that they are requesting consent to dismiss State Court action | 0.2 | 375 | 75 |
| 8/30/12 | Reviewed Philadelphia Court of Common Pleas docket to ascertain claims and nature of action against | 0.3 | 375 | 112.5 |
| 8/30/12 | Reviewed Proof of Claim filed by MEPT Arch, LLC relating to Hill International | 0.25 | 375 | 93.75 |
| 8/30/12 | E-mail to I. Clement, Esquire advising Plan not likely until First Quarter 2013 | 0.25 | 375 | 93.75 |
| 8/30/12 | E-mail to client fwd copy of Order entered by Court requesting follow up on information on units for sale at Packard Building | 0.25 | 375 | 93.75 |
| 8/31/12 | Reviewed portions of Vist Bank Motion for Relief on Second Mortgage on residence | 0.3 | 375 | 112.5 |
| 8/31/12 | E-mail to client alerting him to Vist Bank Motion for Relief;potential stripping issue; tax liabilities | 0.25 | 375 | 93.75 |
| 8/31/12 | Telephone Conference with J. Grasso following up on status ofoutstanding real estate taxes | 0.2 | 375 | 75 |
| 9/5/12 | Telephone Conference with J. Grasso follow up to hearing; Katz request to gain additional 30 day on brief on Stay Appeal | 0.75 | 375 | 281.25 |
| 9/5/12 | Reviewed e-mail from D. Karapelou, Esquire seeking additionaltime to file brief; e-mail confirming will not consent | 0.1 | 375 | 37.5 |
| 9/6/12 | Telephone Conference with E. Godfrey advising that Judge wants to schedule conference call on Grasso | 0.2 | 375 | 75 |
| 9/6/12 | Telephone Conference with client alerting him to conference call with Judge | 0.2 | 375 | 75 |

| 9/6/12 | Telephone Conference with J. Grasso confirming no additional information on subject matter of conference call | 0.2 | 375 | 75 |
|---|---|---|---|---|
| 9/6/12 | E-mail to all counsel providing call in number for conferencecall | 0.2 | 375 | 75 |
| 9/6/12 | Telephone Conference with K. Callahan, Esquire advising on call inquiring whether he has any knowledge of subject matter | 0.1 | 375 | 37.5 |
| 9/7/12 | Telephone Conference with J. Grasso update on discussions with Liam O'Shaughnessy, Esquire requested he call Bank to confirm loan status | 0.25 | 375 | 93.75 |
| 9/7/12 | Reviewed e-mail from S. Schindler-Williams, Esquire on request to file Proof of Claim out of time | 0.1 | 375 | 37.5 |
| 9/7/12 | E-mail to S. Schindler-Williams, Esquire advising would not oppose filing late claim | 0.2 | 375 | 75 |
| 9/7/12 | Reviewed and calendared dates for compliance with Bankruptcy Court Supplemental Reporting Order | 0.3 | 375 | 112.5 |
| 9/10/12 | Telephone Conference with D. Shafkowitz, Esquire following upon inquiries by A. Margolis looking to dismiss State Court Action against Grasso in MEPT Action | 0.2 | 375 | 75 |
| 9/10/12 | Reviewed Entry of Appearance filed by Paige McDonald- Mathes,Esquire for Mid-Penn Bank | 0.1 | 375 | 37.5 |
| 9/11/12 | Correspondence letter to Montgomery County Tax Claim Bureau advising September 27, 2012 Sale is stayed based on Bankruptcy filing | 0.25 | 375 | 93.75 |
| 9/11/12 | Telephone Conference with client following up on open issues and documents required to be produced | 0.1 | 375 | 37.5 |
| 9/11/12 | Telephone Conference with J. Grasso issues with JGKM development in Lansdale, PA negotiations with lending servicer | 0.25 | 375 | 93.75 |
| 9/12/12 | Prepared proposed Form of Order opposing Stay Relief sought by VIST Bank | 0.25 | 375 | 93.75 |
| 9/12/12 | Reviewed VIST Bank Motion for Relief on Second Mortgage effecting personal residence | 0.5 | 375 | 187.5 |
| 9/12/12 | Prepared draft of Response to VIST Bank Motion for Relief | 2 | 375 | 750 |
| 9/12/12 | E-mail to S. White, Esquire fwd copy of Answer to VIST Bank Motion advising of need to continue 9/25 hearing | 0.25 | 375 | 93.75 |
| 9/12/12 | Telephone Conference with A. Moldoff, Esquire and G. Schildhorn, Esquire status of case, recent issues | 0.3 | 375 | 112.5 |
| 9/12/12 | E-mail to client reminding him accounts must be moved and deposited into DIP account at T.D. Bank consistent with Court Order | 0.2 | 375 | 75 |

| 9/12/12 | Telephone Conference with B. Kaplan follow up to confirming documents collected, closing account | 0.2 | 375 | 75 |
|---|---|---|---|---|
| 9/13/12 | E-mail to client fwd draft of Motion intended to be filed by American Express on post-petition charges | 0.2 | 375 | 75 |
| 9/13/12 | Telephone Conference with M. McGowen, Esquire counsel to American Express again suggesting she will file Motion for administrative claim | 0.2 | 375 | 75 |
| 9/17/12 | Telephone Conference with client and accountant update and negotiation on JGKM (Lansdale)- Bancorp preliminary financing; Vist Bank Motion for Relief | 0.5 | 375 | 187.5 |
| 9/17/12 | Telephone Conference with S. Schindler-Williams, Esquire counsel for GS Mortgage Securities on consent to file Proof of Claim on guaranty out of time | 0.2 | 375 | 75 |
| 9/18/12 | Telephone Conference with M. McGowen, Esquire negotiation on post-petition claim | 0.2 | 375 | 75 |
| 9/18/12 | Telephone Conference with J. Grasso update on negotiation with American Express | 0.2 | 375 | 75 |
| 9/19/12 | Reviewed Brief of Appellant filed by Katz in support of appeal of Stay Order | 0.75 | 375 | 281.25 |
| 9/19/12 | Telephone Conference with M. McGowen counsel to American Express agreeing to deferred payment of monies for post-petition charges | 0.2 | 375 | 75 |
| 9/19/12 | Telephone Conference with M. Dorval, Esquire requesting opportunity to sit down and have meeting with Bank to negotiate settlement | 0.25 | 375 | 93.75 |
| 9/20/12 | Telephone Conference with client and B. Kaplan various issuesinvolving assets and reports; acquisition of property and Court 9/7 Order | 0.75 | 375 | 281.25 |
| 9/21/12 | Reviewed e-mail from A. McMullen, Esquire of Madison looking to delay District Court Briefs in Katz- replied not interested | 0.25 | 375 | 93.75 |
| 9/21/12 | Telephone Conference with E. Godfrey coordinating rescheduledVIST Bank Motion for Relief Hearing | 0.2 | 375 | 75 |
| 9/24/12 | Telephone Conference with B. Kaplan on issues with quarterly fee payment for J. Grasso bankruptcy and schedule reflectingsource of revenue | 0.25 | 375 | 93.75 |
| 9/24/12 | E-mail to client following up on additional issues with source of income reports due next Monday | 0.25 | 375 | 93.75 |
| 9/25/12 | Reviewed transcript of Katz hearing on Motion for Relief fromStay to prepare appeal brief | 2 | 375 | 750 |
| 9/26/12 | Prepared draft of Brief of Appellee opposing Katz Appeal of Judge Coleman decision to District Court | 3.5 | 375 | 1312.5 |
| 9/26/12 | Reviewed and revised initial draft of Grasso Brief opposing Katz Appeal | 0.5 | 375 | 187.5 |

| 9/26/12 | Prepared table of contents, table of authorities and cover required pursuant to B.R. 8010 | 0.75 | 375 | 281.25 |
|---|---|---|---|---|
| 9/26/12 | E-mail to counsel serving copy of Brief of Appellee J. Grassofiled with District Court | 0.25 | 375 | 93.75 |
| 9/26/12 | Telephone Conference with client and B. Kaplan concern with other accountant not being able to produce information consistent with Court timeframes | 0.25 | 375 | 93.75 |
| 9/27/12 | Telephone Conference with S. Schiffman, Esquire counsel to Mid Penn Bank lien creditor of Positive Dining Experience | 0.1 | 375 | 37.5 |
| 10/1/12 | Telephone Conference with B. Kaplan reviewing items required for today to be filed with Bankruptcy Court | 0.2 | 375 | 75 |
| 10/2/12 | Reviewed e-mails from R. Greenbaum on JGKM matters in Lansdale confirmation equity interests in entity | 0.1 | 375 | 37.5 |
| 10/2/12 | Telephone Conference with R. Greenbaum, Esquire confirming Meakim and Grasso interest in JGKM | 0.2 | 375 | 75 |
| 10/3/12 | Reviewed e-mail from K. Callahan, Esquire of Office of the U.S. Trustee requesting additional information | 0.1 | 375 | 37.5 |
| 10/3/12 | E-mail to client and accountant fwd additional request by U.S. Trustee for additional documents | 0.2 | 375 | 75 |
| 10/3/12 | Telephone Conference with B. Kaplan finally able to get FirstTrust to release hold on Joe and Donna account will transfer to Debtor in Possession | 0.2 | 375 | 75 |
| 10/3/12 | Reviewed e-mail from S. Forbes on delinquent Monthly Operating Report and inquiring whether monies were transferred to Debtor in Possession account | 0.1 | 375 | 37.5 |
| 10/3/12 | E-mail to client fwd inquiry from Office of the U.S. Trustee on status of Monthly Operating Report for August | 0.2 | 375 | 75 |
| 10/3/12 | E-mail to S. Forbes of Office of the U.S. Trustee advising ofstatus of Monthly Operating Report and confirming monies transferred | 0.2 | 375 | 75 |
| 10/4/12 | E-mail to S. Forbes requesting she confirm whether Debtor owes quarterly fees through second quarter 2012 | 0.1 | 375 | 37.5 |
| 10/4/12 | Reviewed e-mail from H. Ward, Esquire on Grasso quarterly fees; fwd copy of statement to B. Kaplan requesting payment be made immediately | 0.2 | 375 | 75 |
| 10/4/12 | Telephone Conference with B. Kaplan confirming check for quarterly fees through second quarter 2012 has been fwd to Office of the U.S. Trustee | 0.2 | 375 | 75 |
| 10/4/12 | E-mail to S. Forbes at Office of the U.S. Trustee fwd copy ofcheck mailed for second quarter 2012 quarterly fees | 0.25 | 375 | 93.75 |
| 10/4/12 | Reviewed bank statements fwd by accountant evidencing the closing of the PNC Bank account | 0.2 | 375 | 75 |

| 10/4/12 | Telephone Conference with B. Kaplan requesting he explain what occurred on closing the account at PNC Bank and confirmmonies were deposited to Debtor in Possession account at T.D.Bank | 0.2 | 375 | 75 |
|---|---|---|---|---|
| 10/4/12 | Telephone Conference with B. Kaplan following up on additional discussions with use of Debtor in Possession account and closing of PNC account; questioning expenditures | 0.3 | 375 | 112.5 |
| 10/4/12 | E-mail to K. Callahan, Esquire providing Office of the U.S. Trustee counsel with documentation that PNC Bank account wasclosed | 0.25 | 375 | 93.75 |
| 10/4/12 | Telephone Conference with B. Kaplan fwd copy of First Trust statement on frozen account; clean copy of PNC | 0.2 | 375 | 75 |
| 10/4/12 | Reviewed notices of and attached subpoenas served by Madison Capital upon First Trust Bank and PNC Bank | 0.3 | 375 | 112.5 |
| 10/4/12 | E-mail to client fwd copies of subpoenas served on First Trust Bank and PNC Bank | 0.2 | 375 | 75 |
| 10/4/12 | E-mail to S. Forbes at Office of the U.S. Trustee providing copy of Monthly Operating Report  for August filed with Bankruptcy Court | 0.2 | 375 | 75 |
| 10/5/12 | Telephone Conference with J. Grasso update on negotiations with T.D. Bank | 0.2 | 375 | 75 |
| 10/5/12 | Telephone Conference with K. Callahan, Esquire inquiring as to his review of matters | 0.1 | 375 | 37.5 |
| 10/8/12 | E-mail to G. Schildhorn, Esquire,  J. Kurtzman, Esquire, M. Mitts, Esquire and D. Shafkowitz, Esquire fwd alert on next Monday's hearing | 0.25 | 375 | 93.75 |
| 10/8/12 | E-mail to J. Matour, Esquire fwd copies of hearing transcripts | 0.2 | 375 | 75 |
| 10/8/12 | E-mail to D. Shafkowitz, Esquire requesting he be available to testify on Monday | 0.2 | 375 | 75 |
| 10/8/12 | Telephone Conference with J. Grasso desire to possibly bring in new counsel to assist or replace PJW, P.C. | 0.2 | 375 | 75 |
| 10/10/12 | Reviewed Motion filed by Grasso holdings for protective orderfrom Madison Capital subpoena | 0.25 | 375 | 93.75 |
| 10/11/12 | E-mail to J. Grasso confirming appeal filed with Court to engage successor counsel | 0.25 | 375 | 93.75 |
| 10/11/12 | E-mail to J. Matour, Esquire and J. Grasso suggesting that contact be made with Office of the U.S. Trustee that successor counsel being made to avoid problems rather than admission | 0.25 | 375 | 93.75 |
| 10/11/12 | Telephone Conference with C. Strom, Esquire counsel to Bancorp following up on his call seeking documents | 0.2 | 375 | 75 |
| 10/11/12 | E-mail to C. Strom, Esquire at Eckert fwd documents requestedby Bancorp | 0.25 | 375 | 93.75 |

| 10/11/12 | Telephone Conference with B. Kaplan requesting he follow up on locating Curtis Partners Agreement and Operating Agreement | 0.2 | 375 | 75 |
|---|---|---|---|---|
| 10/12/12 | Telephone Conference with B. McVan, Esquire inquiring on issues and how he can help for Monday | 0.2 | 375 | 75 |
| 10/12/12 | E-mail to J. Matour, Esquire, M. Mitts, Esquire and J. Kurtzman fwd Madison request to permit rep to listen in on hearing by telephone | 0.2 | 375 | 75 |
| 10/12/12 | Telephone Conference with K. Callahan, Esquire apprising Office of the U.S. Trustee of reasons for successor counsel to avoid conflict | 0.1 | 375 | 37.5 |
| 10/12/12 | Telephone Conference with J. Grasso evlauation of Madison Capital request to allow representative to listen in | 0.2 | 375 | 75 |
| 10/16/12 | Telephone Conference with G. Schildhorn, Esquire inquiring onbehalf of Bancorp as to what transpired at hearing | 0.2 | 375 | 75 |
| 10/18/12 | Telephone Conference with client evaluating issues for filingPlan immediately believes votes exist to carry unsecured class | 0.4 | 375 | 150 |
| 10/18/12 | Telephone Conference with client desirous to set up meeting with counsel to evaluate options and mechanics moving forward | 0.2 | 375 | 75 |
| 10/19/12 | Reviewed Proposed Form of Order submitted by Rob Cheifetz, Esquire seeking to continue claims objection hearing | 0.1 | 375 | 37.5 |
| 10/19/12 | Meeting with client and participating counsel to discuss strategies for moving forward | 3.5 | 375 | 1312.5 |
| 10/23/12 | Telephone Conference with J. Madden, Esquire re: apprising counsel for Mid-Penn Bank on problems with Grasso personal case | 0.1 | 375 | 37.5 |
| 10/23/12 | E-mail to J. Madden, Esquire updating counsel for Mid-Penn Bank on issues in Grasso personal bankruptcy | 0.25 | 375 | 93.75 |
| 10/23/12 | E-mail to J. Matour, Esquire fwd materials on Ed Waddington | 0.2 | 375 | 75 |
| 10/24/12 | Telephone Conference with J. Grasso new lawyer/issue with JGDG requesting reach out | 0.3 | 375 | 112.5 |
| 10/25/12 | Telephone Conference with J. Grasso confirming dates and hearing issues; telephone conference with counsel on status of ancillary proceeding | 0.5 | 375 | 187.5 |
| 10/25/12 | Reviewed e-mail from S. White, Esquire seeking to continue VIST relief hearing | 0.1 | 375 | 37.5 |
| 10/25/12 | E-mail to S. White agreeing to continue VIST motion for relief to November 13 | 0.2 | 375 | 75 |
| 10/25/12 | Telephone Conference with J. Grasso following up with issues addressed and status of successor counsel | 0.2 | 375 | 75 |

| 10/29/12 | Reviewed files prepare outline for presentation to Court at status hearing | 2 | 375 | 750 |
|---|---|---|---|---|
| 10/29/12 | Research Papercraft and Brown v. Presbyterian Ministers decisions by Third Circuit | 1.5 | 375 | 562.5 |
| 10/29/12 | Telephone Conference with J. Grasso update on communications with HTC counsel efforts and actions with IRS successor counsel issues, options and hearing tomorrow | 0.5 | 375 | 187.5 |

141.9          49006.3